## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF TEXAS,

*Plaintiff-Appellee,*

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL, in his official capacity as United States Attorney General; CHARLOTTE A. BURROWS, in her official capacity as Chair of the U.S. Equal Employment Opportunity Commission; JOCELYN SAMUELS, in her official capacity as Vice Chair of the U.S. Equal Employment Opportunity Commission; KEITH SOLDERLING, in his official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; ANDREA R. LUCAS, in her official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; CHRISTOPHER W. LAGE, in his official capacity as General Counsel of the Equal Employment Opportunity Commission; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
GERARD SINZDAK
COURTNEY L. DIXON
*Attorneys, Appellate Staff
Civil Division, Room 7246
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-8189*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties.  5th Cir. R. 28.2.1

**STATEMENT REGARDING ORAL ARGUMENT**

The government respectfully requests oral argument. The district court held that the U.S. House of Representatives did not have a constitutionally required quorum at the time that it voted on the Consolidated Appropriations Act, 2023, and that the Act was therefore not duly enacted. On that basis, the district court permanently enjoined the federal government from enforcing a component of the Appropriations Act—the Pregnant Workers Fairness Act—against the State of Texas. The government believes that oral argument would provide substantial assistance to the Court in considering the important issues involved in this appeal.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION ......................................................................2

STATEMENT OF THE ISSUES............................................................................3

STATEMENT OF THE CASE................................................................................3

    A.     The House of Representatives' Rules for Determining a Quorum ...........3

    B.     The Consolidated Appropriations Act of 2023 ...........................................7

    C.     This Lawsuit.................................................................................................10

SUMMARY OF ARGUMENT................................................................................14

STANDARD OF REVIEW ......................................................................................19

ARGUMENT .............................................................................................................19

I.     Texas's Claim Is Foreclosed by the Enrolled-Bill Rule of *Marshall Field* ............19

II.    The Appropriations Act Was Lawfully Enacted.......................................29

    A.     The Quorum Clause Does Not Require Physical Presence......................29

    B.     The House's COVID-19 Remote-Voting Rule Was Within Its Constitutional Power to Adopt, and the Appropriations Act Duly Passed the House..........................................................................35

    C.     The District Court's Contrary Interpretation Is Without Merit..............38

CONCLUSION ..........................................................................................................48

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*BNSF Ry. Co. v. International Ass'n of Sheet Metal, Air, Rail & Transp. Workers,*
973 F.3d 326 (5th Cir. 2020) ..........................................................19

*Braniff Airways, Inc. v. Civil Aeronautics Bd.,*
379 F.2d 453 (D.C. Cir. 1967) ........................................................37

*Chiafalo v. Washington,*
591 U.S. 578 (2020) ........................................................................43

*Evans v. Browne,*
30 Ind. 514 (1869) ....................................................................23, 24

*Hurtado v. United States,*
410 U.S. 578 (1973) ........................................................................40

*Idaho v. Interstate Commerce Comm'n,*
939 F.2d 784 (9th Cir. 1991) ..........................................................37

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) ...............................2, 3, 11, 14, 15, 20, 21, 22, 23, 26, 28

*McCarthy v. Pelosi,*
5 F.4th 34 (D.C. Cir. 2021) ...............................................35-36, 36, 45

*McCulloch v. Maryland,*
17 U.S. (4 Wheat) 316 (1819) .........................................................44

*New Process Steel, L.P. v. NLRB,*
560 U.S. 674 (2010) ........................................................................30

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) .........................................17, 18, 31, 33, 34, 42, 43, 44

*Opinion of the Justices,*
247 A.3d 831 (N.H. 2020) ..........................................................40, 41

*Public Citizen v. U.S. Dist. Court for D.C.*,
   486 F.3d 1342 (D.C. Cir. 2007) ........................................25

*Sherman v. Story*,
   30 Cal. 253 (1866) ........................................21

*The Pocket Veto Case*,
   279 U.S. 655 (1929) ........................................33

*United States v. Ballin*,
   144 U.S. 1 (1892) ........................4, 12, 18, 26, 27, 28, 31, 32, 43, 46

*United States v. Farmer*,
   583 F.3d 131 (2d Cir. 2009) ........................................24

*United States v. Gonzalez-Arenas*,
   496 F. App'x 866 (10th Cir. 2012) ........................................24

*United States v. Munoz-Flores*,
   495 U.S. 385 (1990) ........................................22, 24, 25

*United States v. Small*,
   487 F. App'x 302 (7th Cir. 2012) ........................................24

**U.S. Constitution:**

Art. I, § 5, cl. 1 ........................1, 3, 12, 15, 16, 22, 30, 37, 38, 39, 41

Art. I, § 5, cl. 2 ........................2, 3, 16, 29, 31

Art. I, § 5, cl. 3 ........................................27

Art. I, § 7, cl. 1 ........................................24

**Statutes:**

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328, 136 Stat. 4459 (2022) ........................7, 8, 9, 10

1 U.S.C. § 6 ...............................................................................8

28 U.S.C. § 1 ..............................................................................37

28 U.S.C. § 46(d) .....................................................................36

28 U.S.C. § 1291 .........................................................................2

28 U.S.C. § 1331 .........................................................................2

42 U.S.C. § 2000e-4 *et seq.*......................................................9

42 U.S.C. § 2000e-5(f)(1) ..........................................................9

**Regulation:**

29 C.F.R. § 1601.28 ...................................................................9

**Legislative Materials:**

139 Cong. Rec. 27239 (1993) ...................................................34

167 Cong. Rec. H43 (daily ed. Jan. 4, 2021) ...................6, 7, 36

168 Cong. Rec. (daily ed. Dec. 23, 2022):
   p. H10,528 ............................................................1, 28, 38
   p. H10,528-29 ............................................................ 8, 38
   p. H10,529 .......................................................... 8, 38, 41

168 Cong. Rec. S10065 (daily ed. Dec. 22, 2022) ...................7

Cong. Research Serv., *Judicial Nomination Statistics & Analysis: U.S. Circuit & District Courts, 1977-2022* (Apr. 3, 2023), https://perma.cc/2SK5-SB9L ..............................34

H.R. Res. 8, 117th Cong. (2021) ...............................................5

H.R. Res. 965, 116th Cong. (2020) ..........................................5
   § 1(a) ........................................................................ 6, 35
   § 2(a)(1) ..........................................................................6

§ 2(a)(3) .................................................................................................6
§ 3(b).............................................................................................. 6, 36
§ 3(c)............................................................................................... 7, 35
§ 3(c)(1) ...................................................................................... 36, 45
§ 3(c)(6) ...............................................................................................36

*Rules of the House of Representatives*, 118th Cong. (2023) ................................. 4, 5

**Other Authorities:**

John Ash, *New and Complete Dictionary of the English Language* (1795)................................40

Clarence Cannon, *Cannon's Precedents of the House of Representatives of the United States* (1935-1941) ..................................................................................................4

C-SPAN, House Session (Nov. 3, 1993), https://www.c-span.org/video/?52027-1/house-session ............................................34

Lewis Deschler, *Deschler's Precedents of the House of Representatives of the United States* (1994-2013) ...................................................................................4, 5, 33

5 *Fletcher Cyclopedia of the Law of Corporations* .........................................................37

Benjamin Franklin, *Proposed Articles of Confederation, [on or Before 21 July 1775]* (July 21, 1775), https://perma.cc/J2N4-LPW4 ............................................................45

GovInfo, *Precedents of the U.S. House of Representatives*, https://www.govinfo.gov/collection/precedents-of-the-house?path=/GPO/Precedents%20of%20the%20U.S.%20House%20of %20Representatives ........................................................................................4

4 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* (1907)......................................................................................... 4, 33

*Jefferson's Manual of Parliamentary Practice, reprinted in* H.R. Doc. No. 117-161 (2023) ...........5

1 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ...........................40

2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ...........................30

William McKay & Charles W. Johnson, *Parliament & Congress: Representation and*

*Scrutiny in the Twenty-First Century* (2010) ...................................................... 5, 34

Press Release, Nancy Pelosi, Speaker of the House, Dear Colleague to All Members on Extension of Remote Voting 'Covered Period' (Nov. 10, 2022), https://web.archive.org/web/20221111142214/https://www.speaker.gov/newsroom/111022-1 .................................................................................................7

Press Release, U.S. Supreme Court, Press Release Regarding May Teleconference Oral Arguments (Apr. 13, 2020), https://perma.cc/37SS-LU7D .............................37

*Quorum*, Black's Law Dictionary (9th ed. 2009) .................................................30

Floyd M. Riddick & Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices* (1992) .........................................................................................................33

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833) .................. 30, 39

John V. Sullivan, et al., *House Practice: A Guide to the Rules, Precedents, and Procedures of the House* (2024) ............................................................................. 4, 5, 33

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ......... 30, 31, 39, 44

3 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) .............................44

U.S. Senate, The First Unanimous Consent Agreement (Mar. 24, 1846), https://perma.cc/WT8Z-N3LZ ....................................................................................33

Noah Webster, *An American Dictionary of the English Language* (1828) ..............................40

## INTRODUCTION

On December 23, 2022, the U.S. House of Representatives passed the Consolidated Appropriations Act, 2023 (Appropriations Act or Act), a $3 trillion omnibus appropriations bill that appropriated funds for the 2023 fiscal year and enacted several pieces of permanent legislation. According to the congressional record, 225 Members voted in favor of the bill and 201 voted against it. *See* 168 Cong. Rec. H10,528 (daily ed. Dec. 23, 2022). The bill was enrolled and signed by the presiding officers of each House of Congress and sent to the President of the United States, who signed it into law on December 29, 2022. *See* ROA.1672.

