No. 24-10386

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

### STATE OF TEXAS,

*Plaintiff-Appellee,*

- v. -

### MERRICK GARLAND, U.S. ATTORNEY GENERAL, et al.,

*Defendants-Appellants*

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
## CASE NO. 5:23-cv-00034

_____

## BRIEF OF FOUR MEMBERS OF CONGRESS AS *AMICI CURIAE* IN
## SUPPORT OF DEFENDANTS-APPELLANTS

_____

Tammy Lynn Roy
Colleen Tracy James
Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005
(212) 701-3000
*troy@cahill.com*
*ctracyjames@cahill.com*


*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiff-Appellee and Defendants-Appellants are governmental parties for which no certificates of interested persons are required. 5th Cir. R. 28.2.1.

**Amici and Counsel for Amici**:

*Amicus:* Jerrold Nadler is a Member of Congress who represents the Twelfth District of New York in the United States House of Representatives.

*Amicus:* Rosa DeLauro is a Member of Congress who represents the Third District of Connecticut in the United States House of Representatives.

*Amicus:* James P. McGovern is a Member of Congress who represents the Second District of Massachusetts in the United States House of Representatives.

*Amicus:* Joseph Morelle is a Member of Congress who represents the Twenty-Fifth District of New York in the United States House of Representatives.

*Counsel for Amici*: Tammy Lynn Roy and Colleen Tracy James of Cahill Gordon & Reindel LLP.

/s/ Tammy Lynn Roy
Tammy Lynn Roy

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 29............................................................ viii

INTEREST OF AMICI CURIAE........................................................... ix

SUMMARY OF THE ARGUMENT .....................................................1

ARGUMENT ...................................................................................2

I.     THE CONSTITUTION AFFORDS CONGRESS ALONE THE AUTHORITY TO DETERMINE THE RULES OF ITS OWN PROCEEDINGS..........................................................................2

     A.    Congress's Rulemaking Authority is Expressly Provided For in the Constitution .............................................................2

     B.    The House's Exercise of Judgment in Permitting Proxy Voting Under Its Rules of Operation Is Not Subject to Judicial Review....................4

          1.    The Enrolled Bill Doctrine Precludes Judicial Review of the Manner By Which The Act Was Passed ....................4

          2.    The Political Question Doctrine Also Precludes Review of the House's Rule Permitting Proxy Votes to Count in Determining a Quorum ....................................................9

     C.    The Consequences of Interfering With Congress's Authority To Set Its Own Rules Would Be Substantial................................12

II.    THERE IS NO "PHYSICAL PRESENCE" REQUIREMENT IN THE QUORUM CLAUSE....................................................................15

     A.    The Text of the Quorum Clause Does Not Require Physical Presence ........................................................................15

     B.    The Original Public Meaning of the Quorum Clause Confirms That Physical Presence Is Not Required ....................................19

C.     Congress's Historical Practice of Exercising Its Rulemaking Authority Confirms There Is No Physical Presence Requirement In the Quorum Clause ........................................................................................21

D.     The Proxy Voting Rule Furthers the Purpose Behind the Quorum Clause ........................................................................................26

CONCLUSION ...........................................................................................27

CERTIFICATE OF SERVICE ................................................................A

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..................B

# TABLE OF AUTHORITIES

**Cases**

*Abbott* v. *Biden*, 70 F. 4th 817 (5th Cir. 2023) .................................................. 15, 19

*Baker* v. *Carr*, 369 U.S. 186 (1962) ............................................................. 9, 10, 11

*District of Columbia* v. *Heller,* 554 U.S. 570 (2008) .............................................19

*Gilligan* v. *Morgan*, 413 U.S. 1 (1973) ....................................................................10

*Marshall Field & Co.* v. *Clark*, 143 U.S. 649 (1892)...........................................5, 7

*Miller* v. *French*, 530 U.S. 327 (2000) ......................................................................4

*Moore* v. *Harper*, 600 U.S. 1 (2023) .......................................................................21

*N.L.R.B.* v. *Noel Canning*, 573 U.S. 513 (2014) ........................................... *passim*

*Nixon* v. *United States*, 506 U.S. 224 (1993)...........................................................10

*Rucho* v. *Common Cause*, 588 U.S. 684 (2019) ........................................................9

*Transunion LLC* v. *Ramirez*, 594 U.S. 413 (2021)...................................................15

*United States* v. *Ballin*, 144 U.S. 1 (1892) ............................................. 3, 8, 11, 25

*United States* v. *Munoz-Flores*, 495 U.S. 385 (1990) ...............................................6

**Constitutional Provisions**

Art. I, § 5, cl. 3 ...........................................................................................................3

Art. I, § 1 ....................................................................................................................2

Art. I, § 4 ..................................................................................................................17

Art. I, § 5, cl. 2 ...........................................................................................................3

Art. I, § 5, cl. 1 ........................................................... 2, 15, 18

**Legislative Materials**

168 Cong. Rec. H10528-29 (daily ed. Dec. 23, 2022) ................................. 7, 13, 27

Cong. Globe, 37th Cong., 1st Sess. 210 (1861)
https://www.congress.gov/congressional-globe/congress-37-session-1.pdf.
("Cong. Globe, 37th") ............................................................23

Cong. Rec., 51st Cong., 1st Sess. Jan. 29, 1890 Vol. 21 Part 1 – Bound Ed., 949
(1890)................................................................................24

