No. 24-10386

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STATE OF TEXAS,

*Plaintiff-Appellee,*

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas

BRIEF FOR *AMICI CURIAE*
MARCH OF DIMES & A BETTER BALANCE
IN SUPPORT OF DEFENDANTS-APPELLANTS

Dana V. Bolger
Katherine A. Greenberg
Elizabeth Gedmark
A BETTER BALANCE
250 West 55th Street
17th Floor
New York, NY 10019
Phone: (516) 614-3255
dbolger@abetterbalance.org
*Counsel for Amici Curiae*

# SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Amici Curiae**
A Better Balance
March of Dimes

**Counsel for Amici Curiae**
Dana V. Bolger
Katherine A. Greenberg
Elizabeth Gedmark
A Better Balance

Pursuant to Fed. R. App. P. 26.1, *Amici* A Better Balance and March of Dimes are non-profit organizations with no parent corporation, and no publicly held corporation holds an ownership interest of 10% or more in either *Amicus*.

August 16, 2024

/s/ Dana V. Bolger
Dana V. Bolger
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES......** i

**TABLE OF AUTHORITIES** ................................................................. iii

**INTERESTS OF *AMICI CURIAE*** ....................................................... 1

**SUMMARY OF ARGUMENT** ................................................................ 3

**ARGUMENT** ............................................................................................... 5

    I.   Congress Passed the Pregnant Workers Fairness Act to Protect the Health and Financial Security of Pregnant Employees and Their Families. ................................................................................................ 5

       A.    The PWFA Fills a Dire Gap in Existing Federal Laws. ........... 5

       B.    The PWFA Is Essential to Protect the Health of Employees and Their Pregnancies. .................................................................. 10

       C.    The PWFA Safeguards the Financial Security of Families and the Public Fisc. ................................................................................ 18

    II.    The PWFA Is a Broadly Popular Law that Received Widespread Support Across the Ideological Spectrum. ........................................... 26

       A.    The PWFA Received Bipartisan Support in Congress. ........... 26

       B.    Maternal and Infant Health Organizations Fought for the PWFA. ............................................................................................... 27

       C.    The Business Community Championed the PWFA. .............. 28

       D.    Faith Groups Supported the PWFA. ...................................... 30

**CONCLUSION** ........................................................................................ 32

**CERTIFICATE OF SERVICE** ............................................................. 34

**CERTIFICATE OF COMPLIANCE** .................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Aria Health*, No. 17-1827, 2019 WL 1745653 (E.D. Pa. Apr. 17, 2019)................................................................................ 7

*Tomiwa v. PharMEDium Servs., LLC*, No. 4:16-CV-3229, 2018 WL 1898458 (S.D. Tex. Apr. 20, 2018) ........................................ 7

*Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480 (D. Md. 2013)................................................................................. 7

*Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015) ......................... 6

**Statutes**

42 U.S.C. § 12101.............................................................................. 6

42 U.S.C. § 2000e(k)......................................................................... 6

42 U.S.C. § 2000gg...................................................................... 5, 10

42 U.S.C. § 2000gg-1........................................................................ 9

**Legislative Materials**

166 Cong. Rec. H4516–17 (daily ed. Sept. 17, 2020) ...................... 29, 30

168 Cong. Rec. S10071 (daily ed. Dec. 22, 2022) ........................... 18, 26

168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022)..................................... 26

April J. Anderson, Cong. Rsch. Serv., R46821, Pregnancy & Labor: An Overview of Federal Laws Protecting Pregnant Workers (2023), https://crsreports.congress.gov/product/pdf/R/R46821 ....... 7, 10

*Economic Security for Working Women: Briefing Before the S. Comm. on Health, Educ., Labor & Pensions*, 113th Cong. (2014) ....................... 24

*Fighting for Fairness: Examining Legislation to Confront Workforce Discrimination (H.R. 1065): Hearing Before the Subcomms. on Civil & Human Servs. & Workforce Protections of the H. Comm. on Educ. & Lab.*, 117th Cong. (2021)............................................................. 7, 21

H.R. Rep. No. 117–27 (2021) ......................................................... 9, 23

*Long Over Due: Exploring the Pregnant Workers' Fairness Act (H.R. 2694): Hearing Before the Subcomm. on Civil Rights & Human Servs.*, 116th Cong. (2019) ..................................................................passim

## Other Authorities

A Better Balance, Comment Letter on Proposed PWFA Reguls. (Oct. 10, 2023), https://www.regulations.gov/comment/EEOC-2023-0004-98298 .............................................................................................17, 18, 33

A BETTER BALANCE, PREGNANT & JOBLESS (Oct. 2015), https://www.abetterbalance.org/wp-content/uploads/2017/01/PregnantandJobless.pdf ............................... 8

*A Profile of Prematurity in United States*, MARCH OF DIMES, https://www.marchofdimes.org/peristats/reports/united-states/prematurity-profile ................................................................. 14

Alejandra Ros Pilarz, Jessica Pac & Anna K. Walther, *The Effects of State Workplace Pregnancy Accommodation Laws on Women's Employment & Income During Pregnancy* (forthcoming 2024).......... 25

Am. C. Obstetricians & Gynecologists, *ACOG Committee Opinion 733: Employment Considerations During Pregnancy & the Postpartum Period*, 131 OBSTETRICS & GYNECOLOGY 115 (Apr. 2018), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2018/04/employment-considerations-during-pregnancy-and-the-postpartum-period.............................................. 13

*America Is the Only Rich Country Without a Law on Paid Leave for New Parents*, THE ECONOMIST (July 18, 2019), https://www.economist.com/united-states/2019/07/18/america-is-the-only-rich-country-without-a-law-on-paid-leave-for-new-parents......... 9

Bryce Covert, *The New Law to Protect Pregnant Workers Is Already Changing Lives*, THE NATION (Aug. 14, 2023), https://www.thenation.com/article/society/pregnant-workers-fairness-act-3/............................................................................................ 12, 17

CARLY MCCANN & DONALD TOMASKOVIC-DEVEY, PREGNANCY DISCRIMINATION AT WORK (2021), https://www.umass.edu/employmentequity/pregnancy-discrimination-workplace-1 ..........................................................................8, 9, 10, 19

CHELSEA THOMPSON ET AL., A BETTER BALANCE, PREGNANT & *FINALLY PROTECTED* (2024), https://www.abetterbalance.org/pregnant-and-finally-protected/ ........................................................................... 17, 25

Christina Caron, *A $4 Million NICU Bill: The Price of Prematurity*, N.Y. TIMES (Feb. 11, 2020), https://www.nytimes.com/2020/02/11/parenting/nicu-costs.html ....... 16

Compl. at 2, U.S. Conf. of Cath. Bishops v. EEOC, No. 2:24-cv-691 (W.D. La. May 22, 2024) .................................................... 31

CTR. FOR PUB. JUST., PWFA POL'Y BR. (Oct. 2022), https://cpjustice.org/what-we-do/families-valued/pregnant-workers-fairness-act-pwfa-policy-brief/ ........................................... 32

Cynthia E. Rogers et al., *Late Preterm Birth, Maternal Depression, and Risk of Preschool Psychiatric Disorders*, 52(3) J. AM. ACAD. CHILD & ADOLESCENT PSYCH. 309 (Feb. 4, 2013), https://pubmed.ncbi.nlm.nih.gov/23452687........................................ 15

DINA BAKST ET AL., A BETTER BALANCE, LONG OVERDUE (2019), https://www.abetterbalance.org/long-overdue/ ..................................... 6

DINA BAKST ET AL., A BETTER BALANCE, WINNING THE PREGNANT WORKERS FAIRNESS ACT (2023), https://www.abetterbalance.org/winning-pwfa/............................ 23, 26

Dina Bakst, Opinion, *Pregnant, and Pushed Out of a Job*, N.Y. TIMES (Jan. 30, 2012), https://www.nytimes.com/2012/01/31/opinion/pregnant-and-pushed-out-of-a-job.html ................................................................... 2

Emily Batdorf, *Living Paycheck to Paycheck*, FORBES (Apr. 2, 2024), https://www.forbes.com/advisor/banking/living-paycheck-to-paycheck-statistics-2024/................................................................... 22

