No. 24-10386

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellee*,

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL, IN HIS OFFICIAL CAPACITY AS UNITED STATES ATTORNEY GENERAL; CHARLOTTE A. BURROWS, IN HER OFFICIAL CAPACITY AS CHAIR OF THE U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; JOCELYN SAMUELS, IN HER OFFICIAL CAPACITY AS VICE CHAIR OF THE U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; KEITH SOLDERLING, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHRISTOPHER W. LAGE, IN HIS OFFICIAL CAPACITY AS GENERAL COUNSEL OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division
Case No. 5:23-cv-034-H

## BRIEF OF *AMICI CURIAE* MICHAEL CHERTOFF, WILLIAM COHEN, CHUCK HAGEL, THOMAS RIDGE AND OTHER FORMER NATIONAL SECURITY OFFICIALS IN SUPPORT OF DEFENDANTS-APPELLANTS

Skye Perryman
Carrie Y. Flaxman
Kaitlyn Golden
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

John P. Elwood
Ronald D. Lee
Jeffrey H. Smith
Andrew T. Tutt
James William Feeney III
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that, in addition to the named parties, their counsel, and prior *amici*, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### *Amici Curiae*

- **Richard Armitage**

- **Michael Chertoff**

- **General Wesley Clark**

- **William Cohen**

- **Rudy de Leon**

- **Eric Edelman**

- **Chuck Hagel**

- **John Hamre**

- **General Michael Hayden**

- **Admiral Michael Mullen**

- **Thomas Ridge**

- **Suzanne Spaulding**

***Counsel for amici curiae***

ARNOLD & PORTER
KAYE SCHOLER LLP
John P. Elwood
Ronald D. Lee
Jeffrey H. Smith
Andrew T. Tutt
James William Feeney III

DEMOCRACY FORWARD FOUNDATION
Skye Perryman
Carrie Y. Flaxman
Kaitlyn Golden


SO CERTIFIED this Sixteenth day of August 2024.

/s/ *John P. Elwood*
John P. Elwood
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................iv

INTEREST OF *AMICI CURIAE* ...................................................vii

INTRODUCTION.......................................................................................1

ARGUMENT ..............................................................................................1

    I.    ATTACKS OR OTHER EVENTS THAT THREATEN NATIONAL SECURITY COULD PREVENT CONGRESS FROM GATHERING IN PERSON...............................................1

    II.   CONGRESS MUST BE FREE TO ACT SWIFTLY IN TIMES OF NATIONAL EMERGENCIES ................................................8

CONCLUSION.........................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dillon v. Gloss*,
    256 U.S. 368 (1921)...........................................................................13

*Terminiello v. City of Chicago*,
    337 U.S. 1 (1949)...............................................................................11

*Texas v. Garland*,
    No. 5:23-CV-034-H, 2024 WL 967838 (N.D. Tex. Feb. 27, 2024).........5, 11, 13

*United States v. Ballin*,
    144 U.S. 1 (1892)...........................................................................9, 13

*Walter Nixon v. United States*,
    506 U.S. 224 (1993).........................................................................13

**Constitutional Provisions**

U.S. Const. art. I, § 5, cl. 2..................................................................9, 13

U.S. Const. art. I, §§ 7–8......................................................................9

U.S. Const. art. I, § 9, cl. 7...................................................................10

**Other Authorities**

Arms Control Association, U.S. Under Anthrax Attack; Bioterror
    Source Unknown (Nov. 2001) ...........................................................8

Brian Fung, *We finally know what caused the global tech outage - and
    how much it cost*, CNN (July 24, 2024)..............................................4

Center for Counterproliferation Research, *Anthrax In America: A
    Chronology and Analysis of the Fall 2001 Attacks* (2002) ...................7

Charnetta L. Smith, et. al, *Addressing Needs of Contacts of Ebola
    Patients During an Investigation of an Ebola Cluster in the United
    States — Dallas, Texas, 2014*, U.S. Centers for Disease Control
    and Prevention (Feb. 13, 2015)..........................................................5

*Continuity of Congress: An Examination of the Existing Quorum Requirement and the Mass Incapacitation of Members: Hearing Before the Comm. on Rules*, 108 Cong. 2 (Apr. 29, 2004)..................................11

