No. 24-10386

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellee,*

*v.*

MERRICK GARLAND, U.S. ATTORNEY GENERAL, IN HIS OFFICIAL CAPACITY AS UNITED STATES ATTORNEY GENERAL; CHARLOTTE A. BURROWS, IN HER OFFICIAL CAPACITY AS CHAIR OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; JOCELYN SAMUELS, IN HER OFFICIAL CAPACITY AS VICE CHAIR OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; KEITH SOLDERLING, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHRISTOPHER W. LAGE, IN HIS OFFICIAL CAPACITY AS GENERAL COUNSEL OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division

**BRIEF FOR APPELLEE THE STATE OF TEXAS**

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

JACOB C. BEACH
Assistant Solicitor General


Counsel for Appellee State of Texas

# Certificate of Interested Persons

No. 24-10386

### State of Texas,

*Plaintiff-Appellee,*

*v.*

Merrick Garland, U.S. Attorney General, in his official capacity as United States Attorney General; Charlotte A. Burrows, in her official capacity as Chair of the U.S. Equal Employment Opportunity Commission; Jocelyn Samuels, in her official capacity as Vice Chair of the U.S. Equal Employment Opportunity Commission; Keith Solderling, in his official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; Andrea R. Lucas, in her official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; Christopher W. Lage, in his official capacity as General Counsel of the Equal Employment Opportunity Commission; Equal Employment Opportunity Commission; United States Department of Justice,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ Aaron L. Nielson

Aaron L. Nielson
*Counsel of Record for Plaintiff-Appellee*
*The State of Texas*

i

## Statement Regarding Oral Argument

The district court permanently enjoined Appellants—the federal government—from enforcing against Texas a piece of federal legislation. Texas agrees with the federal government that this significant appeal warrants oral argument.

# Table of Contents

Page

Certificate of Interested Persons ..................................................................i

Statement Regarding Oral Argument ...................................................ii

Table of Authorities ........................................................................................v

Introduction ....................................................................................................1

Statement of Jurisdiction .............................................................................2

Issues Presented ..............................................................................................2

Statement of the Case ...................................................................................2

    I.   The Constitution's Physical-Presence Requirement ....................2

        A.  The Constitution requires physical presence ....................2

        B.  The House's departure from the Constitution's physical-presence requirement ..........................................................5

    II.  The Consolidated Appropriations Act of 2023 .............................6

        A.  The Act .....................................................................................6

        B.  Congress's vote without a majority of physically present Members ...............................................................7

    III. Procedural History ...........................................................................8

Summary of the Argument ........................................................................ 11

Standard of Review .................................................................................... 13

Argument ...................................................................................................... 13

    I.   The enrolled-bill doctrine does not preclude review. .............. 13

        A.  This case presents no fact disputes and requires interpreting a constitutional provision. ............................... 13

        B.  The federal government's counterarguments fail. ........... 19

    II.  The Quorum Clause requires physical presence. .....................26

        A.  The Quorum Clause's text, structure, history, and tradition confirm the Constitution's physical presence requirement. .............27

        B.  The federal government's counterarguments again fail. ...................36

    III. Judge Hendrix properly granted a permanent injunction ..........................48

Conclusion ....................................................................................................48

Certificate of Service..............................................................................................49

Certificate of Compliance ......................................................................................49

# Table of Authorities

Page(s)

**Cases:**

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023) ........................................... 27, 29, 33, 34

*Barron v. United States*,
111 F.4th 667 (5th Cir. 2024) ........................................................ 23

*Centaur Partners, IV v. Nat'l Intergroup, Inc.*,
582 A.2d 923 (Del. 1990) .............................................................. 47

*Cohens v. Virginia*,
19 U.S. 264 (1821) ....................................................................... 17

*Dep't of Transp. v. Ass'n of Am. Railroads*,
575 U.S. 43 (2015) ....................................................................... 47

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..................................................................... 29

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ..................................................................... 27

*Evans v. Browne*,
30 Ind. 514 (1869) ....................................................................... 25

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ................................................................ 42-43

*Garrett v. Lumpkin*,
96 F.4th 896 (5th Cir. 2024) .......................................................... 21

*Giles v. California*,
554 U.S. 353 (2008) ................................................................. 27, 45

*Heinsohn v. Carabin & Shaw, P.C.*,
832 F.3d 224 (5th Cir. 2016) ........................................................... 8

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) ...................................................................... 41

*INS v. Chadha*,
462 U.S. 919 (1983) ...................................................................... 47

*Loper Bright Enters. v. Raimondo*,
144 S.Ct. 2244 (2024) ................................................................... 43

*Marbury v. Madison*,
5 U.S. 137 (1803) .............................................. 10, 23, 26, 29, 32, 43

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892) ........... 8-9, 11, 12, 13, 14, 15, 18, 19, 20, 21, 22, 24, 25, 26, 43

*Moore v. Harper*,
   600 U.S. 1 (2023) ............................................................. 33

*Morrison v. Olson*,
   487 U.S. 654 (1988) ......................................................... 39

*United States v. Munoz-Flores*,
   495 U.S. 385 .............................. 11, 13, 15, 16, 17, 20, 21, 22, 23, 25, 26

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ...................................................... 34, 44, 45

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
   103 F.4th 1097 (5th Cir. 2024) ......................................... 37

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ...................................... 16, 35, 36, 40, 44, 46, 47

*The Pocket Veto Case*,
   279 U.S. 655 (1929) ........................................................ 33

*Powell v. McCormack*,
   395 U.S. 486 (1969) ..................................................... 17, 18

*Pub. Citizen v. U.S. Dist. Ct. for D.C.*,
   486 F.3d 1342 (D.C. Cir. 2007) .................................... 21, 22

*Rucho v. Common Cause*,
   588 U.S. 684 (2019) ........................................................ 39

*Seila L. LLC v. CFPB*,
   591 U.S. 197 (2020) ........................................................ 33

*Sturgeon v. Frost*,
   587 U.S. 28 (2019) .......................................................... 45

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ........................................... 13

*Texas v. Yellen*,
   105 F.4th 755 (5th Cir. 2024) ......................................... 13

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*,
   761 F.3d 409 (5th Cir. 2014) ........................................... 21

*U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
   508 U.S. 439 (1993) .................................................... 15, 20

*United States v. Ballin*,
   144 U.S. 1 (1892) .................... 18, 19, 23, 24, 25, 35, 36, 38, 40, 43, 46

*United States v. Rahimi*,
    144 S.Ct. 1889 (2024) ............................................. 27, 29, 33, 34, 45
*Wesberry v. Sanders*,
    376 U.S. 1 (1964) .................................................................................5
*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................47

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. art. I:
    §5, cl. 1.................................................................1, 4, 10, 17, 34
    §5, cl. 2 ..........................................................................................28
    §5, cl. 3 ..........................................................................................24

28 U.S.C.:
    §1291 ...............................................................................................2
    §1331...............................................................................................2

42 U.S.C.:
    §2000e-5..........................................................................................6

Tex. Lab. Code §21.106(a) .................................................................8

Tex. Gov't Code §180.004 .................................................................8

H.R. Rule III:
    117th Cong. (2021) .........................................................................5
    118th Cong. (2023).........................................................................5

H.R. Res. 8, §3(s), 117th Cong. (2021) ........................................5, 6

H. Res. 965, 116th Cong. (2020) ...................................................5, 6

167 Cong. Rec. H5497–98 (2021) .......................................................7

168 Cong. Rec. H9745–52 (2022).......................................................7

N.H. Const. of 1776, preamble ...........................................................3

N.J. Const. of 1776, art. III ..............................................................3

N.Y. Const. of 1777, art. XII ............................................................3

**Other Authorities:**

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833) .... 29, 32

4 Edward Coke, Institutes of the Laws of England 12 (W. Clarke and
    Sons 1817) (1644) ..................................................................... 3, 30

Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71
    U. Chi. L. Rev. 361 (2004) ........................................................15–16

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ..................................................................... 37

Benjamin Franklin, Proposed Articles of Confederation [on or before 21 July 1775] (William B. Willcox ed., 1982) ...................................... 41

The Documentary History of the Ratification of the Constitution, (John P. Kaminski et al., eds., 1976) .............................................. 3, 31

Federalist No. 47 (James Madison) (C. Rossiter ed., 1961) .................................... 38

Harold H. Burton & Thomas E. Waggaman, *The Story of the Place: Where First and A Streets Formerly Met at What Is Now the Site of the Supreme Court Building*, 51/52 Recs. of the Colum. Hist. Soc'y 138 (1951/1952) ....................................................................................... 34

House of Commons, *Vote by Proxy* (T. Duncombe), 38 Commons Sitting Col. 762 (May 9, 1837) ................................................... 3, 4, 30

Ittai Bar-Siman-Tov, *Legislative Supremacy in the United States?: Rethinking the "Enrolled Bill" Doctrine*, 97 Geo. L.J. 323 (2009) ...................... 15

James Madison, *Notes of Debates in the Federal Convention of 1787* (W.W. Norton & Co. 1987) (1840) ...................................................... 4

Jean-Louis De Lolme, The Constitution of England 227 (Arno Press, pub., 1979) ............................................................................... 30

John Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 202 (2007) .................... 47

Kimo Gandall, *Proxies, Quorum, and Legislative Immunity*, Harvard J. L. Pub. Pol'y Per Curiam (Aug. 1, 2024), ................................... 4-5, 31

Lindsay M. Chervinsky, *Interpreting Article II, Section 2: George Washington and the President's Powers*, 37 Law & Hist. Rev. 725 (2019) ....................................................................................... 35

Matthew D. Adler & Michael C. Dorf, *Constitutional Existence Conditions and Judicial Review*, 89 Va. L. Rev. 1105 (2003) .............................. 15

Nat'l Park Serv., *The Constitutional Convention: A Day by Day Account for May 1787, May 25, 1787: Quorum* .................................................. 3

Paul Seaward, *Pairs and Proxies*, History of Parliament (Oct. 1, 2018) ................... 30

S. Journal, 1st Cong., 1st Sess. 6 (1789) ........................................................ 33

Victoria F. Nourse, *The Constitution and Legislative History*, 17 U. Pa. J. Const. L. 313 (2014) ................................................................... 16

W. Blackstone, Commentaries on the Laws of England 168 (Sharswood ed. 1893) ............................................................................ 30

# Introduction

For more than two centuries, it was common ground that—pursuant to the Constitution's Quorum Clause—the U.S. House of Representatives ("the House") cannot enact legislation absent a quorum of physically present Members. Yet in 2020, the House for the first time began using "proxy voting" to enact legislation without a quorum of present Members. After exhaustively evaluating the Quorum Clause's text, structure, history, tradition, and precedent, Judge Wes Hendrix of the Northern District of Texas concluded that such practice violates the Quorum Clause.

