# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF TEXAS,

*Plaintiff-Appellee,*

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL, in his official capacity as
United States Attorney General; CHARLOTTE A. BURROWS, in her official
capacity as Chair of the U.S. Equal Employment Opportunity Commission;
JOCELYN SAMUELS, in her official capacity as Vice Chair of the U.S. Equal
Employment Opportunity Commission; KEITH SOLDERLING, in his official
capacity as Commissioner of the U.S. Equal Employment Opportunity Commission;
ANDREA R. LUCAS, in her official capacity as Commissioner of the U.S. Equal
Employment Opportunity Commission; CHRISTOPHER W. LAGE, in his official
capacity as General Counsel of the Equal Employment Opportunity Commission;
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES
DEPARTMENT OF JUSTICE,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas

## REPLY BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

MICHAEL S. RAAB
GERARD SINZDAK
COURTNEY L. DIXON
*Attorneys, Appellate Staff
Civil Division, Room 7246
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-8189*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ................................................................. 1

ARGUMENT ............................................................................................. 2

    I.    Texas's Claim Is Foreclosed by the Enrolled-Bill Rule of
        *Marshall Field* ............................................................................... 2

    II.   The Appropriations Act Duly Passed the House ........................... 10

CONCLUSION ......................................................................................... 26

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Braniff Airways, Inc. v. Civil Aeronautics Bd.*,
    379 F.2d 453 (D.C. Cir. 1967) ....................................................... 11

*Chiafalo v. Washington*,
    591 U.S. 578 (2020) ....................................................................... 21

*Evans v. Browne*,
    30 Ind. 514 (1869) .......................................................................... 6

*INS v. Chadha*,
    462 U.S. 919 (1983) ......................................................................... 4

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892) ............................................ 2, 3, 4, 5, 6, 9, 10

*McCarthy v. Pelosi*,
    5 F.4th 34 (D.C. Cir. 2021) ...................................................... 17, 22

*New Process Steel, L.P. v. NLRB*,
    560 U.S. 674 (2010) ....................................................................... 11

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) .................................................................. 20, 25

*Opinion of the Justices*,
    247 A.3d 831 (N.H. 2020) ............................................................. 13

*Public Citizen v. U.S. Dist. Court for the Dist. of Columbia*,
    486 F.3d 1342 (D.C. Cir. 2007) .................................................... 4, 7

*Sherman v. Story*,
    30 Cal. 253 (1866) .......................................................................... 3

*United States v. Ballin*,
    144 U.S. 1 (1892) ....................................... 8, 9, 10, 15, 16, 17, 23

*United States v. Munoz-Flores*,
    495 U.S. 385 (1990) ............................................................... 3, 7, 10

*U.S. Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993) ...................................................................... 10

## Constitutions:

U.S. Const. art I, § 5 ............................................................... 3

U.S. Const. art I, § 5, cl. 1 ........................................ 11, 12, 13, 16, 21

U.S. Const. art. I, § 7 ............................................................... 4

N.J. Const. of 1776, art. III ...................................................... 21

## Legislative Material:

167 Cong. Rec. H43 (daily ed. Jan. 4, 2021) ...................................18

168 Cong. Rec. H10,528 (daily ed. Dec. 23, 2022) ..........................2, 9, 18, 25

168 Cong. Rec. H10,529 (daily ed. Dec. 23, 2022) .........................25

H.R. Res. 965, 116th Cong. (2020):
  § 3(b) ............................................................................ 16, 18
  § 3(c)(1) .........................................................................22

## Other Authorities:

Benjamin Franklin, *Proposed Articles of Confederation, [on or Before 21 July 1775]*, https://perma.cc/J2N4-LPW4 ...............................21

1 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ..................... 13, 14

2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ...........................11

*Quorum*, Black's Law Dictionary (9th ed. 2009) .................................................11

Paul Seaward, *Pairs and Proxies*, History of Parliament (Oct. 1, 2018), https://perma.cc/PW9U-QC8L ....................................................21

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833) .......................12

The Federalist No. 47 (James Madison), https://perma.cc/D6A4-9YC8 ...................14

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ..................... 12, 20

Noah Webster, *An American Dictionary of the English Language* (1828) ............................13

## INTRODUCTION AND SUMMARY

As the government's opening brief explained, the district court erred in holding that the House lacked a constitutional quorum at the time that it voted on the Consolidated Appropriations Act, 2023 (Appropriations Act or Act). Texas's claim is foreclosed by the enrolled-bill rule and is, in any event, without merit.

Texas's response confirms the district court's errors. Although Texas, like the district court, questions the application of the enrolled-bill rule to Quorum Clause claims, Texas appears to concede that the enrolled-bill rule can apply to foreclose such claims. *E.g.*, Texas Br. 43. Texas invokes the district court's purported distinction between "fact-intensive" and "legal" challenges (Br. 16-17, 24) but that purported distinction has no basis in *Marshall Field* or the other precedents on which Texas relies, as our opening brief established.