The State of Texas nonetheless contends—and the district court agreed—that the Appropriations Act "never 'passed the House of Representatives'" and is "not law." ROA.66; *see* ROA.1391. The district court understood the Quorum Clause of the U.S. Constitution, which provides that "a Majority of each [House] shall constitute a Quorum to do Business," U.S. Const. art. I, § 5, cl. 1, to impose a "physical-presence requirement" such that a majority of Members must be physically present on the House floor at the time of a vote, ROA.1373. Because the House had voted on the Appropriations Act pursuant to remote-voting procedures that the House had authorized during the COVID-19 pandemic, the district court held that the House lacked a constitutional quorum at the time of its vote on the Act, despite the fact that far more than a majority of Members participated in the vote. *See* ROA.1391-92.

The district court's holding is a remarkable intrusion into the internal proceedings of a coordinate branch of government and it has no basis in the Quorum Clause's text, history, or purpose. At the threshold, the district court should have declined to entertain Texas's claim under the longstanding rule that an enrolled bill that has been signed by the presiding officers of Congress is "conclusive evidence" that the measure was duly passed by Congress. *See Marshall Field & Co. v. Clark*, 143 U.S. 649, 673 (1892). In any event, the Appropriations Act was lawfully enacted. The Quorum Clause says nothing about physical presence. By its plain terms, the Quorum Clause addresses the minimum number of Members that must participate for the House to conduct business, not the manner in which Members may participate. The Constitution grants to each House broad power to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2, and the House was well within its constitutional prerogative to adopt a rule providing a means by which Members could participate in legislative business remotely during the COVID-19 pandemic and be counted towards a quorum.

## STATEMENT OF JURISDICTION

Texas invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.67. The district court entered final judgment on February 27, 2024. ROA.1404. Defendants filed a timely notice of appeal. ROA.1405. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.** Whether Texas's claim that the Appropriations Act did not pass the House of Representatives with a constitutionally required quorum is foreclosed by the enrolled-bill rule of *Marshall Field & Co. v. Clark*, 143 U.S. 649, 673 (1892).

**II.** Whether the district court erred in concluding that the Appropriations Act was not duly passed by the House because the Constitution's Quorum Clause, U.S. Const. art. I, § 5, cl. 1, requires the physical presence of a majority and precludes the House from adopting a rule permitting Members to vote remotely and be counted towards a quorum.

## STATEMENT OF THE CASE

### A. The House of Representatives' Rules for Determining a Quorum

Article I, Section 5 of the Constitution provides that "a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties, as each House may provide." U.S. Const. art. I, § 5, cl. 1. It further specifies that "Each House may determine the Rules of its Proceedings." *Id.*, cl. 2.

**1.** Since the Founding, the House of Representatives has developed practices and procedures for determining how and whether a quorum exists, which have changed over time.

"Until 1890[,] the view prevailed in the House that it was necessary for a majority of the Members to vote on a matter . . . to satisfy the constitutional requirement for a quorum."  John V. Sullivan, et al., *House Practice: A Guide to the Rules, Precedents, and Procedures of the House*, ch. 43, § 5 (2024) (*House Practice*); *see also* 4 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States*, ch. 5, §§ 2895-2903 (1907) (*Hinds'*).[1]  In 1890, however, House Speaker Thomas Reed ruled "that Members present in the Chamber" could be counted for purposes of determining a quorum, whether or not they voted.  *House Practice*, ch. 43, § 5; *see also* 4 *Hinds'*, ch. 85, §§ 2895, 2905.  The House subsequently codified that understanding into its rules.  *See United States v. Ballin*, 144 U.S. 1, 5 (1892) (citing House rule); *see also Rules of the House of Representatives*, 118th Cong., House Rule XX.4(b) (2023) (current version of the rule).

By the end of the 19th century, it was also settled practice that a quorum is "presumed always to be present unless a point of no quorum is made."  5 *Deschler's*, ch. 20, § 1.3; 4 *Hinds'*, ch. 85, § 2961; 6 *Cannon's*, ch. 206, § 624.  Operating under this presumption, the House has long conducted business by "unanimous consent," that

---

[1] The multi-volume precedents of the House comprise the decisions of past Speakers and Chairs on parliamentary questions that have arisen under the House Rules.  *See Hinds'* (covering 1789-1907); Clarence Cannon, *Cannon's Precedents of the House of Representatives of the United States* (1935-1941) (covering 1907-1936) (*Cannon's*); Lewis Deschler, *Deschler's Precedents of the House of Representatives of the United States* (1994-2013) (covering 1936-2013) (*Deschler's*).  The precedents are available online at GovInfo, *Precedents of the U.S. House of Representatives*, https://www.govinfo.gov/collection/precedents-of-the-house?path=/GPO/Precedents%20of%20the%20U.S.%20House%20of%20Represe ntatives.

is, by taking "action that is not in dispute and to which no Member has any objection," which may be accomplished with few Members physically present on the House floor. *See House Practice*, ch. 54, § 1. Unanimous consent "is applied across a wide range of House business," including to "adopt or pass a measure." *Id.*, ch. 54, § 7; *see also Jefferson's Manual of Parliamentary Practice* § 528a, *reprinted in* H.R. Doc. No. 117-161, at 288-89 (2023). Unanimous consent thus "permits many measures to be passed . . . when in fact fewer than a majority of Members" are physically present. *See* William McKay & Charles W. Johnson, *Parliament & Congress: Representation and Scrutiny in the Twenty-First Century* 85 (2010).

The House has also changed its views with respect to the legislative matters for which a quorum is required. Prior to the 1970s, the House viewed a quorum as required for debate and many other non-voting matters. *See* 5 *Deschler's*, ch. 20, § 10. Since that time, however, the House has understood the term "business" in the Quorum Clause as a "term of art which does not encompass all activities." *Id.* (quotation marks omitted); *see also House Practice*, ch. 43, §§ 1, 6. Today, under House Rule XX.7(a), a quorum is required only prior to a vote. *See Rules of the House of Representatives*, *supra*, House Rule XX.7(a) ("The Speaker may not entertain a point of order that a quorum is not present unless a question has been put to a vote.").

**2.** In May 2020, the House of Representatives adopted House Resolution 965 and permitted certain changes to its procedures in response to the COVID-19 pandemic. *See* H.R. Res. 965, 116th Cong. (2020); H.R. Res. 8, § 3(s), 117th Cong.

(2021) (extending to 117th Congress).  The resolution authorized the Speaker of the House—after being "notified by the Sergeant-at-Arms, in consultation with the Attending Physician, that a public health emergency due to a novel coronavirus is in effect"—to "designate a period" during which Members could participate remotely by providing specific instructions to a fellow Member who was physically present in the chamber and who had been designated to cast the remote Member's vote pursuant to the specific instructions received.  *See* H.R. Res. 965, § 1(a).  The resolution provided that any Member who voted or recorded his or her presence pursuant to the remote-voting rule was to be "counted for the purpose of establishing a quorum under the rules of the House."  *Id.* § 3(b).

The resolution set forth specific procedures for remote voting, and the House published additional regulations elaborating on these procedures.  *See* 167 Cong. Rec. H43 (daily ed. Jan. 4, 2021).  A Member wishing to vote remotely pursuant to the House's rule was required to submit to the Clerk of the House a signed and dated letter "specifying by name the Member who is designated" to physically cast the vote on his or her behalf.  *See* H.R Res. 965, § 2(a)(1); *see also* 167 Cong. Rec. H43.  Upon receipt of such a letter, the Clerk was required to "notify the Speaker, the majority leader, [and] the Minority Leader" of the designation.  H.R. Res. 965, § 2(a)(3).  The rule prohibited Members from designating a general proxy to vote on their behalf, but rather required Members wishing to vote remotely to provide an "exact instruction," in writing, specific to a particular vote or quorum call, and required the Member

6

designated to cast the remote Member's vote to do so pursuant to "the exact instruction received." *Id.* § 3(c). The remote Member could revoke his or her proxy designation "at any time for any reason" and could similarly provide new voting instructions at any time (including via electronic communications). *See* 167 Cong. Rec. H43. If the text of a bill changed after a voting instruction was given, the Member wishing to vote remotely was required to provide a "new instruction," in writing. *Id.*

From May 20, 2020, through December 25, 2022, the Speaker of the House—pursuant to notification that a public-health emergency was in effect—designated a covered period pursuant to the resolution and permitted remote voting pursuant to the prescribed procedures.[2]

### B. The Consolidated Appropriations Act of 2023

**1.** On December 23, 2022, the House passed the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022), after the Senate passed the bill the previous day. Because the version of the bill the Senate passed included amendments and was not identical to earlier versions, *see, e.g.*, 168 Cong. Rec. S10065-71 (daily ed. Dec. 22, 2022), those Members of the House who wished to vote on the

---

[2] *See, e.g.*, Press Release, Nancy Pelosi, Speaker of the House, Dear Colleague to All Members on Extension of Remote Voting 'Covered Period' (Nov. 10, 2022), https://web.archive.org/web/20221111142214/https://www.speaker.gov/newsroom/111022-1.

bill remotely pursuant to the House's rule were required to submit new instructions following the Senate's actions, *see* 167 Cong. Rec. H43.