H.Res.5, 118th Cong. (2023) ..................................................12

H.Res.8 § 3(s), 117th Cong. (2021). ........................................12

H.Res.965, 116th Cong. (2020). .......................................... *passim*

R.S. § 34, Act of Apr. 3, 1794, c. 17, 1 Stat. 353 ....................26

**Other Authorities**

"House Voting Procedures: Forms and Requirements," CRS, (Feb. 3, 2023),
https://crsreports.congress.gov/product/pdf/RS/98-228......................................22

"Quorum Busting," U.S. Senate, https://www.senate.gov/about/powers-
procedures/rules-procedures/quorum-busting.htm (last accessed: July 21, 2024).
..........................................................................................24

"The Civil War: The Senate's Story," U.S. Senate,
https://www.senate.gov/artandhistory/history/common/generic/Civil_War_Quor
umDebate.htm (last accessed: July 21, 2024) .....................................23

"The Most Important Politician You've Never Heard Of," NPR, (May 29, 2011)
https://www.npr.org/2011/05/29/136689237/the-most-important-politician-
youve-never-heard-of .............................................................24

"Voting and Quorum Procedures in the House of Representatives," CRS, (March 20, 2023), https://crsreports.congress.gov/product/pdf/RL/98-988 ............. 22, 25

1 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) .............17

2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) .............16

ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 2.8.5 164 (7th ed. 2023).................................................................................................4

Hilarie M. Hicks, "Executive Power in an Epidemic," MONTPELIER, (Mar. 31, 2020), https://www.montpelier.org/executive-power-in-an-epidemic/...............25

James Madison, *Federalist No. 58*, (1788)....................................................... 20, 26

Jane A. Hudiburg, "Suspension of the Rules: House Practice in the 115th Congress (2017-2018)," CRS, (May 19, 2020), https://crsreports.congress.gov/product/pdf/R/R46364........................................23

*No Quorum in the House: Unanimous Consent Necessary to Take a Vote*, N.Y. TIMES, Aug. 5, 1882, https://timesmachine.nytimes.com/timesmachine/1882/08/06/102921928.pdf?pdf_redirect=true&ip=0 ...........................................................................................23

The Debates in the Several State Conventions on the Adoption of the Federal Constitution, Vol. 1, 2d ed., Ed. Jonathan Elliot. (1836), 5 vols. https://oll.libertyfund.org/titles/elliot-the-debates-in-the-several-state-conventions-vol-1. ............................................................................................20

## STATEMENT OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 29

All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. No party, party's counsel or any person other than the *amici curiae*, its members, or its counsel contributed money that was intended to finance the preparation or submission of this brief.

# INTEREST OF AMICI CURIAE

*Amici curiae* are four members of Congress: Jerrold Nadler, Rosa DeLauro, James P. McGovern, and Joseph Morelle. As members of Congress, *Amici* have a special interest in protecting Congress's constitutionally-afforded authority to set the rules of its proceedings under the Rulemaking Clause of the United States Constitution (the "Rulemaking Clause") and to ensure the proper interpretation and enforcement of the Quorum Clause of the Constitution (the "Quorum Clause").

*Amici* believe that the order of the United States District Court for the Northern District of Texas holding that the Pregnant Workers Fairness Act was passed in a manner that violated the Quorum Clause threatens Congress's authority to set its own rules, and is inconsistent with the clear meaning of the Quorum Clause. Accordingly, *Amici* respectfully urge this Court to reverse the District Court's decision.

# SUMMARY OF THE ARGUMENT

It has long been recognized that the Constitution grants Congress broad rulemaking authority to set its own rules of operation, including the authority to determine how and when a "Majority" is present for the purposes of establishing a "Quorum to do Business." The House of Representatives ("the House") exercised this constitutionally-afforded authority in passing House Resolution 965 in the 116th Congress ("H.Res.965" and collectively with other then-applicable rules, the "House Rules"), and in re-adopting it in the 117th Congress. The exercise of this authority is not subject to judicial review in this case under general principles of separation of powers, including the Enrolled Bill Doctrine and the Political Question Doctrine. Allowing the court to now second-guess, or after-the-fact void, the House's exercise of its rulemaking authority threatens to disenfranchise all congressional members, and in turn their constituents, who voted in accordance with then-existing House Rules in voting in favor of the Consolidated Appropriations Act, 2023 (the "Act"). It would also curtail, if not eliminate entirely, Congress's ability to set its own adaptive rules in times of national crisis or other emergency situations, which would hamper Congress's ability to do Business at all.

The District Court erroneously concluded that, notwithstanding this unquestionable authority of Congress's to set its own rules of operation, the House's then-existing rules regarding proxy voting violated the Constitution. The District

Court did so by adding a "physical presence" requirement to the Quorum Clause, which simply does not exist. The absence of any such requirement is evident through, *inter alia*, a textual reading of the Quorum Clause, an analysis of its original public meaning, and historical practice. Moreover, the very purpose underlying the Quorum Clause—*i.e.,* to prevent a minority of congressional members from dictating legislative matters—would be undermined by a ruling that effectively negates a law that was properly passed by a majority of actively participating members.