Frincy Francis et al., *Ergonomic Stressors Among Pregnant Healthcare Workers*, 21(2) SULTAN QABOOS UNIV. MED. J. 172 (June 21, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8219330/ ................. 13

Iris Wilbur Glick, Opinion, *We Need to Have Stronger Support for Pregnant Workers to Help Strengthen the Economy*, LOUISVILLE COURIER J. (Sept. 14, 2020), https://www.courier-

journal.com/story/opinion/2020/09/14/kentucky-lawmakers-should-vote-yes-pregnant-workers-fairness-act/3467921001/ ........................ 30

JASMINE TUCKER ET AL., NAT'L WOMEN'S L. CTR., PREGNANT WORKERS NEED ACCOMMODATIONS FOR SAFE AND HEALTHY WORKPLACES (2021), https://nwlc.org/wp-content/uploads/2021/11/Pregnant-Workers-by-the-Numbers-2021-v4.pdf ................................................................ 12

Jenny Yang, *Median Cost of C-Section Delivery Without Insurance in the U.S. in 2022*, STATISTA (Feb. 6, 2024), https://www.statista.com/statistics/982494/c-section-delivery-cost-without-insurance-by-us-state/ .......................................................... 22

Jessica Silver-Greenberg & Natalie Kitroeff, *Miscarrying at Work: The Physical Toll of Pregnancy Discrimination*, N.Y. TIMES (Oct. 21, 2018), https://www.nytimes.com/interactive/2018/10/21/business/pregnancy-discrimination-miscarriages.html ........................................5, 6, 11, 31

JOB ACCOMM. NETWORK, COSTS AND BENEFITS OF ACCOMMODATION (2024), https://askjan.org/topics/costs.cfm ................................... 13, 29

Kaylee J. Hackney et al., *Examining the Effects of Perceived Pregnancy Discrimination on Mother and Baby Health*, 106(5) J. APPLIED PSYCH. 774 (July 2, 2020), https://faculty.fiu.edu/~aeaton/wp-content/uploads/2020/07/Hackney-et-al.-2020-Examining-the-Effects-of-Perceived-Pregnancy-Discrimination.pdf ...................................... 15

Letter from Galen Carey, Nat'l Ass'n of Evangelicals, to U.S. Sens. (Dec. 20, 2022), https://www.nae.org/support-pregnant-workers-fairness-act-pwfa/ ............................................................................. 32

Letter from Health Providers in Support of PWFA to U.S. Reps. (Sept. 14, 2020), https://www.abetterbalance.org/resources/letter-from-health-providers-in-support-of-the-pregnant-workers-fairness-act/ .. 27

Letter from Maternal Health Equity Organizations in Support of PWFA, to U.S. Reps. (May 14, 2021), https://www.abetterbalance.org/resources/letter-from-maternal-health-equity-organizations-in-support-of-the-pregnant-workers-fairness-act/ ........................................................................ 27

Letter from New York Faith Leaders to Sen. Charles E. Schumer, https://www.abetterbalance.org/wp-content/uploads/2022/06/NY-Faith-Leaders-PWFA-Letter-Final.pdf ............................................. 32

Letter from U.S. Chamber of Com. et al., to Sen. Patty Murray & Sen. Richard Burr (Aug. 2, 2021), https://www.uschamber.com/workforce/education/coalition-letter-s-1486-the-pregnant-workers-fairness-act ............................................. 29

Letter from U.S. Conf. of Cath. Bishops to Cong. (Aug. 9, 2021), https://www.usccb.org/resources/PWFA_letter.pdf ............................ 30

Letter from Wendy Chavkin, MD, MPH, to James Vacca, N.Y.C. Council Member (Nov. 29, 2012), https://www.abetterbalance.org/resources/chavkin-letter/ ................. 14

Letter of Stacey D. Stewart, President & CEO of March of Dimes, to Sen. Majority Leader Charles E. Schumer (Nov. 16, 2022), https://www.marchofdimes.org/sites/default/files/2022-11/11-16-22_March%20of%20Dimes_PWFA_SDS_FINAL.pdf ......................... 27

LOUISVILLE DEP'T OF PUB. HEALTH & WELLNESS, PREGNANT WORKERS HEALTH IMPACT ASSESSMENT (2019), https://hia.communitycommons.org/cc_resource/pregnant-workers-health-impact-assessment/ ........................................................8, 13, 14

Lyndi Trischler, Opinion, *Don't Make Women Choose Between a Job or Pregnancy*, CINCINNATI ENQUIRER (Mar. 23, 2018), https://www.cincinnati.com/story/opinion/2018/03/23/opinion-dont-make-women-choose-between-job-pregnancy/440077002/ ................. 21

MARCH OF DIMES, 2023 MARCH OF DIMES REPORT CARD, https://www.marchofdimes.org/report-card ....................................... 14

MARCH OF DIMES, LONG-TERM HEALTH EFFECTS OF PRETERM BIRTH (Feb. 2024), https://www.marchofdimes.org/find-support/topics/birth/long-term-health-effects-preterm-birth ..................................................... 15

MARCH OF DIMES, PREMATURE BIRTH: THE FINANCIAL IMPACT ON BUSINESS 1 (2013), https://onprem.marchofdimes.org/materials/premature-birth-the-financial-impact-on-business.pdf ....................................................... 16

MARCH OF DIMES, PREMATURITY PROFILE: UNITED STATES (2022), https://www.marchofdimes.org/peristats/assets/s3/reports/prematurity/PrematurityProfile-UnitedStates.pdf ................................................. 16

MELISSA ALPERT & ALEXANDRA CAWTHORNE, CTR. FOR AM. PROGRESS, LABOR PAINS: IMPROVING EMPLOYMENT & INCOME SECURITY FOR PREGNANT WOMEN & NEW MOTHERS (2009), https://cdn.americanprogress.org/wp-content/uploads/issues/2009/08/pdf/labor_pains.pdf .......................... 10

Mette Juhl et al., *Occupational Lifting During Pregnancy & Risk of Fetal Death in a Large National Cohort Study*, 39(4) SCAND. J. WORK ENVIRO. HEALTH 335 (Dec. 3, 2012), https://pubmed.ncbi.nlm.nih.gov/23207454/ ...................................... 13

Nat'l Assoc. of Evangelicals et al., Comment Letter on Proposed Rule to Implement the PWFA (Oct. 10, 2023), https://www.christianlegalsociety.org/wp-content/uploads/2023/10/Comments-to-EEOC-on-PWFA-NPRM-FINAL-101023.pdf .............................................................. 31

NAT'L P'SHIP FOR WOMEN & FAMILIES, LISTENING TO MOTHERS (2014), https://nationalpartnership.org/wp-content/uploads/2023/02/listening-to-mothers-experiences-of-expecting-and-new-mothers.pdf ............... 11

Natasha Jackson, Opinion, *New Law Will Help Pregnant Women on the Job*, THE POST & COURIER (June 3, 2018), https://www.postandcourier.com/opinion/commentary/new-law-will-help-pregnant-women-on-the-job/article_b8a16aee-5f85-11e8-9cab-735870b0d5ed.html .......................................................... 20

Paul Gabrielsen, *U Economists Tally Societal Cost of Preterm Birth*, @THEU (Nov. 4, 2019), https://attheu.utah.edu/facultystaff/u-economists-tally-societal-cost-of-preterm-birth/ ................................ 16

Paul S. Coakley, Archbishop of Okla. City, Labor Day Statement 2022 (Sept. 5, 2022), https://www.usccb.org/resources/labor-day-statement-2022 .................................................................................... 31

*Pregnant Workers Fairness Act*, MARCH OF DIMES, https://www.marchofdimes.org/our-work/policy-advocacy/pregnant-workers-fairness-act ................................................................ 8

Press Release, March of Dimes, Premature Babies Cost Employers $12.7 Billion Annually (Feb. 7, 2014), https://www.marchofdimes.org/about/news/premature-babies-cost-employers-127-billion-annually ....................................... 15