David Schaper, *It Was Shoes On, No Boarding Pass Or ID. But Airport Security Forever Changed On 9/11*, NPR NEWS (Sept. 10, 2021) ...............................................................................................................3

*The Federalist No. 23* (Alexander Hamilton)...........................................10

*The Federalist No. 59* (Alexander Hamilton)...........................................13

*Flying Again Washington's Reagan National to Reopen*, NPR NEWS (Oct. 2, 2001) ........................................................................................3

Harriet Baskas, *What to know about travel safety as the Israel-Hamas war continues*, NBC NEWS (Oct. 24, 2023).....................................2

Holly Yan, Paradise Afshar, Justin Lear & Jessie Yeung, *3,000 US flights are canceled as a global computer outage wreaks havoc on businesses, 911 systems and government agencies*, CNN (July 19, 2024) ........................................................................................................4

Kun Zhai, Xuemei Yuan & Guoqing Zhao, *The impact of major public health emergencies on Trust in Government: From SARS to COVID-19*, FRONT PSYCHOL. (Nov. 16, 2022)....................................12

Lydia Saad, *Historically Low Faith in U.S. Institutions Continues*, GALLUP (July 6, 2023) .......................................................................12

Marc Santora, *First Patient Quarantined Under Strict New Policy Tests Negative for Ebola*, N.Y. TIMES (Oct. 24, 2014)........................5

*No-Fly Zone: Ebola Quarantine Rules Keep Researchers Away*, NBC NEWS (Nov. 4, 2014)........................................................................5

Paul Kane, Congress in grip of confusion, fear over coronavirus unsure whether to stay or go, WASHINGTON POST (Mar. 10, 2020) ....................8

*Preserving Our Institutions: The First Report of the Continuity of Government Commission*, The Continuity of Government Commission (May 2003) ....................................................................12

Sara Machi, Elyssa Kaufman & Kris Habermehl, *FAA system outage disrupts thousands of flights across U.S.*, CNBC (Jan. 11, 2023)........................4

Sara Machi, Elyssa Kaufman & Kris Habermehl, *United flight to L.A. diverted to Chicago due to bomb threat*, CBS NEWS,(Feb. 21, 2024) .................................................................................................2

Sam Sweeney, Jon Haworth, Kevin Shalvey, Meredith Deliso & Josh Margolin, *Software maintenance mistake at center of major FAA computer meltdown: Official*, ABC NEWS (Jan. 11, 2023) ..................................4

Simon A. Andrew, Sudha Arlikatti, Vaswati Chatterjee & Orkhan Ismayilov, *Ebola crisis response in the USA: Communication management and SOPs*, 31 INT'L J. OF DISASTER RISK REDUCTION 243 (2018) ................................................................................5

Thomas Adamson & Jeffrey Schaeffer, *Arsonists attack French high-speed rail system hours before opening ceremonies of the Paris Olympics*, AP NEWS (July 26, 2024) .......................................2, 3

U.S. Centers for Disease Control and Prevention, *Ebola Disease Basics* (Apr. 23, 2024) ............................................................5

U.S. Gov't Accountability Office, GAO-21-86, *Aviation Cybersecurity: FAA Should Fully Implement Key Practices to Strengthen Its Oversight of Avionics Risks* ........................................3, 4

U.S. Gov't Accounting Office, Report to the Chairman, Committee on Finance, U.S. Senate, *CAPITOL HILL ANTHRAX INCIDENT EPA's Cleanup Was Successful; Opportunities Exist to Enhance Contract Oversight* (June 2003) ....................................................7, 8

# INTEREST OF *AMICI CURIAE*[1]

*Amici* represent a bipartisan coalition of former high-ranking national security officials, who have served across the government and military. *Amici* understand the myriad of threats our nation faces, and the necessary response that must be marshaled across all branches of government in response to those threats. They submit this brief to present their perspective on how requiring that Congress meet in person in order to act would undermine our nation's security.

*Amici*[2] are:

- **Richard Armitage,** Deputy Secretary of State (2001-2005), Assistant Secretary of Defense for International Security Affairs (1983-1989);

- **Michael Chertoff,** Secretary of Homeland Security (2005-2009), Judge, United States Court of Appeals for the Third Circuit (2003-2005), Assistant Attorney General for the Criminal Division (2001-2003), United States Attorney for the District of New Jersey (1900-1994);

- **General Wesley Clark,** Supreme Allied Commander Europe of NATO (1997-2000);

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than *amici*, their members, and their counsel contributed money to fund this brief. All parties consent to the filing of this brief.