This Court should affirm. The Quorum Clause requires that a "Majority" of the "Members" of the House must be present for there to be a "Quorum to do Business." U.S. Const. art. I, §5, cl. 1. It also provides that "a smaller Number … may be authorized to *compel the Attendance* of *absent Members*, in such Manner, and under such Penalties as each House may provide." *Id.* (emphases added). If physical presence were not required, the notion of an "absent Member" would be nonsensical. And if such plain constitutional language were not enough, more than 230 years of practice doom this approach. As Judge Hendrix demonstrated, even in times of national crisis, neither the Senate nor the House has ever before purported to enact legislation by counting absent Members as present.

Judge Hendrix's scholarly opinion speaks for itself. With analysis spanning more than one hundred pages, he judiciously considered, and ultimately rejected, each of the federal government's arguments. And the proof that Judge Hendrix answered the question correctly is in the pudding. Time and again, the federal government's briefing ducks his analysis while instead appealing to misguided policy concerns. Yet

as Judge Hendrix explained, the question here is not one of policy—it is a pure issue of constitutional interpretation. By any measure, the Quorum Clause does not allow the House to nullify the Constitution's physical-presence requirement.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331. ROA.67. Judge Hendrix entered final judgment on February 27, 2024, permanently enjoining the federal government from enforcing the Pregnant Worker Fairness Act ("PWFA") against Texas. ROA.1404. Because the federal government filed a timely notice of appeal, ROA.1405, this Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

(1) Whether the enrolled-bill doctrine bars courts from enforcing the Quorum Clause even where, as here, it is undisputed that a majority of House Members was not physically present for the relevant vote.

(2) Whether the Quorum Clause requires the physical presence of a majority of Members for the House to enact legislation.

(3) Whether Judge Hendrix abused his discretion by permanently enjoining enforcement of the PWFA against Texas.

## STATEMENT OF THE CASE

### I.   The Constitution's Physical-Presence Requirement

### A.  The Constitution requires physical presence.

Quorum requirements mandating the physical presence of legislators to conduct business are not new. Even before the Constitutional Convention—which itself

required a quorum, *see* Nat'l Park Serv., *The Constitutional Convention: A Day by Day Account for May 1787, May 25, 1787: Quorum*, https://perma.cc/52TJ-GQV7—such "requirements were commonplace in the thirteen states," ROA.1376.

For example, in New York, the state constitution established that "a majority … of senators … shall be necessary to constitute a senate sufficient to proceed upon business;" so, too, with the "assembly" (i.e., the House). N.Y. Const. of 1777, art. XII.[1] For their parts, New Jersey provided that "no Law shall pass, unless there be a Majority of all the Representatives of each Body personally present and agreeing thereto," N.J. Const. of 1776, art. III, while New Hampshire's upper house consisted of twelve councilmen, "any seven of whom to be a quorum to do business," N.H. Const. of 1776, pmbl. Even Rhode Island, which operated under a Royal Charter until 1843, required its governing body to obtain a quorum prior to acting, a tool the anti-federalists used to prevent Rhode Island from sending delegates to the Constitutional Convention. *See* 24 *Documentary History*, *supra*, at 3-5. This is not because proxy voting was unknown; to the contrary, it was a familiar—and often abused—feature of the English House of Lords. *See, e.g.*, House of Commons, *Vote by Proxy* (T. Duncombe), 38 Commons Sitting Col. 762 (May 9, 1837) (citing Edward Coke, 4 *Institutes of the Laws of England: Concerning the Jurisdiction of Courts* 12 (London,

---

[1] *See, e.g.*, New York Daily Advertiser, Jan. 8, 1788, in 34 The Documentary History of the Ratification of the Constitution 132 (John P. Kaminski et al., eds., 1976) [hereinafter "Documentary History"] ("Saturday twenty-four Members of Assembly, and eight Senators attended; and it is expected there will, by to-morrow, be a sufficient number of Members to make a quorum.").

E. & R. Brooke 15th ed. 1797) (1644)). Proxy votes, however, were banned in the House of Commons. *Id.*

The Framers were aware of these practices when they wrote the Constitution in 1787. The Quorum Clause provides that:

> [A] Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

U.S. Const. art. I, §5, cl. 1.

At the framing, this language was understood as requiring physical presence. For example, delegates to the Constitutional Convention balanced "the difficulties of … having to travel to and remain in the capital for a quorum" against the risk of "the power of a few" to disrupt legislation "by seceding at a critical moment." ROA1376-80 (quoting James Madison, *Notes of Debates in the Federal Convention of 1787* 425, 428-31 (W.W. Norton & Co. 1987) (1840)). And for more than 230 years, no one disagreed. ROA.1370. Congress did not permit absent Members to count towards a quorum despite: (i) wars, including the War of 1812, the Civil War, and the terrorist attacks of September 11, 2001; (ii) technological advancements, including the tele-graph, telephone, and email; and (iii) even global health crises like the Yellow Fever Epidemic (1793) and Spanish Flu Pandemic (1918). To the contrary, history shows that "the physical presence of members of a body to approve legislation is the very essence of a democratic body, without which there is, almost literally, 'legislation without representation.'" Kimo Gandall, *Proxies, Quorum, and Legislative Immunity*,

Harvard J. L. Pub. Pol'y Per Curiam (Aug. 1, 2024), https://perma.cc/PLK9-Q4FX (citing *Wesberry v. Sanders*, 376 U.S. 1, 13–14 (1964)).

Consistent with this history, Rule III of the Rules of the House of Representatives requires "[e]very Member [to] be present within the Hall of the House during its sittings, unless excused or necessarily prevented," and prohibits another person or Member from casting the vote or recording the presence of a Member. H.R. Rule III, 118th Cong. (2023); H.R. Rule III, 117th Cong. (2021). This is not a new requirement. ROA.1370.

## B.  The House's departure from the Constitution's physical-presence requirement.

Congress—and, as especially relevant here, the House—abandoned this longstanding physical-presence requirement in May 2020. *See* H. Res. 8, §3(s), 117th Cong. (2021) (citing H. Res. 965, 116th Cong. (2020)). In the wake of Covid, the House began "treating an absent member as a member of the quorum," which "is an aberration adopted only by [those] Congresses ...." ROA.1370. The House did so by adopting a resolution allowing the Speaker to "designate a period ... during which a Member who is designated by another Member as a proxy ... may cast the vote of such other Member or record the presence of such other Member in the House." H. Res. 965, §1(a). Members—"[n]otwithstanding rule III"—thus could "designate[] another Member as a proxy" to "cast the vote" of the designating Member if "a public health emergency due to a novel coronavirus is in effect." *Id.* And "[a] Member whose vote is cast or whose presence is recorded by a designated proxy ... shall

be counted for the purpose of establishing a quorum under the rules of the House." *Id.* §3(b).

To designate a proxy, the Member was required to submit a signed letter to the House Clerk specifying the proxy's name and to provide "an exact instruction ... with respect to such vote or quorum call." *Id.* §§2(a)(1), 3(c)(1). For any final vote when proxy participation was permitted, "[t]he Majority Leader" was required to "provide Members with 24-hours' notice." ROA.1292. The House continued this new practice during the 117th Congress. *See* H.R. Res. 8 §3(s).

## II.  The Consolidated Appropriations Act of 2023

### A.  The Act

The Consolidated Appropriations Act of 2023 ("the Act") is an omnibus statute including many pieces of legislation, including the twelve regular annual appropriations bills that fund the federal government's operations. ROA.1295. In addition to these annual appropriations bills, the Act contains supplemental appropriations and several pieces of permanent legislation, including a law allowing a pilot program in which aliens are allowed to remain in local communities during immigration proceedings and—as relevant here—the PWFA. ROA.1295.

The PWFA amends Title VII of the Civil Rights Act to open the States to lawsuits to which they have never been subjected. ROA.1296-98, 1316-27. Under the PWFA, States must respond to charges of discrimination filed with the Equal Employment Opportunity Commission (EEOC), investigations by the EEOC and lawsuits by the U.S. Attorney General. *See, e.g.*, 42 U.S.C. §2000e-5. The PWFA also

provides that "[a] State shall not be immune under the 11th Amendment to the Constitution from an action in a Federal or State court of competent jurisdiction for a violation of this division." Pub. L. 117-328, Div. II, §106, 136 Stat. 4459 (codified at 42 U.S.C. §2000gg-4).

## B. Congress's vote without a majority of physically present Members.

After the House passed the Act in September 2021, 167 Cong. Rec. H5497–98 (2021), the Senate passed a different version in November 2022, *id.* at S6704 (2022). To reconcile the two bills, both Houses compromised. On December 14, 2022, the House of Representatives agreed to several of the Senate's amendments while also adding an additional amendment of its own. 168 Cong. Rec. H9745–52, H9790–803 (2022). On December 22, 2022, the Senate added new amendments and in voted in favor it. *Id.* at S10077.

The next day, 201 Members of the House of Representatives—far short of a majority of Members—met in person in the Capitol to consider the Act again. A Member questioned whether there was a quorum, which should have led to a roll call vote. ROA.1389. Instead of entertaining the quorum call, however, the Speaker of the House announced that there was a quorum *as defined by the house rule* and declined to count the Members physically present. ROA.1294. Those present proceeded to vote on accepting the Senate's amendments. According to the Clerk of the House, the final tally was 225 yea, 201 nay, and 1 present. 168 Cong. Rec. H10528-29 (2022). The extra 226 votes—88 yeas and 113 nays—were cast by Representatives who were appointed as proxies for absent Members. *Id.* The week after House Members voted

on H.R. 2617, President Biden signed the Act. ROA.1294-95. Thereafter it was enrolled as Public Law 117-328 on December 29, 2022. ROA.1295.