Texas's merits arguments fare no better. Texas fails to rebut our showing that the plain language of the Quorum Clause addresses the minimum *number* of Members that must participate for the House to conduct business. Nothing in that language addresses the manner in which Members must participate to be counted towards a quorum, let alone requires that a majority of Members be physically present on the House floor—an interpretation that would call into question over a century of congressional practice. The House was well within its constitutional rulemaking power to adopt a rule providing a means by which its Members could participate in legislative business remotely during the COVID-19 pandemic. Indeed, the House's

rule furthered the Framers' goal in adopting the Quorum Clause: to ensure that legislation reflects the "deliberate opinion of a majority of the" Members of the House and is not "decided by a very small number of the members."  U.S. Br. 30 (quotation marks omitted).  With the remote-voting rule in place, nearly *every* Member participated in the vote on the Appropriations Act, and a majority of Members voted in favor of its passage.  168 Cong. Rec. H10,528 (daily ed. Dec. 23, 2022).

## ARGUMENT

### I.  Texas's Claim Is Foreclosed by the Enrolled-Bill Rule of *Marshall Field*

**A.**  The enrolled-bill rule set forth in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), forecloses Texas's Quorum Clause claim.  *See* U.S. Br. 19-28.  In *Marshall Field*, the Supreme Court recognized the duty of federal courts "to give full effect to the provisions of the constitution relating to the enactment of laws."  143 U.S. at 670. But, the Court held, the "respect due to" Congress, as a "coequal and independent department[]" of the government, cabined that duty and barred the Court from second-guessing the two Houses' "official attestations" on an enrolled bill that the bill had been "passed by congress, according to the forms of the constitution."  *Id.* at 672-73.  In declining to review the plaintiff's claim, the Court further emphasized the adverse practical consequences that would result if "every act" could, "at any and all times," be challenged on the ground that it was not in fact passed by Congress "in the

mode prescribed by the constitution." *See id.* at 668, 670, 673, 675 (quotation marks omitted).

As explained in our opening brief, those same principles bar Texas's claim that the Appropriations Act "never 'passed the House of Representatives'" and is "not law" because the House allegedly lacked a requisite quorum at the time of its vote. ROA.66, 68; *see* U.S. Br. 19-22. The Constitution empowers each House to "determine the Rules of its Proceedings," which includes rules governing when a House has "a Quorum to do [its] Business." U.S. Const. art I, § 5. When, applying those rules, the House determines that a quorum is present and that a bill has been passed by a majority vote—and the bill is thereafter enrolled and signed by the presiding officers of Congress and signed by the President of the United States—the respect owed to Congress as a co-equal branch mandates that courts not "gainsay [Congress's] official assertion that [a] bill was passed by the requisite quorum." *United States v. Munoz-Flores*, 495 U.S. 385, 409-10 (1990) (Scalia, J., concurring in the judgment). Allowing parties to challenge an enrolled bill on the ground that a quorum was not, in fact, present at the time of Congress's vote would create the same instability and uncertainty that the Supreme Court in *Marshall Field* found "intolerable." *See* 143 U.S. at 675 (quoting *Sherman v. Story*, 30 Cal. 253, 275 (1866)).

**B.** Texas's arguments against the application of the enrolled-bill doctrine are unavailing.

**1.** Texas appears to suggest that the enrolled-bill rule does not apply at all to constitutional claims. *E.g.*, Br. 16-17. But *Marshall Field* itself involved a constitutional challenge: the plaintiffs alleged that a statute had not passed both Houses of Congress as required by the Bicameralism Clause, U.S. Const. art. I, § 7; *see Marshall Field*, 143 U.S. at 669; *id.* at 670 (recognizing that the case concerned "the provisions of the constitution relating to the enactment of laws"); *see also Public Citizen v. U.S. Dist. Court for the Dist. of Columbia*, 486 F.3d 1342, 1354 (D.C. Cir. 2007) ("The decision in *Marshall Field* addressed a bicameralism challenge.").

For this same reason, Texas errs in alternatively contending that the enrolled-bill rule can apply only to claims based on constitutional provisions that involve "grant[s] of power" to Congress but not claims involving provisions that "constrain[]" Congress's power. Texas Br. 17. Texas cites no authority in support of that distinction, which is clearly wrong. The Bicameralism Clause is a *constraint* on Congress's power, not a grant of power. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 948-49 (1983) (emphasizing that the bicameralism requirement serves to "restrain" legislative authority (quotation marks omitted)). *Marshall Field* nonetheless applied the enrolled-bill rule to foreclose the plaintiffs' bicameralism challenge there.