According to the congressional record, 225 Members voted in favor of the Act, 201 voted against it, one Member voted "present," and four did not record a vote. 168 Cong. Rec. H10,528-29. At the time of the bill's passage, the presiding officer noted that "Members casting their vote or recording their presence" pursuant to the House's remote-voting rule "are counted for the purpose of establishing a quorum under the rules of the House" and that, "under the rules of the House," a quorum was present. 168 Cong. Rec. H10,529. The bill thereafter became an enrolled bill, *see* 1 U.S.C. § 6, and was signed into law by the President on December 29, 2022. *See* ROA.1672.

**2.** The Appropriations Act is a $3 trillion omnibus statute that appropriated funds for the 2023 fiscal year. *See* ROA.1783. Among the Act's provisions, it provided funding for military service members' pay, military aircraft and weapons procurement, the veterans' health care system, the federal judiciary, the Department of Homeland Security (and its components such as U.S. Customs and Border Protection), and the U.S. Marshal's Service. *See, e.g.*, 136 Stat. at 4525, 4566-69, 4575-77, 4668-70, 4729-31, 4951-53; *see also* ROA.1779-82 (describing twelve appropriations provisions). The Act further made billions of dollars of grant funds available, including to States such as Texas. *See, e.g.*, 136 Stat. at 4473, 4871, 5676-77, 5727, 5737-38, 5789. The Act also contained several pieces of permanent legislation,

including the Fairness for 9/11 Families Act, *id.* at 6106-11, and the Providing Urgent

Maternal Protections for Nursing Mothers Act, *id.* at 6093-97.

As particularly relevant here, one permanent piece of legislation included in the

Act is the Pregnant Workers Fairness Act (PWFA), which strengthens federal

protections for pregnant workers. *See* 136 Stat. at 6084-89. The PWFA makes it an

unlawful employment practice for covered entities, including state employers, to

refuse to "make reasonable accommodations to the known limitations related to the

pregnancy, childbirth, or related medical conditions of a qualified employee" unless

they can show that "the accommodation would impose an undue hardship on the

operation of the business of such covered entity." *Id.* at 6085. The statute authorizes

the Equal Employment Opportunity Commission (EEOC), the Attorney General,

and private individuals to seek redress for statutory violations using the same

procedures set forth in Title VII of the Civil Rights Act of 1964. *Id.* at 6085-86 (citing

42 U.S.C. § 2000e-4 *et seq.*). Thus, individuals may file a charge of employment

discrimination with the EEOC, which may conduct further investigation. *See*

ROA.1685, 1689. In the case of a state employer, if the EEOC finds reasonable cause

to believe a statutory violation has occurred and is unable to reach an informal

resolution through conciliation efforts, it refers the charge to the Department of

Justice, which can initiate litigation. *See* 42 U.S.C. § 2000e-5(f)(1); *see also* ROA.1686,

1689. In certain circumstances, the EEOC or the Attorney General may also issue

individuals right-to-sue notices, thus allowing those individuals to bring a private

lawsuit.  *See* 42 U.S.C. § 2000e-5(f)(1); 29 C.F.R. § 1601.28.  The PWFA contains an explicit abrogation of state sovereign immunity to permit suits by private individuals. 136 Stat. at 6089.

### C.  This Lawsuit

**1.**  The State of Texas filed this lawsuit and moved for a preliminary injunction in February 2023, asserting that the Appropriations Act "never 'passed the House of Representatives'" because the House allegedly lacked a quorum at the time of its vote. ROA.66; *see also* ROA.26.  Texas acknowledged that 427 out of 431 Members voted on the Appropriations Act, and that a majority of those Members voted in favor of its passage.  *See* ROA.68.  But Texas asserted that the Quorum Clause "requires physical presence," ROA.74, and that 226 Members are recorded in the congressional record as having voted on the Appropriations Act pursuant to the House's remote-voting procedures, ROA.68.  Based on that record, Texas alleged that "only 201" Members were "physically present" during the House's vote, which Texas claimed was less than the "physical" quorum that the Constitution requires.  ROA.65, 74.  Texas therefore asserted that, despite the President's signature on the enrolled bill, the Appropriations Act "has not been enacted" and is "not law."  *See* ROA.66.

Texas did not seek relief against the Appropriations Act as a whole.  Rather, Texas alleged that it was injured by a component of the Act—the PWFA, which

applies to Texas as an employer—and Texas sought injunctive relief to prevent the federal government from enforcing the PWFA against it. *See* ROA.79.[3]

**2.** The government opposed the preliminary injunction and moved to dismiss. The district court consolidated a hearing on the motions with a bench trial on the merits and entered final judgment in favor of Texas. *See* ROA.1403-04.

As relevant here, the district court rejected the government's arguments that Texas's claim is foreclosed by the enrolled-bill rule of *Marshall Field & Co. v. Clark*, which provides that "an enrolled act, . . . attested by the signatures of the presiding officers of the two houses of congress, and the approval of the president, is conclusive evidence that it was passed by congress, according to the forms of the constitution," 143 U.S. 649, 673 (1892). Although the district court questioned whether the enrolled-bill rule applies at all to Quorum Clause claims, it acknowledged that the principles underlying the rule would apply to foreclose at least some claims alleging that Congress lacked a constitutional quorum at the time of its action. *See* ROA.1343, 1349. In the district court's view, while the enrolled-bill rule should apply to foreclose "fact-intensive" Quorum Clause claims, ROA.1349, the rule does not

---

[3] Texas also claimed injury from the Act's appropriation of funds to a Department of Homeland Security case-management pilot program. *See* ROA.70. The district court concluded that Texas failed to establish standing to challenge the appropriation of funds to that program, however, and dismissed the defendants sued in connection with that claim. *See* ROA.1341, 1404; *see also* ROA.1288 & n.1 (further noting Texas agreed to dismiss "U.S. Customs and Border Enforcement" as a defendant, since "there is no federal agency" with such a name). The district court also dismissed the President of the United States as a defendant. ROA.1341.

apply to Texas's particular claim here, which, according to the district court, "centers around a legal challenge to the House's rule" permitting Members to vote remotely and be counted towards a quorum, ROA.1354-55.  Relying on *United States v. Ballin*, 144 U.S. 1 (1892), the district court reasoned it could properly look beyond the enrolled bill to decide Texas's "legal challenge."  *See* ROA.1351, 1355.

On the merits, the district court agreed with Texas that the Quorum Clause contains a "physical-presence requirement," such that the House was precluded from adopting a rule permitting Members to vote remotely and be counted towards a quorum and that the Appropriations Act was therefore not duly enacted.  *See* ROA.1373, 1391-92.  The court acknowledged that the text of the Quorum Clause does not indicate whether a majority of Members must "be physically present" for the House's power to conduct business to arise.  ROA.1373.  The court reasoned, however, that the Quorum Clause must be understood to impose a physical-presence requirement because Article I, Section 5 further provides that "a smaller Number" of Members than required to establish a quorum may "compel the Attendance of absent Members, in such Manner, and under such Penalties, as each House may provide," U.S. Const. art. I, § 5, cl. 1, which the district court believed "would serve no purpose if" Members were not required to be physically present to count towards a quorum, ROA.1373.  The district court found further support for its interpretation from the debate over the Quorum Clause at the Constitutional Convention, where the Framers discussed the difficulty of travel, which the district court believed made sense only if

the Framers understood the Quorum Clause to require the physical presence of Members. *See* ROA.1379. The court also discussed at length the practices of early Congresses, which assembled in person and adjourned on the occasions that a majority of Members were not physically present. *See* ROA.1381-82.

The district court recognized that, under longstanding practice in both Chambers, each House may conduct business by unanimous consent provided that no Member has any objection, and that, under this practice, "measures [may] be passed in the absence of a physical quorum." *See* ROA.1386-87. The district court distinguished that practice from the House's remote-voting rule, however, because in proceeding by unanimous consent, "no counting of votes occurs" and a unanimous-consent agreement "ends if someone objects." *See* ROA.1389.

The district court further held that Texas had established the remaining permanent-injunctive factors and entered a permanent injunction preventing the Department of Justice and the EEOC from enforcing the PWFA against Texas, "including accepting any charges or issuing any right-to-sue letters" to private individuals. *See* ROA.1401. The court specified that, under its injunction, the EEOC may, "upon receipt of a PWFA claim against the State of Texas, send a written notice to the claimant stating that they received her charge but cannot accept it, investigate it, or issue a right-to-sue notice based on this Order." ROA.1400. The court recognized that it could not properly enjoin third-party employees not before the court from bringing their own private lawsuit and suggested that employees could still file their

13

own lawsuits against Texas under the PWFA and argue, for example, that they were unable to satisfy administrative prerequisites before bringing suit. *See* ROA.1399-1400.