## ARGUMENT

### I. THE CONSTITUTION AFFORDS CONGRESS ALONE THE AUTHORITY TO DETERMINE THE RULES OF ITS OWN PROCEEDINGS

#### A. Congress's Rulemaking Authority is Expressly Provided For in the Constitution

Article I of the Constitution vests all "legislative powers…in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. The Constitution provides few specific procedures for the conduct of legislative business.[1] Beyond these few express requirements, the

---

[1] The Quorum Clause provides that "a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1.

Under the Journal Clause, "[e]ach House" must also "keep a Journal of its Proceedings, and from time to time publish the same," and "the Yeas and Nays of

Constitution provides Congress with wide discretion in determining the manner in which it will govern itself. The Constitution provides in relevant part:

> Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and with the Concurrence of two thirds, expel a Member.

U.S. Const. art. I, § 5, cl. 2. This provision—referred to as the Rulemaking Clause— has long been recognized as granting Congress "broad" authority "to determine how and when to conduct its business." *N.L.R.B.* v. *Noel Canning*, 573 U.S. 513, 550-51 (2014).

Of course, Congress "may not by its rules ignore constitutional restraints or violate fundamental rights," and there must "be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained." *United States* v. *Ballin*, 144 U.S. 1, 5 (1892). "But within these limitations all matters of method are open to the determination of the house" and Congress's power to prescribe such rules is "absolute and beyond the challenge of any other body or tribunal." *Id.*

"With the courts the question is only one of power." *Id.* If such power exists, "it is no impeachment of the rule to say that some other way would be better, more

---

the Members of either House on any question shall, at the Desire of one fifth of those present, be entered on the Journal." *Id.*, Art. I, § 5, cl. 3.

accurate, or even more just," nor is it an "objection to the validity of a rule that a different one has been prescribed and in force for a length of time." *Id.*

## B. The House's Exercise of Judgment in Permitting Proxy Voting Under Its Rules of Operation Is Not Subject to Judicial Review

"The Constitution enumerates and separates the powers of the three branches of Government" and "[w]hile the boundaries between the three branches are not hermetically sealed, . . . the Constitution prohibits one branch from encroaching on the central prerogatives of another." *Miller* v. *French*, 530 U.S. 327, 341–42 (2000) (internal citations and quotations omitted); *see also* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 2.8.5 164 (7th ed. 2023) (observing that the Supreme Court often "has held that congressional judgments pertaining to its internal governance should not be reviewed by the federal judiciary"). Consistent with these principles, the House's exercise of its rulemaking authority to pass House Resolution 965's proxy voting provisions is not subject to judicial review under two well-accepted separation of powers doctrines: (1) the Enrolled Bill Doctrine; and (2) the Political Question Doctrine.

### 1. The Enrolled Bill Doctrine Precludes Judicial Review of the Manner By Which The Act Was Passed

The Enrolled Bill Doctrine provides that "an enrolled act,[2] . . . attested by the signatures of the presiding officers of the two houses of congress, and the approval

---

[2] "[A] bill [that] is signed by the leaders of the House and Senate, signed by the

of the president, is conclusive evidence that it was passed by congress, ***according to the forms of the constitution***." *Marshall Field & Co.* v. *Clark*, 143 U.S. 649, 673 (1892) (emphasis added). There is no dispute that the Act was an enrolled bill (ROA.1294-1295), which should end any further judicial review of the manner by which the Act was passed. As the Supreme Court explains:

> [W]hen a bill, thus attested [as sanctioned by Congress], receives [the president's] approval, and is deposited in the public archives, its authentication as a bill that has passed congress should be deemed ***complete and unimpeachable***. . . . . The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed congress, all bills authenticated in the manner stated. . . .

*Marshall Field*, 143 U.S. at 672.

The District Court, however, erroneously determined that this case was outside the scope of the Enrolled Bill Doctrine, finding that the doctrine only "shields from judicial inquiry ***non-constitutional*** . . . disputes over Congress's passage of a bill" and that this case presents a "constitutional challenge." ROA.1342-1343 (emphasis added)*; see also* ROA.1343 (holding that where "a plaintiff's challenge to a congressional act" implicates a constitutional provision, "the enrolled bill doctrine 'does not apply'").

---

President, and filed by the Secretary of State . . . is considered enrolled and conclusively proven to have been passed by Congress." ROA.1342.

In so holding, the District Court relied heavily on a single sentence in a footnote in *United States* v. *Munoz-Flores* that reads: "Where, as here, a constitutional provision *is* implicated, [*Marshall Field*] does not apply."  495 U.S. 385, 391 n.4 (1990) (emphasis in original).  Significantly, the District Court omitted the immediately-preceding sentence from *Munoz-Florez*, which recognizes that:  "***In the absence of any constitutional requirement binding Congress***, . . . '[t]he respect due to coequal and independent departments' demands that the courts accept as passed all bills authenticated in the manner provided by Congress.'"  *Id.* (citations omitted).

Such is the case here.  The only constitutional requirement at issue, as explained in more detail in Section II, *infra*, is the requirement of "a Majority" to obtain a "Quorum to do Business."  The District Court's holding, however, improperly reads a second requirement into the Constitution—that only members "physically present" may be counted towards determining the existence of a Quorum.  Such a requirement simply does not exist; in fact, the Constitution is silent as to how a Majority may be determined or counted.  In the absence of a specific "constitutional requirement binding on Congress" as to how to determine a Quorum, a court must respect the judgment of Congress that a Quorum existed and "accept [the Act] as passed."  *Id.*

Moreover, the District Court's broad pronouncement that constitutional challenges are outside the scope of the Enrolled Bill Doctrine misreads *Marshall Field*. *Marshall Field* itself implicated a constitutional provision. At issue was Article 1, Section 5 of the Constitution, which "expressly requires" that "certain matters . . . shall be entered on the journal" that each house is required by the Constitution to maintain. *Marshall Field*, 143 U.S. at 671. But, as *Marshall Field* further confirms, there are certain issues on which the Constitution is silent that are "left to the discretion of the respective houses of Congress." 143 U.S. at 671. The manner in which a Majority may be counted to establish a Quorum is one such issue on which the Constitution is silent and is thus left to the discretion of the House to determine pursuant to its broad rulemaking authority.