Press Release, U.S. Chamber of Com., U.S. Chamber Applauds Reintroduction of the Pregnant Workers Fairness Act (Feb. 16, 2021), https://www.uschamber.com/workforce/us-chamber-applauds-reintroduction-of-the-pregnant-workers-fairness-act ......................... 28

PRETERM BIRTH: CAUSES, CONSEQUENCES, AND PREVENTION (Richard E. Behrman & Adrienne Stith Butler eds., 2007) ................................... 16

SARAH JANE GLYNN, CTR. FOR AMERICAN PROGRESS, BREADWINNING MOTHERS CONTINUE TO BE THE U.S. NORM (2019), https://cdn.americanprogress.org/content/uploads/2019/05/12070012/Breadwinners2019-report1.pdf ........................................................... 22

SCOTT BROWN ET AL., LEAVE EXPERIENCES OF LOW-WAGE WORKERS (Nov. 2020), https://www.dol.gov/sites/dolgov/files/OASP/evaluation/pdf/WHD_FMLA_LowWageWorkers_January2021.pdf ............................................ 9

Tasha Murrell, Opinion, *A Paycheck or a Healthy Pregnancy? We Shouldn't Have to Choose*, THE HILL (Dec. 17, 2021), https://thehill.com/blogs/congress-blog/labor/586269-a-paycheck-or-a-healthy-pregnancy-we-shouldnt-have-to-choose/ ......................... 11, 12

*The Women Who Inspired the Movement for the Pregnant Workers Fairness Act*, A BETTER BALANCE, https://www.abetterbalance.org/pregnant-worker-stories/ ......20, 21, 24

U.S. Conf. of Cath. Bishops & Catholic Univ. of Am., Comment Letter on Reguls. to Implement PWFA (Sept. 27, 2023), https://www.usccb.org/sites/default/files/about/general-counsel/rulemaking/upload/2023.USCCB_.CUA_.comments.PWFA_.regulations.pdf ..................................................................................... 31

Yuko Kachi et al., *The Effects of Pregnancy Discrimination on Postpartum Depressive Symptoms*, 22 BMC PREGNANCY & CHILDBIRTH 1 (Nov. 8, 2022), https://link.springer.com/article/10.1186/s12884-022-05148-2 ................................................................................................ 14

## INTERESTS OF *AMICI CURIAE*

*Amici curiae*[1] are non-profit, non-partisan organizations that serve and advocate for the wellbeing of pregnant employees, babies, and families, in Texas and across the country. *Amici* championed passage of the Pregnant Workers Fairness Act ("PWFA") to ensure that all pregnant employees could access the reasonable workplace accommodations they needed to be able to continue working, bringing home a paycheck, and putting food on the table for their families, without harming their health or the health of their pregnancies.

**March of Dimes** ("MOD") is the nonprofit organization leading the fight for the health of all moms and babies. MOD aims to end preventable maternal and infant death, preterm birth, and maternal health complications. For over 85 years, MOD has carried out its mission through research, community service, education, and advocacy, benefitting families across the country, including in Texas.

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or any person other than *Amici* or their counsel contributed money toward this brief. All parties consented to the filing of this brief.

**A Better Balance** ("ABB") is a national nonprofit legal services organization dedicated to ensuring that pregnant, lactating, and postpartum employees can care for themselves and their families without jeopardizing their financial security. To that end, ABB launched and led the decade-long movement to pass the PWFA, drawing the nation's attention to the need for the law,[2] collaborating with lawmakers and a diverse range of stakeholders to draft and refine the statutory text, and testifying repeatedly before Congress. ABB also runs a free, national legal services helpline, through which it has heard from thousands of pregnant and postpartum employees, including scores of Texas workers, about their experiences prior to—and after—passage of the PFWA. This direct access to pregnant workers has illuminated for ABB not only the PWFA's vital impact safeguarding maternal, infant, and financial health but also the consequences, some deadly, of regressing to a pre-PWFA world.

---

[2] Dina Bakst, Opinion, *Pregnant, and Pushed Out of a Job*, N.Y. TIMES (Jan. 30, 2012), https://www.nytimes.com/2012/01/31/opinion/pregnant-and-pushed-out-of-a-job.html.

## SUMMARY OF ARGUMENT

The Pregnant Workers Fairness Act ("PWFA") is a widely popular, overwhelmingly bipartisan law that, in the year since it went into effect, has kept pregnancies healthy, mothers alive, families afloat, and the economy strong. It has done so through a measured, practical approach: It requires employers to provide reasonable accommodations such as a stool or access to water, absent undue hardship, to pregnant and recently postpartum employees, so they can remain in the workforce without jeopardizing their health or the health of their pregnancies. A unicorn piece of legislation, the PWFA was championed by an unlikely coalition of allies, including legislators on both sides of the aisle, maternal and infant health organizations, the U.S. Chamber of Commerce, and the U.S. Conference of Catholic Bishops. The law has been an unparalleled success, benefitting mothers, babies, and families, as well as businesses and the American economy.

The district court's decision disrupted this stable status quo. By enjoining administrative enforcement of the PWFA, the district court gave the State of Texas carte blanche to disregard the accommodation

needs of its own employees, whom the statute requires to administratively exhaust their claims before pursuing relief in court.

*Amici* March of Dimes and A Better Balance write to make clear the serious consequences of affirming the district court decision. *Amici* leave the technicalities of the law's passage to Appellants and other *amici curiae*. Instead, *Amici* (1) describe the dangerous gap in federal protections for pregnant employees prior to the PWFA; (2) explain the grave health and economic need for the PWFA; and (3) highlight the unlikely bedfellows who rallied together to champion its bipartisan passage. *Amici* urge this Court to reverse the district court decision and restore the rights of thousands of Texans to the reasonable accommodations they need to protect their health, their pregnancies, and their financial security.

**ARGUMENT**

### I. Congress Passed the Pregnant Workers Fairness Act to Protect the Health and Financial Security of Pregnant Employees and Their Families.

#### A. The PWFA Fills a Dire Gap in Existing Federal Laws.

Before the Pregnant Workers Fairness Act ("PWFA"), 42 U.S.C. §§ 2000gg–2000gg-6, became law, pregnant employees were losing desperately wanted, long dreamed of pregnancies. Erica Hayes, a warehouse worker who imagined the clothes she would buy her baby, lost her pregnancy after hours of heavy lifting. "It was the worst thing I have ever experienced in my life," she recalled. Reyna Garcia, a grocery store employee, lost her pregnancy after working overtime pushing 200-pound carts. "It was the most painful thing I have ever experienced," she said. "My husband and I watched her die."[3]

Erica, Reyna, and countless employees like them had asked for modest accommodations, like temporary reassignment to less physically-dangerous work, that would have allowed them to keep their jobs and

---

[3] Jessica Silver-Greenberg & Natalie Kitroeff, *Miscarrying at Work: The Physical Toll of Pregnancy Discrimination*, N.Y. TIMES (Oct. 21, 2018), https://www.nytimes.com/interactive/2018/10/21/business/pregnancy-discrimination-miscarriages.html.

income without jeopardizing their health and the health of their pregnancies.[4] Their requests were denied—with irreversible consequences.

At the time, employees had no nationwide right to reasonable accommodations to continue working safely during pregnancy. The existing federal laws—the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213—left a dangerous gap in protections. Under the PDA, pregnant employees had no right to accommodations unless they could show their employer had already accommodated non-pregnant comparators "'similar in their ability or inability to work'"[5]—a near-impossible standard for the many employees who lacked comparators.[6] Likewise, under the ADA, pregnant employees had no

_____

[4] *Id.*; *see also* DINA BAKST ET AL., A BETTER BALANCE, LONG OVERDUE 5–6 (2019) [hereinafter LONG OVERDUE], https://www.abetterbalance.org/long-overdue/.
[5] *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015) (quoting 42 U.S.C. § 2000e(k)).
[6] *See* LONG OVERDUE, *supra* note 4, at 9 (documenting how, due to the PDA's comparator standard, "over two-thirds of courts held employers were not obligated to accommodate pregnant workers under the [PDA]"); *Fighting for Fairness: Examining Legislation to Confront Workforce Discrimination (H.R. 1065): Hearing Before the Subcomms. on Civil & Human Servs. & Workforce Protections of the H. Comm. on*

right to accommodations unless their pregnancy-related condition was a "disability," which often excluded even serious life-threatening complications like hyperemesis gravidarum and preeclampsia—let alone routine pregnancy symptoms like morning sickness.[7] As a result, many employees who needed reasonable accommodations for serious pregnancy-related medical needs, common pregnancy symptoms, or preventive care to avoid complications from arising, found they had no legal right to them.[8]

---

*Educ. & Lab.*, 117th Cong. 7 (2021) (statement of Dina Bakst) [hereinafter *2021 Bakst Testimony*], https://edworkforce.house.gov/uploadedfiles/dina_bakst-_testimony.pdf ("Workers, especially low-wage workers—and particularly women of color—typically do not have access to their coworkers' personnel files and do not otherwise know how they are being treated."); *see also* APRIL J. ANDERSON, CONG. RSCH. SERV., R46821, PREGNANCY & LABOR: AN OVERVIEW OF FEDERAL LAWS PROTECTING PREGNANT WORKERS 14 (2023), https://crsreports.congress.gov/product/pdf/R/R46821.