[2] *Amici* all have had significant and lengthy careers; for the sake of brevity, they are identified by a subset of the positions they have held.

- **William Cohen**, Secretary of Defense (1997-2001), United States Senator (1979-1997), and United States Representative (1973-1979);

- **Rudy de Leon,** Deputy Secretary of Defense (2000-2001), Staff Director for the U.S. House Armed Services Committee (1985-1993);

- **Eric Edelman,** Undersecretary of Defense for Policy (2005-2009);

- **Chuck Hagel,** Secretary of Defense (2013-2015), United States Senator (1997-2009);

- **John Hamre**, Deputy Secretary of Defense (1997-2000);

- **General Michael Hayden**, Director of Central Intelligence Agency (2006-2009), Principal Deputy Director of National Intelligence (2005-2006), and Director of National Security Agency (1999-2005);

- **Admiral Michael Mullen**, Chairman of the Joint Chiefs of Staff (2007-2011);

- **Thomas Ridge,** Secretary of Homeland Security (2003-2005), Governor of Pennsylvania (1995-2001); and

- **Suzanne Spaulding,** Undersecretary for the Department of Homeland Security (2011-2017).

**INTRODUCTION**

*Amici* know all too well the unfortunate reality of today is that there are innumerable threats to the safety and stability of the United States. Whether those threats are foreign or domestic in origin, or unpredictable disasters or acts of God, there is a real possibility that a national security crisis could disrupt our government's ability to carry out its essential functions. It is imperative that Congress be free to act when faced with such a crisis regardless of whether its Members are able to physically convene in a single location. The Constitution vests Congress with the authority to carry out its essential functions during a national emergency. That authority lies with Congress's rulemaking power under the Constitution, which provides that the legislature itself shall determine how Congressional proceedings will be carried out. The district court's opinion undermines Congress's ability to act during times of crisis.

**ARGUMENT**

**I.     ATTACKS OR OTHER EVENTS THAT THREATEN NATIONAL SECURITY COULD PREVENT CONGRESS FROM GATHERING IN PERSON**

*Amici* know from experience that our nation faces a myriad national security threats. Some of those threats are posed by an array of malicious actors, ranging from foreign terrorist organizations and adversary foreign nations to domestic criminal entities, hackers, and homegrown terrorists. Other threats are less nefarious—such as accidents, technology errors, or public health crises—but still

pose significant national security risks especially when such events may impede Congressional ability to convene and respond to an immediate or intervening security threat. Many potential attacks or events could impair our nation's travel system—and therefore prevent Members of Congress from returning to Washington or from traveling to the Capitol—like physical or cyber attacks on infrastructure. Others, such as threats to public buildings, also may prevent Members from gathering in person.

The most apparent threat that would prevent Members from gathering in person are physical attacks on our nation's airports, railways, or roadways. Since the 9/11 terrorist attacks, security at our nation's airports has dramatically increased. But this security is not impermeable: explosives, arson, and hijackings remain an active threat.[3] And while *amici* have confidence in our security measures to deter and prevent such an attack, if one were to occur, it could result in the closure of United States airspace for a prolonged period. On September 11, 2001, the FAA Command Center closed all US airspace, and commercial flights did not resume

---

[3] *See* Sara Machi, Elyssa Kaufman & Kris Habermehl, *United flight to L.A. diverted to Chicago due to bomb threat,* CBS NEWS,(Feb. 21, 2024), https://www.cbsnews.com/chicago/news/flight-to-la-diverted-to-chicago-due-to-bomb-threat/; *see also* Harriet Baskas, *What to know about travel safety as the Israel-Hamas war continues*, NBC NEWS (Oct. 24, 2023), https://www.nbcnews.com/business/travel/travel-safety-israel-hamas-conflict-what-know-rcna121482 (quoting TSA spokesman that the TSA is operating at a "heightened level of security as a result of world events and the current threat environment"); *see also* Thomas Adamson & Jeffrey Schaeffer*, Arsonists attack French high-speed rail system hours before opening ceremonies of the Paris Olympics*, AP NEWS (July 26, 2024), https://apnews.com/article/france-trains-olympics-74c9727d33ac86bfc126f98e45cb874f.

until September 14, 2001.[4]  But not all airports resumed operations immediately. The airport closest to Washington, DC—Ronald Reagan Washington National Airport—remained closed for over three weeks, and did not reopen until October 2, 2001.[5]  Lengthy closures could prevent Members from traveling to Washington.