## III. Procedural History

The State filed this lawsuit and moved for a preliminary injunction in February 2023, alleging that the House lacked a quorum when it voted for the Act. ROA.66; *see also* ROA.26. While 427 out of 431 Members voted on the Act, 226 Members are officially recorded in the congressional record as having voted pursuant to the House's proxy-voting procedures. ROA.68. Based on that record, only 201 Members were physically present during the House's vote, which is less than the majority threshold that the Quorum Clause requires. ROA.65, 74.

Texas provides generous benefits to pregnant workers. *See, e.g.*, Tex. Loc. Gov't Code §180.004; Tex. Lab. Code §21.106(a); *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016). The PWFA, however, purports to preempt Texas law and expose the State to new liability, thus increasing the State's administrative burdens while not providing more meaningful protection for pregnant workers.

Texas explained that because of this constitutional violation, the Act was invalid and sought injunctive relief against the PWFA and the Act's new immigration program. ROA.1296. The federal government opposed the preliminary injunction and moved to dismiss. Judge Hendrix consolidated a hearing on the motions with a bench trial and entered final judgment in favor of Texas. ROA.1403-04.

Judge Hendrix first concluded that Texas's claim is justiciable. To do so, he addressed the enrolled-bill doctrine of *Marshall Field & Co. v. Clark*, which provides that "an enrolled act, … attested by the signatures of the presiding officers of the

8

two houses of congress, and the approval of the president, is conclusive evidence that it was passed by congress, according to the forms of the constitution." 143 U.S. 649, 673 (1892); *see also* ROA.1342-49. Relying on Supreme Court precedent interpreting *Marshall Field*, Judge Hendrix concluded that this evidentiary principle does not bar Texas's claim, which "centers around a legal challenge to the House's rule" permitting Members to vote remotely and still be counted towards a quorum. ROA.1355. That distinction is key, the Supreme Court has explained, because the enrolled-bill doctrine does not bar constitutional challenges or apply when no facts are disputed. *See infra* 16-18. Here, there is no dispute that the Act was enacted without a majority of Members being physically present. ROA.1351, 1355.

Judge Hendrix also concluded that Texas—as a regulated party—has standing to raise its constitutional claim and disagreed with the federal government that this lawsuit offends the political-question doctrine. After all, "Texas's challenge involves ordinary constitutional interpretation of a restriction on congressional power," and does not require "[t]he Court … [to] engage in policymaking to resolve the merits." ROA.1285, 1357. Indeed, courts "routinely" interpret "the Constitution's text, original public meaning, and historical practice." ROA.1285.[2]

On the merits, Judge Hendrix concluded that the Quorum Clause contains a "physical-presence requirement." ROA.1373, 1391-92. Even if the word "quorum" does not by itself answer the question, the Quorum Clause further provides that "a

---

[2] The federal government has abandoned its arguments regarding standing and the political-question doctrine. To the extent this Court considers such questions, Judge Hendrix's analysis confirms that this Court has jurisdiction.

smaller Number" of Members may "compel the Attendance of absent Members, in such Manner, and under such Penalties, as each House may provide." U.S. Const. art. I, §5, cl. 1; ROA.1373. Judge Hendricks reasoned that the power to "compel" "the attendance of" Members who are "absent" "would serve no purpose if" Members were not required to be physically present to count towards a quorum. ROA.1373.

Judge Hendrix found further support from the Constitutional Convention, where delegates discussed the issue at length, including the difficulty of travel. ROA.1377-79 (citing, *inter alia*, Madison, *supra*, at 430). That debate also makes no sense unless the Quorum Clause requires the physical presence of Members. ROA.1379. Judge Hendrix also detailed the practices of early Congresses, which assembled in person and adjourned when a majority of Members was not physically present—another practice that makes no sense absent a physical-presence requirement. ROA.1381-82. Furthermore, Congress's consistent practice for more than 200 years further confirms that the Constitution requires physical presence. ROA.1370.

Judge Hendrix also addressed counterarguments. He acknowledged, for example, that Congress conducts business by unanimous consent, which sometimes means a majority is not physically present. ROA.1386-87. Yet under unanimous consent, "no counting of votes occurs" and a unanimous consent agreement "ends if someone objects." ROA.1389. By contrast, here, official counts were performed, and objections were ignored.

Finally, Judge Hendrix concluded that Texas "carried its burden" as to the remaining injunction factors. ROA.1392. Texas, for example, "faces irrecoverable

compliance costs and the waiver of its sovereign immunity." ROA.1393. Considering Texas's "strong public interest in favor of preventing unlawful and unconstitutional government action" combined "with the narrow scope of the injunctive remedy needed to prevent harm to Texas," ROA.1393, Judge Hendrix granted a permanent injunction against enforcement of the PWFA against Texas, ROA.1401.[3]

## Summary of the Argument

The Quorum Clause imposes on Congress a physical-presence requirement. Not only is that what Constitution says, it's also the only interpretation that accounts for the Clause's structure, history, tradition, and two centuries of implementation. Judge Hendrix thus did not remotely abuse his discretion by enjoining the federal government from enforcing the PWFA against Texas.

I.    On appeal, the federal government doubles down on its argument that the enrolled-bill doctrine bars all Quorum Clause litigation. Judge Hendrix, however, correctly relied on the Supreme Court's instruction that *Marshall Field* "concerned 'the nature of the evidence' the Court would consider in determining whether a bill had actually passed Congress," and that where—as here— "a constitutional provision *is* implicated, *Field* does not apply." *United States v. Munoz-Flores*, 495 U.S. 385, 391 n.4 (1990) (quoting *Marshall Field*, 143 U.S. at 670). Because there is no dispute that a majority of the House was not physically present when it voted on the Act, the

_____

[3] Judge Hendrix found that Texas lacked standing to challenge the Act's immigration pilot program. ROA.1341. Texas did not cross-appeal this issue.

rule of evidence is irrelevant. Regardless, the *Marshall Field* rule does not bar suits about the meaning of constitutional provisions. *Id.*

**II.**   The Quorum Clause requires that a majority of House Members be physically present to legislate. Judge Hendrix correctly looked at the Constitution's plain text, as confirmed by structure, history, tradition, and precedent, to conclude that the Quorum Clause operates as a constraint on legislative power that courts are dutybound to enforce. All these tools of interpretation point the same way: The Constitution imposes a physical-presence requirement on the House. Because the uncontested record confirms that a majority of the House was not physically present to vote on the Act, the PWRA was never validly enacted.

The federal government offers numerous counterarguments, none of which is new or persuasive. The federal government has no good answer for what the Constitution says—let alone how it has been interpreted since 1789. Instead, it leans heavily on policy arguments while repeatedly ignoring critical aspects of Judge Hendrix's analysis. The Court can and should affirm that analysis, which addresses point-by-point every counterargument offered by the federal government.

**III.** Finally, Judge Hendrix properly granted a permanent injunction. He emphasized "the narrow scope of the injunctive remedy needed to prevent harm to Texas" and Texas's strong interest in "preventing unlawful and unconstitutional government action." ROA.1393. The federal government does not raise (and thus forfeits) any arguments on this front.

## Standard of Review

This Court reviews a district court's grant of a permanent injunction for abuse of discretion. *Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024). "A district court abuses its discretion if it (1) relies on clearly erroneous factual findings or erroneous conclusions of law when deciding to grant the injunction, or (2) misapplies the factual or legal conclusions when fashioning its injunctive relief." *Texas v. United States*, 50 F.4th 498, 530 (5th Cir. 2022).

## Argument

### I.  The enrolled-bill doctrine does not preclude review.

Having abandoned its arguments about standing and the political-question doctrine, the federal government's lead argument is that Judge Hendrix misapplied the enrolled-bill doctrine. Yet as the Supreme Court has explained, that doctrine does not apply where, as here, no factual dispute exists, and certainly does not prevent courts from interpreting the Constitution.

### A.  This case presents no fact disputes and requires interpreting a constitutional provision.

**1.**  As Judge Hendrix explained, the enrolled-bill doctrine "concerns 'the nature of the evidence the Court [may] consider in determining whether a bill had actually passed Congress.'" ROA.1343-44 (alteration in original) (quoting *Munoz-Flores*, 495 U.S. at 391 n. 4). "After a bill is signed by the leaders of the House and Senate, signed by the President, and filed by the Secretary of State, the bill is considered enrolled and conclusively proven to have been passed by Congress." ROA.1342 (citing *Marshall Field*, 143 U.S. at 672). Thus, "when a party challenges whether each

house of Congress passed a bill with identical text, the enrolled bill doctrine dictates that a court must treat the enrolled bill as indisputable evidence that the enrolled text was adopted by both houses." ROA.1342. Courts therefore may not "consult legislative journals to resolve questions of whether the law in question is the same one that passed either house of Congress and that the President signed." ROA.1342 (citing *Marshall Field*, 143 U.S. at 668-73).

The doctrine's origin demonstrates its narrowness. In *Marshall Field*, textile importers challenged a tariff by focusing on a paragraph in the House-approved version of the bill that was absent in the version signed by the President. 143 U.S. at 662-65, 669. This flaw, the importers argued, meant the bill never became law. *Id.* at 668-69. The Supreme Court rejected that challenge by recognizing an "evidence" rule barring courts from comparing versions of statutes against enrolled bills to prevent "a state of uncertainty" that "would lead to mischiefs absolutely intolerable." *Id.* at 675. The Court also emphasized that "[t]he signing by the speaker of the house of representatives, and by the president of the senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress" because an enrolled bill is "a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress." *Id.* at 672. The Court was clear, however, that although the judiciary should not second guess whether the words in an enrolled bill are accurate, judges should "determine, when the question properly arises, whether the act so authenticated, is in conformity with the Constitution." *Id.*

14

Accordingly, the enrolled-bill doctrine has a limited scope. As Judge Hendrix recognized, the doctrine does not apply where there is no evidentiary question to answer—such as when facts are undisputed. ROA.1346. Nor does it bar courts from interpreting constitutional constraints on Congress. ROA.1346.