Texas underscores its misunderstanding in quoting (Br. 19-20) *Marshall Field*'s language that the Judiciary must "accept, as having passed congress," an enrolled bill that has been signed by the presiding officers of Congress, "leaving the courts to determine, when the question properly arises, whether the act so authenticated, is in

conformity with the constitution." *Marshall Field*, 143 U.S. at 672. The Supreme

Court was distinguishing in that passage between familiar constitutional claims that a

court may properly address—claims that ask whether a law, by its terms or as applied,

is consistent with a constitutional requirement, such as the First Amendment or the

Commerce Clause—and claims that, like the bicameralism claim at issue in *Marshall*

*Field*, ask the Court to look behind Congress's official attestations and declare that an

enrolled bill, "appearing, upon its face, to have become a law in the mode prescribed

by the constitution," was not in fact "passed by congress, according to the forms of

the constitution." *See id.* at 668-70, 673.

That discussion only confirms the application of the enrolled-bill rule here.

Texas's Quorum Clause claim, like the bicameralism claim at issue in *Marshall Field*,

asks the Court to inquire into Congress's internal proceedings and second-guess its

official attestations in order to decide that a bill "was not passed by congress."

*Marshall Field*, 143 U.S. at 670. Texas's complaint underscores this. Texas asserts that,

in order for a bill to become a law, the Constitution "require[s]" that the bill be

"passed by a majority of a quorum of the House." ROA.78. And Texas alleges that,

because a majority of House Members were not physically present on the House floor

at the time of its vote on the Appropriations Act, the Act "never 'passed the House of

Representatives'" and was "never enacted into law," despite the signatures of the

presiding officers of Congress on the enrolled bill and the signature of the President

of the United States. ROA.66, 78. Although Texas seeks to downplay its own

allegations as "semantics," Texas Br. 23, they reflect the nature of Texas's claim, to which the enrolled-bill rule applies with full force, U.S. Br. 22-24.

Texas's contention that the enrolled-bill rule does not apply to Quorum Clause claims is undermined by *Marshall Field* for yet another reason. As our opening brief explained, in declining to review the bicameralism claim at issue in *Marshall Field*, the Supreme Court cited a number of state court decisions which it identified as consistent with its holding. 143 U.S. at 673-80. Among those cases was *Evans v. Browne*, 30 Ind. 514 (1869), in which the Supreme Court of Indiana concluded that it was duty-bound to accept an enrolled bill as conclusive evidence that a bill had been passed with a requisite quorum. *See id.* at 523-27. Texas notes (Br. 25) that the quorum-based challenge in *Evans* arose out of a different factual context. But the rule adopted in *Evans* in no way turned on the particular facts of the case. The Indiana Supreme Court held that it would improperly "supervise [a] co-ordinate" branch of state government for the court to "look beyond" the legislature's "official attestation" that a bill was passed "in the form required by the constitution," and the court emphasized the harm to the public interest if it were to open the door to permit statutes to be challenged in that manner. *See Evans*, 30 Ind. at 523-26. The Supreme Court in *Marshall Field* later relied on similar reasoning to recognize the same principle. *See* 143 U.S. at 670, 673.

In keeping with the Supreme Court's reliance on *Evans*, courts of appeals have repeatedly applied the enrolled-bill doctrine to claims alleging that a federal law is

invalid because Congress enacted the bill without the requisite quorum. *See* U.S. Br. 24 (citing cases). Texas fails even to acknowledge that authority, let alone address it.

Texas's reliance on *Munoz-Flores*, 495 U.S. at 391 n.4, fails for the reasons explained in our opening brief. U.S. Br. 24-25. Texas asserts that the Supreme Court acknowledged in a footnote in that decision that the enrolled bill doctrine "does not bar constitutional claims." Texas Br. 22. Although that "obscure" footnote "def[ies] easy comprehension," *Public Citizen*, 486 F.3d at 1353-54, it plainly cannot be read to suggest that the enrolled-bill rule is inapplicable to all constitutional claims. As explained above, *Marshall Field* itself "addressed a bicameralism challenge," and reading that footnote as Texas urges would "narrow[]" *Marshall Field* "out of existence." *Id.* at 1354. And while the Court in *Munoz-Flores* declined to extend the enrolled-bill rule to the Origination Clause claim at issue in that case, that casts no doubt on the application of the rule to a Quorum Clause claim such as Texas's here, which challenges whether an "enrolled bill ha[s] passed Congress" and squarely implicates the principles underlying the enrolled-bill rule. *See id.* at 1353; *supra* pp. 5-6; U.S. Br. 22-24.

**2.** Texas itself appears to concede that the enrolled-bill rule can apply to foreclose some Quorum Clause claims. *See* Texas Br. 25, 43. Indeed, in (unsuccessfully) attempting to reconcile its merits argument with the longstanding practice of unanimous consent, Texas retreats to arguing that the enrolled-bill rule

would apply to foreclose Quorum Clause challenges to bills enacted pursuant to that practice. *See* Texas Br. 43; *infra* pp. 23-24.