## SUMMARY OF ARGUMENT

**I.** Texas's claim is foreclosed by the enrolled-bill rule of *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892). Texas alleges that the Appropriations Act "never 'passed the House of Representatives'" and is "not law" because a majority of House Members were not "physically present" in the House chamber at the time of the House's vote on the bill. *See* ROA.66, 68. Texas does not dispute, however, that the Appropriations Act was enrolled and signed by the presiding officers of Congress and the President of the United States. *See* ROA.1672. The Supreme Court has long explained that "an enrolled act, . . . attested by the signatures of the presiding officers of the two houses of congress, and the approval of the president, is conclusive evidence that it was passed by congress, according to the forms of the constitution." *Marshall Field*, 143 U.S. at 673.

The district court erred in concluding that the enrolled-bill rule does not apply to Texas's claim. The court reasoned that while the enrolled-bill rule would apply to foreclose "fact-intensive" claims alleging that Congress lacked a sufficient quorum at the time of a vote, the rule does not apply to Texas's particular Quorum Clause claim here, which involves a "legal challenge to the" House's remote-voting rule. *See* ROA.1349, 1355. Nothing in the Supreme Court's precedents, however, suggests that

14

the enrolled-bill rule is limited to only "fact-intensive" disputes about a bill's passage. The enrolled-bill rule is grounded in respect for the separation of powers and the Supreme Court's recognition of the significant public "consequences" that would result if it were to "declare that an enrolled bill, on which depend public and private interests of vast magnitude," "was not in fact passed." *See Marshall Field*, 143 U.S. at 670. Those concerns are just as apparent in the context of a purportedly "legal" challenge as a "fact-intensive" one. Texas's claim here underscores this. Texas asks the Court to second-guess the House's determination that a quorum was present at the time of its vote and decide that a $3 trillion omnibus appropriations bill was "never enacted," despite the signatures of the presiding officers of Congress on the enrolled bill and the signature of the President of the United States. *See* ROA.66. The principles underlying the enrolled-bill rule apply with full force to Texas's claim.

**II.** In all events, the Appropriations Act was lawfully enacted. The district court erred in concluding that the Quorum Clause requires the physical presence of a majority of Members such that the House was precluded from adopting a rule permitting Members to participate remotely and be counted towards a quorum. The Quorum Clause says nothing about physical presence. By its plain terms, the Quorum Clause establishes the minimum number of Members that must participate for the House's power to conduct business to arise—a "Majority of each" House, U.S. Const. art. I, § 5, cl. 1—not the manner in which Members must participate. The Rulemaking Clause, which immediately follows the Quorum Clause in the

Constitution, grants each House broad power to "determine the Rules of its Proceedings." *Id.* cl. 2. The House was well within its constitutional prerogative to adopt a rule during the COVID-19 pandemic specifying a means by which Members could participate remotely and be counted towards a quorum. The House's rule did not change the number of Members required to establish a quorum, but rather provided an additional means by which Members could cast their vote during a public-health emergency when they otherwise might not have been able to do so.

Although the text of the Quorum Clause does not require the physical presence of Members, the district court reasoned that the Clause must be understood to impose such a requirement because an ancillary phrase in Article I, Section 5 authorizes "a smaller Number" of Members than required to establish a quorum "to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1. According to the district court, the power of less than a majority of Members to "compel the Attendance of absent Members," *id.*, "would serve no purpose" if Members did not need to be physically present to count toward the constitutionally required quorum, *see* ROA.1373. That is incorrect. The Framers empowered a smaller number of Members to compel the attendance of absent Members to ensure that, if a faction of Members were to engage in quorum-busting techniques to prevent the House from conducting business, a smaller number than required to establish a quorum may act to secure a quorum so that legislative matters may proceed. There is no basis to

understand that provision as referring to the physical presence of Members any more than the Quorum Clause. If the House has prescribed by its rules particular methods for Members to participate in House business, whether in person or remote, a Member participating in accordance with those rules is attending to legislative business and is not "absent," and there is no need for their attendance to be compelled. By contrast, if a Member was refusing to participate in legislative business through any method the House has prescribed and thereby seeking to deny the House a quorum, a smaller number of Members than required to establish a quorum could act in that circumstance—if the House has authorized such a rule—to "compel" such an absent Member to attend to legislative business, through whatever procedures the House has prescribed for participation.

The district court's additional reasons for grafting a physical-presence requirement onto the Quorum Clause are no more persuasive. Relying on the Framers' debate over the Quorum Clause at the Constitutional Convention, the district court emphasized that the Framers assumed that Members would assemble in person to establish a quorum and conduct legislative business. Even if that is true, however, that does not mean that the Framers intended to "restrict" future Congresses to only that method of participation, which is the "relevant" interpretive question. *See NLRB v. Noel Canning*, 573 U.S. 513, 533 (2014). Nothing suggests the Framers intended to do so. Rather, the text of the Quorum and Rulemaking Clauses establish that the Framers intended each House to determine, over time, how

Members may participate and how a quorum is to be established.  *See United States v. Ballin*, 144 U.S. 1, 4-5 (1892).

For similar reasons, the district court's extensive reliance on the practice of early Congresses, which assembled in person and adjourned on the occasions that a physical majority of Members was not present, does not support its interpretation of the Quorum Clause as *prohibiting* the House from adopting a rule permitting Members to vote remotely and be counted towards a quorum.  The Supreme Court has made clear that the House's rulemaking power is a "continuous" one, and the House is free to change its rules over time.  *Ballin*, 144 U.S. at 4-5.  Exercising its rulemaking power, the House has throughout its history adopted a number of quorum-related rules that specify, for example, how a quorum is to be determined, how long a quorum is presumed to last once established, and how and when objections to a lack of a quorum may be made.

Longstanding practice of the House and Senate confirm that a physical majority of Members is not required to transact business.  For over a century, the House and the Senate have provided rules that allow business to be conducted by unanimous consent with no more than a few Members physically present on the floor—a practice the Supreme Court recognized in *Noel Canning*, 573 U.S. at 551-54. The district court acknowledged this longstanding and "widespread" congressional practice and did not purport to cast any doubt on its constitutionality.  *See* ROA.1386-87.  But the court failed to reconcile that practice with its interpretation of the

Quorum Clause as requiring the physical presence of a majority of Members. The court emphasized that, when the House proceeds by unanimous consent, it does not take a recorded vote and a unanimous-consent agreement ends if a Member objects. *See* ROA.1389. It is unclear, however, why that is relevant to the constitutional inquiry. If the Quorum Clause requires the physical presence of a majority of Members for the House's power to transact business to arise (as the district court held), that constitutional requirement presumably cannot be excused merely because no Member objects and the House proceeds without a roll-call vote.

## STANDARD OF REVIEW

"A trial court's grant of a permanent injunction is reviewed for abuse of discretion." *BNSF Ry. Co. v. International Ass'n of Sheet Metal, Air, Rail & Transp. Workers*, 973 F.3d 326, 333 (5th Cir. 2020). "The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." *Id.* at 333-34.

## ARGUMENT

## I. Texas's Claim Is Foreclosed by the Enrolled-Bill Rule of *Marshall Field*

Texas contends that the Appropriations Act "never 'passed the House of Representatives'" and is "not law" because a majority of House Members were not

"physically present" in the House chamber at the time of the House's vote on the bill. ROA.66, 68; *see* ROA.78. As discussed further below, the Quorum Clause does not require the physical presence of a majority of Members in the House chamber, and the Appropriations Act was lawfully enacted. *See infra* Part II. At the threshold, however, the district court should have rejected Texas's claim under the enrolled-bill rule of *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892). The Supreme Court has long explained that "an enrolled act, . . . attested by the signatures of the presiding officers of the two houses of congress, and the approval of the president, is conclusive evidence that it was passed by congress, according to the forms of the constitution." *Id.* at 673. That rule forecloses Texas's claim that the Appropriations Act "never 'passed the House of Representatives.'" ROA.66.

**A.** In *Marshall Field*, several importers challenged an assessment of duties on the ground that the tariff statute "had not in fact been passed by congress." 143 U.S. at 669. The tariff statute had been enrolled and "attested by the signatures" of the Speaker of the House and the President of the Senate and had been signed by the President of the United States. *Id.* at 668, 671. Nonetheless, the plaintiffs argued that the statute was a "nullity, in all its parts," because the enrolled bill allegedly differed from what Congress had passed. *Id.* at 668-89. The plaintiffs sought to establish their claim by relying on "the congressional records of proceedings," conference and committee reports, "and other papers printed by authority of congress." *Id.*

The Supreme Court declined to entertain the plaintiffs' claim. The Court agreed with the "general principle" that "[t]here is no authority in the presiding officers of the House of Representatives and the Senate to attest by their signatures, nor in the president to approve, . . . any bill not passed by Congress." *Marshall Field*, 143 U.S. at 669. The Court stressed, however, that the question was "the nature of the evidence upon which a court may act when the issue is made as to whether a bill . . . was or was not passed." *Id.* at 670. The Court held that the plaintiffs could not rely on extrinsic evidence to challenge the two Houses' "official attestation[s]" on the enrolled bill that the bill had been properly enacted. *See id.* at 672.