As summarized by the District Court, (i) "[i]f the House determined that it had a quorum;" and (ii) "its rule is valid," then (iii) "the quorum challenge ends." ROA.1354. However, the District Court erred in finding that the manner in which the House may determine a Quorum is dictated by the Constitution. It is not. Here, (i) the House determined it had a Quorum;[3] (ii) the relevant rule—on an issue on which the Constitution is silent and that is well within Congress's rulemaking authority—is valid; and thus, (iii) this quorum challenge should end.

---

[3] 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022) (THE SPEAKER pro tempore: "The Chair would simply note again that under the rules of the House, a quorum was, indeed, present." Mr. Roy: "Mr. Speaker, withdrawn. No objection.").

*Ballin* confirms this outcome. In *Ballin*, the Supreme Court considered a quorum challenge, namely whether only those members who had voted on a question should be counted towards determining the presence of a Majority to establish a Quorum. 144 U.S. at 5. The Supreme Court found that the Constitution "has prescribed no method of making [the] determination" as to how the "presence of a majority [should be] determined," and that "it is therefore within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact." *Id.* at 6. Accordingly, in *Ballin*, the Supreme Court upheld a House rule that stated that members who did not vote, but were present in the hall of the house, would be counted towards determining a Quorum. That rule, like the proxy rules at issue here, merely "prescribe[d] a method for ascertaining the presence of a majority, and thus establis[ed] the fact that the house is in a condition to transact business." *Id.* And where, as here, "no constitutional method [is] prescribed, and [there is] no constitutional inhibition" in the method chosen by the House, this issue is well within Congress's rulemaking authority. *Id.*

In short, the House determined that a Quorum to do Business existed. Pursuant to the Enrolled Bill Doctrine, this Court should accept Congress's determination, and accept the Act as passed.

**2.** **The Political Question Doctrine Also Precludes Review of the House's Rule Permitting Proxy Votes to Count in Determining a Quorum**

Under the Political Question Doctrine, where a controversy is said to present a nonjusticiable "political question," it is "beyond the courts' jurisdiction." *Rucho* v. *Common Cause*, 588 U.S. 684 (2019); *Baker* v. *Carr*, 369 U.S. 186, 210 (1962). The Supreme Court defined a political question in *Baker* v. *Carr* by providing six factors (the "*Baker* factors") that are "[p]rominent on the surface of any case held to involve a political question":

> [1] [A] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.

The Supreme Court has applied the *Baker* factors to find that a variety of controversies are nonjusticiable political questions. *See, e.g.*, *Rucho*, 588 U.S. at 718 (holding that claims of excessive partisanship in districting are nonjusticiable because "[f]ederal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution [*Baker* factor 1], and no legal standards to limit and direct their decisions [*Baker*

factor 2]"); *Nixon* v. *United States*, 506 U.S. 224, 229-236 (1993) (declining to adjudicate whether a particular Senate Rule[4] violates the Impeachment Trial Clause (Art. I, § 3, cl. 6) because the text of that Clause grants the Senate the sole power to try all impeachments (satisfying *Baker* factor 1), and allowing judicial review would introduce "the lack of finality and the difficulty of fashioning relief" (satisfying *Baker* factor 2)); *Gilligan* v. *Morgan*, 413 U.S. 1, 6-10 (1973) (declining to review the conduct of the Ohio National Guard after its soldiers fired upon student protestors at Kent State University because Art. I, § 8, cl. 16 expressly vests this power in Congress, satisfying *Baker* factor 1).

This case presents a similar nonjusticiable political question under at least three of the *Baker* factors. First, this case seeks to overturn an exercise of Congress's authority to set the rules of its own proceedings. As explained above, there is "a textually demonstrable constitutional commitment of [this] issue to [Congress]," thus satisfying *Baker* factor 1. *See Baker*, 369 U.S. at 217. The Rulemaking Clause expressly gives Congress the sole power to set the rules of its proceedings, and the Quorum Clause requires "a Majority" "to do Business," but is silent on any method for calculating that Majority.

---

[4] The Senate Rule at issue, Senate Rule XI, allowed a committee of Senators to hear evidence against an individual who has been impeached and to report that evidence to the full Senate.

The District Court rejected the argument that the Rulemaking and Quorum Clauses together are a textually demonstrable constitutional commitment of the instant issue to Congress's authority. *See* ROA.1360. The District Court primarily focused on the Quorum Clause, which it characterized as a "limit" on Congress's power, observing that "nothing in the Quorum Clause denotes that the House or Senate has the power to define a quorum." ROA.1359-60. This misses the point. No one disputes that the Constitution itself defines a Quorum as "a Majority." But the procedural rules at issue here do not purport to change the Majority requirement. Rather, they simply seek to provide a means for counting a Majority. On this issue, the Constitution is silent. *See Ballin*, 144 U.S. at 6.