[7] *See, e.g.*, *Brown v. Aria Health*, No. 17-1827, 2019 WL 1745653, at *4 (E.D. Pa. Apr. 17, 2019) ("A routine pregnancy is not considered a disability within the meaning of the ADA."); *Tomiwa v. PharMEDium Servs., LLC*, No. 4:16-CV-3229, 2018 WL 1898458, at *5 (S.D. Tex. Apr. 20, 2018) (dismissing plaintiff's ADA claim despite two emergency surgeries she underwent for her high-risk pregnancy); *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 482–84, 490–91 (D. Md. 2013) (dismissing ADA claim of plaintiff with hyperemesis gravidarum and hypokalemia).

[8] *See 2021 Bakst Testimony*, *supra* note 6, at 10–12; *Long Over Due: Exploring the Pregnant Workers' Fairness Act (H.R. 2694): Hearing Before the Subcomm. on Civil Rights & Human Servs.*, 116th Cong. 44–

Because of this void in federal protections, thousands of pregnant employees—particularly those working low-wage, physically-strenuous jobs—struggled to secure even modest accommodations, "such as permission to sit during a long shift, an extra restroom break, or temporary relief from heavy lifting to avoid pregnancy complications."[9] Many suffered serious health consequences, including preeclampsia, preterm birth, and pregnancy loss.[10] Still others, who otherwise would have been able to continue working *with* accommodations, had no choice but to go on unpaid leave[11] they could not afford—or were even fired—

---

45 (2019) (statement of Dina Bakst) [hereinafter *2019 Bakst Testimony*].

[9] A Better Balance, Pregnant & Jobless 3 (Oct. 2015), https://www.abetterbalance.org/wp-content/uploads/2017/01/PregnantandJobless.pdf; *see also* Carly McCann & Donald Tomaskovic-Devey, Pregnancy Discrimination at Work 8–9 (2021), https://www.umass.edu/employmentequity/pregnancy-discrimination-workplace-1 ("[A]n estimated 250,000 women are denied accommodations related to their pregnancies each year.").

[10] *See, e.g.*, Louisville Dep't of Pub. Health & Wellness, Pregnant Workers Health Impact Assessment 7, 23 (2019) [hereinafter Impact Assessment], https://hia.communitycommons.org/cc_resource/pregnant-workers-health-impact-assessment/; *Pregnant Workers Fairness Act*, March of Dimes, https://www.marchofdimes.org/our-work/policy-advocacy/pregnant-workers-fairness-act (last visited Aug. 2, 2024).

[11] No federal law provides U.S. employees a right to paid medical leave, and most low-wage workers lack access to any employer-provided paid medical leave. *America Is the Only Rich Country Without a Law on*

losing income and health insurance at the moment they needed it most.[12] Again and again, pregnant employees across the country were forced to make an impossible choice: quit their job to protect their pregnancy or risk their health to keep food on the table.  Congress passed the PWFA to fix that.[13]

Patterned off the ADA's familiar accommodation framework, the PWFA requires employers to reasonably accommodate pregnancy, childbirth, or related medical conditions, unless it would be an undue hardship for the employer to do so.[14]  By entitling employees to reasonable accommodations regardless of whether their medical

_____

*Paid Leave for New Parents*, THE ECONOMIST (July 18, 2019), https://www.economist.com/united-states/2019/07/18/america-is-the-only-rich-country-without-a-law-on-paid-leave-for-new-parents.  Many low-wage workers lack a right to even *unpaid* leave: almost two-thirds are ineligible for unpaid leave under the Family and Medical Leave Act. SCOTT BROWN ET AL., LEAVE EXPERIENCES OF LOW-WAGE WORKERS 1 (Nov. 2020), https://www.dol.gov/sites/dolgov/files/OASP/evaluation/pdf/WHD_FMLA_LowWageWorkers_January2021.pdf.  The same low-wage industries that are least likely to offer sick time or medical leave are the industries that tend to be most physically demanding—the kind of jobs where pregnant workers most need accommodations.  MCCANN & TOMASKOVIC-DEVEY, *supra* note 9, at 18–19.
[12] *2019 Bakst Testimony*, *supra* note 8, at 44, 50.
[13] H.R. REP. NO. 117-27, pt. 1, at 22 (2021).
[14] 42 U.S.C. § 2000gg-1.

condition is an ADA-qualifying "disability," the PWFA ensures pregnant employees can access the accommodations they need to address routine pregnancy symptoms like nausea and to prevent complications from developing.[15] Likewise, the PWFA avoids the perils of the PDA's comparator framework by providing pregnant employees an affirmative right to reasonable accommodations.[16]

### B. The PWFA Is Essential to Protect the Health of Employees and Their Pregnancies.

Three-quarters of women in the workforce will be pregnant and working at some point in their career.[17] Some will need a workplace accommodation to safeguard their health; of those, the vast majority will require only a modest accommodation, like extra bathroom breaks.[18] Before the PWFA, at least 250,000 women were denied pregnancy accommodations each year[19]—a sure undercount, since more than a third

---

[15] 42 U.S.C. § 2000gg(4); *see also* ANDERSON, *supra* note 6, at 19.
[16] ANDERSON, *supra* note 6, at 19–20.
[17] MELISSA ALPERT & ALEXANDRA CAWTHORNE, CTR. FOR AM. PROGRESS, LABOR PAINS: IMPROVING EMPLOYMENT & INCOME SECURITY FOR PREGNANT WOMEN & NEW MOTHERS 2 (2009), https://cdn.americanprogress.org/wp-content/uploads/issues/2009/08/pdf/labor_pains.pdf.
[18] MCCANN & TOMASKOVIC-DEVEY, *supra* note 9, at 8.
[19] *Id.* at 8–9.

of women who needed accommodations never worked up the courage to ask for one.[20]

Pregnant employees whose employers did not provide them accommodations had no choice but to quit their jobs and lose vital income, or stick it out at work, sometimes with irreparable health consequences. *Amicus* A Better Balance ("ABB") served many of these women on its free helpline. One pregnant worker, Tasha Murrell, was planning to name her baby "Dallas" after her favorite football team, the Dallas Cowboys.[21] After twelve hours of heavy lifting at her warehouse job, she felt extreme stomach pain and asked to leave work early.[22] Her supervisor refused, made clear Tasha would be punished if she left—and told her to get an abortion.[23] "So I stayed and worked an extra hour in terrible pain," Tasha

---

[20] NAT'L P'SHIP FOR WOMEN & FAMILIES, LISTENING TO MOTHERS 2 (2014), https://nationalpartnership.org/wp-content/uploads/2023/02/listening-to-mothers-experiences-of-expecting-and-new-mothers.pdf.
[21] Silver-Greenberg & Kitroeff, *supra* note 3.
[22] Tasha Murrell, Opinion, *A Paycheck or a Healthy Pregnancy? We Shouldn't Have to Choose*, THE HILL (Dec. 17, 2021), https://thehill.com/blogs/congress-blog/labor/586269-a-paycheck-or-a-healthy-pregnancy-we-shouldnt-have-to-choose/.
[23] Silver-Greenberg & Kitroeff, *supra* note 3.

recalled.  "I had no choice.  I couldn't afford to lose my job."[24]  The next day, she woke up drenched in blood.  She had lost her pregnancy.