In today's world, though, bad actors do not need to cause physical damage to grind travel to a halt.  Much of our nation's transportation system relies on cybersecurity infrastructure.  Take air travel.  Airplanes include avionics systems— which include "engine controls, flight control systems, navigation, communications, flight recorders, lighting systems that provide interior and exterior illumination, fuel systems, weather radar, performance monitors, and systems that carry out hundreds of other mission and flight management tasks."[6]  The connectivity of "airplane networks and systems and various other systems via the Internet increasingly presents more opportunities for cyberattacks."[7]  For example, "critical data used by cockpit systems could be altered, someone with authorized access could intentionally or unintentionally misuse flight data, commercial components within

---

[4] David Schaper, *It Was Shoes On, No Boarding Pass Or ID. But Airport Security Forever Changed On 9/11*, NPR NEWS (Sept. 10, 2021), https://www.npr.org/2021/09/10/1035131619/911-travel-timeline-tsa.

[5] *Flying Again Washington's Reagan National to Reopen*, NPR NEWS (Oct. 2, 2001), https://legacy.npr.org/news/specials/americatransformed/airways/reagan.national.html.

[6] U.S. Gov't Accountability Off., GAO-21-86, *Aviation Cybersecurity: FAA Should Fully Implement Key Practices to Strengthen Its Oversight of Avionics Risks* 5 https://www.gao.gov/assets/gao-21-86.pdf.

[7] *Id.* at 19.

avionics systems could contain vulnerabilities that enable cyberattacks, and malevolent hackers could seek to disrupt flight operations with various types of attacks on navigational data."[8]

Recent technical outages show the potential havoc that a cyberattack could have on our nation's air system. In January 2023, a Federal Aviation Administration pilot alert system failed after an engineer inadvertently replaced one file with another.[9] This prompted an hour-long nationwide ground stop with effects that reverberated for days.[10] And just last month, thousands of flights were grounded in the United States (and thousands more worldwide) after a cybersecurity company released a faulty software update.[11] While these incidents were inadvertent technological errors, both demonstrate the potential cyber vulnerabilities of our aviation infrastructure, and the potential impacts on travel for Members of Congress that could preclude timely response to a national security challenge.

---

[8] *Id.*

[9] Sam Sweeney, Jon Haworth, Kevin Shalvey, Meredith Deliso & Josh Margolin, *Software maintenance mistake at center of major FAA computer meltdown: Official*, ABC NEWS (Jan. 11, 2023), https://abcnews.go.com/US/computer-failure-faa-impact-flights-nationwide/story?id=96358202.

[10] Sara Machi, Elyssa Kaufman & Kris Habermehl, *FAA system outage disrupts thousands of flights across U.S.*, CNBC (Jan. 11, 2023), https://www.cnbc.com/2023/01/11/faa-orders-airlines-to-pause-departures-until-9-am-et-after-system-outage.html.

[11] Holly Yan, Paradise Afshar, Justin Lear & Jessie Yeung, *3,000 US flights are canceled as a global computer outage wreaks havoc on businesses, 911 systems and government agencies*, CNN (July 19, 2024), https://www.cnn.com/2024/07/19/business/delta-american-airlines-flights-outage-intl-hnk/index.html; Brian Fung, *We finally know what caused the global tech outage - and how much it cost,* CNN (July 24, 2024), https://www.cnn.com/2024/07/24/tech/crowdstrike-outage-cost-cause/index.html.

Exposure to dangerous pathogens or other biohazards also could prevent Members from traveling to and convening in Washington in person.  Consider an Ebola outbreak.  Ebola is a rare, but deadly virus, with a mortality rate as high as 80 to 90 percent.[12]  From 2014 to 2016, a major Ebola outbreak ravaged West Africa, with over 11,000 confirmed deaths in Guinea, Liberia and Sierra Leone.[13]  Many U.S. states issued strict protocols to ensure that individuals who were potentially exposed did not spread the virus.[14]  After the first U.S. Ebola case occurred, legal control orders were placed on seven individuals, ordering them not to travel or leave their homes for 21 days.[15]  Just from that one case, a total of 68 health care worker contacts were eventually placed under "controlled movement restrictions," directing them to avoid going into the public and to avoid long distance travel by commercial conveyances.[16]  If there was an outbreak of Ebola, or a biological attack of another

---

[12] U.S. Centers for Disease Control and Prevention, *Ebola Disease Basics* (Apr. 23, 2024), https://www.cdc.gov/ebola/about/index.html.