Supreme Court precedent confirms Judge Hendrix's understanding of *Marshall Field*. In *Munoz-Flores*, the Court rejected that an enrolled bill's designation as a House or Senate resolution is dispositive for purposes of an Origination Clause challenge. 495 U.S. at 391 n.4; *accord* ROA.1345. Justice Scalia, concurring, cited *Marshall Field* to argue that the Court cannot consider whether a bill's origination designation is accurate. *Munoz-Flores*, 495 U.S. at 408-09. The Court, however, disagreed, explaining that *Marshall Field* "concerned 'the nature of the evidence' the Court would consider in determining whether a bill had passed Congress." *Id.* at 391 n.4 (majority op.). As an evidentiary rule, the enrolled-bill doctrine is "'irrelevant' where 'there is no doubt … that the [challenged act] as printed in the Statutes at Large is identical to the enrolled bill.'" ROA.1346 (second alteration in original) (quoting *U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 n.7 (1993)). Furthermore, "[w]here … a constitutional provision *is* implicated, *Field* does not apply." *Munoz-Flores*, 495 U.S. at 391 n.4.

Given this precedent, a wide range of scholars agree that the enrolled-bill doctrine is narrow. *See* ROA.1348 (citing, *inter alia*, Matthew D. Adler & Michael C. Dorf, *Constitutional Existence Conditions and Judicial Review*, 89 Va. L. Rev. 1105, 1181 (2003); Ittai Bar-Siman-Tov, *Legislative Supremacy in the United States?: Rethinking the "Enrolled Bill" Doctrine*, 97 Geo. L.J. 323, 351-52 (2009); Adrian

Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. Chi. L. Rev. 361, 426 n.209 (2004)). That is because, "[i]n general, the 'enrolled bill doctrine'"—a "much criticized" and now "cabined" doctrine—"applies in a very limited set of cases in which a litigant is claiming that a clerk made an error in transcription." Victoria F. Nourse, *The Constitution and Legislative History*, 17 U. Pa. J. Const. L. 313, 336 (2014). But where, as here, "the dispute turns on a clear constitutional limitation on Congress's power that does not devolve into battles over conflicting legislative records, the mere act of enrollment cannot thwart a court's ordinary power to resolve constitutional challenges." ROA.1342-43.

**2.**    The enrolled-bill doctrine does not preclude Texas's Quorum Clause claim for two reasons: (1) the facts are undisputed and (2) "'[w]here, as here, a constitutional provision is implicated,' the … doctrine generally 'does not apply.'" ROA.1356 (quoting *Munoz-Flores*, 495 U.S. at 391 n.4 (emphasis omitted)).

*First*, this is not a case where anyone disagrees about what language Congress voted on and the President signed. Instead, the question is about the House's voting rule. And even as to this particular vote, no facts are disputed. Even the federal government agrees that: 201 Members were present to vote and 226 were not; a Member called a point of quorum; the House record identifies who was present; and the Speaker permitted the vote in the absence of a physical majority. *See* Fed.Gov.Br.10. Thus, "the Court is not asked to inquire into the accuracy of the House's method of counting. Both parties accept the House's record as the definitive evidence of how the Members participated in the vote in question—whether in person or by proxy." ROA.1365-66; *accord NLRB v. Noel Canning*, 573 U.S. 513, 554 (2014) (consulting

the Senate Journal and Congressional Record). Because there is no evidentiary dispute, there is no reason to apply the enrolled-bill doctrine's rule of evidence.

*Second*, regardless, "Texas's claim implicates a constitutional provision and does not contest whether the Act contains the text adopted by Congress." ROA.1349. Accordingly, this is a situation in which the Supreme Court has said—explicitly—that the enrolled-bill doctrine "does not apply." *Munoz-Flores*, 495 U.S. at 391 n.4. Instead, whether the House's amended (and unprecedented) rule allowing proxy voting comports with the Constitution is a pure question of law, and courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821).

**3.** Furthermore, constitutional structure confirms that the enrolled-bill doctrine does not apply here. The Quorum Clause constrains Congress's power; it is not a grant of power. This distinction is critical. Whereas Courts are reluctant to second-guess Congress's exercises of power plainly granted, they have no such reluctance to enforce the constraints on Congress's power.

Although the federal government has abandoned its argument that this case presents a nonjusticiable political question, *Powell v. McCormack*, 395 U.S. 486 (1969), provides guidance here. In *Powell*, the Supreme Court explained how to delineate between permissible constitutional interpretation (which courts must do) and impermissible infringement on other branches (which courts must not do). The case concerned the Qualifications Clause, which provides that "[e]ach House shall be the Judge of the … Qualifications of its own Members." U.S. Const. art. I, §5, cl. 1. The question was whether that language allows Congress—under the pretense of judging

qualifications—to add new ones. *Powell*, 395 U.S. at 520-22. The Supreme Court held that although Congress's factual judgment regarding qualifications generally cannot be second guessed, judges can prevent Congress from misinterpreting what the Constitution says. *Id.* at 489, 547-48. So, when the House excludes a Member-elect for reasons the Constitution does not allow, courts may resolve the constitutional question. *Id.*

The analogy between *Powell* and *Marshall Field* jumps off the page. Congress has a free hand to judge whether the contents of an enrolled bill are accurate, just as Congress has a free to hand to judge whether a Member-elect satisfies the Constitution's eligibility requirements. But Congress has no power to adopt a voting rule that conflicts with the Constitution's quorum requirements, just as it has no power to adopt eligibility rules contrary to the Constitution's eligibility requirements.

In fact, the Supreme Court has already applied this distinction in the context of ascertaining a quorum. ROA.1351-52. *United States v. Ballin*, 144 U.S. 1 (1892), decided the same day as *Marshall Field*, involved a claim that the House enacted an enrolled bill without a quorum. *Ballin*, 144 U.S. at 4-6, 9. There, a House rule provided that any Member "in the hall of the house who d[id] not vote" still counted as part of the quorum. *Id.* at 5. "[T]he question presented was 'the validity of this rule'—more specifically, whether the House had the power to adopt" it. ROA.1351 (quoting *Ballin*, 144 U.S. at 5). The Supreme Court did not rely on the enrolled-bill doctrine, but instead held—*on the merits*—that "the House's rule did not violate the Constitution because 'all that [the] rule attempts to do is to prescribe a method for

ascertaining the presence of a majority.'" ROA.1351 (alterations in original) (quoting *Ballin*, 144 U.S. at 6). In so doing, the Court identified the principle:

> [The House] *may not by its rules ignore constitutional restraints* or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But *within these limitations* all matters of method are open to the determination of the house ….

*Ballin*, 144 U.S. at 5 (emphases added). The enrolled-bill doctrine thus cannot bar Texas's claim.

## B.  The federal government's counterarguments fail.

Despite the foregoing, the federal government argues that the enrolled-bill doctrine "forecloses Texas's claim that the Appropriations Act 'never passed the House of Representatives' and is 'not law' because the House allegedly lacked a quorum at the time of its vote." Fed.Gov.Br.22 (quoting ROA.66). The federal government's theory, however, suffers from at least three fundamental errors: it (1) overreads *Marshall Field*; (2) wrongly suggests a factual dispute despite acknowledging that none exists; and (3) gives short shrift to the judiciary's role to prevent constitutional violations.

**1.** The federal government peppers its brief with citations to *Marshall Field* but omits key language:

> The respect due to coequal and independent departments requires the judicial department to act upon that *assurance*, and to accept, as having passed congress, all bills authenticated in the manner stated; *leaving the courts to determine, when the question properly arises, whether the act so authenticated, is in conformity with the constitution.*

143 U.S. at 672 (emphases added).

*Marshall Field* thus makes plain that the enrolled-bill doctrine does not apply where there is no factual dispute (and thus no "assurance" for courts to "accept") or where the question is whether a statute "is in conformity with the Constitution." *Id.* After all, "the precise question before the court … [was] the *nature of the evidence* upon which a court may act when the issue is made as to whether a bill … was or was not passed by congress." *Id.* at 670 (emphasis added). The Court thus held that "an enrolled act … is *conclusive evidence* that it was passed by congress," but reserved the right to review "constitution[al]" questions. *Id.* at 670, 672-73 (emphasis added). Accordingly, the enrolled-bill doctrine does not apply here because "the present challenge does not involve a factual dispute as to whether the text of the bill at issue passed Congress and implicates a constitutional provision." ROA.1346.

To the extent ambiguity remains about *Marshall Field*'s holding, "the Supreme Court has twice reiterated that the enrolled-bill doctrine is a principle of evidence concerned with disputes over whether a bill has indeed passed Congress and that it has limited applicability in constitutional challenges." ROA.1345-46 (citing *Munoz-Flores*, 495 U.S. at 391 n.4, and *U.S. Nat. Bank of Or.*, 508 U.S. at 455 n.7). Indeed, the Court was plain in *Munoz-Flores* that *Marshall Field* is a rule of evidence that bars parties from using legislative materials to impeach what a bill says—and is not a bar on judicial scrutiny writ large or constitutional review. The federal government's claim (at 14-15) that "[n]othing in the Supreme Court's precedents … suggests that the enrolled-bill rule is limited to only 'fact-intensive' disputes about a bill's passage" cannot be squared with *Munoz-Flores*, which indicates just that.

20

The federal government offers two reasons why *Munoz-Flores* is not fatal to its argument. *First*, it claims that *Munoz-Flores* did not decide "[the] origination question." *Id.* at 24 (alteration in original). True, the Court explained that because the bill "was not one for raising revenue," it "need not consider whether the Origination Clause would require its invalidation if it *were* [one]." *Munoz-Flores*, 495 U.S. at 401. But the Court also rejected Justice Scalia's view and held that *Marshall Field*'s evidentiary rule was no bar to reaching the constitutional question. In other words, "[a]lthough the *Munoz–Flores* Court … found 'consideration of [the] origination question unnecessary,' it first addressed justiciability." *Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1352 (D.C. Cir. 2007) (quoting *Munoz-Flores*, 495 U.S. at 401).