Texas's argument thus appears to rest on its assertion that the enrolled-bill rule does not apply where "there is no factual dispute." Texas Br. 16, 20. As our opening brief explained, however, nothing in *Marshall Field* suggests that the enrolled-bill doctrine is limited to only fact-intensive challenges about a bill's passage. U.S. Br. 26. The respect the Judiciary owes to the Legislative Branch is no less implicated when a plaintiff contends that the legislature committed a legal error than when a plaintiff contends the legislature committed a factual one. Either challenge requires a court to second-guess Congress's attestation that a bill was passed in the manner prescribed by the Constitution. And the disruptive practical effects of a court entertaining such challenges on purportedly "legal" grounds are no different from the consequences of allowing fact-intensive challenges.

Texas's reliance (Br. 18-19) on *United States v. Ballin*, 144 U.S. 1 (1892), is misplaced. As our opening brief explained, the plaintiffs in *Ballin* asserted that a new quorum rule was unlawful and that, accordingly, a bill enacted pursuant to that rule had not "legally passed" the House. *Id.* at 3. In a passage that Texas ignores, the Court recognized that the plaintiffs' challenge to the House's quorum rule was of the same "nature" as the bicameralism challenge in *Marshall Field*, *id.* at 4, and thus presumably could have been decided on the same ground. The Court explicitly "assum[ed]," "without deciding," that it could look behind the House's attestation

that the relevant law had been passed with the requisite quorum, and the Court proceeded to confirm that the law, "as found in the office of the secretary of state, is beyond challenge." *Id.* at 4-9.

Moreover, as explained (U.S. Br. 27-28), even in proceeding to assume that it could look past the enrolled bill to consult the House's official journal, the Court assumed only that it could "appeal[]" to the journal with respect to "the facts which the constitution requires to be placed" there—*i.e.*, "whether the yeas and nays were ordered, and, if so, what was the vote disclosed thereby." *Ballin*, 144 U.S. at 4; *see Marshall Field*, 143 U.S. at 679-80 (refusing to look to the House's journal when asked to consider matters "the constitution does not require to be entered" there). Here, even if this Court makes the same assumption as in *Ballin* and considers the House's official record to see "whether the yeas and nays were ordered, and if so," "the vote disclosed thereby," 144 U.S. at 4, that record plainly reveals the existence of a quorum, *see* 168 Cong. Rec. H10,528 (recording 225 yeas, 201 nays, and one Member voting "present").

Texas's Quorum Clause claim turns on its assertion that "only 201" Members were physically present in the House chamber during its vote on the Appropriations Act, which Texas calculates based on a separate list in the congressional record of the Members who are identified as having voted on the Act pursuant to the House's remote-voting rule. ROA.68, 1392. The Constitution did not require the House to record that information, and nothing in *Marshall Field* or *Ballin* supports Texas's

9

argument that it can appropriately appeal to such information to "overthrow" a bill that has been "enrolled and authenticated by the" presiding officers of Congress and signed by the President. *Ballin*, 144 U.S. at 4; *see Marshall Field*, 143 U.S. at 679-80.

**3.** Finally, Texas repeatedly describes the enrolled-bill rule as a "rule of evidence," but that characterization does not aid its claim. *E.g.*, Texas Br. 20 (first citing *Munoz-Flores*, 495 U.S. at 391 n.4; and then citing *U.S. Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 n.7 (1993)). Even if the doctrine is aptly described as a rule of evidence, the evidentiary principle for which it stands is that a court must accept as conclusive Congress's attestation that an enrolled bill was passed by Congress in compliance with the "forms of the constitution." *Marshall Field*, 143 U.S. at 673. For the reasons explained, applying that evidentiary principle here requires this Court to accept Congress's attestations on the enrolled bill that the Appropriations Act was duly passed by a majority of a quorum of each House. *See* ROA.1672 (enrolled bill).

## II. The Appropriations Act Duly Passed the House

In all events, the district court erred in interpreting the Quorum Clause to impose a "physical-presence requirement." ROA.1373. Our opening brief thoroughly explained why the district court's interpretation is inconsistent with text, history, and precedent. None of Texas's arguments establishes otherwise.

**A.** Texas does not engage with, much less refute, our showing that the term "quorum"—both today and at the time of the Founding—means "the number of

members of a larger body that must *participate* for the valid transaction of business."
*New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 683-84 (2010) (emphasis added) (citing
*Quorum*, Black's Law Dictionary (9th ed. 2009)); *see* 2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) (defining a quorum as the "number of any officers as is sufficient to do business").  In setting this number at "a majority of each" House, U.S. Const. art. I, § 5, cl. 1, the Quorum Clause requires that at least half of each Chamber participate to conduct legislative business.

Nothing in that language addresses how Members must participate to be counted towards a quorum, let alone requires that Members be physically present. That is consistent with how the term "quorum" has long been understood across a range of analogous contexts, in which it is readily recognized that a quorum can be established where the requisite number of members participate in the relevant decision, even if they are not "physically present together" in a single location.  *See, e.g.*, *Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967) (recognizing that members of a multi-member agency did not need to decide matter while "jointly in conference" to satisfy statutory quorum requirement and noting that "[a] similar system is in use on this court for processing motions and the deluge of petitions for rehearing en banc"); U.S. Br. 36-37.