The Court explained that it would be inconsistent with "the respect due to a co-ordinate branch of the government" for the Judiciary to look behind the official attestations of Congress and examine extrinsic evidence to declare that a bill had not become law. *See Marshall Field*, 143 U.S. at 673. Similarly, the Court emphasized the significant public "consequences" that would result if the Court were to "declare that an enrolled bill, on which depend public and private interests of vast magnitude," "was not in fact passed." *Id.* at 670. If "every act" could, "at any and all times, be liable to be put in issue and impeached by the journals, loose papers of the legislature, and parol evidence," "[s]uch a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable." *Id.* at 675 (quoting *Sherman v. Story*, 30 Cal. 253, 275 (1866)); *see id.* at 677.

**B. 1.** The enrolled-bill rule forecloses Texas's claim that the Appropriations Act "never 'passed the House of Representatives'" and is "not law" because the House allegedly lacked a quorum at the time of its vote. ROA.66. Texas does not dispute that the Act was enrolled and signed by the presiding officers of each House of Congress and signed by the President of the United States. *See* ROA.66; ROA.1672. Under *Marshall Field*, that resolves the inquiry: Texas may not seek to appeal to extrinsic legislative history to demonstrate that the Act was not enacted "according to the forms of the constitution." *See Marshall Field*, 143 U.S. at 673; *see also United States v. Munoz-Flores*, 495 U.S. 385, 409-10 (1990) (Scalia, J., concurring in the judgment) (recognizing that, under *Marshall Field*, courts should not "gainsay [Congress's] official assertion that [a] bill was passed by the requisite quorum" (citing U.S. Const. art. I, § 5, cl. 1)).

**2.** In nonetheless proceeding to consider Texas's claim, the district court misunderstood both the enrolled-bill rule and the nature of Texas's challenge.

**a.** At the outset, the district court questioned whether the enrolled-bill rule applies at all to claims under the Quorum Clause, which the district court suggested do not present the same concerns as the bicameralism claim at issue in *Marshall Field*. *See, e.g.*, ROA.1344. Similar to the claim at issue in *Marshall Field*, however, a claim under the Quorum Clause asks the Court to inquire into Congress's internal proceedings and second-guess its official attestations in order to decide that a bill "was not passed by congress." *Marshall Field*, 143 U.S. at 670. Texas's claim here

underscores this: Texas asks the Judiciary to disregard the House's determination that a quorum of its Members was present when it voted on the Appropriations Act and to conclude that a $3 trillion omnibus appropriations statute "has not been enacted," despite the attestations of the presiding officers of Congress on the enrolled bill and the signature of the President of the United States. *See* ROA.66; *see* ROA.78 (alleging that the President "signed a bill that was not passed by a majority of a quorum of the House" and the bill therefore "was never enacted into law"). The separation-of-powers and public-policy concerns underlying the enrolled-bill rule apply with full force to that claim. *See Marshall Field*, 143 U.S. at 672, 675.

Indeed, in surveying decisions that supported its approach, the Supreme Court in *Marshall Field* favorably cited a state-court decision applying the enrolled-bill rule to a state Quorum Clause challenge. *See Marshall Field*, 143 U.S. at 677 (citing *Evans v. Browne*, 30 Ind. 514 (1869)). In *Evans*, the Indiana Supreme Court refused to look beyond an enrolled bill to decide whether a "constitutional quorum" was present at the time of the state legislature's vote, relying on the same separation-of-powers and public-policy considerations that *Marshall Field* later emphasized. *See* 30 Ind. at 515, 523-27. The Indiana Supreme Court explained that it would improperly "supervise [a] co-ordinate department[]" of state government to look beyond the official attestations of the legislature to consider extrinsic evidence and decide whether a quorum was or was not present at the time of the legislature's vote, and the Court stressed the

23

significant public "consequences" that would result if it were to open the door to allowing statutes to be invalidated in that manner. *See id.* at 526; *see also id.* at 524-25.

Those concerns remain no less powerful today than when *Marshall Field* was decided. Thus, applying *Marshall Field*, courts of appeals have consistently held that the enrolled-bill rule applies to claims alleging that a statute is invalid because Congress allegedly lacked a quorum at the time of its vote. *See United States v. Farmer*, 583 F.3d 131, 151-52 (2d Cir. 2009) ("Farmer contends that the Congressional Record from the date that the Act was passed shows that a quorum was not present . . . . [T]he enrolled-bill rule precludes [that] challenge."); *see also United States v. Small*, 487 F. App'x 302, 303 (7th Cir. 2012) (recognizing that the enrolled-bill rule "foreclosed" the defendant's argument that a statute "was passed without a quorum in the House of Representatives"); *United States v. Gonzalez-Arenas*, 496 F. App'x 866, 867 (10th Cir. 2012) (similar).

Contrary to the district court's suggestion, the Supreme Court's decision in *Munoz-Flores*, 495 U.S. 385, does not establish otherwise. *See* ROA.1345-46. The question at issue in *Munoz-Flores* was whether a provision that had passed Congress was a bill for raising revenue. 495 U.S. at 387-88. If so, the Constitution required that the provision originate in the House of Representatives. U.S. Const. art. I, § 7, cl. 1. The Court in *Munoz-Flores* ultimately found "consideration of [the] origination question 'unnecessary'" because it determined that the challenged bill "was not one for raising revenue." 495 U.S. at 401. In a footnote, however, the Court also rejected

the contention that the Origination Clause question was foreclosed by *Marshall Field.* *Id.* at 391 n.4. As other courts of appeals have recognized, the Supreme Court's reasoning in that footnote is not entirely clear. *See, e.g., Public Citizen v. U.S. Dist. Court for D.C.*, 486 F.3d 1342, 1352, 1354 (D.C. Cir. 2007) (recognizing the footnote is "oblique" and "def[ies] easy comprehension"). It is clear, however, that while the Court declined to extend *Marshall Field* to the Origination Clause claim at issue in that case, the Court did not purport to "modify the enrolled bill rule" or limit its application where, as here, a plaintiff challenges whether an "enrolled bill ha[s] passed Congress." *See id.* at 1353-54; *see also Munoz-Flores*, 495 U.S. at 391 n.4. As discussed above, Texas's Quorum Clause claim squarely implicates the principles underlying the enrolled-bill rule, and courts have continued to apply the enrolled-bill rule to foreclose Quorum Clause challenges after *Munoz-Flores. See supra* pp. 22-24.

**b.** Indeed, despite questioning the application of the enrolled-bill rule to Quorum Clause claims, the district court recognized that the enrolled-bill rule can apply to such claims. *See* ROA.1349; *see also* ROA.1354 (acknowledging separation-of-powers and "judicial competence" concerns). The court nonetheless purported to distinguish Texas's challenge here from the type of Quorum Clause claim the district court believed the rule should foreclose. The court reasoned that while the enrolled-bill rule should apply to preclude "fact-intensive" Quorum Clause claims, it does not apply to the type of challenge brought by Texas, which the court viewed as

"center[ing] around a legal challenge to the House's rule" permitting Members to vote remotely and be counted towards a quorum.  *See* ROA.1349, 1355.

The district court's purported distinction does not withstand scrutiny.  The uncertainty and disruption that would result if statutes could be invalidated on the basis of an alleged lack of a quorum at the time of Congress's vote are just as apparent in the context of a purportedly "legal" challenge as a "fact-intensive" one.  Nothing in *Marshall Field* suggests that the enrolled-bill rule is limited to only "fact-intensive" disputes about a bill's passage.  Rather, as discussed above, *Marshall Field* reflects the Supreme Court's conclusion that the public should be permitted to rely on the attestations of the presiding officers of Congress and the President of the United States as "conclusive" assurance that a measure was duly enacted.  *See Marshall Field*, 143 U.S. at 672-73.

The district court erred in interpreting *United States v. Ballin*, 144 U.S. 1 (1892), to support its approach.  *See* ROA.1351.  The claim in *Ballin* arose after the House had changed its quorum rules—from counting only those Members voting on a bill towards a quorum, to counting all Members physically present in the hall of the House, whether or not they voted.  *See* 144 U.S. at 3, 5; *see also supra* p. 4 (discussing House's change in rules).  The plaintiffs in *Ballin* alleged that a bill had not "legally passed" the House where it had been voted on pursuant to the new quorum procedures.  144 U.S. at 3.  In addressing that claim, the Supreme Court "[a]ssum[ed]," "without deciding," that it could look to the House's official journal

for its record of the roll-call vote, and on that assumption, the Court discussed the House's record of its vote and the Quorum and Rulemaking Clauses and explained that the House's new quorum rule was within its constitutional power to enact. *Id.* at 4-6; *see infra* pp. 31-32.

The Court in *Ballin* did not purport to make any distinction between "fact-intensive" and "legal" claims, nor did the Court hold that the enrolled-bill rule did not apply to the plaintiffs' quorum challenge there. To the contrary, *Ballin* recognized that the plaintiffs' claim was of the same "nature" as the claim at issue in *Marshall Field*, which the Court had decided that same day. *See Ballin*, 144 U.S. at 3. The Court in *Ballin* only assumed that it could look to the House's journal, and even in proceeding on that assumption, the Court emphasized "the danger of appealing to" extrinsic legislative history "to overthrow" a "bill enrolled and authenticated by the signatures of the presiding officers of the two houses and the president of the United States." *Id.* at 3-4. The Court discussed the House's record of its vote and the Quorum and Rulemaking Clauses only in the course of confirming that the enrolled bill, "as found in the office of the Secretary of State, is beyond challenge." *Id.* at 4, 9.