With no express constitutional requirement on the issue, resolving this case necessarily requires a policy determination, implicating *Baker* factors 2 and 3. Specifically, there are no "judicially discoverable and manageable standards for resolving" how Congress can and should determine when a Majority is present; to even attempt to do so, this Court would be required to make "an initial policy determination of a kind clearly for nonjudicial discretion." *See Baker*, 369 U.S. at 217. At its core, this case is one in which the trier of fact is being "tasked with determining whether proxy participation is good or bad policy." ROA.1365. This policy issue is a nonjusticiable political question reserved for the judgment and

discretion of Congress.  Accordingly, this Court should defer to the judgment of Congress and dismiss this challenge.

### C.    The Consequences of Interfering With Congress's Authority To Set Its Own Rules Would Be Substantial

Each congressional session, the House exercises its rulemaking authority by considering and voting on the rules that will govern its proceedings for that session. *See, e.g.*, H.Res.5, 118th Cong. (2023).  House Resolution 965 was first passed by the vote of a majority of representatives on May 15, 2020.  H.Res.965, 116th Cong. (2020).   It was adopted again by the 117th Congress on January 4, 2021.  H.Res.8 § 3(s), 117th Cong. (2021).  Throughout the 117th Congress, representatives were on notice of, and took actions in reliance on, these then-operative and agreed-upon rules.

As required by the proxy voting rule, each member voting by proxy was required to proactively participate in the vote by (i) designating another member as a proxy in a signed letter to the clerk; and (ii) providing "an exact instruction" to the proxy, prior to the vote, as to how the designated proxy should exercise the vote of the member.  H.Res.965, § 3(c).  These voting instructions were required to be provided in writing and "[i]f the text of [the relevant] measure change[d] after such instruction [was] received, the Member serving as a proxy" was not permitted to "cast a vote for the Member voting by proxy until new instruction is received." *See*

Voting by Proxy Regulations Pursuant to House Resolution 8, House of Representatives Committee on Rules (2020).

The proxy voting rule (H.Res.965, § 3(b)) also made crystal clear that all votes cast by proxy would be counted in determining the presence of a quorum:

> Any Member whose vote is cast or whose presence is recorded by a designated proxy under this resolution shall be counted for the purpose of establishing a quorum under the rules of the House.

In voting on the Act during the 117th Congress, a majority of House representatives actively participated in the vote, consistent with the requirements of H.Res.965. In fact, 226 House members voted on the Act using the proxy procedures, including 135 Democrats and 91 Republicans. 168 Cong. Rec. H10528-529 (daily ed. Dec. 23, 2022). These members did not assign away their right to vote; they actively participated in the vote—sometimes using the proxy procedures to change their vote in real-time. For example, Democratic Representative Alexandria Ocasio-Cortes changed her vote on the Act from "yea" to "nay" using the proxy procedures; Republican Representative Harold Rogers also changed his vote in real-time from "nay" to "yea" using the proxy procedures.[5] There has been no suggestion by anyone that the prescribed procedures of House Resolution 965 were not followed. There have been no allegations of error, fraud, or other similar

---

[5] *See* 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).

issues in its implementation.  Yet, this case seeks to invalidate the votes of all 226 members who voted in accordance with the then-in-force proxy voting rules.  No member, or their constituents, should be disenfranchised in this manner.  All of their votes should count.

Furthermore, the implications of limiting or voiding after-the-fact Congress's authority to determine the rules of its proceedings go beyond this case.  Reading an "in person" requirement into the Quorum Clause (notwithstanding its silence on the issue) could, in future times of crisis, jeopardize national security, threaten the safety of members of Congress, and potentially immobilize the legislative branch.[6]  This cannot be the meaning of the Quorum Clause.  In such times of crisis, Congress must be able to exercise its legislative powers and to set the procedural rules that will best enable it to do so.

---

[6] This concern over the possible incapacitation of the legislative branch in times of national emergency is what prompted the "provisional quorum rule" following the terrorist attacks of September 11, 2001.  This rule, which remains in place today, is discussed in further detail in Section II, *infra*.

## II. THERE IS NO "PHYSICAL PRESENCE" REQUIREMENT IN THE QUORUM CLAUSE

### A. The Text of the Quorum Clause Does Not Require Physical Presence

When evaluating constitutional questions, courts first look to the "text of the Constitution." *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 423 (2021).  The text of the Quorum Clause reads:

> Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and ***a Majority of each shall constitute a Quorum to do Business***; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

U.S. Const. art. I, § 5, cl. 1 (emphasis added).

On its face, the Quorum Clause specifies the requisite number of congressional members (*i.e.,* a "Majority") needed "to do Business."  The text of the Quorum Clause, however, does not state that the Majority needed for a Quorum must be physically present.  In fact, the Quorum Clause is silent on the issue.

Historical dictionaries from the time when the Constitution was written support the finding that the Quorum Clause does not require that the "Majority" be physically present to constitute a "Quorum."  *See Abbott* v. *Biden*, 70 F.4th 817, 829-831 (5th Cir. 2023) (demonstrating that courts look to contemporaneous dictionary definitions in interpreting the text of the Constitution).  In 1785, "quorum" was defined as "[a] bench of justices; such a ***number*** of any officers as is sufficient

to do business." *See* 2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) (emphasis added). This contemporaneous definition of "quorum" addresses the **number** required for a quorum, not where the members of the quorum must be located or whether the members must be physically present to qualify as a quorum. This 1785 definition is consistent with the text of the Quorum Clause, which also explicitly quantifies the requisite number for a quorum (*i.e.*, a Majority) and is silent on where the members of the Quorum must be located or whether they must be physically present.