Another pregnant worker ABB assisted, Rebecca Macri, a certified nursing assistant, was told to lift a patient at work.  When she refused and requested an accommodation, she was told, "Clearly you don't want your job if you can't do this."[25]  She complied and began bleeding heavily, ultimately losing her pregnancy.  It "was absolutely horrendous," she remembered.[26]

Tasha and Rebecca's experiences were not unique.[27]  Studies show the risk of miscarriage and stillbirth increases with the frequency and

---

[24] Murrell, *supra* note 22.
[25] Bryce Covert, *The New Law to Protect Pregnant Workers Is Already Changing Lives*, THE NATION (Aug. 14, 2023), https://www.thenation.com/article/society/pregnant-workers-fairness-act-3/.
[26] *Id.*
[27] JASMINE TUCKER ET AL., NAT'L WOMEN'S L. CTR., PREGNANT WORKERS NEED ACCOMMODATIONS FOR SAFE AND HEALTHY WORKPLACES 1–2 (2021), https://nwlc.org/wp-content/uploads/2021/11/Pregnant-Workers-by-the-Numbers-2021-v4.pdf.

weight of lifting,[28] exposure to chemicals,[29] irregular or long work hours,[30] night shifts,[31] and even the denial of accommodations as simple as bathroom breaks.[32] Indeed, the failure to provide pregnant employees accommodations—which are often low- or no-cost to the employer[33]—is linked not only with pregnancy loss but also a range of other adverse health impacts. A literature review conducted by the Louisville, Kentucky Department of Public Health found, for instance, that, while

---

[28] Mette Juhl et al., *Occupational Lifting During Pregnancy & Risk of Fetal Death in a Large National Cohort Study*, 39(4) SCAND. J. WORK ENVIRO. HEALTH 335 (Dec. 3, 2012), https://pubmed.ncbi.nlm.nih.gov/23207454/.

[29] *See, e.g.*, IMPACT ASSESSMENT, *supra* note 10, at 19 (documenting a "62% higher risk of perinatal death in hairdressers" and a 36% higher risk in cosmetologists, occupations with significant exposure to chemicals); Frincy Francis et al., *Ergonomic Stressors Among Pregnant Healthcare Workers*, 21(2) SULTAN QABOOS UNIV. MED. J. 172, 174 (June 21, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8219330/ (documenting "a significant increase in the rate of spontaneous miscarriage [among pregnant nurses] after handling cytotoxic drugs").

[30] *See, e.g.*, Francis, *supra* note 29, at 174.

[31] *See, e.g.*, *id.* at 174; Am. C. Obstetricians & Gynecologists, *ACOG Committee Opinion 733: Employment Considerations During Pregnancy & the Postpartum Period*, 131 OBSTETRICS & GYNECOLOGY 115, 119 (Apr. 2018), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2018/04/employment-considerations-during-pregnancy-and-the-postpartum-period.

[32] IMPACT ASSESSMENT, *supra* note 10, at 19.

[33] JOB ACCOMM. NETWORK, COSTS AND BENEFITS OF ACCOMMODATION (2024), https://askjan.org/topics/costs.cfm.

"overall, employment during pregnancy is associated with a reduction in the risk of preterm birth,"[34] the failure to accommodate pregnant employees' needs could cause significant repercussions for the health of the infant and the mother, including preterm birth, low birth weight, and pregnancy-induced hypertension.[35] (Notably, preterm birth is among the leading causes of infant mortality nationwide,[36] and Texas's pre-term birth rate of 11.3% earned it a D- on the 2023 March of Dimes Report Card.)[37] Other health consequences include placental separation, uterine rupture, fetal malformation, and postpartum depression.[38]

---

[34] IMPACT ASSESSMENT, *supra* note 10, at 16.
[35] *Id.* at 7, 18, 23; *see also 2019 Bakst Testimony*, *supra* note 8, at 69; Letter from Wendy Chavkin, MD, MPH, to James Vacca, N.Y.C. Council Member (Nov. 29, 2012), https://www.abetterbalance.org/resources/chavkin-letter/.
[36] *A Profile of Prematurity in United States*, MARCH OF DIMES, https://www.marchofdimes.org/peristats/reports/united-states/prematurity-profile (last visited Aug. 6, 2024).
[37] MARCH OF DIMES, 2023 MARCH OF DIMES REPORT CARD, https://www.marchofdimes.org/report-card.
[38] *See, e.g.*, Francis, *supra* note 29, at 174–75, 177; *see also* Yuko Kachi et al., *The Effects of Pregnancy Discrimination on Postpartum Depressive Symptoms*, 22 BMC PREGNANCY & CHILDBIRTH 1, 4 (Nov. 8, 2022), https://link.springer.com/article/10.1186/s12884-022-05148-2 ("[P]regnancy discrimination was significantly associated with postpartum depressive symptoms."); Kaylee J. Hackney et al., *Examining the Effects of Perceived Pregnancy Discrimination on Mother and Baby Health*, 106(5) J. APPLIED PSYCH. 774, 781 (July 2, 2020), https://faculty.fiu.edu/~aeaton/wp-content/uploads/2020/07/Hackney-et-

These health consequences can be long-lasting. As March of Dimes

has documented, preterm birth can lead to long-term impacts on a child's

brain, lungs, teeth, eyes, ears, intestines, and immune system.[39] Preterm

birth is likewise associated with diagnoses of anxiety, depression, and

attention deficit hyperactivity disorder ("ADHD") later in life.[40]

Heightened rates of preterm birth not only harm children and

parents, but also come at significant cost to employers, the healthcare

system, and the government. According to March of Dimes, "preterm

birth costs employers more than $12 billion in excess health care

costs"[41]—twelve times as much as for babies born without

---

al.-2020-Examining-the-Effects-of-Perceived-Pregnancy-
Discrimination.pdf (demonstrating that "perceived pregnancy
discrimination . . . leads to increased postpartum depressive symptoms
for mothers, decreased birth weight and gestational age, and increased
doctors' visits for their babies").

[39] *See, e.g.*, MARCH OF DIMES, LONG-TERM HEALTH EFFECTS OF PRETERM
BIRTH (Feb. 2024), https://www.marchofdimes.org/find-
support/topics/birth/long-term-health-effects-preterm-birth.

[40] *Id.*; *see also* Cynthia E. Rogers et al., *Late Preterm Birth, Maternal
Depression, and Risk of Preschool Psychiatric Disorders*, 52(3) J. AM.
ACAD. CHILD & ADOLESCENT PSYCH. 309 (Feb. 4, 2013),
https://pubmed.ncbi.nlm.nih.gov/23452687.

[41] Press Release, March of Dimes, Premature Babies Cost Employers
$12.7 Billion Annually (Feb. 7, 2014),
https://www.marchofdimes.org/about/news/premature-babies-cost-
employers-127-billion-annually.

complications.[42]  The annual societal cost of preterm births is 25.2 billion dollars, a cost often shouldered by taxpayers through the Medicaid and Supplemental Security Income ("SSI") programs.[43]  Costs extend well beyond the initial medical cost of childbirth itself: from long-term medical expenses, such as for rehabilitation, therapy services, and long-term care, to early intervention services, special education services, and lost household and labor market productivity stemming from preterm-birth-associated disabilities and caregiving.[44]

With the passage of the PWFA, millions of workers overnight gained the right to the accommodations they needed to safeguard their

_____

[42] MARCH OF DIMES, PREMATURE BIRTH: THE FINANCIAL IMPACT ON BUSINESS 1, 2 (2013), https://onprem.marchofdimes.org/materials/premature-birth-the-financial-impact-on-business.pdf.
[43] MARCH OF DIMES, PREMATURITY PROFILE: UNITED STATES 2 (2022), https://www.marchofdimes.org/peristats/assets/s3/reports/prematurity/PrematurityProfile-UnitedStates.pdf; Christina Caron, *A $4 Million NICU Bill: The Price of Prematurity*, N.Y. TIMES (Feb. 11, 2020), https://www.nytimes.com/2020/02/11/parenting/nicu-costs.html; Paul Gabrielsen, *U Economists Tally Societal Cost of Preterm Birth*, @THEU (Nov. 4, 2019), https://attheu.utah.edu/facultystaff/u-economists-tally-societal-cost-of-preterm-birth/.
[44] PRETERM BIRTH: CAUSES, CONSEQUENCES, AND PREVENTION, ch. 12 (Richard E. Behrman & Adrienne Stith Butler eds., 2007), https://www.ncbi.nlm.nih.gov/books/NBK11358/.