[13] Simon A. Andrew, Sudha Arlikatti, Vaswati Chatterjee & Orkhan Ismayilov, *Ebola crisis response in the USA: Communication management and SOPs*, 31 INT'L J. OF DISASTER RISK REDUCTION 243 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7104258/.

[14] Marc Santora, *First Patient Quarantined Under Strict New Policy Tests Negative for Ebola*, N.Y. TIMES (Oct. 24, 2014), https://www.nytimes.com/2014/10/25/nyregion/new-york-ebola-case-craig-spencer.html; *No-Fly Zone: Ebola Quarantine Rules Keep Researchers Away*, NBC NEWS (Nov. 4, 2014), https://www.nbcnews.com/storyline/ebola-virus-outbreak/no-fly-zone-ebola-quarantine-rules-keep-researchers-away-n241051.

[15] Charnetta L. Smith, et. al, *Addressing Needs of Contacts of Ebola Patients During an Investigation of an Ebola Cluster in the United States — Dallas, Texas, 2014*, U.S. Centers for Disease Control and Prevention (Feb. 13, 2015), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6405a2.htm.

[16] *Id.*

pathogen with a long quarantine period, and a significant number of Members were exposed, it could wreak havoc on the ability of Members of Congress to gather in person.

Security threats that prevent travel to Washington, D.C., are not the only type of threat that could require flexibility in Congress's procedures: under the district court's holding, circumstances that prevent Members already present in the metropolitan Washington, D.C. area from convening in person in one physical location could cause Congress to grind to a halt. To be sure, nationwide threats unfolding over the course of days or weeks could prevent or significantly delay Congress's ability to convene in person. But what if Congress needs to convene to undertake a particular legislative task that is critical for national security and must be accomplished immediately, within a matter of hours, or within the day? Obstructing even for a few hours the ability of Congress to raise the debt ceiling or meet another critical deadline could trigger an economic crisis and global instability. The ability to convene virtually could prove a crucial tool in the event that Congress is prevented from gathering in person at a crucial moment.

This is not a hypothetical concern. Terrorists have used biological weapons to disrupt Congress before. A month after the terror attacks of September 11, 2001, the United States recorded its first death from anthrax in 25 years—a member of the

media in Florida.[17]  Then, in New York City, other cases began to appear at media outlets.[18]  Almost all of those infected in New York had come into direct contact with letters containing a mysterious powder.[19]  The crisis reached the halls of Congress in mid-October 2001 "when an anthrax-laden letter was opened in the office of Senator Tom Daschle (D-SD)."[20]  In addition, "[s]everal workers at the postal facility that processed the letter fell ill with pulmonary anthrax [and] Congressional office buildings were evacuated."[21]  A letter addressed to Senator Patrick Leahy (D-VT) "was found during a search of quarantined mail, bringing the total number of anthrax-laden letters sent to at least four."[22]

The letter to Senator Daschle "contaminated several congressional and other buildings along the mail delivery route and elsewhere, and approximately 30 congressional employees tested positive for anthrax exposure soon after."[23]  As a result of the anthrax contamination, the Hart Senate Office building—a 10-million-cubic-foot building that houses the personal legislative offices and staffs of half of

---

[17] Center for Counterproliferation Research, *Anthrax In America: A Chronology and Analysis of the Fall 2001 Attacks* 1 (2002), https://bit.ly/3WyMUfA.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] U.S. Gov't Accounting Off., Report to the Chairman, Committee on Finance, U.S. Senate, *CAPITOL HILL ANTHRAX INCIDENT EPA's Cleanup Was Successful; Opportunities Exist to Enhance Contract Oversight* 1 (June 2003), https://bit.ly/3LVWDYe.

all senators—was closed, as were several others on Capitol Hill.[24]  The building was

shuttered for more than three months at a cleanup cost of $27 million.[25]  The House

of Representatives was forced to adjourn for five days as a result of the attack.[26]

A well-timed pathogen attack on the House and Senate could force Congress

to disperse, unable to convene in time to meet a critical deadline.  Even a minor delay

of hours or days could paralyze the United States, precipitate a financial crisis, or

even trigger global instability.