This Court cannot brush aside *Munoz–Flores*. "In this circuit, 'if the statement is *necessary to the result* or *constitutes an explication of the governing rules of law*, it is not dictum." *Garrett v. Lumpkin*, 96 F.4th 896, 902 (5th Cir. 2024) (some emphasis added) (quoting *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 427-28 (5th Cir. 2014)). Here, the Supreme Court's analysis satisfies either condition; the Court addressed *Marshall Field* as part its justiciability analysis and rejected its relevance with reasoned analysis. And even if this discussion in *Munoz–Flores* were dicta, it would still be binding on this Court because it comes from the Supreme Court and is "crystal clear and supported by ample authority and explanation." *Id.* at 902 n.4.

*Second*, the federal government quotes the D.C. Circuit's statement in *Public Citizen* that *Munoz-Flores* "defies easy comprehension," yet "clear[ly] … did not

purport to 'modify the enrolled bill rule' of *Marshall Field*." Fed.Gov.Br.25 (quoting *Public Citizen*, 486 F.3d at 1354). Texas agrees that the *Munoz-Flores* did not modify the enrolled-bill doctrine; the Supreme Court merely acknowledged what has always been true—the doctrine is one of evidence and does not bar constitutional claims. *See* 495 U.S. at 391 n.4. The Court concluded that judges can "independently consider[ ]" a bill's origin. *Id.* Further, "[w]here, as here, a constitutional provision *is* implicated, *Field* does not apply." *Id.*; *accord* ROA.1346-47. *Munoz-Flores* is thus dispositive here.

2.    The federal government also argues that Texas's claim implicates the enrolled-bill doctrine by "appeal[ing] to extrinsic legislative history to demonstrate that the Act was not enacted 'according to the forms of the constitution.'" Fed.Gov.Br.22 (quoting *Marshall Field*, 143 U.S. at 673). According to this argument, "a claim under the Quorum Clause asks the Court to inquire into Congress's internal proceedings and second-guess its official attestations in order to decide that a bill 'was not passed by congress.'" *Id.* (quoting *Marshall Field*, 143 U.S. at 670).

Not so. In an attempt to shoehorn this litigation into *Marshall Field*'s prohibition, the federal government emphasizes Texas's language that the Act "never passed the House of Representatives," and that the challenge in *Marshall Field* was "on the ground that the tariff statute 'had not in fact been passed by congress,'" and "a claim under the Quorum Clause asks the Court to inquire into Congress's internal proceedings and second-guess its official attestations in order to decide that a bill 'was not passed by congress.'" *Id.* at 20 (quoting ROA.66), 22 (quoting *Marshall Field*, 143 U.S. at 670).

The federal government's argument rests on the (unstated) premise that there is a relevant distinction between saying a bill "did not pass" and saying it "passed in violation of the Constitution." The Supreme Court, however, rejected this semantic distinction in *Munoz-Flores*. Justice Stephens, concurring, argued that "a bill that originated unconstitutionally may nevertheless become an enforceable law if passed by both Houses of Congress and signed by the President." *Munoz Flores*, 495 U.S. at 401. The Court disagreed because "saying that a bill becomes a 'law' … does not answer the question whether that 'law' is *constitutional*." *Id.* at 397 (majority op.). And "the principle that the courts will strike down a law when Congress has passed it in violation of such a command has been well settled for almost two centuries." *Id.* at 386 (citing *Marbury v. Madison,* 5 U.S. 137, 176-80 (1803)).

Here, Texas does not question the *fact* that Congress voted on the law but rather that constitutional validity of that vote given the House relied on a rule that did not require physical presence. Congress can "pass" a bill into "law" even if it is in violation of the Constitution—but that does not mean that law is valid. *See id.* at 397; *see also Ballin*, 144 U.S. at 9 (determining whether a bill "legally passed the house"). Here, Judge Hendrix correctly interpreted the "nature of the claim" without tripping over semantics. ROA.1343. Given the Quorum Clause's requirements, courts must decide if a House rule "seeks to evade the majority-presence requirement" or "merely adopts a process to determine that a majority is present[.]" ROA.1350. What courts must not do, however, is impose a "magic words" requirement. *See, e.g.*, *Barron v. United States*, 111 F.4th 667, 674 (5th Cir. 2024).

**3.**   The federal government also takes issue with Judge Hendrix's distinction between "legal" versus "fact-intensive" Quorum Clause challenges. *See* Fed.Gov.Br.25-26 (citing ROA.1349, 1355). But this distinction finds ample support in caselaw. For example, *Marshall Field* distinguishes between the "fact" of authentication and "whether the act so authenticated, is in conformity with the constitution." 143 U.S. at 672. So, too, in *Ballin*, where the Court deferred to the House's "reasonable" rule for "establishing the fact that the house is in a condition to transact business"—but only when "there is no constitutional method prescribed, and no constitutional inhibition" against the chosen process. 144 U.S. at 5-6.

Furthermore, the federal government's argument (at 27-28) about what courts can look to under *Ballin* fails on its own terms because the House's official record of its proceedings—consistent with the Journal Clause's structure, U.S. Const. art. I §5, cl. 3—here differentiated in-person and proxy votes. In fact, the word "Present" in the Journal Clause can only mean physical presence because it was not until 2020 that the concept of an absent-but-still-present Member emerged.

Additionally, *Ballin* addresses a power squarely within the Rulemaking Clause: *how* the House takes attendance. *See* ROA.1361 ("*Ballin* provides specific examples of different ways that a member could be identified as present."). Every example that the federal government identifies falls in the same category: "how a quorum is to be determined, how long a quorum is presumed to last once established, and how and when objections to a lack of a quorum may be made" are all "how" questions within

rulemaking discretion. Fed.Gov.Br.18. Nothing in that list suggests that Congress need not comply with the Quorum Clause's physical-presence requirement.[4]

*Evans v. Browne*, 30 Ind. 514 (1869), moreover, is inapt—even apart from the fact that a state court decision from 1869 is a poor source from which to understand a federal constitutional provision enacted 80 year earlier. There, the court was left with conflicting evidence regarding the existence of a quorum, including: (1) a letter from disgruntled house members that implied there was no quorum; (2) the legislative journal, which was silent on the issue; and (3) a letter from the governor saying he refused to sign the bill because of his consternation over the disagreement. *See id.* at 515-18. Those facts are nothing like the case here which involves undisputed facts from the congressional record showing a constitutional violation.

Finally, the federal government's suggestion (at 23, 26) that allowing constitutional challenges to House voting rules (as *Munoz-Flores* does) would open the same floodgates as factual challenges to the text of enrolled bills (which are barred by *Marshall Field*) is misguided. The number of plausible constitutional challenges to House voting rules is inherently limited and—in the ordinary course—such claims will fail because it is not difficult for Congress to obey the Quorum Clause. In fact, even

---

[4] The federal government contends (*e.g.*, 19-20) that Judge Hendrix requires physical presence *in the house chamber*. In fact, his opinion does not define "presence" but acknowledges Congress's "power to prescribe a method to determine the presence of the majority." ROA.1363. Judge Hendrix's decision not to granularly define "presence" is a feature of his decision, not a bug. It acknowledges Congress's discretion over the minutia of where to check in, how long one is considered present, etc. ROA.1361. But as *Ballin* shows, at some point the Quorum Clause's constraint on Congress's power begins and any rulemaking flexibility ends.

during Covid, this legislation was "atypical." ROA.1355. By contrast, there can be as many factual challenges as there are factual circumstances.

**4.** Undeterred, the federal government asserts that "the respect due to a coordinate branch of the government" requires the Court to accept "official attestations of Congress ... that a bill had ... become law." Fed.Gov.Br.21 (quoting *Marshall Field*, 143 U.S. at 672). This argument conflicts with *Marshall Field*, which says courts may "determine, when the question properly arises, whether the act so authenticated, is in conformity with the constitution." 143 U.S. at 672. The federal government omits that key language.

The argument also conflicts with *Munoz-Flores*, where the Court explained that "[a] law passed in violation of the Origination Clause would ... be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would be a law passed in violation of the First Amendment." 495 U.S. at 397. Judge Hendrix concluded the same, reasoning that "[a] Quorum Clause challenge is similar to other constitutional challenges of congressional acts"—while "[officers'] signatures foreclose debate over what language was presented to and agreed upon," they "provide no definitive proof that Congress had the power to pass the legislation." ROA.1349. Any theory that a bill is free from judicial scrutiny merely because it is signed by congressional officers runs headlong into *Marbury v. Madison*. *See Munoz-Flores*, 495 U.S. at 396-97 (citing *Marbury*, 5 U.S. at 176-80).

## II.  The Quorum Clause requires physical presence.

Turning to the merits, Judge Hendrix concluded that the Quorum Clause's text, structure, history, tradition, and precedent all point the same direction: The

Constitution imposes a physical-presence requirement. The federal government does not raise a single point that Judge Hendrix failed to rebut.

## A. The Quorum Clause's text, structure, history, and tradition confirm the Constitution's physical presence requirement.

**1.** When interpreting the Constitution, "[t]he Court must 'interpret the Constitution in light of its text, structure, and original understanding'—as informed by history and tradition." ROA.1371 (quoting *Abbott v. Biden*, 70 F.4th 817, 827 (5th Cir. 2023)). "The central aim is to determine 'the original public meaning of the Constitution's text.'" ROA.1372 (quoting *Abbott*, 70 F.4th at 829). This is "because the Constitution enshrines the people's choice to achieve certain policies, purposes, and values 'through very specific means.'" *United States v. Rahimi*, 144 S.Ct. 1889, 1908 (2024) (Gorsuch, J., concurring) (quoting *Giles v. California*, 554 U.S. 353, 375 (2008)). Accordingly, "when a party asks us to sustain some modern exception to" what the Constitution says, courts "require them to point to a close historic analogue to justify it." *Id.* This way, "a court may not 'extrapolate' from the Constitution's text and history 'the values behind [specific language], and then ... enforce its guarantees only to the extent they serve (in the courts' views) those underlying values.'" *Id.* (quoting *Giles*, 554 U.S. at 375). Here, each inquiry supports Judge Hendrix's decision.