**B. 1.**  To the extent Texas addresses the operative text of the Quorum Clause at all, Texas appears to agree—as the district court did—that the text refers to the "number" of Members for each House to conduct business, while giving no

"indication" as to whether those Members must be "physically present."  *See* Texas

Br. 28 (quoting ROA.1373).

The crux of Texas's argument for nonetheless reading a "physical-presence

requirement" into the Constitution is that a neighboring phrase in Article I, Section 5,

authorizes "a smaller Number" of Members than required to establish a quorum to

"compel the Attendance of absent Members, in such Manner, and under such

Penalties as each House may provide."  U.S. Const. art. I, § 5, cl. 1.  Texas contends

(Br. 37) that this phrase would be "surplusage" if Members did not need to be

physically present to count towards a quorum.

The district court relied on similar reasoning, and our opening brief explained

why that reasoning is incorrect.  As we established, the Framers authorized less than a

majority of Members to "compel the Attendance of absent Members" to ensure that,

if a faction of Members were to engage in quorum-busting techniques to prevent a

quorum and stop legislative business from proceeding, a smaller number of Members

than required to establish a quorum could act to secure a quorum so that legislative

business may proceed.  U.S. Br. 39; *see* 2 *The Records of the Federal Convention of 1787*, at

252-54 (Max Farrand ed., 1911); 2 Joseph Story, *Commentaries on the Constitution of the

United States* § 834 (1833); *see also* Amicus Br. of Legal Historians 8-9.

Thus, just as the Quorum Clause does not specify how Members must

participate to be counted towards a quorum, the power to "compel the Attendance of

absent Members" also says nothing about that question.  In this context,

"Attendance" refers to participation in the House's business through the rules the House has adopted. If the House has promulgated a rule allowing its Members to vote on legislation remotely and be counted towards a quorum, a Member participating in accordance with those procedures is not "absent" from legislative business and there is no need for their "Attendance" to be "compel[led]." U.S. Const. art. I, § 5, cl. 1; *see Opinion of the Justices*, 247 A.3d 831, 840 (N.H. 2020) (recognizing that state legislators participating in proceedings remotely would not be "absent"). But if a Member were refusing to participate in the House's business through any of the procedures the House has adopted for such participation, and thereby seeking to deny the House a quorum, a smaller number of Members could act in that circumstance—if the House has authorized such a rule—to "compel" that Member to attend to legislative business, through whatever procedures the House has adopted for such participation, including remote voting. There is no "surplusage." Texas Br. 37.

Texas insists that the terms "absent" and "attendance" often carry a "physical-presence connotation." Texas Br. 28 (quoting ROA.1374). Both Founding-era dictionaries and modern sources establish, however, that those terms do not necessarily refer to physical presence in a particular location. U.S. Br. 40-41. "Absent" can, for example, mean "inattentive," while, correspondingly, "attendance" is defined as, among other things, "[a]ttention" and "regard." U.S. Br. 40 (first quoting 1 Samuel Johnson*, supra*; and then quoting Noah Webster, *An American Dictionary of the English Language* (1828)); *see also id.* (noting that Founding-era

dictionaries similarly define "to attend" as "[t]o yield attention" or "to fix the mind upon" (quoting 1 Samuel Johnson, *supra*)). Texas asserts (Br. 38) that it would be "odd" to give those terms such a meaning here. But it is unclear why that is so, and that understanding is far more plausible in the context of the Constitution's quorum requirement than definitions cited by the district court as supposedly connoting physical presence. *See, e.g.*, ROA.1374 (noting that "attendance" is commonly defined as "[s]ervice" or "[t]he act of waiting on another" and inferring a physical-presence requirement because "[t]o serve or wait on another, one typically would need to be in the same place as the person served"). Texas acknowledges, moreover, that even under definitions the district court relied upon, the text can encompass remote-voting procedures. *See* Texas Br. 38 (acknowledging that "'absent' could mean 'at such a distance to prevent communication'"); U.S. Br. 41 (explaining how Members voting remotely were not "at such a distance as to prevent communication").

Texas is thus left to invoke (Br. 37-38) a sentence from the Federalist Papers in which James Madison—addressing the separation of powers between the Branches—noted that judges under the "British Constitution" may "attend and participate in" legislative deliberations. *See* The Federalist No. 47 (James Madison).[1] Madison was not addressing quorum requirements or the meaning of the term "Attendance" in

---

[1] https://perma.cc/D6A4-9YC8.

Article I, and that sentence in the context of an unrelated discussion sheds no light on whether the Quorum Clause requires physical presence.

**2.** Texas is on no firmer footing in urging (Br. 38) that *Ballin* precludes understanding "Attendance" to mean participation in House business through the rules the House has adopted. Texas quotes *Ballin*'s language that the House's "capacity to transact business" is established by the "presence of a majority, and does not depend upon the disposition or assent or action of any single member or fraction of the majority present." 144 U.S. at 5-6. Echoing the district court, Texas interprets this sentence to mean that, for purposes of determining a quorum, whether a Member participates in House business is irrelevant.