Furthermore, to the extent the Court in *Ballin* "[a]ssum[ed]" that it could look to extrinsic legislative history, it assumed only that it could look to the House's official journal, and only with respect to the material "the constitution requires to be placed on the journal" —that is, "to see whether the yeas and nays were ordered, and if so, what was the vote disclosed thereby." 144 U.S. at 3-4; *see* U.S. Const. art. I, § 5, cl. 3

(requiring each House to record the "Yeas and Nays" in its journal at the desire of one-fifth of those present). In *Marshall Field*, by contrast, the Supreme Court precluded resort to the House's journal when it was asked to consider matters "the constitution does not require to be entered" there, emphasizing that, with respect to that material, there is no basis to conclude that the House's record is "complete" and accurate, and the Court therefore closed the door on relying on any such extrinsic legislative history to show that an enrolled bill was not duly enacted. *See* 143 U.S. at 679-80.

Here, even if the Court were to look to the House's official record to see "whether the yeas and nays were ordered, and if so," "the vote disclosed thereby," *Ballin*, 144 U.S. at 4, that record does not aid Texas. As discussed above, the House's official record of its vote on the Act shows that there were 225 yeas, 201 nays, one Member voting "present," and four not voting—a vote that, on its face, establishes a quorum. *See* 168 Cong. Rec. H10,528. Texas's assertion that "only 201" Members were physically present during the House's vote relies on a list of Members who are identified in the congressional record as having voted on the Act pursuant to the House's remote-voting rule, *see* ROA.68, 1392, which the Constitution did not require the House to record. Neither *Marshall Field* nor *Ballin* supports the district court's conclusion that Texas can appropriately appeal to such information to upend an enrolled bill on which "public and private interests of vast magnitude" depend. *See Marshall Field*, 143 U.S. at 670, 679-80; *Ballin*, 144 U.S. at 4.

## II.    The Appropriations Act Was Lawfully Enacted

In all events, the district court erred in concluding that the Quorum Clause requires the physical presence of a majority of House Members such that the House was precluded from adopting a rule permitting Members to participate in legislative business remotely and be counted for purposes of determining a quorum.  By its plain terms, the Quorum Clause establishes the number of Members that must participate for the House's power to arise—a majority—not the manner in which Members may participate.  The Framers left that and other unanswered questions to each House to address pursuant to the Rulemaking Clause, which grants each House broad power to "determine the Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2.  Pursuant to that broad delegation of authority, the House has for centuries prescribed rules governing how Members may participate and how a quorum is to be determined, including rules that permit each House to pass legislation with less than a majority of Members physically present.  Neither text, history, nor precedent supports the district court's conclusion that the Quorum Clause imposes a "physical-presence requirement."  *See* ROA.1373.

### A.    The Quorum Clause Does Not Require Physical Presence

**1.**  The Quorum Clause's text does not limit the House's authority to adopt remote-voting procedures.  By its plain terms, the Quorum Clause establishes the minimum number of Members that must participate for each House to conduct business, without specifying the manner in which Members may participate.

29

The term "quorum"—today and at the time of the Founding—means the "number of members of a larger body that must participate for the valid transaction of business." *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 683-84 (2010) (citing *Quorum*, Black's Law Dictionary (9th ed. 2009)); *see* 2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) (defining a quorum as the "number of any officers as is sufficient to do business"). The Quorum Clause sets this number at "a Majority of each" House. *See* U.S. Const. art. I, § 5, cl. 1. In establishing a majority as the requisite number for a quorum, the Framers thereby sought to ensure that issues are not "decided by a very small number of the members of each body . . . against the deliberate opinion of a majority of the representative body." 2 Joseph Story, *Commentaries on the Constitution of the United States* § 832 (1833).

The history of the Quorum Clause underscores that it concerns the minimum number of Members that must participate for the House to conduct business, not the method of their participation. The Framers settled on "a Majority" to constitute a quorum after debating proposals for higher or lower numbers. *See* 2 *The Records of the Federal Convention of 1787* at 251-54 (Max Farrand ed., 1911). Some delegates at the Constitutional Convention urged that a quorum should be "less than a Majority" out of concern that, if the number were set higher, minority factions could withhold their participation and prevent the legislature from acting. *See id.* at 251-52 (discussing arguments by Nathaniel Gorham and John Mercer). Others, however, feared minority rule if the number for a quorum were set too low and "a small number of

30

members" could "make laws." *See id.* at 252-53 (discussing arguments by Oliver Ellsworth, James Wilson, and George Mason). Ultimately, the delegates decided that a quorum would be a majority, requiring at least half of each chamber to participate. *See id.* at 252-54. In other words, the Quorum Clause was designed to ensure that a small number of House Members could not conduct or prevent the conduct of House business, thereby thwarting the will of the majority.

**2.** While the Quorum Clause establishes the minimum number of Members who must participate for each House to conduct business, it does not specify further details, including how Members may participate in legislative business and be counted towards a quorum. The Supreme Court has explained that the Constitution leaves such unanswered questions to each House to address pursuant to the Rulemaking Clause. *See Ballin*, 144 U.S. at 5-6. The Rulemaking Clause, which immediately follows the Quorum Clause in Article I, grants to each House the power to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. Pursuant to that "broad delegation" of authority, each House has "wide latitude to determine" how to conduct its business. *NLRB v. Noel Canning*, 573 U.S. 513, 550-51 (2014).

The Supreme Court stressed the breadth of the House's rulemaking power in *Ballin* in concluding that the House's new quorum rule was within its constitutional power to enact. *See* 144 U.S. at 5-6. As discussed above, *Ballin* arose after the House had amended its rules so that all Members "in the hall of the house" were to "be counted" in determining a quorum, rather than only those Members voting on the

bill, as the House had counted a quorum historically. *See* 144 U.S. at 3, 5 (quotation marks omitted); *see also supra* p. 4. The Court explained that the House's new rule complied with the Quorum Clause. The Court stated that while the Quorum Clause requires that "a majority" of Members be "in a position to do business," it does not fix a method for determining whether a quorum exists, and "it is therefore within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact." *Ballin*, 144 U.S. at 5-6. The Court emphasized that the "constitution empowers each house to determine its rules of proceedings," and while the House "may not by its rules ignore constitutional restraints or violate fundamental rights," "within these limitations all matters of method are open to the determination of the house, and it is no impeachment of the [House's] rule to say that some other way would be better, more accurate, or even more just," or that "a different [rule] has been prescribed and in force for a length of time." *Id.* at 5.

Consistent with the Quorum and Rulemaking Clauses, the House has throughout its history promulgated a number of quorum-related rules that address, for example, how a quorum is to be determined, how long a quorum is presumed to last once established, and how and when objections to a lack of a quorum may be made. *See supra* pp. 3-5.

**3.** As particularly relevant here, for more than a century, the House and the Senate have each prescribed rules that permit legislative business to be conducted with less than a majority of Members physically present on the floor. Specifically, the

32

House and the Senate have long conducted business by "unanimous consent," that is, by a single Member requesting that the Chamber take "some action that is not in dispute and to which no Member has any objection," which may be accomplished with no more than a few Members physically present. *See House Practice*, ch. 54, §§ 1, 7. This "[l]ong settled and established" congressional practice underscores the breadth of the House's rulemaking power, and further confirms that the Quorum Clause does not require the physical presence of a majority. *See Noel Canning*, 573 U.S. at 524 (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).

The practice of unanimous consent dates to at least 1832 in the House and originated in the Senate as early as 1789. *See* 4 *Hinds'*, ch. 88 § 3155; *see also* U.S. Senate, The First Unanimous Consent Agreement (Mar. 24, 1846), https://perma.cc/WT8Z-N3LZ. Unanimous consent "is applied across a wide range of House business," including to "adopt or pass a measure." *House Practice*, ch. 54, § 7. The unanimous-consent practice relies on the presumption, long adopted in both Chambers, that "a quorum is presumed always to be present unless a point of no quorum is made." 5 *Deschler's*, ch. 20, § 1.3; *see also* Floyd M. Riddick & Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices* 1038 (1992) ("Until a point of no quorum has been raised, the Senate operates on the assumption that a quorum is present, and even if only a few Senators are present, a measure may be passed or a nomination agreed to.").

Unanimous consent thus "permits many measures to be passed . . . when in fact fewer than a majority of Members" are physically present on the floor. *See* McKay & Johnson, *supra*, at 85. Indeed, the House has passed landmark legislation pursuant to this practice, including the Religious Freedom Restoration Act of 1993.[4] "Historically," the Senate has "confirmed most U.S. circuit and district court nominations by unanimous consent or by voice vote." Cong. Research Serv., *Judicial Nomination Statistics & Analysis: U.S. Circuit & District Courts, 1977-2022*, at 33 (Apr. 3, 2023), https://perma.cc/2SK5-SB9L.