As is clear from the plain text of the Constitution and the meaning of "quorum" at the relevant time, the important issue for the Framers was the number of members who should participate in the legislative process, not the location of the members. The District Court, however, read a "physical presence" requirement into the text of the Quorum Clause. *See, e.g.*, ROA.1373. Such a reading is not only inconsistent with the plain text of the Clause, but also contrary to the understanding of the definition of the term "quorum" at the time. Indeed, the fact that the District Court repeatedly used the word "physical" to modify "presence" (*see, e.g.*, ROA.1285, ROA.1290, ROA.1370-1371, ROA.1374, ROA.1379-1380, ROA.1382, ROA.1385, ROA.1387, ROA.1389, ROA.1391) confirms that "presence" itself can be achieved in multiple ways.

Further, at the time of the founding of the Constitution, the authors of the Constitution were well aware of the practice of proxy voting, as acknowledged by the District Court. *See* ROA.1376, ROA.1379-1380. The fact that the Founders were aware of the practice, and yet did not forbid it or otherwise include an express "physical presence" requirement in the Quorum Clause confirms that the plain text of the clause does not restrict Congress as to the manner in which a Quorum can be reached. Adopting the same reasoning the Supreme Court expressed in *Noel Canning*, one could frame the issue as follows:

> The question is not: Did the Founders at the time think about [proxy voting]? Perhaps they did not. The question is: Did the Founders intend to restrict the scope of the [Quorum] Clause to the form of congressional [practice] then prevalent, or did they intend a broader scope permitting the Clause to apply, where appropriate, to somewhat changed circumstances? The Founders knew they were writing a document designed to apply to ever-changing circumstances over centuries.

*Noel Canning*, 573 U.S. at 533-34.

It is also instructive to look to the text of other sections of the Constitution to understand the meaning of the Quorum Clause. For example, Art. I, § 4 of the Constitution states that Congress shall ***assemble*** at least once every year …") (emphasis added). The historical definition of "assemble" is "to bring together into one place." *See* 1 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785). The word "assemble" is notably absent from the Quorum Clause. If the Founders wanted to limit the "Quorum" to only a "Majority" of physically present

members, the Founders could have stated so explicitly by using the word "assemble." The Framers knew how to communicate a physical presence requirement in other constitutional provisions. The Framers' choice not to use the word "assemble" (or other similar term) in the Quorum Clause indicates that there is no physical presence requirement in the Quorum Clause.

The other language surrounding the Quorum Clause is also instructive. The District Court, and the Appellee emphasized the language immediately following the Quorum Clause, which states that Congress can "compel the attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1. The District Court found "that this provision would serve no purpose if the Quorum Clause lacked a physical-presence requirement." ROA.1373. In so holding, the District Court seems to suggest that the phrase "compel the attendance of absent Members" *must* mean to compel the physical presence of absent Members. Such a reading, however, would render the phrase "in such Manner" meaningless. It is far more reasonable to read the Quorum Clause to require a "Majority" of participating members and to read the second part of the Quorum Clause to mean that Congress can compel the participation of non-participating members "in such Manner . . . as each House may provide."

The Founders could have expressly required physical presence in the text of the Quorum Clause. They did not do so. As the Supreme Court instructs in *Noel*

*Canning*:  "[T]he linguistic question here is not whether the phrase can be, but whether it must be, read more narrowly."  *Noel Canning*, 573 U.S. at 540.   Nothing in the text of the Quorum Clause suggests that it must be read more narrowly to require physical presence.  This Court should overrule the District Court's reading otherwise.

### B.    The Original Public Meaning of the Quorum Clause Confirms That Physical Presence Is Not Required

The original public meaning of the Quorum Clause, like its text and contemporaneous dictionary definitions, points to a numerical, not physical location requirement for Congress.  In interpreting the Constitution, courts are "guided by the principle that '[it] was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia* v. *Heller,* 554 U.S. 570, 576 (2008) (quoting *United States* v. *Sprague*, 282 U.S. 716, 731 (1931)).  The goal, in other words, is to determine the "original public meaning of the Constitution's text."  *Abbott*, 70 F. 4th at 829 (citation omitted).

The debate surrounding the Quorum Clause at the founding of the Constitution centered around setting the number of members, such as a majority versus a super majority, that should be required to constitute a Quorum.  The Founders did not debate whether the number of members required to constitute a Quorum must be present in person or in one location.