health and their pregnancies.[45]  The impact was transformative.  Rebecca Macri, who had lost her prior pregnancy, *supra*, was newly pregnant in the weeks before the PWFA went into effect.[46]  Desperate to avoid repeating the loss of her prior pregnancy, Rebecca again requested a temporary lifting accommodation from her employer, and again was refused.  But when the PWFA took effect a few weeks later in June 2023, everything changed: "Suddenly they agreed to accommodate me after being completely resistant before,"[47] Rebecca recalled.  "Having these laws in place means pregnant women can have a . . . healthy pregnancy and keep their job."[48]

In the year since the PWFA went into effect, many other pregnant employees have echoed Rebecca's experience, sharing how the PWFA protected their health and their pregnancies.[49]  A hospital employee who

---

[45] *See generally* CHELSEA THOMPSON ET AL., A BETTER BALANCE, PREGNANT & *FINALLY* PROTECTED 17 (2024) [hereinafter FINALLY PROTECTED], https://www.abetterbalance.org/pregnant-and-finally-protected/.

[46] Covert, *supra* note 25.

[47] A Better Balance, Comment Letter on Proposed PWFA Reguls. 87 (Oct. 10, 2023) [hereinafter "ABB Cmt."], https://www.regulations.gov/comment/EEOC-2023-0004-98298.

[48] *Id.* at 86–87.

[49] *See, e.g.*, FINALLY PROTECTED, *supra* note 45, at 17–31; Covert, *supra* note 25.

needed an accommodation for her pregnancy—a pregnancy "that [she] had wholeheartedly prayed for"—was able to get what she needed, thanks to the new law.  She recalled, "When I received the call that my accommodation was approved I burst into tears.  It felt like a load of bricks had been lifted off my chest."[50]  Another pregnant worker, a telecommunications employee, explained, "The new [PWFA] has meant so much to me.  I am more than thankful for this law because I can now focus on caring for my baby and myself, and truly recover from my post-pregnancy complications."[51]

### C. The PWFA Safeguards the Financial Security of Families and the Public Fisc.

Congress also passed the PWFA to safeguard the economic security of women, families, and the economy.[52]  Before the PWFA, employers could lawfully deny pregnant employees even minor accommodations

---

[50] ABB Cmt., *supra* note 47, at 87.

[51] *Id.* at 88–89.

[52] *See, e.g.*, 168 CONG. REC. S10071 (daily ed. Dec. 22, 2022) (statement of Sen. Bill Cassidy), (explaining that the PWFA would "help a pregnant woman support herself, her family, and her unborn child" and "does what we would want for ourselves, our wives, our sisters, and our daughters").

they needed to continue working.[53]  As a result, employees who, with accommodations, would have been able to continue working were forced to go on unpaid leave they could not afford—or even fired—losing essential income and health insurance at the very moment they needed it most and, sometimes, turning to public assistance to survive.[54]

One pregnant employee, Natasha Jackson, an account executive, was forced onto leave and then terminated, all because she needed occasional help with lifting, and despite her co-workers' willingness to assist her.  The economic impact was severe: "My husband and I had just made a down payment on a house and were about to close the deal. Without my income, we were forced to back out of the contract. . . . [M]y husband and I saw our dream to own a home vanish,"[55] she recalled.  "We

---

[53] *2019 Bakst Testimony*, *supra* note 8, at 55–63; MCCANN & TOMASKOVIC-DEVEY, *supra* note 9, at 8–9 (finding that, "[w]hile most of the surveyed women reported that their employers honored their [accommodation] request, a significant number of women reported that employers denied their requests and claimed they were not required to honor pregnancy-related accommodations").

[54] *2019 Bakst Testimony*, *supra* note 8, at 50–51; LONG OVERDUE, *supra* note 4, at 23–24.

[55] *2019 Bakst Testimony*, *supra* note 8, at 48.

became homeless and were placed in emergency public housing. I could no longer afford child care and had to pull my kids out of day care."[56]

Like Natasha, other pregnant workers experienced housing insecurity after being refused accommodations. For example, one pregnant worker ABB assisted, Denizer Carter, a cashier at a large grocery store in Louisiana, rushed to the hospital after almost having a miscarriage and was later fired after requesting an accommodation at work. "As a result, I almost lost my home multiple times," she remembered later.[57] Betzaida Cruz Cardona, also a cashier ABB served, was fired after she requested a lifting restriction for her pregnancy. With no paycheck, she became homeless and had to rely on family and friends for shelter, moving from couch to couch, all while trying to ready herself to be a mom.[58]

---

[56] Natasha Jackson, Opinion, *New Law Will Help Pregnant Women on the Job*, THE POST & COURIER (June 3, 2018), https://www.postandcourier.com/opinion/commentary/new-law-will-help-pregnant-women-on-the-job/article_b8a16aee-5f85-11e8-9cab-735870b0d5ed.html.
[57] *The Women Who Inspired the Movement for the Pregnant Workers Fairness Act*, A BETTER BALANCE [hereinafter *Women Who Inspired*], https://www.abetterbalance.org/pregnant-worker-stories/ (last visited Aug. 4, 2024).
[58] *2019 Bakst Testimony*, *supra* note 8, at 48.

Lyndi Trischler, a police officer ABB assisted, was pushed off her job after requesting light duty on her health provider's advice and told, in the middle of her medically complicated pregnancy, that she would lose her health insurance. Losing her income took an emotional and financial toll on Lyndi and her family. "My one-year-old daughter and I had to move out of the apartment we could no longer afford," she recalled.[59] Devastatingly, her son passed away shortly after birth due to a genetic condition. "As heartbreaking as this experience was[,] it was made all the worse by having to face workplace discrimination too. If there had been a clear law on the books, then this likely never would have happened."[60]

These women were not alone.[61] Of the majority of women who will be pregnant while working, many are sole or primary breadwinners in

---

[59] Lyndi Trischler, Opinion, *Don't Make Women Choose Between a Job or Pregnancy*, CINCINNATI ENQUIRER (Mar. 23, 2018), https://www.cincinnati.com/story/opinion/2018/03/23/opinion-dont-make-women-choose-between-job-pregnancy/440077002/.
[60] *Women Who Inspired*, *supra* note 57.
[61] Congress heard Natasha, Betzaida, and Lyndi's experiences when A Better Balance testified about the need for the PWFA. *2019 Bakst Testimony*, *supra* note 8, at 46–48; *2021 Bakst Testimony*, *supra* note 6. Many of these women went on to become advocates for the PWFA, penning op-eds and testifying before Congress themselves. *See Women Who Inspired*, *supra* note 57.

their families.[62]  Due to soaring costs of living and medical expenses, 78% of Americans live paycheck to paycheck, making it impossible to save up an emergency fund for an unanticipated job loss or unpaid leave.[63]  And when pregnant workers are not accommodated and are pushed off the job, they lose not just their income but also their health insurance, resulting in childbirth costs up to and above $50,000.[64]  They lose other workplace benefits, too, like 401K contributions, seniority, pensions, social security contributions, and life insurance.[65]  Even if they are able to return to the workforce, the financial impacts can follow them for

---

[62] SARAH JANE GLYNN, CTR. FOR AMERICAN PROGRESS, BREADWINNING MOTHERS CONTINUE TO BE THE U.S. NORM 5 (2019), https://cdn.americanprogress.org/content/uploads/2019/05/12070012/Breadwinners2019-report1.pdf.

[63] Emily Batdorf, *Living Paycheck to Paycheck*, FORBES (Apr. 2, 2024), https://www.forbes.com/advisor/banking/living-paycheck-to-paycheck-statistics-2024/.