## II.    CONGRESS MUST BE FREE TO ACT SWIFTLY IN TIMES OF NATIONAL EMERGENCIES

When the executive branch is faced with an emergency, it must be able to act

swiftly and decisively.  To ensure that the executive branch can do that, it is critical

that Congress remain able to do its job regardless of whether the majority of its

Members can physically convene in the same location.  In order to achieve these

aims, Congress must be permitted to set its own rules for determining whether a

quorum is present in times of crisis when physical attendance is impossible.  The

Founders knew this to be true, and accordingly granted the Houses of Congress the

flexibility to govern themselves to accomplish those ends.  The Rulemaking Clause

---

[24] *Id.*

[25] Paul Kane, Congress in grip of confusion, fear over coronavirus unsure whether to stay or go, WASHINGTON POST (Mar. 10, 2020), https://bit.ly/4fwqjc9.

[26] Arms Control Association, U.S. Under Anthrax Attack; Bioterror Source Unknown (Nov. 2001), https://bit.ly/4duGgxv.

empowers each House to "determine the Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2.  As the Supreme Court has instructed, absent a conflict with an express constitutional requirement or a violation of "fundamental rights," the rulemaking power of each House is plenary and beyond judicial review.  *United States v. Ballin*, 144 U.S. 1, 5 (1892).  This authority necessarily allows Congress broad authority to determine the best method for meeting if a physical quorum is impossible due to a national emergency.

Congress alone has the power of the purse, the power to write legislation, and the power to declare war, among other powers.  U.S. Const. art. I, §§ 7–8.  Congress's powers are "not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole."  *Ballin*, 144 U.S. at 7.  The executive branch necessarily relies on Congress being able to wield those powers in times of national crisis.  Delay, or an insufficient response to an emergency, could potentially magnify the harm.  Thus, it is imperative that Congress be free to act and wield its powers in times of crisis when it is needed most.

The Founders contemplated as much.  For instance, Alexander Hamilton acknowledged that it would be "impossible" to predict or delineate the types of threats or crises that the nation may face, and Congress must be able to exercise its powers "without limitation" to confront any such emergency:

The authorities essential to the common defense are these: to raise armies; to build and equip fleets; to prescribe rules for the government of both; to direct their operations; to provide for their support. ***These powers ought to exist without limitation, because it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent and variety of the means which may be necessary to satisfy them***. The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed.

*The Federalist No. 23* (Alexander Hamilton) (emphasis added). The Constitution serves to facilitate a functioning government, and should not be an impediment, particularly in times of emergency or crisis.

For instance, if the United States is ever faced with an imminent threat or attack from a hostile actor or actors, the executive branch may require Congressional action to authorize certain military responses. Further, regardless of the type of crisis, the executive branch will inevitably require appropriations to mount an effective emergency response. This cannot be achieved without Congressional assent. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law").

Further, in times of national emergencies all three branches of government must be able to act to allow for continuity of the government. "One of the most important duties of the Congress is to assure continuing representation and

Congressional operations for the American people during times of crisis."[27]   If Congress is unable to physically gather in the same location for a period of days, weeks, or even longer, this could mean that no legislation would be passed, no appropriations would be made, no vacancies filled, no declarations of war, and no laws to assist the intelligence community in response to a threat or attack.   It has been said that the Constitution is not a "suicide pact" but a document built on "practical wisdom." *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).   The Constitution plainly gives Congress the ability to ensure the continuity of its operations even in the face of circumstances that would prevent its Members from convening in person, and thereby potentially endanger the nation.

The district court emphasized that the Quorum Clause prevents the nation from "be[ing] governed by a small subset, particularly by those members from states closest to the capital." *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *34 (N.D. Tex. Feb. 27, 2024).   Yet, if the district court opinion is affirmed, and Members who are able and willing to govern cannot gather in a singular location to establish a physical quorum, then the nation is left with a Congress that is paralyzed to act.   Alternatively, this could create a situation where the President is left without a legislative check on his powers.   Allowing each House to meet under quorum rules

---

[27] *Continuity of Congress: An Examination of the Existing Quorum Requirement and the Mass Incapacitation of Members: Hearing Before the Comm. on Rules*, 108 Cong. 2 (Apr. 29, 2004) (Purpose of the Hearing).

that each deems appropriate in times of crisis is necessary to ensure that executive branch is able to do everything it must in response to the emergency, as well as to prevent unchecked, unilateral executive branch authority for extended periods of time.