**2.** The Court's "analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022); *accord* ROA.1371-72.

An ordinary English speaker associates the word "quorum" with a group of people. ROA.1373. True, the word does not *necessarily* mean everyone is physically together (even if that is what it usually means), so, "[o]n its own," it is linguistically possible that that word "provid[es] solely a number with no real indication of whether this number needed to be physically present." ROA.1373. But that is not *all* the Quorum Clause says—it also empowers Congress to compel the presence of absent Members. The "authori[ty] to compel the attendance of absent Members" only makes sense if the Constitution requires physical presence. ROA.1373.

Founding-era dictionaries show that "'absent' often had a physical component to it." ROA.1374. So, too, with "the meaning of 'attendance' or 'attend'" which, "at the time of the Founding[,] carried a physical-presence connotation." ROA.1374. Read together, "[i]t would belie logic for the Constitution to give the House the ability '[t]o force' or 'oblige' members who are '[n]ot present' to attend—right after noting the number necessary to do business—if physical presence were unnecessary for a member to count as part of the quorum." ROA.1374.

Constitutional structure also supports Judge Hendrix. The Rulemaking Clause provides that "[e]ach House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." U.S. Const. art. I, §5, cl. 2. If the Constitution did not require physical presence, the Rulemaking Clause would allow Congress to do everything the federal government erroneously says the Quorum Clause accomplishes. All Congress would have to do is adopt a de minimis "participation" standard that could be met from

anywhere. But "it is not the role of this Court to pronounce the [Quorum Clause] extinct." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

**3.** Historical context also demonstrates that the Quorum Clause requires physical presence. "After considering the text, courts look to history, starting with the period around the provision's ratification—here, the Founding Era. … This involves looking to 'background concerns that informed the [Quorum] Clause[ ]' and debates over the Clause." ROA.1372 (quoting *Abbott*, 70 F.4th at 835, 839). For example, in *Rahimi*, the Supreme Court held that a prohibition on gun possession by an individual subject to a restraining order does not violate the Second Amendment. 144 S.Ct. at 1896. To reach that holding, the Court surveyed the historical context that informed the Second Amendment's ratification. *Id.* at 1897-99.

Here, historical context shows that Parliament and the early Colonies experienced problems with quorum manipulation. The House of Commons, for example, "consist[ed] of nearly six hundred members," yet "forty-five constitute[d] a quorum to do business." 2 Joseph Story, *Commentaries on the Constitution of the United States* §832 (1833). This exposed the good people of Britain to "[the] hazard of passing laws by surprise, or against the deliberate opinion of a majority of the representative body." *Id.* No wonder Convention delegates thought that "the Quorum Clause"—with its majority requirement—was a necessary protection and would provide "'confidence to the people that no law or burden could be imposed on them, by a few men.'" ROA.1378 (quoting Madison, *supra*, at 430).

Nor was fear of minority rule the only concern—Parliament and the King also had a history of exploiting legislative proxies. Originally, participation by proxy was

permitted in the House of Lords but not the House of Commons. According to Sir Edward Coke, "any Lord of the Parliament, by licence of the King, upon just cause, to be absent, may make a proxy; … but a knight, citizen, or burgess of the House of Commons cannot by any means make any proxy, because he is elected and trusted by multitudes of the people." 4 Edward Coke, Institutes of the Laws of England 12 (W. Clarke and Sons 1817) (1644) (cleaned up); *accord* 1 W. Blackstone, Commentaries on the Laws of England 168 (Sharswood ed. 1893). Or as Jean-Louis De Lolme put it, "the Lords were Members of the Legislature by virtue of a right inherent in their own persons … in consequence of this they had the privilege of voting by proxy, [while] the Commons not having this privilege, as they were but proxies for the people." House of Commons, *supra* (quoting Jean-Louis De Lolme, The Constitution of England 227 (Arno Press, pub., 1979)). The Lords' use of proxies, moreover, was not popular. *See, e.g.*, Paul Seaward, *Pairs and Proxies*, History of Parliament (Oct. 1, 2018), https://perma.cc/8WNE-785G.

Because the Crown controlled proxies, "permission to be absent and a corresponding proxy" were gifts the "king or queen" could bestow—and manipulate. *Id.* Indeed "in the seventeenth century and afterwards … the crown was using proxies to manage the risk of difficult votes in the House of Lords," requiring "the government [to] put considerable effort into soliciting proxies from Members who intended to be absent and distributing them among reliable peers." *Id.* And, over time, proxies came to be viewed as contrary to the purpose of a deliberative legislative body. *Id.*

To be sure, physical-presence requirements also can prompt concerns, including that minority factions can disrupt the legislative process by withholding attendance.

The threat of "quorum busting" was well known. For example, the Anti-Federalists in Pennsylvania "stayed away" from the state ratifying convention "to prevent a quorum[;]" this practice was "not new in Pennsylvania politics" and "facilitated by the Pennsylvania constitution" which "defined a quorum as two-thirds of elected members." 2 *Documentary History*, *supra*, at 54, 55-56. In response, "[t]he members present then ordered the sergeant at arms … to bring in the absent members" which led to "a mob … forcibly return[ing]" those absent; as a result, "a quorum was then declared present." *Id.* at 55. Notably, "Pennsylvania was the focus of national attention during the first few weeks after the Constitutional Convention" and "the force it used to secure a quorum, was reported throughout the United States." *Id.* Indeed, "[t]he Founders, having learned from the exploitation of quorum rules in colonial assemblies, were keenly attuned to debates about the nature of quorum." Gandall, *supra* (citing Robert Luce, Legislative Procedure Parliamentary Practices and the Course of Business in the Framing of Statutes 25-28 (1922)).

In other words, when it comes to voting, there is no perfect solution; every option has downsides. The Framers thus had to choose what would be the lesser of evils for the United States. With this background in mind, it incredible that the Constitution's quorum requirement was unimportant to the Framers, who—in designing Congress's voting rules—had to answer four questions:

- *First*, should the requisite quorum be established in the Constitution or left to Congress? This was the subject of debate, with one delegate advocating for Congress, and another warning that the "legislature could not be trusted to require a sufficient number of members if not compelled by the

Constitution." ROA.1377-78 (citing Madison, *supr*a, at 430). The Framers opted to place the requirement in the Constitution itself.

- *Second*, how many Members should be required to conduct business? If the quorum requirement were too low, "a small number of members … [could] make laws"—as with the House of Commons—but if the requirement were too great, it could "lead to great delays in business and … become increasingly inconvenient as the number of members grew" or create "problems that could 'spring from the secession of a small number.'" ROA.1377-78 (quoting Madison, *supra*, at 428-29). The Framers answered this question, too: a majority.

- *Third*, should proxies be allowed? The Framers knew about them—as confirmed by Alexander Hamilton and Ben Franklin. ROA.1379-80. Yet rather than adopting proxy voting, the Framers added a quorum requirement.

- *Fourth*, how to compel attendance? The Articles of Confederation lacked any enforcement mechanism, permitting States to sit out of calls for assembly. Story, *supra*, at §834. To prevent such a "secession" of Members, the Framers included the ability to "compel" attendance. ROA.1378 (citing Madison, *supra*, at 429-30). Yet unlike the quorum requirement, the Constitution leaves the *method* of compulsion to the House, which is understandable given that some States used fines, some used arrest, while others used a combination. *Compare* Rhode Island, *supra* 3, *with* Pennsylvania, *supra* 31.

That the Framers considered these issues and imposed a quorum requirement—while leaving the power to compel attendance to Congress—speaks volumes.

32

Allowing proxy voting to replace the Constitution's physical-presence requirement would destroy the constitutional compromise. And make no mistake: it was a compromise. A physical-presence requirement imposed disproportionate hardship on distant states. Yet the Constitution imposed it anyway. "The delegates' concern about the inconvenience and difficulty of obtaining a quorum based on travel from the states far from the capital makes little sense if the representatives were not required to appear in order to participate and be counted." ROA.1379. And the fear that a small number of the States could freeze business "could only materialize if physically leaving had some impact on whether a quorum existed." ROA.1379.

**3.** Historical practice confirms what the Quorum Clause says. *See, e.g.*, *Moore v. Harper*, 600 U.S. 1, 32 (2023) (holding that courts "'look[ ] to 'settled and established practice' to interpret the Constitution.'") (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)); *accord* ROA.1380. "The actions of the 'Founding-era Congress' can also inform the proper understanding of the Constitution." ROA.1372 (quoting *Abbott*, 70 F.4th at 841-42; *see also Seila L. LLC v. CFPB*, 591 U.S. 197, 214 (2020) (similar).

Here, "the longstanding historical practice of Congress reflects the understanding that the Quorum Clause counted only those physically present." ROA.1380. Judge Hendrix detailed the proceedings of the First Congress, explaining that "[b]oth chambers waited nearly a month for enough members to arrive, and the Senate specified in its letter that the 'presence' of a majority of members was 'indispensably necessary.'" ROA.1382 (quoting S. Journal, 1st Cong., 1st Sess. 6 (1789)). So, too, with numerous subsequent Congresses. ROA.1382-85. Indeed, "[u]ntil the

resolutions used to adopt the proxy rule at issue here, no house of Congress had ever attempted to affirmatively count a non-present member as part of the quorum." ROA.1380.

An example illustrates the point. During the War of 1812, British troops burned the District of Columbia, including the Capitol, to the ground. *See* Harold H. Burton & Thomas E. Waggaman, *The Story of the Place: Where First and A Streets Formerly Met at What Is Now the Site of the Supreme Court Building*, 51/52 Recs. of the Colum. Hist. Soc'y 138, 141-42 (1951/1952)). Yet "the Thirteenth Congress still convened in special session at Blodgett's 'Great Hotel.'" *Id.* at 142.