Texas misreads *Ballin*. *Ballin* concluded that the House had the constitutional authority to change its quorum rules from how it had determined a quorum for its first 100 years. Instead of counting towards a quorum only those Members who voted on a bill—as the House did from the Founding until 1890, *see* U.S. Br. 4—*Ballin* recognized that the House could permissibly change its rules to count Members physically present "in the hall of the house," whether or not they voted, *see* 144 U.S. at 5. Contrary to Texas's suggestion, *Ballin* did not conclude that a Member's physical presence is the sole criterion Congress may use in determining whether it is in a "condition to transact business." *Id.* at 6. To the contrary, the Court made clear that the Constitution does not fix the method for determining whether the requisite

majority is in place and instead leaves it to "the competency of the [H]ouse to prescribe any method which shall be reasonably certain to ascertain the fact." *Id.*

Thus, in *Ballin*, the Court acknowledged that a Member's physical presence is a criterion that Congress may reasonably use to establish that a Member is participating in the matter at hand and can be counted in determining whether the House is "in a position to do business." *See Ballin*, 144 U.S. at 5. In other words, a Member's physical presence can demonstrate that a Member has "yield[ed] attention" to the relevant House vote and thus can be counted towards a quorum. *See supra* p. 14. Similarly, here, Congress reasonably exercised its discretionary authority when it concluded that Members are participating in its business and may be counted towards a quorum where they cast a vote on a particular piece of legislation pursuant to the specific remote-voting procedures the House adopted. *See* H.R. Res. 965, 116th Cong. § 3(b) (2020). In each circumstance, the House has prescribed "a method for ascertaining the presence of a majority, and thus establishing the fact that [it] is in a condition to transact business." *Ballin*, 144 U.S. at 6. *Ballin* confirms the House's wide latitude under the Rulemaking Clause to prescribe such rules. *See id.* at 5-6.

**3.** Texas suggests that, if the House may define by its rules the circumstances under which its Members are present and may be counted towards a quorum, "[t]here would be no need for the Quorum Clause." Texas Br. 39. That is meritless. No one disputes that the Quorum Clause requires "a Majority" for the House to conduct business. U.S. Const. art. I, § 5, cl. 1. The Supreme Court recognized over 100 years

ago in *Ballin*, however, that that requirement leaves other details unaddressed. *See* 144

U.S. at 6. Since the Founding, the House has answered the questions left unanswered

by the Quorum Clause pursuant to the Rulemaking Clause, promulgating rules (which

have varied over time) establishing the circumstances under which its Members may

be counted towards a quorum, how long a quorum is presumed to last once it is

established, and what matters constitute legislative "Business" for which a quorum is

required. U.S. Br. 3-5. Texas largely ignores that history. And while Texas speculates

about hypothetical ways the House could seek to define a quorum that would

"nullify" the Quorum Clause's majority requirement, Texas Br. 40, Texas does not

explain how the House did so here, where its rule did not change the number of

Members required for a quorum but rather provided an additional means by which

Members could "cast their votes on legislation" during the pandemic, *see McCarthy v.*

*Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021). Whatever the outer limits of the House's

authority to define when its Members are participating in its business and may be

counted towards a quorum, the House is well within its discretion to count towards a

quorum those Members who affirmatively vote on legislation.

   Texas's concern that some Members might participate remotely "in the

morning" but then "stop participating in the afternoon" (Br. 46) is puzzling. Under

the House's longstanding rules, a quorum is required only prior to a vote, U.S. Br. 5,

and under the House's remote-voting rule, a Member would be counted towards a

quorum if they cast a vote on a particular bill pursuant to the prescribed remote-

voting procedures, *see* H.R. Res. 965, § 3(b); 167 Cong. Rec. H43 (daily ed. Jan. 4, 2021). To the extent Texas is concerned that a quorum could have "disappear[ed]" if a Member who voted remotely on a bill declined to participate in a later vote (Br. 46), that is an aspect of any quorum rule. Under the rule approved by the Court in *Ballin*, for instance, Members who were physically present in the morning could leave at lunchtime, thus depriving the House of a quorum for a vote in the afternoon.

**C.** Texas's discussion (Br. 29) of the "historical context" of the Quorum Clause and its identification of the "background concerns that informed" its content only underscore the validity of the House's rule. Texas notes, for example, that the Convention delegates adopted the Quorum Clause and its majority requirement to avoid laws being adopted by "a few men" and "against the deliberate opinion of a majority of the representative body." *Id.* The House remote-voting rule is plainly consistent with those goals, as the passage of the Appropriations Act illustrates. The Act was not passed by "a few men" or "against the deliberate opinion of a majority" of the House. As explained, over 400 Members cast a vote on the Act, and there is no dispute that 225 members voted in favor of the bill—a majority of the total number of House members at the time. *See* 168 Cong. Rec. H10,528.