The Supreme Court has recognized the validity of this practice. In *Noel Canning*, in considering the President's power to make recess appointments, the Supreme Court considered whether the Senate was "in session" or "in recess" during two "*pro forma* sessions." 573 U.S. at 550. The Court held that the Senate was "in session" during those times because, "under its own rules," the Senate "retain[ed] the capacity to transact Senate business." *Id.* Although "the Senate Chamber was, according to C-SPAN coverage, almost empty," the Court recognized that, if the Senate had wished, it could have conducted business "by passing a unanimous consent agreement" pursuant to the presumption "that a quorum is present." *Id.* at 552-54. The Court emphasized that "[t]he Senate in fact conducts much of its business through unanimous consent." *Id.* at 553; *see also, e.g.*, Brief of Senate

---

[4] *See* 139 Cong. Rec. 2739-41 (Nov. 3, 1993); C-SPAN, House Session (Nov. 3, 1993), https://www.c-span.org/video/?52027-1/house-session (1:06:20-1:12:21).

Republican Leader Mitch McConnell and 44 Other Members of the United States Senate as Amici Curiae in Support of Respondent at 18-19, 25, *Noel Canning*, 573 U.S. 513 (No. 12-1281), 2013 WL 6228469, at *18-19, *25 (describing examples of legislation the Senate had passed pursuant to unanimous-consent agreements during pro forma sessions and emphasizing the presumption of a quorum under the Senate's rules).

### B. The House's COVID-19 Remote-Voting Rule Was Within Its Constitutional Power to Adopt, and the Appropriations Act Duly Passed the House

The House was well within its constitutional authority to adopt a rule specifying a means by which Members could participate in legislative business remotely and be counted towards a quorum.

The House's rule provided that the Speaker of the House—after being notified by the Sergeant-at-Arms "that a public health emergency" was in effect—was authorized to "designate a period" during which a Member could participate in legislative business remotely. *See* H.R. Res. 965, § 1(a). A Member wishing to do so was required to provide "an exact instruction," in writing, to a fellow Member that was physically present in the Chamber that had been designated to cast the remote Member's vote pursuant to the "exact instruction received." *See id.* § 3(c). The written instruction was required to be "specific to a *particular* vote or quorum call," and if the text of a bill changed after the instruction was given, the Member wishing to vote remotely was required to provide a new instruction, in writing. *See McCarthy v.*

*Pelosi*, 5 F.4th 34, 37 (D.C. Cir. 2021) (emphasis added) (citing H.R. Res. 965, § 3(c)(1), (6)); *see also* 167 Cong. Rec. H43. The House's rule specified that any Member whose vote or presence was recorded in this manner "shall be counted for the purpose of establishing a quorum under the rules of the House." H.R. Res. 965, § 3(b).

The House's rule therefore did not change the number of Members required to establish a quorum but rather specified an additional means by which Members could "cast their votes on legislation and mark their presence for purposes of establishing a legislative quorum" during a public-health emergency. *See McCarthy*, 5 F.4th at 39. Permitting Members to cast a vote remotely—and counting all Members who participate in the vote for purposes of establishing a quorum, whether remote or in-person—is fully consistent with the Quorum Clause's text and its central purpose of ensuring majority participation. Indeed, the House's rule facilitated majority participation by enabling Members to vote on legislation during the COVID-19 pandemic when they otherwise might not have been able to do so. *See also infra* pp. 43-44. As discussed above, nothing in the Quorum Clause specifies that Members must be physically present.

The validity of the House's rule is reinforced by analogous contexts in which it is readily understood that a quorum can be established regardless of physical presence. A "quorum" for purposes of the federal courts of appeals, for example, is "[a] majority of the number of judges authorized to constitute a court or panel thereof." 28 U.S.C. § 46(d). What matters for purposes of that provision is that a majority of a

36

merits or motions panel participate in the relevant proceedings, not that a majority

hear and decide a matter while physically conferenced in a single location. Similarly,

while "any six" of the nine Supreme Court justices "shall constitute a quorum," *id.* § 1,

the Supreme Court retained the power to hear and decide cases remotely throughout

the pandemic, *see* Press Release, U.S. Supreme Court, Press Release Regarding May

Teleconference Oral Arguments (Apr. 13, 2020), https://perma.cc/37SS-LU7D

(announcing proceedings during which "the Justices and counsel will all participate

remotely"). Courts have also long recognized that members of a multi-member

agency or commission do not need to "be physically present together" to decide a

matter in order to satisfy statutory quorum requirements. *See Braniff Airways, Inc. v.

Civil Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967); *see also, e.g.*, *Idaho v. Interstate

Commerce Comm'n*, 939 F.2d 784, 787 & n.2 (9th Cir. 1991). And it is a well-established

rule of corporate law that a shareholder may vote by proxy and be counted towards

the quorum required for shareholder meetings. *See* 5 *Fletcher Cyclopedia of the Law of

Corporations* § 2013 ("A shareholder holding proxies for other shareholders and

present and participating in the meeting will be regarded as present both in the

shareholder's individual and representative capacities, in counting a quorum.").

The House's vote on the Appropriations Act confirms that its rule presents no

constitutional concern. As discussed above, the congressional record shows that 427

out of 431 Members participated in the vote on the Act—far exceeding the

"Majority" necessary under the Quorum Clause. *See* U.S. Const. art. I, § 5, cl. 1; *see*

*also* 168 Cong. Rec. H10,528-29.  Texas does not dispute, moreover, that a majority of those Members voted in favor of the Act's passage.  *See id.* at H10,528.  As the House itself determined, a quorum existed and the Appropriations Act properly passed.  *See id.* at H10,529 (statement of Speaker pro tempore); ROA.1672 (enrolled bill).

### C.  The District Court's Contrary Interpretation Is Without Merit

The district court acknowledged that the text of the Quorum Clause gives no "indication" that a majority of Members must be "physically present" in the House chamber for a quorum to be established.  *See* ROA.1373.  Citing Founding-era dictionaries, the district court agreed that the Quorum Clause refers to the "number of members for either house of Congress to do business."  ROA.1373 & n.20 (citing numerous Founding-era dictionaries).  The district court's reasons for nonetheless interpreting the Quorum Clause to impose a "physical-presence requirement" such that a "physical quorum" of Members must be present on the House floor, ROA.1373, 1384, are without merit.

**1.**  The district court primarily reasoned that the Quorum Clause must be understood to impose a physical-presence requirement because an ancillary phrase in Article I, Section 5, provides that "a smaller Number" of Members than required to establish a quorum "may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide."  U.S. Const., art. I, § 5, cl. 1.  In the district court's view, the power of less than a majority of Members to "compel the Attendance of absent Members" "would serve no purpose"

38

if Members did not need to be physically present to count toward the constitutionally required quorum.  *See* ROA.1373.

The district court's reasoning is incorrect.  The Framers authorized a smaller number of Members to "compel the Attendance of absent Members" to ensure that, if a faction of Members were to engage in quorum-busting techniques to prevent the House from conducting business, a smaller number of Members than required to establish a quorum may act to secure a quorum so that legislative matters may proceed.  *See* 2 *The Records of the Federal Convention of 1787*, *supra*, at 252-54; *see also* 2 Joseph Story, *supra*, § 834 (explaining the power to "compel the attendance of absent members" ensures that "the interests of the nation, and the d[i]spatch of business, are not subject to the caprice, or perversity, or negligence of the minority").

There is no basis to understand that phrase as referring to the *physical* presence of Members any more than the Quorum Clause.  The district court presupposed that an "absent" Member must be one that is not physically appearing in person in the House chamber.  *See* ROA.1374-75; *see also* ROA.1379.  But if the House has prescribed by its rules particular procedures for Members to participate—whether in person or not—a Member participating in accordance with those procedures is not "absent" from legislative business and there is no need for their attendance to be "compel[led]."  *See* U.S. Const. art. I, § 5, cl. 1.  By contrast, if a Member was refusing to participate in legislative business through any of the methods the House has prescribed for participation and thereby seeking, for example, to deny the House a

quorum, a smaller number of Members than required to establish a quorum could act in that circumstance—if the House has authorized such a rule—to "compel" that absent Member to attend to legislative business, through whatever procedures the House has adopted for such participation, including through remote participation.

The district court reasoned that the terms "absent" and "attendance" "often ha[ve] a physical component." *See* ROA.1374. But those terms do not necessarily refer to physical presence in a particular location. *See, e.g.*, *Hurtado v. United States*, 410 U.S. 578, 583-84 (1973) (recognizing that a statute addressing payment for witnesses "'attending in any court of the United States' . . . 'for each day's attendance'" did "not speak in terms of 'physical' or 'actual' attendance," and declining to "engraft such a restriction upon the statute"); *Opinion of the Justices*, 247 A.3d 831, 840 (N.H. 2020) (concluding that "holding a House session remotely" would not violate state constitutional quorum requirement and emphasizing that representatives participating "virtually" would not be "absent" from the proceedings (quotation marks omitted)). Founding-era dictionaries confirm that the term "absent" can mean, for example, "inattentive." 1 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785). Similarly, the term "attendance" can mean "[a]ttention" and "regard." Noah Webster, *An American Dictionary of the English Language* (1828); *see also, e.g.*, 1 Samuel Johnson, *supra* (defining "to attend" as "[t]o yield attention," "[t]o regard," or "to fix the mind upon"); John Ash, *New and Complete Dictionary of the English Language* (1795) (similar).