For example, in *Federalist No. 58*, James Madison addressed the argument that "more than a majority ought to have been required for a quorum." *See* James Madison, *Federalist* No. 58 (1788). He acknowledged that while there may be some advantages to requiring a supermajority, there are more disadvantages, like the danger that "[i]t would be no longer the majority that would rule: the power would be transferred to the minority." *Id.*

Throughout the letters and debates contained within the *Debates in Several State Conventions of the Adoption of the Federal Constitution in 1787*,[7] the Framers used "quorum" in the same way they used "majority"—to connote the number of members, not the physical location of the members, that would make up a quorum. *See, e.g.*, *Letter Containing the Reasons of the Hon. Elbridge Gerry, Esq. For Not Signing the Federal Constitution (Oct. 10, 1787)* ("with the advice of two thirds of a quorum of the Senate."); *Letter of His Excellency, Edmund Randolph, Esq. on the Federal Constitution; Addressed to the Honorable the Speaker of the House of Delegates, Virginia* ("A quorum of eleven states"); Address of Luther Martin (1788)

---

[7] The Debates in the Several State Conventions on the Adoption of the Federal Constitution, Vol. 1, 2d ed., Ed. Jonathan Elliot. (1836), 5 vols. https://oll.libertyfund.org/titles/elliot-the-debates-in-the-several-state-conventions-vol-1.

("number of delegates would be seventy-one, thirty-six of which would be a quorum to do business.").[8]

The Framers used "quorum" repeatedly to describe quantity of requisite members, not the location of those members.

### C. Congress's Historical Practice of Exercising Its Rulemaking Authority Confirms There Is No Physical Presence Requirement In the Quorum Clause

The Supreme Court "has treated practice as an important interpretative factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Noel Canning*, 573 U.S. at 525. *See also Moore* v. *Harper*, 600 U.S. 1, 32 (2023) (citations and quotes omitted) ("We have long looked to settled and established practice to interpret the Constitution.").

On numerous occasions throughout history, Congress has exercised its rulemaking authority to adjust the manner in which it conducts business, including in times of crisis or national emergency. This has ranged from the suspension of a Quorum through the practice of unanimous consent, to changes in the method of calculating a "Majority" to account for the succession of Confederate states during the Civil War to, most recently, allowing proxy voting during the global COVID-19

---

[8] *Id.*

pandemic. Two hundred years of historical practice confirms that there is no physical presence requirement in the Quorum Clause:

***Voice Voting.*** Voice voting is a well-accepted congressional procedure,[9] which allows Business to be conducted even in the absence of an in-person Majority. When a vote is conducted through voice voting, "[t]he chair instructs those who favor the question to call out 'aye,' and then those who oppose it to call out 'no;' the chair then announces which side has won the vote and whether the bill has passed.[10] A physical majority is not confirmed and "[i]n practice, such votes might be taken with few Members present on the floor."[11]

***Unanimous Consent.*** Much of the Business of Congress is achieved through unanimous consent—a practice that presumes the continued existence of a Quorum after one is initially established when members are first sworn in. *See Noel Canning*, 573 U.S. at 553 (explaining that the practice "presume[s] that a quorum is present"

---

[9] Congress routinely employs different voting methods, such as voice votes, electronic voting, and roll calls, without challenge. *See generally*, "Voting and Quorum Procedures in the House of Representatives," CRS, (March 20, 2023), https://crsreports.congress.gov/product/pdf/RL/98-988. Each of these voting methods was developed by Congress; they are not specifically authorized by or even mentioned in the Constitution. It is without question that the establishment and use of these methods is well within Congress's rulemaking authority.

[10] *Id.* at 3; "House Voting Procedures: Forms and Requirements," CRS, at 1-2 (Feb. 3, 2023), https://crsreports.congress.gov/product/pdf/RS/98-228.

[11] CRS, at 2 (March 20, 2023), https://crsreports.congress.gov/product/pdf/RL/98-988.

unless a present congressional member challenges that presumption). The presumption of a Quorum is accepted even in instances where it is apparent that a Majority is not physically present.[12] Not only is this practice well-accepted in Congress,[13] the Supreme Court acknowledged the practice with approval in *Noel-Canning*. *Noel Canning*, 573 U.S. at 553.

**Civil War Rule Changes.** During the Civil War, Congress changed how it determined the presence of a Majority in order to conduct Business without acknowledging the secession of the Confederacy. Up to this point, a Quorum was considered "to be a majority of all authorized seats, whether or not those seats happened to be filled," thus including the seats of members from Confederate states.[14] In the House, this issue of maintaining a Quorum was resolved when it was

---

[12] *See, e.g.*, *No Quorum in the House: Unanimous Consent Necessary to Take a Vote*, N.Y. TIMES, Aug. 5, 1882, https://timesmachine.nytimes.com/timesmachine/1882/08/06/102921928.pdf?pdf_redirect=true&ip=0 ("There are not more than 130 members of the House in the city, and it is absolutely impossible for them to transact any business except by unanimous consent.")

[13] In the 115th Congress, 10% "of all measures that received floor action were initially considered" under unanimous consent. Jane A. Hudiburg, "Suspension of the Rules: House Practice in the 115th Congress (2017-2018)," CRS, at 3 (May 19, 2020), https://crsreports.congress.gov/product/pdf/R/R46364.

[14] "The Civil War: The Senate's Story," U.S. Senate, https://www.senate.gov/artandhistory/history/common/generic/Civil_War_Quorum Debate.htm (last accessed: July 21, 2024); *see* Cong. Globe, 37th Cong., 1st Sess. 210 (1861) https://www.congress.gov/congressional-globe/congress-37-session-1.pdf. ("Cong. Globe, 37th").

raised as a point of order that "there [was] no quorum" during a vote on relocating the Naval Academy. Cong. Globe, 37th, at 210. The Speaker, reading together Art. I, sec. 5 and sec. 2 ("The House of Representatives shall be composed of members chosen every second year by the people of the several States."), determined that a Majority existed based on the total of members *chosen* as representatives, not the total possible members had all states sent the maximum number of representatives to which they were entitled. *Id.* While this change was rooted in the Constitution, it was a departure from practice to that point that allowed Congress to function when it would otherwise have been incapacitated by crisis.