[64] LONG OVERDUE, *supra* note 4, at 24; Jenny Yang, *Median Cost of C-Section Delivery Without Insurance in the U.S. in 2022*, STATISTA (Feb. 6, 2024), https://www.statista.com/statistics/982494/c-section-delivery-cost-without-insurance-by-us-state/.  Indeed, "[o]ne woman who called [A Better Balance's] hotline lost her health insurance while eight months pregnant after her employer cut her hours.  She requested that her doctor induce her labor early while she still had insurance so that she would not have to face exorbitantly expensive hospital bills." *2019 Bakst Testimony*, *supra* note 8, at 50.

[65] *2019 Bakst Testimony*, *supra* note 8, at 50.

decades, curtailing their lifelong earnings and retirement income.[66] Another pregnant worker ABB served, for instance, had to turn to government assistance to make ends meet when she was forced off her job after missing a shift to seek emergency medical attention for stabbing uterine pain. She said it took "years" for her "family [to] finally recuperat[e] from the losses experienced during this period—a situation that could have been avoided had [she] been able to keep [her] job with reasonable, short-term accommodations."[67]

The public bears many of these costs. Pregnant employees who, with accommodation, could continue working[68] and supporting their families instead must turn to public benefits, relying on food stamps, housing assistance, Medicaid, unemployment, and WIC benefits just to get by.[69] Amanda, a veteran and emergency room technician, who was forced onto unpaid leave after requesting an accommodation, lost her

---

[66] H.R. REP. NO. 117–27, pt. 1, at 21–22, 25 (2021).

[67] DINA BAKST ET AL., A BETTER BALANCE, WINNING THE PREGNANT WORKERS FAIRNESS ACT 51 (2023) [hereinafter WINNING THE PWFA], https://www.abetterbalance.org/winning-pwfa/.

[68] As described above, pregnant workers' attempts to stick it out at work without accommodation can result in substantial economic costs to families and the healthcare and education systems. *See supra* (describing the economic costs of non-accommodation).

[69] *2019 Bakst Testimony*, *supra* note 8, at 70.

health insurance as a result: "Needing to apply for public assistance just to survive felt like the lowest point in my adult life.  I had worked since I was 15-years-old, I was the first in my family to earn a college degree, and I served proudly in the military," she reflected.  She and her husband, who was also in uniform, "had always been proud to give back to our country and community, yet our community was failing us."[70] Another pregnant worker ABB served, Armanda Legros, was pushed out of her job after asking to avoid heavy lifting in the final months of her pregnancy.  The primary breadwinner in her family, she lost her health insurance and turned to food stamps just to get by.[71]  "Once my baby arrived, just putting food on the table for him and my four-year-old was a challenge.  I was forced to use water in his cereal at times because I could not afford milk."[72]

    With the PWFA's passage, workers like Amanda and Armanda gained a legal right to the accommodations they needed to continue

---

[70] *Women Who Inspired*, *supra* note 57.
[71] *Economic Security for Working Women: Briefing Before the S. Comm. on Health, Educ., Labor & Pensions*, 113th Cong. 3 (2014) (statement of Armanda Legros), https://www.help.senate.gov/imo/media/doc/Legros2..pdf.
[72] *Id.* at 2.

working, making it possible for employees across the country to keep their jobs without jeopardizing their pregnancies. The impact has been profound.[73] A pregnant hospitality worker ABB served, who initially had been fired after needing limited time off for severe nausea and bleeding,[74] felt painfully the economic costs of not being accommodated: "Losing my job put me and my family in immediate danger of being evicted from our home, and loss of medical coverage for not only ourselves but also our unborn child."[75] With the PWFA's passage, however, she was able to educate her employer about its obligations and get her job back.[76] "Knowing that the PWFA had my back meant that . . . I was able to go to [my employer] . . . with confidence, resulting in receiving my full-time status and benefits at work again."[77]

---

[73] *See, e.g.*, FINALLY PROTECTED, *supra* note 45, at 20–31; Alejandra Ros Pilarz, Jessica Pac & Anna K. Walther, *The Effects of State Workplace Pregnancy Accommodation Laws on Women's Employment & Income During Pregnancy* (forthcoming 2024) (manuscript at 29–30) (on file with author) (finding that pregnancy accommodation laws "led to substantial increases in employment and earnings during pregnancy, with larger effect sizes among pregnant women without a college education").

[74] FINALLY PROTECTED, *supra* note 45, at 31.

[75] *Id.*

[76] *Id.*

[77] *Id.* at 31–32.

## II. The PWFA Is a Broadly Popular Law that Received Widespread Support Across the Ideological Spectrum.

### A. The PWFA Received Bipartisan Support in Congress.

Congress championed the PWFA on both sides of the aisle. Lead Republican Senate sponsor, Senator Bill Cassidy (R-LA), fought fiercely for the PWFA's passage, describing it as "pro-family, pro-mother, pro-baby, pro-employer, and pro-economy."[78] Citing the experience of Kentucky police officer Lyndi Trischler, *supra*, who was denied an accommodation and, at five months pregnant, threatened with losing her health insurance, Senator Cassidy explained that "the pro-life position is to make an accommodation for that woman who has those needs so she can safely carry the baby to term."[79] Texas Senator Ted Cruz and dozens of other Senate Republicans joined Senator Cassidy in voting to pass the PWFA.[80] Likewise, over its years in Congress, the PWFA repeatedly passed the House with overwhelming bipartisan support.[81]

---

[78] 168 CONG. REC. S7050 (daily ed. Dec. 8, 2022) (statement of Sen. Bill Cassidy).
[79] *Id.*
[80] 168 CONG. REC. S10071 (daily ed. Dec. 22, 2022) (rollcall vote on PWFA).
[81] WINNING THE PWFA, *supra* note 67, at 3.

## B. Maternal and Infant Health Organizations Fought for the PWFA.

March of Dimes, the preeminent organization committed to ending preventable preterm birth, maternal morbidity and mortality, and infant death, championed passage of the PWFA.[82]  Through op-eds, Hill briefings, rallies, and actions, March of Dimes made the case that the PWFA was a "measured approach to a serious problem," one that would "ensure that pregnant persons can continue to provide for their families and have safe and healthy pregnancies."[83]  Hundreds of health care clinicians, public health professionals, and maternal-fetal health organizations joined March of Dimes in its advocacy.[84]

---

[82] *Long Over Due*, *supra* note 8, at 184 (statement of Stacey D. Stewart, President & CEO, March of Dimes).

[83] Letter from Health Providers in Support of PWFA to U.S. Reps. (Sept. 14, 2020), https://www.abetterbalance.org/resources/letter-from-health-providers-in-support-of-the-pregnant-workers-fairness-act/; *see also* Letter of Stacey D. Stewart, President & CEO of March of Dimes, to Sen. Majority Leader Charles E. Schumer (Nov. 16, 2022), https://www.marchofdimes.org/sites/default/files/2022-11/11-16-22_March%20of%20Dimes_PWFA_SDS_FINAL.pdf.

[84] Health Providers Letter, *supra* note 83; Letter from Maternal Health Equity Organizations in Support of PWFA, to U.S. Reps. 2–3 (May 14, 2021), https://www.abetterbalance.org/resources/letter-from-maternal-health-equity-organizations-in-support-of-the-pregnant-workers-fairness-act/ (explaining the PWFA's role in reducing "miscarriage, excessive bleeding, and other devastating health consequences," with

## C. The Business Community Championed the PWFA.

The business community also rallied behind the PWFA, calling it "pro-business,"[85] with the U.S. Chamber of Commerce ("the Chamber") praising the legislation as "set[ting] up an equitable process for employers and employees to work together in finding reasonable solutions to keeping pregnant employees in the workplace" and "provid[ing] needed clarity in the law."[86] Indeed, the Chamber became such an outspoken campaigner for the PWFA that it placed the bill on its "scorecard," scoring lawmakers positively if they voted for the PWFA.[87] The Society for Human Resource Management ("SHRM"), the National Retail Federation, and the National Restaurant Association joined the

---

"the potential to improve some of the most serious health consequences Black pregnant people experience").