Further, in every crisis there is an inevitable second crisis of confidence that follows, whether or not the government can respond and protect citizens in time of peril. Public confidence in the government remains at or near its all-time low,[28] and that trust generally declines during disasters.[29] Impediments to the Congress assembling only intensifies the question of credibility, and amplifies the second crisis of confidence.[30]

Finally, to effectively govern during a time of crisis, flexibility is vital. The district court's opinion has ramifications well beyond this instance of proxy voting. A judicially imposed "physical presence" requirement undermines Congress's authority and ability to govern. Congress must be free to act in times of national exigencies to fulfill its duties and execute its constitutional powers. As Alexander

---

[28] Lydia Saad, *Historically Low Faith in U.S. Institutions Continues*, GALLUP (July 6, 2023), https://news.gallup.com/poll/508169/historically-low-faith-institutions-continues.aspx.

[29] Kun Zhai, Xuemei Yuan & Guoqing Zhao, *The impact of major public health emergencies on Trust in Government: From SARS to COVID-19*, FRONT PSYCHOL. (Nov. 16, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9710386/.

[30] *Preserving Our Institutions: The First Report of the Continuity of Government Commission*, The Continuity of Government Commission, at 3 (May 2003), https://www.brookings.edu/wp-content/uploads/2016/06/continuityofgovernment.pdf.

Hamilton noted, "every government ought to contain in itself the means of its own preservation." *The Federalist No. 59* (Alexander Hamilton). The Founders **gave** Congress this means of preservation through the Rulemaking Clause, which provides that "[e]ach House may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. "The power to make rules is not one which once exercised is exhausted." *Ballin*, 144 U.S. at 5. And "'[i]t is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time." *Id.* Rather, "the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require.'" *Walter Nixon v. United States*, 506 U.S. 224, 230 (1993) (quoting *Dillon v. Gloss*, 256 U.S. 368, 376 (1921)). This constitutional authority is paramount in times of crisis when Congress **must** be able to act quickly despite the impossibility—for whatever reason—for the majority of Members to gather in a single physical location.

Rather, in holding that the Quorum Clause requires Members' physical presence, the district court ultimately undermines Congress's ability to act during times of national emergencies. The district court opinion acknowledges—albeit in a footnote—that it is "not an unforeseen problem" that the Quorum Clause may "paralyze the legislative branch" in a time of crisis. *See Garland*, 2024 WL 967838, at *35, n.19. This, however, downplays the enormity of the potential national crisis

that could be caused by an adverse ruling here.  Under the district court's rationale,

if the nation is ever faced with a national crisis that would make a physical quorum

impossible, Congress would be "paralyzed" even if the majority of Members were

able to meet remotely.  Such a constraint is neither permissible nor necessary, and

would only serve to hinder Congress's ability to respond in the time of a crisis.

## CONCLUSION

For the foregoing reasons, the Court should reverse the decision below.

Respectfully submitted,

Skye Perryman                                    */s/ John P. Elwood*
Carrie Y. Flaxman                             John P. Elwood
Kaitlyn Golden                                   Ronald D. Lee
DEMOCRACY FORWARD FOUNDATION     Jeffrey H. Smith
P.O. Box 34553                                  Andrew T. Tutt
Washington, DC 20043                       James William Feeney III
(202) 448-9090                                  ARNOLD & PORTER
                                                         KAYE SCHOLER LLP
                                                      601 Massachusetts Ave., NW
                                                      Washington, DC 20001
                                                      (202) 942-5000

                                                      *Counsel for Amici Curiae*
                                                      Dated: August 16, 2024

## CERTIFICATE OF COMPLIANCE
### With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

I certify that this filing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 3,301 words.

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font, with 12-point font for footnotes.

*/s/ John P. Elwood*
Dated: August 16, 2024

## CERTIFICATE OF SERVICE

I, John P. Elwood, counsel for *amici*, certify that on August 16, 2024, a copy of the foregoing brief was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

*/s/ John P. Elwood*
Dated: August 16, 2024