**4.** Tradition also confirms that the Constitution imposes a physical-presence requirement. ROA.1371 (quoting *Abbott*, 70 F.4th at 827). Under this inquiry, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S.Ct. at 1898 (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26–31 (2022)). A regulation's "[w]hy and how … are central to this inquiry." *Id.*

Here, one of the "particular problems" Congress sought to address—i.e., one "[w]hy" the Quorum Clause exists—was preventing "rule of the country by a few representatives of the states closest to the nation's capital" while limiting "[the] power [of] a few members to 'secede' from the legislature and deprive it of its power." ROA.1379. The Constitution's solution—in other words, the "how"—was to impose a requirement that a majority of a house be physically present before legislative business may proceed while "giving the non-quorum the ability to compel the attendance of absent members." ROA.1376 (citing U.S. Const. art. I, §5, cl. 1).

Nor was this "how" limited to the founding era. The federal government cannot identify a single preceding example in U.S. history where absent Members were counted towards the quorum. ROA.1370.

Nor was fear of minority usurpation the only motivating concern. As noted, the founding generation also had reason to fear proxy votes—long tainted by monarchial abuse—and to value the enhanced deliberation of in-person, face-to-face discussion. One of the keys of success for the Constitutional Convention was physical interaction among the delegates. *See, e.g.*, Lindsay M. Chervinsky, *Interpreting Article II, Section 2: George Washington and the President's Powers*, 37 Law & Hist. Rev. 725, 730-31 (2019).

**5.** Finally, precedent also recognizes a physical-presence requirement.

Consider *Ballin*, where the Supreme Court explained that the House in issuing rules about how to determine whether a Member is present "may prescribe answer to rollcall as the only method of determination; or require the passage of members between tellers, and their count, as the sole test; or the count of the speaker or the clerk, and an announcement from the desk of the names of those who are present." 144 U.S. at 6. What do these examples have in common? Physical presence.

So, too, with *Noel Canning*, which examined pro forma sessions and the Recess Appointments Clause. ROA.1388. As relevant here, "the Court explained that if the congressional record or the journal of either house 'indicates that a quorum was present, *under a valid [House or] Senate rule*, at the time [it] passed a bill,'" then a court "'will not consider an argument that a quorum was not, in fact, present.'" ROA.1350 (quoting *Noel Canning*, 573 U.S. at 551). That language presupposes that

"a court may consider whether the rule adopted by the House or Senate seeks only 'to prescribe a method for ascertaining the presence of a majority' or instead seeks to evade the majority-presence requirement through a method 'inhibit[ed]' by the Constitution." ROA.1350 (quoting *Ballin*, 144 U.S. at 6). The Court also stressed that "if the Senate had *left the Capitol*" and stopped legislating, then even if it said it was in session, the Senate would be "unable" to act. *Noel Canning*, 573 U.S. at 552 (emphasis altered). That analysis presumes physical presence.

## B.  The federal government's counterarguments again fail.

**1.** The federal government's argument (at 30) that the Quorum Clause merely establishes "the minimum number of Members that must participate for the House to conduct business" effectively writes the second half of the Clause out of the Constitution. To reach that conclusion, the federal government contends (at 40) that the words "absent" and "attendance" "do not necessarily refer to physical presence in a particular location[,]" but can be used to describe a Member's focus or attention. Under this reading, a Member is "absent" when she is "inattentive," at which point the House can compel the Member "to yield attention to" or "fix the mind upon" legislative business. Fed.Gov.Br.40. The federal government further argues (at 31) that "the Quorum Clause …does not specify … how Members may participate in legislative business and be counted towards a quorum[,]" and "the Constitution leaves such unanswered questions to each House to address pursuant to the Rule-making Clause." Thus, it concludes (at 39) that "if the House has prescribed by its rules particular procedures for Members to participate—whether in person or not—

a Member participating in accordance with those procedures is not 'absent' from legislative business and there is no need for their attendance to be 'compel[led].'"

This argument defies well-established canons of interpretation. *First*, it violates the rule that courts read texts as a whole and avoid surplusage. *See, e.g.*, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012). The federal government argues that a "majority" of Members constitutes a quorum—a point no one disputes. The key text, however, is the second half of the Quorum Clause, which sets forth the House's power to "compel" the "attendance" of Members who are "absent." That language only makes sense with a physical-presence requirement. ROA.1372. Yet the federal government dismisses (at 16, 38) the second half of the Clause as an "ancillary phrase." In fact, it is dispositive, and the federal government's "reading … transforms the ability to compel attendance into mere surplusage." ROA.1371.

*Second*, the federal government's theory (at 40) that "absent" means "inattentive" defies the common or natural use of language. *See Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1110 (5th Cir. 2024) ("The ordinary-meaning canon is 'the most fundamental semantic rule of interpretation.'") (quoting Scalia & Garner, *supra* §6, at 69). Whereas the common use of "'absent' often had a physical component," the federal government invokes "a 'figurative[]' use of the word," which "would seem odd given its place in the Constitution." ROA.1374-75.

So, too, with defining "attend" as "give attention" or "participate." *See* Fed.Gov.Br.40. In Federalist 47, Madison explains that the legislative, executive, and judicial branches of the British government "are by no means totally separate

and distinct from each other," to which he provides this example: "The judges …
are so far connected with the legislative department as often *to attend and participate
in* its deliberations, though not admitted to a legislative vote." The Federalist No.
47, at 302 (James Madison) (C. Rossiter ed., 1961) (emphasis added). If these words
had the same meaning, Madison's phrasing would be wholly redundant.

Of necessity, the federal government (at 41) latches on to Judge Hendrix's
acknowledgement that "absent" could mean "at such a distance to prevent commu-
nication," which it says does not apply anymore "in light of modern technology."
But that is just one of the three options in one of the dictionaries—and not the most
natural one. *See* ROA.1374 (noting that the same dictionary defines "absent" as
"[n]ot present," or "not in company"). Members of Congress in 1789, moreover,
could communicate by letter, yet no one suggested that would satisfy the Quorum
Clause.

*Third*, reading "attend" to mean "participate" defies precedent. "[T]he Su-
preme Court has previously held that the House's 'capacity to transact business' is
'created by the mere presence of a majority, and does not depend upon the disposi-
tion or assent or action of any single member or fraction of the majority present.'"
ROA.1375 (quoting *Ballin*, 144 U.S. at 5–6). The federal government's reading runs
headlong into *Ballin*. After all, "[i]f no affirmative act or particular disposition of a
member is necessary to count towards the quorum, it would be odd for the Framers
to place a provision requiring a member's attention or participation in the latter half
of the Quorum Clause." ROA.1375. Furthermore, "it is unclear why [the Clause]
would direct [Members] to 'yield their attention' to the legislative matters at hand,

since proxy participation permits a member to focus on another matter while someone else conducts the legislative business on the absent member's behalf." ROA.1375.

*Fourth*, the federal government's argument invites rather than solves separation-of-powers concerns. As written, the Quorum Clause provides "discernible and manageable standards for deciding whether there has been a violation." ROA.1365 (quoting *Rucho v. Common Cause*, 588 U.S. 684, 708 (2019)). The federal government's reading, by contrast, would force courts to determine whether enough Members "participated" and what level of "attention" or "participation" is sufficient. The Court should not create a political question where one does not exist.

**2.**    The federal government (at 29-31) also urges that a *different* provision (the Rulemaking Clause) is more probative of the Quorum Clause's meaning than the Quorum Clause itself. Specifically, it argues (at 39-41) that "attend" means "participate" and that the Rulemaking Clause lets the House define participation. Once more, this theory conflates the *constraint* in the Quorum Clause with the *conferral of power* in the Rulemaking Clause. There would be no need for the Quorum Clause if the Framers were not concerned about Congress abusing authority—the Rulemaking Clause would suffice. Just as "shackles" are not "an effective means of locomotion," *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting), a restriction on congressional authority does not expand that authority.

In its brief, the federal government fails to identify anything the Quorum Clause does that Congress could not also do with the Rulemaking Clause alone in light of the federal government's "participation" theory. The House, for example, could

create a rule to prevent inattentiveness; it does not need the Quorum Clause for that. And by rule, the House could say that every Member is *always* counted as present so long as some Members are in the Capitol to conduct business, thus defeating—in its words—"quorum-busting techniques" without need for the Quorum Clause. Fed.Gov.Br.16.

The federal government's argument also violates the Court's duty to determine whether a rule is constitutionally valid before deferring to it. ROA.1349-50. Congress "[cannot] by its rules *ignore constitutional restraints* or violate fundamental rights, and there should be a *reasonable relation* between the mode or method of proceeding established by the rule and the result which is sought to be attained." *Ballin*, 144 U.S. at 5 (emphases added). Or as Judge Hendrix put it, both *Ballin* and *Noel Canning* presume a valid rule. ROA.1350. In short, so long as the Quorum Clause is obeyed, Congress has considerable flexibility to make rules. But Congress cannot use the power to make rules to the nullify the Constitution's quorum requirement, as that would not be a "method which shall be *reasonably* certain to ascertain the fact" of actual presence. *Ballin*, 144 U.S. at 5 (emphases added).

**3.** The federal government's appeals to history suffer from similar flaws. It reasons (at 31) that although "[t]he Framers may very well have assumed, given the available means of communication at the time, that Members would assemble in person to determine a quorum and conduct legislative business," "[t]he 'relevant' question for purposes of interpreting the Constitution … is whether the Framers intended to 'restrict' future Congresses to only that method of participation."

True, one of the reasons for the Quorum Clause is to prevent a congressional minority from enacting legislation. But the Constitution "is concerned with means as well as ends." *Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015). The inquiry thus is what the text says. ROA.1376. And here, the means to prevent minority usurpation is a physical-presence requirement, backed by power to compel attendance. Regardless, preventing minority usurpation is hardly the only concern. Requiring physical presence helps ensure more meaningful debate and prevents misuse of proxy voting. *Supra* at 29-31, 33.

On that last point, the federal government quibbles (at 44-45) with Judge Hendrix's interpretation of certain historical materials regarding proxy voting. The federal government says those proxy votes were "meaningfully different than the House's rule at issue here." Fed.Gov.Br.44. Yet Judge Hendrix merely observed that "proxy participation was known to the Framers" and offers examples from Hamilton and Franklin in support. ROA.1379-80 (citing Benjamin Franklin, Proposed Articles of Confederation [on or before 21 July 1775], *in* 22 *The Papers of Benjamin Franklin* 120–25 (William B. Willcox ed., 1982); Farrand, *supra*, at 620). He was not relying on Hamilton's "personal opinions" but instead was merely observing a historical fact that the Framers knew about proxy voting but omitted it from the Constitution.