The rule likewise accords with the Quorum Clause's asserted goal of "preventing 'rule of the country by a few representatives of the states closest to the nation's capital' while limiting "'[the] power [of] a few members to secede from the legislature and deprive it of its power.'" Texas Br. 34. The House rule enabled

representatives of all States to participate in the vote on the Appropriations Act during a pandemic. By contrast, as explained (U.S. Br. 43-44), interpreting the Quorum Clause to require physical presence could hinder Congress' ability to take needed and desired action during a future health emergency or other crisis where travel or physical assembly is dangerous or infeasible—as numerous amici underscore. *See, e.g.*, Amicus Br. of Senate Republican Leader Mitch McConnell 17-18; Amicus Br. of Former Nat'l Sec. Officials 1-14. In such a situation, a physical presence requirement would limit participation in House business and hamstring House operations, the very ills the Quorum Clause was designed to avoid.

Texas's other history-based arguments likewise fail to demonstrate that the Quorum Clause includes a physical-presence requirement and bars the House's remote-voting rule. Texas repeats the district court's conclusion that the Framers' discussion during the Constitutional Convention about the difficulty of "travel from the states far from the capital" only makes "sense" if the Framers believed that Members' physical presence was required in order to be counted towards a quorum. Texas Br. 33 (quoting ROA.1379). As our opening brief explained, however, the Framers' debate at the Convention related to the *number* of Members that should be required to establish a quorum, and the "constitutional compromise" (*id.*) the Framers reached was their selection of a majority as the requisite number. *See* U.S. Br. 30-31, 42-43. The Framers' statements about the difficulty and inconvenience of travel in the context of that discussion merely reflect the available means of communication at

the time. *See* 2 *The Records of the Federal Convention of 1787, supra*, at 252-54. Texas only

confirms the district court's error in asserting that, in 1789, it was possible to

communicate by "messenger or letter." Texas Br. 45. Those methods of

communication could take weeks or months to arrive at their destination at that time.

Even if the Framers assumed, in light of those available means of communication,

that Congress would meet in person to establish a quorum and conduct business, that

"does not fully describe the relevant founding intent." *See NLRB v. Noel Canning*, 573

U.S. 513, 533-34 (2014). Nothing in the Framers' debate at the Convention or the

text of the Quorum Clause suggests that the Framers intended to "restrict" future

Congresses to only that method of participation. *See id.* at 533; U.S. Br. 42

Texas's discussion of "legislative proxies" at the time of the Founding (Br. 29-

30) does not further its argument. Texas argues at length that the Framers "knew"

about the use of legislative proxies in the English House of Lords. *See* Texas Br. 30,

32, 41, 45. Even so, Texas cites no debate about the topic at the Constitutional

Convention. To the extent the Framers addressed the question in earlier writings,

those writings only cut against Texas's argument. As our opening brief explained,

Benjamin Franklin's proposed draft Articles of Confederation, which would have

explicitly authorized allowing a Member to designate a proxy to vote on his behalf,

specified that a "Quorum" would be "[o]ne half of the Members . . . exclusive of

Proxies," suggesting that the term "Quorum," by itself, was not understood to require

physical presence and could encompass the counting of proxies if not otherwise

specified. *See* Benjamin Franklin, *Proposed Articles of Confederation, [on or Before 21 July 1775]*, https://perma.cc/J2N4-LPW4. Texas does not address that language.

As for the text of the Constitution, the Framers specified only that a quorum is "a Majority of each" House. U.S. Const. art. I, § 5, cl. 1. To the extent the Framers "knew about proxy voting" and wanted to prohibit it, Texas Br. 41, they could have easily done so in the constitutional text. But whatever the Framers may have thought about the question, they "did not reduce their thoughts . . . to the printed page." *Chiafalo v. Washington*, 591 U.S. 578, 592 (2020). That omission is particularly telling given that contemporaneous state constitutions did contain specific language prohibiting the practice. *See, e.g.,* N.J. Const. of 1776, art. III ("[N]o Law shall pass, unless there be a Majority of all the Representatives of each Body *personally present*." (emphasis added)).

In all events, even if the Framers considered and rejected the form of proxy voting that Texas discusses, that form of voting bears little resemblance to the House's remote-voting rule at issue here. U.S. Br. 44-46. The form of proxy voting that Texas discusses involved a Member "delegat[ing]" *discretionary* voting power to another Member, effectively allowing a Member to cast multiple votes in the way of his choosing. *See* Paul Seaward, *Pairs and Proxies*, History of Parliament (Oct. 1, 2018)[2]; *see also id.* (discussing the English Crown managing "the risk of difficult votes

---

[2] https://perma.cc/PW9U-QC8L.

in the House of Lords" by "soliciting proxies" and distributing the delegated votes "among reliable peers").

That form of proxy voting raises very different concerns than the House's rule here, which explicitly prohibited any such discretionary delegation and instead required Members wishing to vote remotely to transmit an "exact" written instruction "specific to a *particular* vote or quorum call," which the Member designated to physically cast the vote was required to follow. *See McCarthy*, 5 F.4th at 37 (emphasis added) (quoting H.R. Res. 965, § 3(c)(1)). The House's remote-voting rule thus allowed Members to participate remotely in a manner that is materially indistinguishable from the manner in which Members participate when physically present. *See* U.S. Br. 44-45. Texas does not explain how the form of remote voting authorized by the House implicates any of the concerns Texas raises about legislative proxies, and Texas cites no evidence the Framers considered and rejected the form of remote voting the House authorized.

Finally, Texas does not present any Founding-era documents or discussion to support its assertion that the Framers enacted the Quorum Clause to ensure "meaningful debate." Texas Br. 35, 41. Nor does Texas explain, in any event, how the form of remote-voting procedures authorized by the House reduces meaningful debate in the House. Texas's argument is particularly misplaced given that, as discussed above, under longstanding House rules, the House does not require a quorum to debate—a quorum is required only prior to a vote. U.S. Br. 4-5. And even

with respect to passing legislation, the House and the Senate frequently conduct business with few Members physically present.  *See infra* pp. 24-25.

**D.**  Texas's arguments from congressional practice underscore its flawed reasoning.  As an initial matter, Texas fundamentally mistakes the relevant inquiry in urging that the House must identify a "historical analogue" to support its rule.  Texas Br. 45.  To the contrary, the Supreme Court made clear in *Ballin* that the House's rulemaking power is a "continuous one," and the House may change its rules over time.  144 U.S. at 5.  Indeed, as explained above, the Court in *Ballin* confirmed the House's power to amend its quorum rules, even though the House's new rule differed from the way it had determined a quorum for the first 100 years of its history.

Regardless, longstanding congressional practice confirms that the Quorum Clause does not require physical presence.  Texas does not dispute that, under procedures dating back over a century, each Chamber may pass legislation—and the Senate may confirm judges and other appointees—by unanimous consent and voice vote with few Members physically present.  U.S. Br. 33; *see* Amicus Br. of Republican Senate Leader McConnell 20-22.  Like the district court, Texas fails to reconcile that practice with its interpretation of the Quorum Clause.  As our opening brief explained, if the district court is correct that the Quorum Clause requires a physical quorum of Members in the House chamber for the House's power to conduct business to arise, that constitutional requirement presumably cannot be excused merely because no Member raises an objection and the House proceeds without a

recorded vote.  U.S. Br. 47.  Texas offers nothing to demonstrate otherwise, and instead pivots to arguing that the enrolled-bill rule would foreclose a claim that the House lacked a quorum at the time that it passed a bill by unanimous consent or voice vote.  Texas Br. 43-44.

And if unanimous consent and voice voting procedures were not sufficiently close historical analogues, yet another exists:  For the first century of its existence, the House counted only those Members who voted on a bill towards a quorum.  U.S. Br. 4; *see* Amicus Br. of Legal Historians 17.  Thus, whether a Member voted on a specific bill was the sole criterion the House used to determine a quorum.  The House's remote voting procedure, which counts towards a quorum those Members who cast an individual vote on a specific piece of legislation, accords with that historical practice.

Texas does not bolster its argument by repeating the district court's conclusion that the House's rule "affirmatively" counted "absent member[s]" as present.  Texas Br. 42 (quoting ROA.1370).  For the reasons already explained, that is not true:  Members voting remotely pursuant to the House's rule were not "absent" from the proceedings but were rather participating pursuant to the procedures the House has provided.[3]  Texas quotes (Br. 44) the Supreme Court's statement in *Noel Canning* that

---

[3] To the extent Texas suggests that the House ignored an objection to a lack of a quorum during its vote on the Appropriations Act (*e.g.*, Br. 7), that is incorrect.  No Member raised an objection.  Representative Roy made a "parliamentary inquiry,"

*Continued on next page.*

"[w]hen the Senate is without the capacity to act, under its own rules, it is not in session even if it so declares." 573 U.S. at 552 (emphasis omitted). But Texas ignores the clause "under its own rules." *Id.* Here, the House's rule provided that Members casting a vote remotely were to be counted for purposes of determining a quorum, and the House therefore determined that—when nearly *every* Member voted on the Appropriations Act—a quorum existed under the rules of the House. *See* 168 Cong. Rec. H10,529.

---

which he then withdrew. *See* 168 Cong. Rec. H10,529. And contrary to Texas's further suggestion, the House held a "roll call vote" (Br. 7) on the Appropriations Act. *See* 168 Cong. Rec. H10,528 (recording the "yeas and nays").

## CONCLUSION

For the foregoing reasons, and those explained in our opening brief, the

judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
    *General*

MICHAEL S. RAAB
GERARD SINZDAK
/s/ *Courtney L. Dixon*
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7246*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-8189*

November 2024

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Courtney L. Dixon*
Courtney L. Dixon

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,493 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Courtney L. Dixon*
Courtney L. Dixon