The district court found it significant that some Founding-era dictionaries define "absent" as being "at such a distance as to prevent communication" or "out of the sight and hearing of a person." *See* ROA.1374 (quotation marks omitted). But of course, in light of modern technology, Members voting remotely pursuant to the House's rule were not "at such a distance as to prevent communication" or out of "sight and hearing" of their physically present colleagues in the Chamber. ROA.1374 (quotation marks omitted).; *see also Opinion of the Justices*, 247 A.3d at 840. Indeed, the congressional record shows that at least three Members who are recorded as having voted on the Appropriations Act pursuant to the remote-voting rule changed their vote during the course of the proceedings. *See* 168 Cong. Rec. H10,529 (recording, for example, Representatives Brown and Rogers as having "changed their vote from 'nay' to 'yea'" and recording each as having voted pursuant to the House's remote-voting rule). Those Members were not "absent" from legislative business.

The district court's cramped interpretation is particularly inapt given that the Constitution empowers a smaller number of Members "to compel the Attendance of absent Members, *in such Manner* . . . as each House may provide." U.S. Const., art. I, § 5, cl. 1 (emphasis added). Consistent with the Rulemaking Clause, the Framers thus left it to each House to specify the "Manner" in which absent members could be compelled to "Attend[]" to legislative business. *Id.* Nothing in that provision, like the Quorum Clause, precludes the House from specifying by its rules that Members may

participate in legislative business remotely through specific procedures and thereby be counted towards a quorum.

**2.** The district court's additional reasons for reading a "physical-presence requirement" into the Quorum Clause are no more persuasive.

**a.** The district court concluded that its interpretation was further supported by the "discussion of the Quorum Clause at the Constitutional Convention." ROA.1376. But as discussed above, the Framers' debate over the Quorum Clause at the Convention related to the *number* of Members required to establish a quorum, not the manner in which Members may participate and be counted. *See supra* pp. 30-31.

The district court found it significant that, in debating the appropriate number for a quorum, some delegates stressed the difficulty of travel and the possibility that, if the number were set too low, issues could be decided by "a few representatives of the states closest to the nation's capital." *See* ROA.1376. From this discussion, the district court reasoned that the Framers must have necessarily assumed that Members would meet in person "in order to participate and be counted." *See* ROA.1379. But even if that is true, that "does not fully describe the relevant founding intent." *See Noel Canning*, 573 U.S. at 533. The Framers may very well have assumed, given the available means of communication at the time, that Members would assemble in person to determine a quorum and conduct legislative business. The "relevant" question for purposes of interpreting the Constitution, however, is whether the Framers intended to "restrict" future Congresses to only that method of participation.

*See id.* at 533-34.  For the reasons discussed above, nothing in the Framers' debate at the Convention—let alone in the text of the Constitution—suggests that the Framers intended to do so.  Rather, the text of the Quorum and Rulemaking Clauses demonstrate that the Framers intended to leave it to future Houses to determine, over time, how Members may participate and how a quorum is to be determined.  *See Ballin*, 144 U.S. at 5; *see also, e.g.*, *Chiafalo v. Washington*, 591 U.S. 578, 592 (2020) (recognizing that where the Framers' "sparse instructions" in the Constitution "took no position" on a matter, the Framers left the matter "to the future" to be determined).

If anything, it is the district court's interpretation that runs contrary to the Framers' goal of ensuring that issues are not decided by only a small number of representatives "closest to the nation's capital."  ROA.1376.  As discussed above, the House's remote-voting rule allowed Members to continue to participate in House business during the COVID-19 pandemic, when travel was significantly impacted and gathering in person was contrary to public-health advice.  Future crises, too, may arise that make travel and assembling in person in Washington, D.C. difficult or impossible.  Permitting Members to vote remotely allows House business to proceed in such a circumstance with majority participation from Members representing districts from across the country, rather than risking legislative business grinding to a halt or permitting issues to be decided by only those Members able to travel under the circumstances and attend in person.  The district court erred in adopting an

interpretation of the Quorum Clause that unduly constrains the House's ability to adapt its rules to respond in such circumstances, where that restrictive interpretation is not compelled by the Quorum Clause's text and risks frustrating its "essential purposes." *See Noel Canning*, 573 U.S. at 532-33; *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 415 (1819) (emphasizing that the Constitution was "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs" (emphasis omitted)).

To the extent the district court believed that the Framers considered and rejected proposals similar to the House's remote-voting rule, *see* ROA.1379-80, that is incorrect. The court cited notes from Alexander Hamilton that proposed allowing Members to "vote by proxy." 3 *The Records of the Federal Convention of 1787*, *supra*, at 620. Those notes were "not submitted to the Convention and ha[ve] no further value than attaches to the personal opinions of Hamilton." *Id.* at 619. Regardless, Hamilton's proxy-voting proposal appears to have contemplated permitting a Member to designate a general proxy to vote on his or her behalf. *See id.* at 620. Permitting Members to delegate all voting power to another Member—effectively allowing a single Member to cast multiple votes in the way of his or her choosing—is meaningfully different than the House's rule at issue here, which prohibited Members from granting "blanket" proxy-voting authority to another Member and instead required Members wishing to vote remotely to transmit "exact" written instructions

44

"specific to a *particular* vote or quorum call." *See McCarthy*, 5 F.4th at 37 (emphasis added) (quoting H.R. Res. 965, 116th Cong. § 3(c)(1) (2020)).

For the same reason, the district court erred in relying on a proposal by Benjamin Franklin, ROA.1379-80, which would have authorized in the Articles of Confederation allowing a representative to "appoint" another representative to "vote for him." *See* Benjamin Franklin, *Proposed Articles of Confederation, [on or Before 21 July 1775]* (July 21, 1775), https://perma.cc/J2N4-LPW4. Franklin's proposed Articles provided, moreover, that a "Quorum" would be "One half of the Members . . . exclusive of Proxies," *see id.*, further confirming that the term "Quorum," by itself, was not understood to specify how Members must participate to be counted or require physical presence.

Moreover, the Framers could not have contemplated the type of remote-voting procedures adopted by the House. The House's remote-voting rule relied on modern technologies that permit instantaneous access to information and communication regardless of physical distance. Members participating remotely pursuant to the House's rule were thus able to do so in a manner that is materially indistinguishable from the manner in which those who are physically present participate. Members participating remotely, for example, had access to all relevant legislative materials on demand, could communicate with their staff and other Members at any time, and could follow the legislative proceedings and change their vote in real time. *See supra* p.

41.  Neither Hamilton, Franklin, nor the other Framers had such circumstances in mind when evaluating the merits of proxy voting.

**b.**  The district court likewise erred in concluding that "longstanding" congressional practice supports its "physical quorum" requirement.  *See* ROA.1380, 1384.  The district court discussed at length the practices of early Congresses, which met in person and adjourned on the occasions that a majority of Members were not physically present.  *See* ROA.1381.  But as with the Framers, it is unsurprising that early Congresses met in person to conduct business and establish a quorum given the available means of communication at the time—as underscored by the district court's observation that the first Congress needed to issue a "circular to absent members" in order to request that they attend.  *See* ROA.1381.  That early congressional practice does not mean that future Houses are prohibited from adopting rules that count Members participating in ways other than being physically present on the House floor. To the contrary, the Supreme Court made clear in *Ballin* that the House's rulemaking power is a "continuous" one and that the House is free to change its rules over time. *See* 144 U.S. at 4-5.  Exercising its rulemaking authority, the House has done so.

It is the district court's interpretation that cannot be reconciled with longstanding congressional practice.  As discussed above, for over a century, each House has prescribed procedures that permit legislation to be passed by unanimous consent with few Members physically present.  The district court acknowledged this longstanding and "widespread" practice, ROA.1386-87, but failed to persuasively

reconcile that practice with its interpretation of the Quorum Clause. The district court observed that, when the House proceeds by unanimous consent, "no counting of votes occurs" and any unanimous-consent agreement "ends if someone objects." *See* ROA.1389. But it is unclear why that is relevant to the constitutional inquiry. If, as the district court held, the Quorum Clause requires a "physical quorum" of Members in the House chamber for the House's power to conduct business to arise, that constitutional requirement presumably cannot be excused merely because no Member raises an objection and the House proceeds without a recorded vote. *See* ROA.1389.

The district court further suggested that, in contrast to the presumption of a quorum and an agreement to proceed by unanimous consent, the House's rule here permitted the House to "affirmatively count[]" "absent member[s] as present." ROA.1390. As explained above, however, that is not true: Members voting remotely pursuant to the House's rule were not "absent" from legislative business but were rather participating pursuant to the procedures the House provided. *See supra* pp. 35-36, 40-41.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

MICHAEL S. RAAB
GERARD SINZDAK
/s/ *Courtney L. Dixon*
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7246*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-8189*

August 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Courtney L. Dixon*

Courtney L. Dixon

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,305 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Courtney L. Dixon*
Courtney L. Dixon