**The Reed Rules of 1890.** During the 51st Congress, Speaker Thomas Brackett Reed changed the means of determining a Majority by counting the members *present*, instead of the members *voting*. Previously, it had been Congress's practice to allow present members to refuse to vote, thus creating a "disappearing quorum."[15] This changed in the House in 1890 when Speaker Reed declared after a vote that the clerk should also count "members present and refusing to vote," leading to vigorous dissent and debate from those "disappearing" members.[16] Reed argued in part that

---

[15] "The Most Important Politician You've Never Heard Of," NPR, (May 29, 2011) https://www.npr.org/2011/05/29/136689237/the-most-important-politician-youve-never-heard-of; *see* "Quorum Busting," U.S. Senate, https://www.senate.gov/about/powers-procedures/rules-procedures/quorum-busting.htm (last accessed: July 21, 2024).

[16] Cong. Record, 51st Cong., 1st Sess. Jan. 29, 1890 Vol. 21 Part 1 – Bound Ed.,

some state legislatures had made similar changes and that, "[i]f members can be present and refuse to exercise their function, to wit, not be counted as a quorum, that provision [allowing members to be compelled to attend] would seem to be entirely nugatory." *Id*. at 950. Notably, this rule change gave rise to the *Ballin* case, discussed above, where the Supreme Court allowed the rule to stand. *See Ballin*, 144 U.S. at 11.

*2005 Provisional Quorum Rule.* This rule, which remains part of the House's Rules today as Rule XX, clause 5, was enacted to allow the House to conduct business should a catastrophe prevent the House from determining exactly how many members are currently "elected, sworn, and living."[17] This rule provides a method for determining a provisional Quorum to be used until the number of members may be ascertained.[18]

*Yellow Fever Epidemic.* Following Congress's return after the yellow fever epidemic that devastated the then-capital of Philadelphia in the summer of 1793,[19]

---

949 (1890) https://www.congress.gov/bound-congressional-record/1890/01/29/house-section.

[17] "Voting and Quorum Procedures in the House of Representatives," CRS, at 13 (Updated March 20, 2023), https://crsreports.congress.gov/product/pdf/RL/98-988.

[18] *Id*.

[19] Hilarie M. Hicks, "Executive Power in an Epidemic," MONTPELIER, (Mar. 31, 2020), https://www.montpelier.org/executive-power-in-an-epidemic/.

Congress adopted a law providing that in circumstances when "the prevalence of contagious sickness" made it "be hazardous to the lives or health of the members to meet at the seat of Government," the President could "convene Congress at such other place as he may judge proper." *See* R.S. § 34, Act of Apr. 3, 1794, c. 17, 1 Stat. 353, codified at 2 U.S.C. § 27.

### D. The Proxy Voting Rule Furthers the Purpose Behind the Quorum Clause

Proxy voting advances the purpose of the Quorum Clause. In interpreting a constitutional provision, courts also look to the underlying purpose of the provision. *See, e.g.*, *Noel Canning*, 573 U.S. at 541 (adopting the "broader construction" of a constitutional provision where it was the "only construction of the constitution which is compatible with its spirit, reason, and purposes; while, at the same time, it offers no violence to its language") (citation omitted).

It is undisputed that the underlying purpose of the Quorum Clause is to prevent a congressional minority from dictating legislation. *See* ROA.1283 (holding that the Quorum Clause "prevents a minority of members from passing legislation that affects the entire nation"); *see also* James Madison, *Federalist No. 58*, (1788) (observing that without a quorum requirement, "[i]t would no longer be the majority that would rule: the power would be transferred to the minority").

Yet, accepting the District Court's interpretation of the Quorum Clause would do just that. The ***majority*** of the House passed the Act. Invalidating the votes of the

226 House members who voted on the Act by proxy, including the 137 members who voted in favor of the Act,[20] would mean that the ***minority*** who voted against the Act would now prevail—years after the fact. This cannot be the correct interpretation of the Quorum Clause. The Court should adopt a broader interpretation that is "more consistent with the Constitution's 'reason and spirit.'" *Noel Canning*, 573 U.S. at 542 (adopting broader constitutional interpretation where "narrower interpretation risks undermining constitutionality conferred powers more seriously and more often"). The Court should adopt the interpretation that allows all congressional members' votes and voices to be recognized.

## <u>CONCLUSION</u>

For the foregoing reasons, *Amici* respectfully request that this Court reverse the District Court's decision.

---

[20] 168 Cong. Rec. H10528-529 (daily ed. Dec. 23, 2022).

Dated: August 16, 2024

Respectfully submitted,

/s/ Tammy Lynn Roy
Tammy Lynn Roy
Colleen Tracy James
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, NY 10005
(212) 701-3000
troy@cahill.com
ctracyjames@cahill.com

*Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed on this date with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users such that service will be accomplished by the appellate CM/ECF system.

Dated: August 16, 2024

/s/ Tammy Lynn Roy
Tammy Lynn Roy

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limitation of 5th Cir. R. 32.3, Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains **6,437** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

Dated: August 16, 2024

/s/ Tammy Lynn Roy
Tammy Lynn Roy