[85] *Long Over Due*, *supra* note 8, at 28 (statement of Iris Wilbur, Vice President Gov't Affs. & Pub. Pol'y, Greater Louisville Inc.) [hereinafter Wilbur Statement].

[86] Press Release, U.S. Chamber of Com., U.S. Chamber Applauds Reintroduction of the Pregnant Workers Fairness Act (Feb. 16, 2021), https://www.uschamber.com/workforce/us-chamber-applauds-reintroduction-of-the-pregnant-workers-fairness-act.

[87] *Id.*

Chamber in supporting the PWFA,[88] along with major corporations like Verizon, Johnson & Johnson, and Nestle.[89]

The business community explained that all employers stood to benefit from the PWFA, with reductions in employee absenteeism, turnover, training costs, and healthcare expenses.[90] They also appreciated the predictability and national uniformity a single federal law would provide.[91] Indeed, Congress heard testimony from the Louisville, Kentucky chamber of commerce, explaining that, without a law like the PWFA, "[O]ur employers were forced to navigate a complex web of federal laws and court decisions to figure out what their obligations are when it comes to appropriately accommodating pregnant

---

[88] Letter from U.S. Chamber of Com. et al., to Sen. Patty Murray & Sen. Richard Burr (Aug. 2, 2021), https://www.uschamber.com/workforce/education/coalition-letter-s-1486-the-pregnant-workers-fairness-act.

[89] Letter from Business Leaders Supporting the PWFA, 166 CONG. REC. H4516–17 (daily ed. Sept. 17, 2020).

[90] *See, e.g.*, Wilbur Statement, *supra* note 85, at 28; LONG OVERDUE, *supra* note 4, at 27 ("According to the March of Dimes, each premature/low birth weight baby costs employers an additional $49,760 in newborn health care costs. When maternal costs are added, employers and the'r employees pay $58,917 more when a baby Is born prematurely."); JOB ACCOMM. NETWORK, *supra* note 33.

[91] LONG OVERDUE, *supra* note 4, at 27; U.S. Chamber of Com. Letter, *supra* note 88.

workers and new mothers."[92]   The business community observed, too, that by keeping Americans in the workforce, the PWFA "would also boost the economy overall."[93]   Where the PWFA's passage brought clarity, uniformity, and economic growth, the district court has turned back the clock, confusing employers and forcing them, yet again, to navigate a complicated patchwork of laws and court decisions.

### D. Faith Groups Supported the PWFA.

Religious organizations also championed the PWFA.  As the U.S. Conference of Catholic Bishops, a key backer of the bill, explained:

> Catholic teaching is clear that policy choices around work should be made to support the family because family life and work mutually affect one another. . . .  We applaud these efforts [to pass the PWFA] which demonstrate a respect for life, family, and the dignity of workers.[94]

---

[92] Wilbur Statement, *supra* note 85, at 27.

[93] Iris Wilbur Glick, Opinion, *We Need to Have Stronger Support for Pregnant Workers to Help Strengthen the Economy*, LOUISVILLE COURIER J. (Sept. 14, 2020), https://www.courier-journal.com/story/opinion/2020/09/14/kentucky-lawmakers-should-vote-yes-pregnant-workers-fairness-act/3467921001/ ("Studies show that when more women participate in the workforce, the economy benefits with increases in GDP and businesses experiencing more organizational effectiveness as well as growth."); *see also* Letter from Business Leaders, *supra* note 89.

[94] Letter from U.S. Conf. of Cath. Bishops to Cong. (Aug. 9, 2021), https://www.usccb.org/resources/PWFA_letter.pdf (internal quotation marks omitted).  Despite challenging narrow portions of the regulations that the EEOC promulgated under the PWFA, the U.S. Conference of

The Archbishop of Oklahoma City echoed the need for the law, explaining, "No woman should be forced to risk her or her child's health, miscarriage, preterm birth, economic security or losing insurance benefits."[95]  Americans United for Life agreed: "Women have lost their children due to the lack of robust pregnancy protections in the workplace. . . .  Anyone who can't get behind this or uses it as a political game—it's a travesty."[96]  A number of other faith-based organizations,

---

Catholic Bishops continues to enthusiastically support the statute itself.  *See, e.g.*, Compl. at 2, U.S. Conf. of Cath. Bishops v. EEOC, No. 2:24-cv-691 (W.D. La. May 22, 2024), ECF No. 1 (praising the PWFA's "uncontroversial and laudable purpose"); U.S. Conf. of Cath. Bishops & Catholic Univ. of Am., Comment Letter on Reguls. to Implement PWFA 1–2 (Sept. 27, 2023), https://www.usccb.org/sites/default/files/about/general-counsel/rulemaking/upload/2023.USCCB_.CUA_.comments.PWFA_.regulations.pdf (applauding the statute and its "commendable goal of advancing the well-being of pregnant women").  Other religious organizations likewise continue to support the statute.  *See, e.g.*, Nat'l Assoc. of Evangelicals et al., Comment Letter on Proposed Rule to Implement the PWFA (Oct. 10, 2023), https://www.christianlegalsociety.org/wp-content/uploads/2023/10/Comments-to-EEOC-on-PWFA-NPRM-FINAL-101023.pdf ("commend[ing] the Congress and the President on enactment of a law protecting women and their unborn children").

[95] Paul S. Coakley, Archbishop of Okla. City, Labor Day Statement 2022 (Sept. 5, 2022), https://www.usccb.org/resources/labor-day-statement-2022.

[96] Silver-Greenberg & Kitroeff, *supra* note 3.

including the National Association of Evangelicals, likewise echoed the call for the PWFA, calling it "consistent with a strong pro-life, pro-family commitment."[97]

## CONCLUSION

The PWFA is the product of rare political consensus in the United States. Lawmakers worked across the aisle, and with the backing of faith, business, and maternal and infant health organizations, to usher to passage a bill with a remarkable goal: to guarantee pregnant workers across the country the right to the support they need to carry their pregnancies to term while keeping the lights on at home. In the year since the law went into effect, the PWFA has done just that.

In the wake of the PWFA's astonishing success, and against the extraordinary, and unlikely, coalition that got the law over the finish line, a single state has sought to turn back the clock, snatching from

---

[97] Letter from Galen Carey, Nat'l Ass'n of Evangelicals, to U.S. Sens. (Dec. 20, 2022), https://www.nae.org/support-pregnant-workers-fairness-act-pwfa/; *see also, e.g.*, CTR. FOR PUB. JUST., PWFA POL'Y BR. (Oct. 2022), https://cpjustice.org/what-we-do/families-valued/pregnant-workers-fairness-act-pwfa-policy-brief/; Letter from New York Faith Leaders to Sen. Charles E. Schumer, https://www.abetterbalance.org/wp-content/uploads/2022/06/NY-Faith-Leaders-PWFA-Letter-Final.pdf (last visited Aug. 5, 2024) ("Supporting pregnant workers is a matter of religious, moral, and ethical concern.").

pregnant Texans and their families a right on which they have come to rely. This Court should reject such overreach.

In the words of one mother, who benefited from PWFA's protections:

> I cannot begin to describe the relief that the PWFA provided me. As a first-time mom . . . the protections I have been afforded have greatly supported my physical and mental health, which helps me to be a better mom, wife, and community member. This law makes me proud to be an American.[98]

In passing the PWFA, Congress overwhelmingly chose to stand with American families and their ability to welcome their children into a safe, financially secure home. This Court should do the same.

August 16, 2024

Respectfully submitted,

/s/ Dana V. Bolger
Dana V. Bolger
Katherine A. Greenberg
Elizabeth Gedmark
A BETTER BALANCE
250 West 55th Street
17th Floor
New York, NY 10019
Phone: (516) 614-3255
dbolger@abetterbalance.org
*Counsel for Amici Curiae*

---

[98] ABB Cmt., *supra* note 47, at 87–88.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit via the CM/ECF system. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Dana V. Bolger
Dana V. Bolger

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,472 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2.

This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) and Fifth Circuit Rule 32.1 because it was prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Century Schoolbook font.

August 16, 2024                                    /s/ Dana V. Bolger
                                                   Dana V. Bolger