The federal government's own history argument, moreover, illustrates why the Court should affirm. Contesting Judge Hendrix's historical examples, the federal government explains that "Hamilton's proxy-voting proposal appears to have contemplated permitting a Member to designate a general proxy to vote on his or her

behalf, which would "effectively allow[] a single Member to cast multiple votes." Fed.Gov.Br.44. According to the federal government, that is "meaningfully different than the House's rule at issue here." *Id.* Presumably the federal government means that the general proxy is "meaningfully *worse.*" The federal government's intuition is correct: A general proxy would depart even further from what the Constitution says and historical practice. Yet the federal government's argument would permit precisely such a general proxy. Remember its position is that: (1) the Quorum Clause just means majority "participation," Fed.Gov.Br.29-31; (2) the House, via rulemaking, can determine what it means to participate, *id.* at 31-32; and, (3) said determination is beyond judicial scrutiny, *id.* at 22-23, 26. What, then, stops Congress from permitting general proxies? The federal government has no answer.

**4.** The federal government also says almost nothing about the fact—thoroughly documented by Judge Hendrix—that Congress required physical presence in their rules for more than 230 years. Instead, the federal government invokes the practice of unanimous consent to claim that "[i]t is the district court's interpretation that cannot be reconciled with longstanding congressional practice." *Id.* at 46-47. This argument is wrong in numerous respects.

To begin, "[a]ffirmatively treating an absent member as a member of the quorum is an aberration adopted only by the 116th and 117th Congresses." ROA.1370. Thus, whatever one may say about unanimous consent, this is different. For the first time, Congress counts Members as present even when a quorum call shows otherwise. Sometimes "the most telling indication of the severe constitutional problem … is the lack of historical precedent," *Free Enter. Fund v. Pub. Co.*

*Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (citation omitted), and here, "the House's attempt to evade the roll-call vote's revelation that a majority of members were not present and instead had voted by proxy cannot be justified by historical practice," ROA.1380.

Regardless, as Judge Hendrix explained, the practice of unanimous consent is fully consistent with a physical presence requirement because "if a quorum fails to vote on legislation, any presumption of a quorum is extinguished." ROA.1371. The federal government admits (at 4-5, 13) that unanimous consent operates as a presumption of a quorum under congressional rules. Yet under those same rules, the presumption can be defeated by a quorum call. ROA.1386-87. If even a single Member identifies a lack of quorum to the Chair, the presumption ends. Unanimous consent is thus consistent with judicial deference to a House's findings of fact that Members are present (*Ballin*) and the enrolled-bill's prohibition on parole evidence to impeach a legislative journal indicating as much (*Marshall Field*).

The principle that courts in some circumstances will not second guess findings of fact—but will do so for conclusions of law—is foundational. Even when judges treat "determinations of *fact* as binding on the courts," they do not do the same with questions of *law*. *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2258 (2024). After all, "[w]hen the legislature itself acts within the broad field of legislative discretion … its determinations are conclusive," but "[t]he supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied." *Id.* at 2258-59 (quotations omitted). Courts do not lightly surrender the power "to say what the law is." *Id.* at 2257 (quoting *Marbury*, 5 U.S. at 177).

By contrast, no precedent requires courts to blindly accept a quorum determination where—as here—undisputed facts show otherwise. In *Noel Canning*, for example, the Court recognized that despite "great weight" afforded to the Senate, "deference to the Senate cannot be absolute." 573 U.S. at 552. Therefore, "[w]hen the Senate is without the capacity to act, under its own rules, it is not in session *even if it so declares*." *Id.* at 552 (emphasis altered). *Noel Canning* thus fatally undermines the federal government's argument that (at 29) that "[t]he Framers left … unanswered questions to each House to address pursuant to the Rulemaking Clause." If that were so, *Noel Canning* would be a much shorter—and much different—opinion. *But see* 573 U.S. at 537 (holding that the Constitution imposes a floor of how long a "recess" must be). In all events, unanimous consent does not violate the Quorum Clause but, even if it did, "post-ratification adoption or acceptance" of practices "that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36; *accord* ROA.1372.

**5.**    As to tradition, the federal government agrees regarding one of the "whys" for the Quorum Clause but not the "how." It argues (at 31) that "the Quorum Clause was designed to ensure that a small number of House Members could not conduct or prevent the conduct of House business, thereby thwarting the will of the majority." The federal government thus concludes that the use of proxies is a permissible method to resolve "the Framers' concerns about minority rule." ROA.1379.

The federal government's argument is wrong. Once more, the Constitution speaks not just to ends but to means—and here, the means is a physical-presence requirement. *See supra* 41. Regardless, the concerns motiving the Quorum Clause

extend beyond fear of minority rule. *Id.* And even putting that aside, the federal government fails to identify a single "contemporary law[]" at the founding "imposing similar [conditions] for similar reasons." *Rahimi*, 144 S.Ct. at 1898. To be sure, "the Framers could not have contemplated the type of remote-voting procedures adopted by the House" which "relied on modern technologies that permit instantaneous access to information and communication regardless of physical distance." Fed.Gov.Br.45. But it was certainly possible even in 1789 to vote by messenger or letter, yet the federal government cannot point to any such history.

Of course, a modern practice does not need a precise "historical *twin*." *Bruen*, 597 U.S. at 30; *accord Rahimi*, 144 S.Ct. at 1898. But the federal government's theory has the opposite problem. There *is* a historical twin—proxy voting. And the Framers rejected it. "While the use of proxies was not an unfamiliar concept to the Framers, the delegates chose to ensure the presence of a majority by giving the non-quorum the ability to compel the attendance of absent members." ROA.1376.

With no historical analogue in hand, the federal government is left to appeal (at 43) to the "goals" underlying the Quorum Clause. The federal government leans on "the Framers' goal of ensuring that issues are not decided by only a small number of representatives 'closest to the nation's capital,'" and emphasizes that "[p]ermitting Members to vote remotely" may be valuable in "[f]uture crises." Yet the Supreme Court "ha[s] expressly rejected" relying on "overarching 'policies,' 'purposes,' or 'values' to guide them in future cases." *Rahimi*, 144 S.Ct. at 1908 (Gorusch, J., concurring) (quoting *Giles*, 554 U.S. at 375). Courts cannot even rely on enacted statutory statements of purpose, *Sturgeon v. Frost*, 587 U.S. 28, 55 (2019), let alone

unstated constitutional values that depart from plain constitutional text. If a constitutional clause is outdated, the answer is to amend it.

**6.** The federal government also suggests that precedent requires the Court to defer to the House's view that non-present Members can count towards establishing a quorum. For example, it urges that "[t]he Supreme Court has explained that the Constitution leaves such unanswered questions to each House," Fed.Gov.Br.31 (citing *Ballin*, 144 U.S. at 5-6), and "each House has 'wide latitude to determine' how to conduct its business," *id.* (quoting *Noel Canning*, 573 U.S. at 550-51).

As Judge Hendrix explained, the federal government misreads precedent. As indicated above, *supra* 38-39, the federal government's "participation" argument fails *Ballin*'s rule that "the House's 'capacity to transact business' is 'created by the mere presence of a majority, and does not depend upon the disposition or assent or action of any single member or fraction of the majority present.'" ROA.1375 (quoting *Ballin*, 144 U.S. at 5-6). Nothing in that language suggests that the House may act where a majority is not "present" yet somehow "participates." And what would happen—on the federal government's view—if all Members submit proxies in the morning but then some Members stop participating in the afternoon? Under the federal government's "participation" theory, the quorum would disappear. But under *Ballin*, "[t]he exercise of law-making power is not stopped by the mere silence and inaction of some of the law-makers who are present." 144 U.S. at 9.

The federal government also points to (at 36-37) authority addressing the modern understanding of a quorum as applied to a panel of judges. Congress, of course, can allow courts and agencies to use different quorum rules—or none. What

Congress cannot do, however, is nullify a constitutional limit on itself. The corporate analogy (at 37) confirms the point. Corporations can place a quorum requirement in either a company's charter or bylaws, but bylaws are invalid to the extent they conflict with the charter. *See Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 929 (Del. 1990) ("Where a by-law provision is in conflict with a provision of the charter, the by-law provision is a nullity.") (quotations omitted). The Constitution is the House's charter.

**7.** Finally, the federal government and its amici fret that affirming Judge Hendrix would prevent quick action by Congress. But that turns the Constitution upside down. "The Constitution's deliberative process was viewed by the Framers as a valuable feature, not something to be lamented and evaded." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (citing John Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 202 (2007)). The Constitution creates tools "to permit the Executive Branch to function smoothly when Congress is unavailable." *Noel Canning*, 573 U.S. at 537. Article I, by contrast, "disfavors easygoing, high-volume lawmaking," Manning, *supra*, at 198, and "[t]here is no support in the Constitution or decisions of [the Supreme] Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided, either by the Congress or by the President," *INS v. Chadha*, 462 U.S. 919, 959 (1983) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)).

The federal government's concerns about promptness are also overstated. Technology makes quorums easier—not harder. Even a century ago, travel from

California to Washington, D.C. would have taken days on a train. And even the slowest automobile moves faster than the quickest horse. The federal government's arguments about the utility of modern communications technology in conducting Congress's business, moreover, would apply with equal force to telephones, which have been available for nearly 150 years. Nevertheless, it was not until 2020 that Congress did away with physical presence.

### III. Judge Hendrix properly granted a permanent injunction.

Because Texas is correct on the merits, Judge Hendrix did not abuse his discretion by granting a permanent injunction against enforcing the PWFA against Texas. ROA.1393. Indeed, the federal government does not challenge Judge Hendrix's application of the remaining factors, thus forfeiting any such arguments, which would be meritless regardless.

## CONCLUSION

The Court should affirm.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Aaron L. Nielson
Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

Jacob C. Beach
Assistant Solicitor General

Counsel for Appellee State of Texas

## CERTIFICATE OF SERVICE

On October 9, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,952 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON