# In the United States Court of Appeals for the Fifth Circuit

---

STATE OF TEXAS,

*Plaintiff-Appellee,*

*v.*

PAMELA BONDI, U.S. ATTORNEY GENERAL, IN HER OFFICIAL CAPACITY AS UNITED STATES ATTORNEY GENERAL; CHARLOTTE A. BURROWS, IN HER OFFICIAL CAPACITY AS CHAIR OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; JOCELYN SAMUELS, IN HER OFFICIAL CAPACITY AS VICE CHAIR OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; KEITH SOLDERLING, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHRISTOPHER W. LAGE, IN HIS OFFICIAL CAPACITY AS GENERAL COUNSEL OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division

---

## PETITION FOR REHEARING EN BANC

---

*(Counsel Listed on Inside Cover)*

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Jacob C. Beach
Assistant Solicitor General

Christopher J. Pavlinec
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Plaintiff-Appellee

Robert E. Henneke
Chance Weldon
Matthew R. Miller
Eric Heigis

Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701

# Certificate of Interested Persons

No. 24-10386

### State of Texas,

*Plaintiff-Appellee,*

*v.*

Pamela Bondi, U.S. Attorney General, in her official capacity as United States Attorney General; Charlotte A. Burrows, in her official capacity as Chair of the U.S. Equal Employment Opportunity Commission; Jocelyn Samuels, in her official capacity as Vice Chair of the U.S. Equal Employment Opportunity Commission; Keith Solderling, in his official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; Andrea R. Lucas, in her official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; Christopher W. Lage, in his official capacity as General Counsel of the Equal Employment Opportunity Commission; Equal Employment Opportunity Commission; United States Department of Justice,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ William F. Cole

William F. Cole
*Counsel of Record for
Plaintiff-Appellee*

ii

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ...................................................................... ii

Table of Authorities .......................................................................................... iv

Introduction and Rule 40(b) Statement ............................................................. 1

Issue Meriting En Banc Consideration .............................................................. 2

Statement of the Case ........................................................................................ 2

Argument ............................................................................................................ 6

    I.   This Appeal Presents a Novel Question Regarding a Core
        Constitutional Limit on the Exercise of Legislative Power. ...................... 7

        A.   The Quorum Clause's text and historical context require
            physical presence. .......................................................................... 7

        B.   Historical practice confirms the physical-presence requirement ....... 10

        C.   Precedent strongly suggests that the Quorum Clause does not
            permit presence by proxy. .............................................................. 12

    II.   The Quorum Clause's Limit on Congressional Authority is
        Exceptionally Important and Must be Addressed by the Full Court. ........ 13

Conclusion ....................................................................................................... 15

Certificate of Service ....................................................................................... 16

Certificate of Compliance ............................................................................... 16

**Page(s)**

**Cases:**

*Clinton v. City of New York*,
524 U.S. 417 (1998) ............................................................. 13

*INS v. Chadha*,
462 U.S. 919 (1983) ............................................................. 13

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) .................................................... 4, 11, 12

*Texas v. Garland*,
719 F. Supp. 3d 521 (N.D. Tex. 2024) .............................. 3, 4, 7

*United States v. Ballin*,
144 U.S. 1 (1892) ......................................... 1, 3, 4, 5, 6, 12, 13

*United States v. Lopez*,
514 U.S. 549 (1995) ............................................................. 13

**Constitutional Provisions, Statutes and Rules:**

U.S. Const.:
art. I, § 5 ................................................................... 1, 2, 7
art. I, § 6 ........................................................................... 8

Consolidated Appropriations Act of 2023,
Pub. L. No. 117–328, 136 Stat. 4459 (2022) ..................... 2, 3

Fed. R. App. P. 40(b)(2)(D) ....................................................... 1

**Other Authorities:**

1 Annals of Cong. (March 4, 1789–April 6, 1789) ...................... 11

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) .......... 14

H.R. Res. 8, 117th Cong. (2021) ............................................... 2

H.R. Res. 965, 116th Cong. (2020) ........................................... 2

James Madison, *Notes of Debates in the Federal Convention of 1787*
(W.W. Norton & Co. 1987) ................................................. 9

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation
of Legal Texts (2012) ......................................................... 8

## Introduction and Rule 40(b) Statement

This case presents a novel constitutional question of exceptional importance: whether Congress may rely on proxies to count members for purposes of establishing a quorum under Article I, Section 5 of the Constitution. Fed. R. App. P. 40(b)(2)(D). A divided panel of this Court held that presence by proxy may satisfy the Constitution's quorum requirements. The House attempted this procedure in 2020 for the first time in this Nation's history, and thus no court has previously addressed the constitutionality of the practice. The sole guidance from the Supreme Court— *United States v. Ballin*, 144 U.S. 1 (1892)—strongly indicates that the Quorum Clause requires members of Congress to be physically present.

The question presented concerns the constitutional limits of Congress's authority to exercise the legislative power. That issue's importance warrants consideration by this Court as a whole. Indeed, the stakes extend far beyond this case. As Judges Wilson and Hendrix have explained, allowing Congress to define "presence" to include members who are undisputably absent collapses a constitutional requirement into an internal housekeeping matter and dilutes an important limit on the exercise of Congress's lawmaking power. That approach creates uncertainty regarding the legitimacy of the process for federal lawmaking.

This Court should grant rehearing en banc to resolve this novel and fundamental issue, restore the Quorum Clause as a check on legislative power, and enforce the Constitution's requirement that a house of Congress must have the physical presence of a majority of its members to pass laws.

# Issue Meriting En Banc Consideration

Whether presence by proxy satisfies Article I, Section 5's requirement that a "Quorum" of "a Majority [of Members]" of a house of Congress is necessary "to do Business."

# Statement of the Case

**1.** On May 15, 2020, the House of Representatives adopted House Resolution 965, which permitted absent members to participate in House proceedings by proxy. H.R. Res. 965, 116th Cong. (2020). Under this resolution, a proxy vote not only registered a member's vote but also "record[ed] the presence of such other Member in the House" for purposes of a quorum. *Id.* §1(a). To appear by proxy, a member was required to submit a signed letter to the Clerk of the House with his or her name and that of a different member who would be appearing in person. *Id.* §2(a)(1). The physically present member would submit responses to quorum calls or votes according to the physically absent member's "exact" instructions. *Id.* §3(c)(3). The House extended this proxy voting rule into the 117th Congress, ending in January 2023. H.R. Res. 8, § 3(s), 117th Cong. (2021).

The House relied on this proxy-presence rule when it passed the Consolidated Appropriations Act of 2023, an omnibus measure encompassing twelve annual appropriations bills and various pieces of permanent legislation. App.4. It is undisputed that on December 23, 2022, the day the House voted on the Act, fewer than a majority of members were physically present in the Chamber. *Id.* Representative Chip Roy of Texas raised a parliamentary inquiry on the basis that the Constitution requires a physical quorum. *Id.* Nevertheless, the Speaker Pro

Tempore announced that a quorum was present because, pursuant to the proxy-presence rule, proxy designations counted toward the total. *Id.* Of the 431 votes cast, 205 were cast in person and 226 were cast by proxy. *Id.*

The bill proceeded to the Senate, which approved it, and it was enrolled and presented to the President, who signed the Act into law. *See id.* (citing Pub. L. No. 117–328, 136 Stat. 4459 (2022)).

**2.** In February 2023, the State of Texas filed suit in the Northern District of Texas, challenging two components of the Consolidated Appropriations Act of 2023: (1) the Pregnant Workers Fairness Act (PWFA) and (2) a $20 million appropriation for a Department of Homeland Security Case Management Pilot Program. App.5. After trial, Judge Hendrix found that Texas had standing only to challenge the PWFA. *Id.* He also held that the enrolled-bill rule—which treats an enrolled bill's text as conclusive evidence of the bill both houses passed—did not foreclose review because Texas raised a constitutional challenge under the Quorum Clause, not a factual dispute about the accuracy of the legislative record. *Id.*

On the merits, Judge Hendrix held that the Quorum Clause requires physical presence. App.6. He reasoned that "the Clause's text distinguishes those absent members from the quorum and provides a mechanism for obtaining a physical quorum by compelling absent members to attend." *Texas v. Garland*, 719 F. Supp. 3d 521, 536 (N.D. Tex. 2024). The "Quorum Clause is not a majority-participation requirement, but a majority-presence requirement." *Id.* at 582 (citing *Ballin*, 144 U.S. at 6). And as a matter of historical practice from the First Congress onward, both houses required a majority of members to assemble physically before

transacting business. *Id.* at 588–91. Concluding that the House lacked authority to redefine "presence" as understood by *Ballin*, Judge Hendrix permanently enjoined enforcement of the PWFA against Texas. *Id.* at 594–97.

**3.** A divided panel of this Court reversed. App.28. All three judges agreed that the enrolled-bill rule did not bar review because the facts in the legislative record are undisputed and the claim is constitutional in nature. App.7–17.

Two judges held that the Quorum Clause does not demand physical presence and thus that the proxy procedures satisfied the Constitution's presence requirement. App.18–28. The majority first observed that "the Quorum Clause contains no *physical* presence requirement." App.20. It then invoked *Ballin* for the proposition that Congress has discretion to determine the methods of ascertaining presence so long as the method was "reasonably certain" to do so, App.27, and reasoned that the House's decision to treat a proxy vote as a form of presence fell within that discretion. App.27–28.

The majority further explained that founding-era dictionaries sometimes defined "absence" and "attendance" in mental or functional terms, suggesting that physical presence was not the only possible meaning. App.21. And it pointed to the historical practice of unanimous-consent agreements as an analogy to justify dispensing with the physical-presence requirement. App.22–24. The majority buttressed its holding by relying on *NLRB v. Noel Canning*, 573 U.S. 513 (2014), which it read to authorize a flexible reading of the constitutional text to accommodate the Clause's "essential purpose," which it defined here as "majoritarian rule." App.26.

4

Judge Wilson dissented. In his view, *Ballin* confirmed that the Constitution requires a physically present majority to do business while allowing Congress discretion only as to the methods of ascertaining that fact. App.32–33. By treating proxies as "present" members, the House impermissibly redefined the constitutional requirement. App.32. As for the text, the authority to "compel the Attendance of absent Members" only makes sense if members must assemble physically. App.36–37. Judge Wilson also emphasized that the Framers were familiar with proxies but did not provide for their use. App.37–38. And he pointed to the unbroken historical practice from the First Congress through modern times that a quorum always required physical presence. App.39–41.

Judge Wilson concluded by explaining that the majority's approach erases a structural constitutional safeguard on Congress's lawmaking power, allowing each Chamber to dilute the Constitution's quorum requirement. App.44. He would have held that the House lacked the constitutionally required quorum when voting and affirmed Judge Hendrix's injunction against the PWFA. *Id.*

## Argument

Whether Congress may define "quorum" to include members who are "present" only by proxy—through signed letters allowing different members to vote on their behalf—is a novel constitutional question of exceptional importance. The majority frames the issue as whether strict physical presence is always required, suggesting that *any* exception to traditional physical presence (such as the majority's interpretation of Congress's unanimous consent practice) justifies *every* exception. This framing effectively nullifies the Quorum Clause.

But as Judge Wilson explained in his dissent, this appeal does not concern challenges to hypothetical procedures for "remote voting" or virtual participation. App.30 n.2. Rather, Texas challenges "the House's ability to count proxies for purposes of establishing a quorum." *Id.*

The Quorum Clause's text, informed by history, tradition, and Supreme Court precedent, confirms that proxies cannot be used to establish a quorum. The most natural reading of the Constitution's text—which permits Congress to "compel the Attendance of absent Members"—concerns physical presence, not mental attentiveness. The Framers were familiar with the practice of proxy voting and never suggested that proxies could be used to satisfy the Quorum Clause.

Nor does the practice of unanimous consent support the majority's conclusion. That practice merely presumes that a physically present quorum, once established, continues until it is challenged. Finally, the Supreme Court's *Ballin* decision, which is its only guidance on the issue, all but says that physical presence is necessary to establish a quorum.

# I. This Appeal Presents a Novel Question Regarding a Core Constitutional Limit on the Exercise of Legislative Power.

This appeal involves a novel question of first impression concerning a core restriction the Constitution places on Congress's lawmaking powers: the presence of a quorum. The Quorum Clause provides that "a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number . . . may be authorized to compel the Attendance of absent Members." U.S. Const. art. I, § 5, cl. 1. By holding that Congress may count members as part of a quorum if they have empowered another member to cast a proxy vote on their behalf, the majority undermines this constitutional requirement—contrary to text, history, and precedent.

## A. The Quorum Clause's text and historical context require physical presence.

**1.** The Quorum Clause's plain text requires the physical presence of members.

Although the word "quorum," standing alone, does not necessarily suggest that members must be physically present, the Clause's second half—empowering Congress to compel the "attendance" of "absent" members—strongly indicates such a requirement. As Judge Hendrix explained, founding-era dictionaries consistently defined the term "absent," as well as "the meaning of 'attendance' or 'attend,'" in physical terms. *Garland*, 719 F. Supp. 3d at 584–85 (collecting dictionary definitions).

The majority concluded that the term "absent" did not necessarily "entail a lack of physical presence" in the founding era because "founding-era dictionaries only *often* required physical presence" but "other times they did not." App.21. But the majority erred by stopping its analysis after noting that "absent" could have a

7

meaning other than in the physical sense. The alternative, non-physical definition is relevant only if it is a plausible usage of the words in the text. Judge Wilson's dissent explains why it is not. The alternative founding-era definitions of "absent" and "attendance" concern "the mental sense," i.e., "not paying attention." App.35 (Wilson, J., dissenting). But no one—neither the majority nor the dissent—suggests that the Quorum Clause uses "absent" and "attendance" in the mental sense. *See id.* In context, this reading would make little sense since it would confer "the power to compel distracted Members to snap out of it and give their attention." *See id.*

Because the Constitution did not use "absent" and "attendance" in the mental sense, it necessarily uses those terms in the physical sense. As Judge Wilson explained, "'contextual and idiomatic clues' . . . readily resolve any ambiguity" in favor of physical presence. App.34 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 70 (2012)). And "given the interoperation of the Quorum Clause's majority threshold and its grant of power to a minority to compel attendance of absent members to meet that threshold, it is clear that the Quorum Clause is concerned with *physical*, and not mental, presence[.]" App.36. Other constitutional provisions point in the same direction. *See* U.S. Const. art. I, § 6, cl. 1 ("They shall in all Cases . . . be privileged from Arrest during their Attendance at the Session of their respective Houses, *and in going to and returning from the same*[.]" (emphasis added)).

**2.** The ratification debates confirm this understanding. The Framers' debates about how high to set the quorum requirement featured concerns about the *physical* obstacles of mustering a majority of members who were spread across the continent.

App.36–37. Nathaniel Gorham expressed concern that a majority requirement would be inconvenient and thus delay legislative business. *See* James Madison, *Notes of Debates in the Federal Convention of 1787* 428–29 (W.W. Norton & Co. 1987). John Mercer was concerned that a majority requirement would empower the "few" who could "seced[e] at a critical moment" and halt legislative business. *Id.* at 429. But George Mason warned that without a majority requirement, "a small number of members" could "make laws," which "would be dangerous to the distant parts [of the country]," and members of nearby states could "outstay[]" those of more distant ones and pass legislation without them. *Id.* Gorham and Mercer's concerns presuppose that physical presence affects a quorum. And if members from distant states could simply appear via signed letter, Mason's fears appear trivial.

Nor is the physical-presence requirement "simply a vestige of the era"— "despite their knowledge of the practice," "the Framers never mentioned the use of proxies." App.37. The British House of Commons, for example, banned proxy voting because the members themselves were proxies for the people. App.38–39. American representatives similarly hold their positions "in trust for their constituents," and that explains why, "like the House of Commons, Founding era American legislatures required members' physical presence to satisfy their respective quorum requirements." App. 38 & n.6, 39.

Texas does not argue, as the majority suggests, that "the Framers meant physical presence because they could not have imagined any other." App.25. This appeal does not concern a novel new form of "presence" that the Framers could not have envisioned. *See* App.37 (distinguishing the well-known use of proxies from new

technologies such as "real-time participation" "by videoconference"). To the contrary, the Framers were fully aware of the practice of voting by proxy. They consciously did not incorporate this practice into the Constitution, choosing instead to allow a physically present minority to compel the attendance of absent members. The majority cannot avoid the historical context by suggesting that the Framers were unfamiliar with proxy voting.

3.    The majority also justifies its interpretation of the Quorum Clause based on the particular proxy-voting procedures used in this vote. *See* App.26 (noting that "over 99% of House Members—an overwhelming majority—participated in the vote on the bill at issue"); App.26–27 (quoting an amicus brief for the proposition that members "actively participated" and "sometimes use[d] the proxy procedures to change their vote[s] in real-time"). These procedures, the majority held, serve the purpose of "ensur[ing] majoritarian rule." App.26. But the majority's holding that Congress can use proxy votes to satisfy the quorum requirements is not limited to these particular facts and procedures. Either the Constitution, from the Framing until today, allows Congress to count proxies for a quorum—or it does not. The facts and procedures of the particular vote at issue, including the use of modern technology to change proxy votes, do not alter the legal test.

## B.  Historical practice confirms the physical-presence requirement.

"Congress's post-ratification practices from the 18th to 20th centuries confirm . . . only the physical presence of a majority of Members as sufficient to establish a quorum." App.40–41 (Wilson, J., dissenting). The First Congress, while struggling to gather a quorum, sent circulars to "the nearest absent members . . . desiring *their*

*attendance*, in order to form a quorum." App. 40 (quoting 1 Annals of Cong. 15–16 (March 4, 1789–April 6, 1789). "There is not even a hint that, had an absent Member returned a proxy letter in response to such a 'circular,' he would have been counted as present for purposes of a quorum." *Id.* Congressional practice reflected this understanding for "more than 200 years." App. 40–41.

Contrary to the majority's assertion, the practice of operating by unanimous consent—where one house presumes that a quorum exists when all members unanimously agree on a bill or resolution—does not change this conclusion. App.22–24. That practice requires that a physically present quorum be established at the start of the session and merely presumes that the quorum continues. App.41–42. And it presumes a quorum only "unless and until" a member challenges it or "an on-the-record vote reveals the absence of a quorum." App.41. Although this presumption "leaves open the possibility" that Congress could sometimes act "without a quorum physically present," it cannot be used to *create* a quorum where there is none. App.41. Here, "[n]o one contests that there was not a physical quorum." App.14.

The majority also cites *Noel Canning* to justify a broad interpretation of the Quorum Clause. App.26–28 (citing 573 U.S. at 533–34). There, the Supreme Court, faced with the Recess Appointments Clause's ambiguous text and 200 years of unbroken historical practice, adopted a broad interpretation in part to advance the Clause's "purpose . . . to permit the President to obtain the assistance of subordinate officers" during a recess. *Noel Canning*, 573 U.S. at 540.

But the Quorum Clause is a constitutional limit, not a grant of power, App.44, and unlike in *Noel Canning*, there is no ambiguity because text and practice work

together to *reject* presence by proxy. Moreover, there is no inter-branch tension to resolve here. *See Noel Canning*, 573 U.S. at 555 (addressing how its holding would not "significantly alter the constitutional balance" between the President and the Senate). The majority's reasoning subordinates the Quorum Clause's restraint to Congress's "broad delegation of [rulemaking] authority," permitting Congress to circumvent a restraint on its own power so long as its rule is "reasonable." App.27.

### C. Precedent strongly suggests that the Quorum Clause does not permit presence by proxy.

The only guidance from the Supreme Court—*United States v. Ballin*—confirms that the Constitution requires physical presence; Congress may choose methods to count this presence, but it may not redefine "presence" itself. App.32–33.

In *Ballin*, the Court upheld a House rule permitting the Speaker to count non-voting members who were nonetheless physically present in the Chamber. 144 U.S. at 5. The Court held that the Constitution "has prescribed no method" of determining the presence of a majority, "and it is therefore within the competency of the house to prescribe any method which shall be reasonably certain *to ascertain the fact*." *Id.* at 6 (emphasis added). Critically, however, the Court's examples of how a house of Congress might ascertain the presence of a quorum— "answer[ing] to roll-call," "requir[ing] the passage of members between tellers, and their count," or relying on "the count of the Speaker or the cle[r]k, and an announcement from the desk of the names of those who are present"—all presuppose that members are physically present. *Id.* So, as Judge Wilson correctly observes, *Ballin* "all but states" the point at issue: presence meant physical presence. App.33 n.3. Applying *Ballin*

here, no one suggests that counting proxies is a "method . . . reasonably certain to ascertain" whether members are physically present. 144 U.S. at 6.

The majority opinion conflicts with *Ballin* because it conflates Congress's discretion on how to determine whether a majority is present with the ability of Congress to define what presence means. As Judge Wilson explained, "*Ballin* does not stand for the proposition that Congress may define the fact itself—what being 'present' means—particularly to define it into nonexistence." App.32.

\*   \*   \*

Text, history, and precedent all point in the same direction: The Quorum Clause requires members be physically present when Congress conducts business, and Congress cannot satisfy that requirement through proxies.

## II. The Quorum Clause's Limit on Congressional Authority is Exceptionally Important and Must be Addressed by the Full Court.

Our Constitution is one of "enumerated powers." *United States v. Lopez*, 514 U.S. 549, 552 (1995). "The procedures governing the enactment of statutes set forth in the text of Article I were the product of the great debates and compromises that produced the Constitution itself." *Clinton v. City of New York*, 524 U.S. 417, 439 (1998). "Familiar historical materials provide abundant support for the conclusion that the power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Id.* at 439–440 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). The Constitution's quorum requirement, in particular, "secure[s] the public from any hazard of passing laws by surprise, or

against the deliberate opinion of a majority of the representative body." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 832 (1833).

Whether a house of Congress may redefine "presence" to include members present by proxy to conduct its business is a novel question concerning the exercise of the legislative power. The majority's decision below effectively delegates the interpretation of this constitutional provision to Congress, App.28, allowing it to decide how it will measure its own quorum. Answering this novel and fundamental question will define a key constitutional guardrail for future Congresses. Whatever the answer, it deserves to be resolved by the en banc court.

# Conclusion

The majority's holding answers a novel question regarding the meaning of a constitutional provision at odds with its text, with history, and with precedent. Because of the importance of this holding to the exercise of Article I's legislative power, this Court should grant rehearing en banc.


Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Jacob C. Beach
Assistant Solicitor General

Christopher J. Pavlinec
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Plaintiff-Appellee

Robert E. Henneke
Chance Weldon
Matthew R. Miller
Eric Heigis

Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701

## CERTIFICATE OF SERVICE

On September 29, 2025, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ William F. Cole
WILLIAM F. COLE

## CERTIFICATE OF COMPLIANCE

This petition complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,560 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ William F. Cole
WILLIAM F. COLE

# In the United States Court of Appeals for the Fifth Circuit

State of Texas,

*Plaintiff-Appellee,*

*v.*

Pamela Bondi, U.S. Attorney General, in her official capacity as United States Attorney General; Charlotte A. Burrows, in her official capacity as Chair of the U.S. Equal Employment Opportunity Commission; Jocelyn Samuels, in her official capacity as Vice Chair of the U.S. Equal Employment Opportunity Commission; Keith Solderling, in his official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; Andrea R. Lucas, in her official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; Christopher W. Lage, in his official capacity as General Counsel of the Equal Employment Opportunity Commission; Equal Employment Opportunity Commission; United States Department of Justice,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division

## APPENDIX

Opinion (Filed August 15, 2025) ....................................................................1

# United States Court of Appeals
# for the Fifth Circuit

---

No. 24-10386

---

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2025

Lyle W. Cayce
Clerk

State of Texas,

*Plaintiff—Appellee,*

*versus*

Pamela Bondi, *U.S. Attorney General, in his official capacity as United States Attorney General*; Charlotte A. Burrows, *in her official capacity as Chair of the U.S. Equal Employment Opportunity Commission*; Jocelyn Samuels, *in her official capacity as Vice Chair of the U.S. Equal Employment Opportunity Commission*; Keith Solderling, *in his official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission*; Andrea R. Lucas, *in her official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission*; Christopher W. Lage, *in his official capacity as General Counsel of the Equal Employment Opportunity Commission*; Equal Employment Opportunity Commission; United States Department of Justice,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:23-CV-34

---

Before Graves, Higginson, and Wilson, *Circuit Judges.*

James E. Graves, Jr., *Circuit Judge*:

No. 24-10386

During the COVID-19 pandemic, the United States House of Representatives adopted a rule allowing remote voting. Pursuant to this rule, the House determined there was a quorum to do business and passed the Consolidated Appropriations Act of 2023 and sent it to the Senate, which passed the bill. The enrolled bill was sent to the President, who signed it into law.

The State of Texas, however, contends that the Act is invalid because the Quorum Clause required that a majority of Members be physically present on the House floor at the time of the vote. Instead of attacking the entirety of the multi-trillion-dollar omnibus appropriations bill, Texas seeks to invalidate specific portions of it. The Federal Government argues that the enrolled-bill rule, which says that a bill's enrollment is conclusive proof of its authenticity, prevents court review of the Act's constitutionality, and that even if it does not, the Quorum Clause does not require physical presence. The district court held that the enrolled-bill rule did not apply and that the Quorum Clause required physical presence. Accordingly, it enjoined the Government from enforcing the portion of the omnibus legislation that it concluded Texas had standing to challenge.

We conclude that because this is a constitutional challenge that does not implicate a dispute of fact governed by the enrolled-bill rule, the rule does not bar our review. After reading the text, analyzing binding and persuasive authority, and reviewing our Nation's history and tradition, we conclude that the Quorum Clause does not require physical presence. Accordingly, we REVERSE the judgment of the district court and VACATE the district court's permanent injunction.

No. 24-10386

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Facts

On May 15, 2020, in response to the COVID-19 pandemic, the House of Representatives adopted House Resolution 965, which authorized remote committee proceedings and remote voting in the House. Resolution 965 provides that:

> [A]t any time after the Speaker . . . is notified . . . that a public health emergency due to a novel coronavirus is in effect, the Speaker . . . may designate a period . . . during which a Member who is designated by another Member as proxy in accordance with section 2 may cast the vote of such other Member or record the presence of such other Member in the House.

H.R. Res. 965 § 1(a), 116th Cong. (2020). Section 2 described the process for designating proxies: the designating Member had to submit a signed letter to the Clerk that specified the designated Member. *Id.* § 2. Section 3 outlined the process for voting during covered periods, which, absent an extension, ran for forty-five days after the Speaker, or their designee, designated such a period. *Id.* §§ 1(b), 3. Section 4 authorized remote Committee proceedings. *Id.* § 4. Section 5 mandated that the chair of the Committee on House Administration certify that it would be feasible to use technology to conduct remote voting in the House, required that the chair of the Committee on Rules submit regulations providing for the implementation of remote voting, and provided for remote voting once those regulations were in place. *Id.* § 5. Section 6 required that Sections 1, 2, and 3 be carried out in accordance with existing House rules to the extent practicable. *Id.* § 6. During the 117th Congress, the House reaffirmed this practice in House Resolution 8 and continued to apply it. H.R. Res. 8 § 3(s), 117th Cong. (2021).

No. 24-10386

At issue here: the House used these procedures as it voted on and passed the Consolidated Appropriations Act of 2023.[1] *See* 168 Cong. Rec. H10,529 (daily ed. Dec. 23, 2022). Under House rules, a quorum of the 435-Member House is a simple majority: 218. *See, e.g.*, Rules of the House of Representatives, R. XX, cl. 6(b), H.R. Doc. No. 116-177, at 873–74 (2021). The vote on the final passage of the Act was 225 yeas, 201 nays, 1 "present," and 4 non-votes. 168 Cong. Rec. H10,528 (daily ed. Dec. 23, 2022). Out of the 431 votes, 205 votes were cast by Members in person and 226 were cast by proxy. *See id.* at H10,529.

Even though less than a majority was physically present at the time of the vote, no Member objected that a quorum was lacking. *Id.* Representative Chip Roy of Texas, however, noted that a physical quorum was not present and reserved the right to object. *Id.* In response to a series of parliamentary inquiries from Representative Roy as to how a quorum was present, the Speaker Pro Tempore, Representative G.K. Butterfield, responded that a quorum was present because "Members casting their vote or recording their presence by proxy [we]re counted for the purpose of establishing a quorum" pursuant to House Resolution 8. *Id.*

After the Act passed the House, presiding officers of both chambers of Congress printed and signed the bill. *See* 1 U.S.C. § 106. At that point, it was an "enrolled bill." *Id.* The enrolled bill was then sent to the President, who signed the Consolidated Appropriations Act of 2023 into law. *See* Pub. L. No. 117-328, 136 Stat. 4459 (2022).

---

[1] The Act included the twelve regular annual appropriations bills that generally fund the federal government's operations, supplemental appropriations, and several pieces of permanent legislation.

No. 24-10386

### B. Procedural History

Texas sought a declaratory judgment that the Act violated the Constitution's Quorum Clause and injunctive relief preventing the Government[2] from enforcing two portions of the Act—(1) the Pregnant Workers Fairness Act (PWFA) and (2) a $20 million appropriation to the Department of Homeland Security's Alternatives to Detention Case Management Pilot Program.

After a bench trial, the district court found that Texas had standing to challenge the Pregnant Workers Fairness Act, but not the Pilot Program. 719 F. Supp. 3d at 551, 553.

The district court then turned to the enrolled-bill rule. Citing the "unique circumstances of this case," the district court concluded that the enrolled-bill rule did not preclude it from reaching the merits. *Id.* at 567. It reasoned that this "particular challenge falls outside of the enrolled bill doctrine's scope," for two reasons. *Id.* First, "when the dispute turns on a clear constitutional limitation on Congress's power that does not devolve into battles over conflicting legislative records, the mere act of enrollment cannot thwart a court's ordinary power to resolve constitutional challenges." *Id.* "Second, to the extent that quorum-based challenges can implicate the principles of the enrolled bill doctrine, the Court must first resolve any

---

[2] Texas sued several governmental entities and actors, including the President of the United States; the United States Attorney General; the Department of Justice; the Department of Homeland Security; the Federal Emergency Management Agency; the United States Equal Employment Opportunity Commission; the Office of Civil Rights and Liberties; and other officials in their official capacities. *See Texas v. Garland*, 719 F. Supp. 3d 521, 537 (N.D. Tex. 2024). Pursuant to Federal Rule of Civil Procedure 25(d) and Federal Rule of Appellate Procedure 43(c)(2), all successors-in-office have been automatically substituted as defendants in this matter.

No. 24-10386

challenge to the constitutionality of the procedural rule at issue that was used . . . to determine the existence of a quorum." *Id.*

The district court proceeded to the merits, concluding that "[g]iven the Constitution's text, original public meaning, and historical practice," the Constitution did not allow the House to count physically absent Members toward a quorum. *Id.* at 582. That is so, theorized the district court, because the "Quorum Clause is not a majority-participation requirement, but a majority-presence requirement." *Id.* (citing *United States v. Ballin*, 144 U.S. 1, 6 (1892)).

The district court then found that "Texas is entitled to a permanent injunction of the PWFA's enforcement against it," *id.* at 597, but denied Texas' request for a declaratory judgment that the Pregnant Workers Fairness Act was enacted in violation of the Constitution because it "would be redundant and provide no further relief." *Id.* at 599.

This timely appeal followed.

## II. STANDARD OF REVIEW

We review a trial court's grant of a permanent injunction for abuse of discretion. *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers*, 973 F.3d 326, 333 (5th Cir. 2020). "The district court abuses its discretion if it '(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.'" *Id.* at 333–34 (quoting *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018)).

## III. DISCUSSION

We begin with the threshold inquiry of (A) whether the enrolled-bill rule forecloses Texas' claim that the Consolidated Appropriations Act of 2023 did not pass the House with a constitutionally required quorum. After concluding that the enrolled-bill rule does not bar the suit, we turn to (B) the merits question: whether the district court relied on an erroneous conclusion of law in finding that the Quorum Clause required the physical presence of a majority of Members for the House to duly pass the Act.

### A. The Enrolled-Bill Rule

The parties agree that the Act was signed and enrolled. They disagree, however, on what that means. The Government contends that because the Act is an enrolled bill, the enrolled-bill rule articulated in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), forecloses review of Texas' challenge. Texas says the enrolled-bill rule is inapplicable, so court review is appropriate.

In *Marshall Field*, the appellants argued that the enrolled act should be "deemed an absolute nullity, in all its parts, because . . . it [was] shown by the congressional records . . . that a section of the bill, as it finally passed, was not in the bill authenticated by the signatures of the presiding officers of the respective houses of congress, and approved by the president." *Id.* at 668–69. Put differently, the appellants contended that an enrolled act "cannot be regarded as a law of the United States if the journal of either house fails to show that it passed in the precise form in which it was signed." *Id.* at 672.

The Supreme Court rejected that argument; it concluded that "it is not competent for the appellants to show, from the journals of either house, from the reports of committees, or from other documents printed by authority of congress, that the enrolled bill . . . as finally passed, contained a section that does not appear in the enrolled act." *Id.* at 680.

No. 24-10386

As it dealt with this question of first impression, *id.* at 670, the Court cited several state court decisions as persuasive. *See id.* at 674–79. Those decisions help shed light on *Marshall Field*: the issue was whether courts could review extrinsic evidence to determine if the enrolled act included the language that the legislature *actually* intended to enact. *See, e.g., id.* at 674 ("[A] copy of a bill bearing the signatures of the presiding officers of the two houses of the legislature and the approval of the governor, and found in the custody of the secretary of state, was conclusive proof of the enactment and contents of a statute, and *could not be contradicted by the legislative journals or in any other mode.*" (emphasis added) (discussing *Pangborn v. Young*, 32 N.J.L. 29 (1866))).

A few years later, the Supreme Court faced a nearly identical question, albeit at the territorial level: could "evidence derived from the journals of the council and house of representatives" be used to show that an enrolled bill "contained, at the time of its final passage, *provisions that were omitted from it without authority of the council or the house*, before it was presented to the governor for his approval?" *Harwood v. Wentworth*, 162 U.S. 547, 557–58 (1896) (emphasis added). "Upon the authority of *Field v. Clark*," the Court said that "this question must be answered in the negative."[3] *Id.* at 558. The Court saw "no reason to modify the principles announced in *Field v. Clark,*" and affirmed the applicability of the enrolled-bill rule in review of acts of territorial legislatures. *Id.* at 562.

---

[3] A quick note on nomenclature: the Supreme Court referred to the case as *Field v. Clark* (as the case is captioned in the *U.S. Reports*), but the suit was not brought by Marshall Field, the retailer, but by Marshall Field & Company, his department store. As Marshall is, in the sense of the case name, part of the corporation's name, we choose to refer to the case as *Marshall Field*. We follow that convention other than when directly quoting other courts referring to *Field v. Clark*. The two, of course, are referring to the same decision.

No. 24-10386

Despite this, the Government contends that "[n]othing in the Supreme Court's precedents . . . suggests that the enrolled-bill rule is limited to only 'fact-intensive' disputes about a bill's passage." But when the facts of a bill's enrollment are not in dispute, placing a total bar on review of constitutional questions finds, at best, thin support in the relevant precedents.

The Court more recently characterized its holding in *Marshall Field* as follows:

> That case concerned "the nature of the evidence" the Court would consider in determining whether a bill had actually passed Congress. [*Marshall Field,* 143 U.S.] at 670, 12 S. Ct., at 496–97. Appellants had argued that the constitutional Clause providing that "[e]ach House shall keep a Journal of its Proceedings" implied that whether a bill had passed must be determined by an examination of the journals. *See ibid.* (quoting Art. I, § 5) (internal quotation marks omitted). The Court rejected that interpretation of the Journal Clause, holding that the Constitution left it to Congress to determine how a bill is to be authenticated as having passed.

*United States v. Munoz-Flores*, 495 U.S. 385, 391 n.4 (1990). In other words, the Court once again emphasized that the enrolled-bill rule concerns what *evidence* can be considered to authenticate a bill's passage.

If the Court's explicit language is not sufficiently telling, additional context makes the meaning clear. The above language from Footnote 4 in *Munoz-Flores* was in response to an alternative interpretation of *Marshall Field* offered by Justice Scalia.

In his concurrence in *Munoz-Flores*, Justice Scalia posited that the enrolled-bill rule should be read more broadly. In his view, "the enrolled bill's indication of its House of origin establishes that fact as officially and authoritatively as it establishes the fact that its recited text was adopted by

No. 24-10386

both Houses." *Id.* at 409 (Scalia, J., concurring in judgment). Justice Scalia continued, saying that the Court "should no more gainsay Congress' official assertion of the origin of a bill than [it] would gainsay its official assertion that the bill was passed by the requisite quorum." *Id.* at 410. His view was that "[m]utual regard between the coordinate branches, and the interest of certainty, both demand that official representations regarding such matters of internal process be accepted at face value." *Id.*

But this view, which the Government presses now, did not rule the day. Instead, the *majority* of the Court read the enrolled-bill rule differently: "*In the absence of any constitutional requirement binding Congress*, we stated [in *Marshall Field*] that '[t]he respect due to coequal and independent departments' demands that the courts accept as passed all bills authenticated in the manner provided by Congress. Where, as here, a constitutional provision *is* implicated, [*Marshall*] *Field* does not apply." *Id.* at 391 n.4 (majority opinion) (first emphasis added) (citation omitted) (quoting *Marshall Field*, 143 U.S. at 672). Put differently, our deference to Congress' understanding of its powers stops at questions of constitutionality.

The reason is clear: "this Court has the duty to review the constitutionality of congressional enactments." *Id.* at 391. The duty exists because "congressional consideration of constitutional questions does not foreclose subsequent judicial scrutiny of the law's constitutionality." *Id.* "Of course, saying that a bill becomes a 'law' within the meaning of the second Clause does not answer the question whether that 'law' is *constitutional*. To survive this Court's scrutiny, the 'law' must comply with all relevant constitutional limits." *Id.* at 397 (emphasis in original).

The petitioner in *Munoz-Flores* contended that the challenged statute was a "Bill[] for raising Revenue" that did not "originate in the House of Representatives," as required by Article I, section 7 of the Constitution. The

No. 24-10386

Court concluded that "[a] law passed in violation of the Origination Clause would . . . be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would be a law passed in violation of the First Amendment." *Id.* The same is true of a law passed in violation of the Quorum Clause. *Munoz-Flores* indicates that respect for coequal branches of government does not require, or even suggest, abdication of the judiciary's constitutionally vested authority in that situation. *See* U.S. Const. art. III, § 2, cl. 1.

Finally, the Supreme Court considered a similar challenge under the Recess Appointments Clause in *NLRB v. Noel Canning*, 573 U.S. 513 (2014). The Court noted that under the enrolled-bill doctrine, courts are generally to "take at face value the Senate's own report of its actions." *Id.* at 551. The Court suggested that it would not readily embark on a "factual appraisal" of "such matters as who is, and who is not, in fact present on the floor during a particular Senate session," *id.* at 555, particularly with "nothing in the Journal of the Senate or the Congressional Record" to suggest the absence of a quorum, *id.* at 554. Instead, "when the Journal of the Senate indicates that a quorum was present, under a valid Senate rule, at the time the Senate passed a bill, we will not consider an argument that a quorum was not, in fact, present." *Id.* at 551. The Court gave the example of a unanimous consent agreement, noting that "Senate rules presume that a quorum is present unless a present Senator questions it." *Id.* at 553. Here, however, the Congressional Record makes apparent that remote Members were counted as present, without any further "factual appraisal" required.

Finding no refuge in the Supreme Court precedent that binds us, the Government pivots to persuasive authority. Our sister courts' opinions, however, have spoken about the enrolled-bill rule in similar terms as the Court. *See OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197, 205 (2d Cir. 2007) ("Permitting litigants to *impeach the text* of an enrolled bill by other

No. 24-10386

congressional documents would likewise create 'uncertainty in the statute laws.'" (emphasis added) (quoting *Marshall Field*, 143 U.S. at 675)); *Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1349 (D.C. Cir. 2007) ("The Court crafted a clear rule: 'It is not competent for a party raising a bicameralism challenge to show, from the journals of either house, from the reports of committees or from other documents printed by authority of Congress, that an enrolled bill' differs from that actually passed by Congress." (cleaned up) (quoting *Marshall Field*, 143 U.S. at 680)).

To be sure, *Public Citizen* (which preceded *Noel Canning*) gave *Munoz-Flores* little weight in its analysis of the enrolled-bill rule. As *Public Citizen* put it:

> *Munoz-Flores* did not in any way involve the question raised in *Marshall Field*, *i.e.*, whether an authenticated enrolled bill had passed Congress. The question instead was whether a provision that unquestionably had passed Congress constituted a bill for raising revenue. It is not plausible to think that the Court meant to overrule the enrolled bill rule in the last two sentences of an obscure footnote in a case that did not involve an application of the rule.

*Id.* at 1353. The court, seemingly somewhat mystified, reasoned that "[t]he footnote indicates that the 'H.J. Res.' moniker does not carry the conclusive weight in the Origination Clause context that the signatures of the presiding officers command in the Bicameralism Clause context." *Id.* at 1354. The court therefore applied the enrolled-bill rule and did not reach the appellant's Bicameralism Clause challenge that the House and Senate passed different versions of the bill at issue. *Id.* at 1355.

We appreciate the analytical complexity, but it need not trouble us in this case. The enrolled-bill rule cautions courts against second-guessing a bill's passage as a factual matter. But in this case, *the facts are not, and could not be, in any dispute*. As in *Munoz-Flores*, there is no dispute that the bill

No. 24-10386

passed Congress. And there is similarly no dispute that it did so on the basis of a quorum that included Members who were not physically present. The specter—of courts shuffling through alternative drafts of bills, trying to assess their authenticity after the fact—that clouded over *Marshall Field* and *Public Citizen* simply does not exist in this case.

This conclusion is consistent with *Marshall Field*. The *Marshall Field* Court refused to consider the notion that "the speaker of the house of representatives and the president of the senate" might "impose upon the people as a law a bill that was never passed by congress" out of "the respect due to a co-ordinate branch of the government." 143 U.S. at 672–73. But the Court explained that "this possibility is too remote to be seriously considered *in the present inquiry*" based on extrapolations from absent journal entries of "a deliberate conspiracy" to thwart the regular observance of the procedures prescribed in the Constitution. *Id.* (emphasis added).

By contrast, in this case, the lack of a physically present majority of Members is undisputed, clearly supported by the legislative record, and does not meaningfully contradict the fact of the bill's enrollment, because Congress' own rules explained with particularity how the bill was to be passed without a majority of Members physically assembling in the Capitol to vote on it. Without even a shadow of a "possibility" that things were other than as the parties agree that they were, there is no issue of fact for the enrolled-bill rule to resolve.

Even so, the Government resists this conclusion; it says that "applying *Marshall Field*, courts of appeals have consistently held that the enrolled-bill rule applies to claims that a statute is invalid because Congress allegedly lacked a quorum at the time of its vote." *See United States v. Farmer*, 583 F.3d 131, 151–52 (2d Cir. 2009); *United States v. Small*, 487 F. App'x 302,

303 (7th Cir. 2012); *United States v. Gonzalez-Arenas*, 496 F. App'x 866, 867 (10th Cir. 2012).

These holdings, however, are inapposite because those cases involved what would have been issues of fact had the enrolled-bill rule not conclusively resolved any potential dispute.

For example, in *Farmer*, the Second Circuit agreed with the Government that the enrolled-bill rule precluded the Quorum Clause challenge to the Act at issue. 583 F.3d at 152. There, Farmer raised omissions or vaguenesses in the Congressional Record to argue that a quorum was not present. *Farmer*'s brief discussion gives little indication that the challenge did not raise the issues of factual investigation that the enrolled-bill rule forecloses, hence the application of the rule.

*Small* is no different. Sure, the Seventh Circuit said that the enrolled-bill rule foreclosed a challenge to a criminal statute because it was allegedly "passed without a quorum in the House of Representatives" and "therefore invalid." *Small*, 487 F. App'x at 303. But again, there is no indication that the number of Members of the House in the chamber did not present an active issue of fact. That aligns with *Marshall Field* and *Farmer*. The same was true in *Gonzalez-Arenas*. *See* 496 F. App'x at 867 ("Gonzalez-Arenas argues that a quorum was not present for a vote taken in the House of Representatives when § 3231 was passed into law . . . ."). All these cases are alike; courts applied the enrolled-bill rule to foreclose a factual investigation into the actions of a coordinate branch.

Texas' Quorum Clause challenge is not like the others. True, the present challenge includes the argument that there were not sufficient Members in the House chamber. But the State cuts past the factual issue of how many Members were physically present. No one contests that there was not a physical quorum. Instead, Texas is questioning whether the House's

remote-voting rule comported with an alleged constitutional restraint—a purely legal question. Applying the enrolled-bill doctrine to bar review in this case would amount to requiring the district court to find counterfactually, as a matter of law, a factual proposition that the parties agree would be false. That cannot be so.

Undeterred by both binding precedent and the lack of persuasive authority supporting its arguments, the Government pivots away from doctrinal arguments about this constitutional issue and turns to policy arguments and the principles undergirding the enrolled-bill rule. The Government contends that the "rule is grounded in respect for the separation of powers and the Supreme Court's recognition of the significant public 'consequences' that would result if it were to 'declare that an enrolled bill, on which depend public and private interests of vast magnitude,' 'was not in fact passed.'" (quoting *Marshall Field*, 143 U.S. at 670). The Government also warns that the "uncertainty and disruption that would result if statutes could be invalidated on the basis of an alleged lack of a quorum at the time of Congress's vote are just as apparent in the context of a purportedly 'legal' challenge as a 'fact-intensive' one."

The "respect for the separation of powers" that the Government attempts to rely on undermines its point. True: "Each House may determine the Rules of its Proceedings . . . ." U.S. Const. art. I, § 5, cl. 2. Equally true: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution . . . ." *Id.* art. III, § 2, cl. 1. If the rule permits us to adjudicate a constitutional claim, we have "no more right to decline the exercise of jurisdiction" in such a case than we would to usurp Congress' prerogative to control its own affairs in a case where the rule *did* restrict our review. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

No. 24-10386

On the one hand, *Noel Canning* counsels deference to the House's attestations made pursuant to "a valid [House] rule." *See Noel Canning*, 573 U.S. at 551; *see also id.* at 555 ("We do not believe . . . that engaging in the kind of factual appraisal that the Solicitor General suggests is either legally or practically appropriate. From a legal perspective, this approach would run contrary to precedent instructing us to 'respect . . . coequal and independent departments' by, for example, taking the Senate's report of its official action at its word. From a practical perspective, judges cannot easily determine such matters as who is, and who is not, in fact present on the floor during a particular Senate session. Judicial efforts to engage in these kinds of inquiries would risk undue judicial interference with the functioning of the Legislative Branch." (internal citations omitted)).

On the other, the legal question presented here implicates whether Congress has flouted a constitutional requirement *through* one of its rules. Framed differently, we might even call this a question as to the validity of the House's rule. But the factual basis for the claim is undisputed, clearly supported by the legislative record, and in no meaningful contradiction with the bill's enrollment, so neither the enclosed-bill rule nor its rationales apply.[4]

Yes, "[t]he constitution empowers each house to determine its rules of proceedings." *Ballin*, 144 U.S. at 5. But a house of Congress "may not by its rules ignore constitutional restraints." *Id.* Courts have a duty to strike down laws that flout the Constitution. And the judiciary has in similar

---

[4] There is no suggestion in this case that the court must embark upon its own tenuously supported expedition into the "loose papers of the legislature" in order to second-guess the attestations of the officers of Congress. *Marshall Field*, 143 U.S. at 675 (quoting *Sherman v. Story*, 30 Cal. 253, 275 (1866)). Instead, we take Congress at its word—including the fact of the bill's enrollment.

No. 24-10386

contexts repeatedly exercised this constitutionally enshrined power. *See, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 512 (1969); *INS v. Chadha*, 462 U.S. 919, 943–44 (1983). "[T]o give full effect to the provisions of the constitution relating to the enactment of laws" is a "duty of this court, from the performance of which it may not shrink." *Marshall Field*, 143 U.S. at 496.

It goes without saying that the judicial power is one of those established and secured by the Constitution. We cannot express our respect for our coordinate branch and the separation of powers by failing to exercise our judicial power in a case arising under the Constitution that vests us with that very power. Undermining the very foundation of our system of democratic republican government in that way, too, may lead to "uncertainty and disruption." *See* THE FEDERALIST No. 51 (James Madison or Alexander Hamilton) ("[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others."); The FEDERALIST No. 9 (Alexander Hamilton) ("The regular distribution of power into distinct departments; the introduction of legislative balances and checks . . . are means, and powerful means, by which the excellences of republican government may be retained.").

In sum, the enrolled-bill rule is no bar to our review of whether the undisputed manner of passage of this legislation failed to conform to the requirements of the Constitution. In a case like this, lacking any disputes of fact, that issue amounts to a question of law properly brought to the judicial department. Accordingly, the enrolled-bill rule does not foreclose Texas' challenge. Having addressed the threshold inquiry, we turn to the merits.

No. 24-10386

## B. The Quorum Clause

### 1. The Text

Unlike the facts in this case, the parties *do* disagree over what the Quorum Clause means. Faced with competing interpretations of the Constitution, we begin with the text. "Constitutional analysis must begin with the language of the instrument, which offers a fixed standard for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (cleaned up).

Article I, Section 5, Clause 1 of the United States Constitution provides that:

> Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

U.S. Const. art. I, § 5, cl. 1. The Supreme Court has rarely had to interpret the second sub-clause, the Quorum Clause.

The first such case was *United States v. Ballin*. At issue in *Ballin* was House Rule 15, which allowed the Speaker to count non-voting Members who were in the chamber when determining if a quorum was present to do business. *See Ballin*, 144 U.S. at 5. Pursuant to this rule, the House passed a bill classifying worsted cloths as woolen cloths, and directing the Secretary of the Treasury to impose the relevant tariff. *Id.* at 1. When the bill came to a vote, there were 138 yeas, 3 nays, and 189 non-votes. *Id.* at 2. Given the power granted to him under House Rule 15, the Speaker counted dozens of non-voting Members as present, which combined with the yeas showed a total of 212 Members present, more than enough for a quorum at the time. *Id.* at 2–4.

No. 24-10386

Because the Speaker's action "was in direct compliance" with Rule 15, the Court said the question was "as to the validity of this rule, and not what methods the speaker may of his own motion resort to for determining the presence of a quorum, nor what matters the speaker or clerk may of their own volition place upon the journal." *Id.* at 5.

Here, just like in *Ballin*, the House acted pursuant to a rule, House Resolution 8. *See* H.R. Res. 8 § 3(s), 117th Cong. (2021). Similarly, the Speaker's action here "was in direct compliance" with the rule, so our question is "as to the validity of this rule."[5] Accordingly, we follow the same principles and mode of analysis as the Court in *Ballin*.

After naming that the relevant question was the validity of the rule, the *Ballin* Court stated that:

> Neither do the advantages or disadvantages, the wisdom or folly, of such a rule present any matters for judicial consideration. With the courts the question is only one of power. The constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained.

*Id.* at 5. Thus, in this context, we may review the House's rule to ensure that it (1) does not "ignore constitutional restraints," (2) does not "violate

---

[5] Our dissenting colleague asserts that this majority opinion "overreads *Ballin* and conflates two distinct concepts: the fact to be ascertained and the method used to ascertain it." *Post*, at 30 n.10. But it seems the dissent is the one doing the conflating. Any method for ascertaining presence can be turned into "defining the fact." What *Ballin* instead counsels is that courts focus on "the validity of this rule." 144 U.S. at 5. That is precisely what the ensuing analysis does—focuses on the validity of one method to ascertain the fact of presence.

No. 24-10386

fundamental rights," and (3) does have "a reasonable relation" between means and ends.

Texas focuses on the first of these limitations and claims that the House has ignored a constitutional restraint: an alleged physical presence requirement in the Quorum Clause.

But the plain text of the Quorum Clause contains no *physical* presence requirement. As the Supreme Court explained in *Ballin*,

> The constitution provides that 'a majority of each [house] shall constitute a quorum to do business.' In other words, when a majority are present the house is in a position to do business. Its capacity to transact business is then established, created by the mere presence of a majority, and does not depend upon the disposition or assent or action of any single member or fraction of the majority present. All that the constitution requires is the presence of a majority, and when that majority are present the power of the house arises.

*Id.* at 5–6. In *Ballin*, the Court did not graft the word physical onto the constitutional text as Texas would have us do.[6] Texas concedes that "the word [quorum] does not *necessarily* mean everyone is physically together (even if that is what it usually means), so, on its own, it is linguistically possible that that word provides solely a number with no real indication of whether this number needed to be physically present" (cleaned up).

"But," Texas qualifies, "that is not *all* the Quorum Clause says—it also empowers Congress to compel the presence of absent Members. The

---

[6] *Cf. Hurtado v. United States*, 410 U.S. 578, 583–84 (1973) ("The statute provides to a 'witness attending in any court of the United States' $20 'for each day's attendance.' . . . [The statute] does not speak in terms of 'physical' or 'actual' attendance, and we decline to engraft such a restriction upon the statute." (quoting 28 U.S.C. § 1821 (1970))).

No. 24-10386

authority to compel the attendance of absent Members only makes sense if the Constitution requires physical presence" (cleaned up).

This argument, however, begs the question. It only works if one assumes precisely the conclusion sought to be proved—that the presence compelled must be physical. And that proposition, as we have explained, is not spelled out in the Constitution. Just like the Quorum Clause fails on its face to help us understand whether presence requires *physical* presence, the ability to compel said presence does little to help us understand what the limits or modifiers of the presence being compelled are. We can discern no reason why, for example, if Congress chooses to assemble digitally, it could not attempt to exercise its Article I authority to compel absent Members to log onto the session.

Texas also points out that founding-era dictionaries "show that '"absent" often had a physical component to it.'" But instead of helping, this undermines Texas' position. The fact that founding-era dictionaries only *often* required physical presence necessarily means that other times they did not. So, Texas again concedes, that even at the Founding, the ordinary public meaning of the term "absent" did not entail a lack of physical presence. This suggests that if the Framers wanted to require physical presence, they would have done just that. *See United States v. Rahimi*, 602 U.S. 680, 715 (2024) (Kavanaugh, J., concurring) ("As a general matter, the text of the Constitution says what it means and means what it says. And unless and until it is amended, that text controls."). But they did not.

### 2. Historical Practice

Failing with just the text, Texas invites us to consider the historical practice of Congress.

"For more than 200 years, [courts have] relied on history when construing vague constitutional text in all manner of constitutional

disputes." *Id.* at 717. "In other words, we recognize that 'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 36 (2022) (first quoting *Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring in the judgment); then citing *Myers v. United States*, 272 U.S. 52, 174 (1926); and then citing *Printz v. United States*, 521 U.S. 898, 905 (1997)); *see also Noel Canning*, 573 U.S. at 524–25 (majority opinion); Letter from James Madison to Spencer Roane (Sept. 2, 1819), in 8 *The Writings of James Madison* 447, 450 (Gaillard Hunt ed., 1908).

This historical inquiry leads to the same conclusion. Texas asserts that the "historical context shows that Parliament and the early Colonies experienced problems with quorum manipulation." Texas' Br. at 29 (citing 2 Joseph Story, *Commentaries on the Constitution of the United States* § 832 (1833)) (noting that the House of Commons only required 45 Members to establish a quorum even though nearly 600 Members made up the body, thereby allowing minority rule). Texas also relies on the district court's explanation that during the First Congress "[b]oth chambers waited nearly a month for enough members to arrive, and the Senate specified in its letter that the 'presence' of a majority of members was 'indispensably necessary,'" 719 F. Supp. 3d at 589 (quoting S. Journal, 1st Cong., 1st Sess. 6 (1789)).

However, Amici explain that through the practice of unanimous consent, "Congress presumes that a quorum exists whenever members unanimously agree on a bill or a resolution, even when it is *obvious* that 'fewer than a majority of Members' are physically present in the chamber." Br. for Legal Historians at 20 (emphasis in original) (quoting WILLIAM MCKAY & CHARLES W. JOHNSON, PARLIAMENT AND CONGRESS: REPRESENTATION AND SCRUTINY IN THE TWENTY-FIRST CENTURY 85 (2010)); Br. for Sen. Mitch McConnell at 19 ("Under the

No. 24-10386

unanimous consent process, there is no recording of the yeas and nays. As such, it is almost universally the case that the unanimous consent process is employed when there is well less than a majority of senators present."). "[T]he Majority Leader or his designee runs through all the agreed upon matters, calling voice votes and presenting measures or matters for adoption without objection, *often only in the presence of the presiding officer*." Br. for Sen. Mitch McConnell at 18–19 (emphasis added).

Of particular note, this process—that does not require the physical presence of Congressmembers—has been around since 1789—the first year that the First Congress met. Br. for Legal Historians at 20 (citing U.S. Senate, The First Unanimous Consent Agreement, https://perma.cc/WT8Z-N3LZ)); Cong. Rsch. Serv., RL33939, The Rise of Senate Unanimous Consent Agreements 1 (2008), https://www.congress.gov/crs_external_products/RL/PDF/RL33939/RL33939.4.pdf. Several delegates to the Constitutional Convention, who signed the Constitution at Independence Hall, were members of the Senate in 1789. Charlene Bangs Bickford & Kenneth R. Bowling, Birth of the Nation: The First Federal Congress, 1789–1791, at 12 (1989). Presumably, if the charter they helped shape (over the months-long deliberation) and signed required physical presence for the Senate to do business, they would have piped up when the Senate adopted rules operating via unanimous consent, i.e., without members being physically present.

Moreover, not only has the Senate used this practice continuously since the Nation's Founding, but it has also been used to pass not only run-of-the-mill legislation, but to pass a "super statute" like the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb to 2000bb-4, to confirm 69 Supreme Court justices, i.e., nearly three-fifths of them to date, and to promote 422 military flag officers in a single day. Br. for Sen. Mitch McConnell at 21; Br. for Legal Historians at 21. Taken together, this evinces

a strong history and tradition of understanding the Quorum Clause to *not* require *physical* presence.

Nor does it matter that this variation of the legislative procedure was unique and allowed for remote voting instead of simply assuming a quorum when no quorum clearly existed. "It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time." *Ballin*, 144 U.S. at 5. "The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house, and, within the limitations suggested, absolute and beyond the challenge of any other body or tribunal." *Id.*

Put simply, historical practice over the last 235 years strongly favors rejecting Texas' narrow interpretation. Even the First Congress, which included Framers of our national charter, well understood that physical attendance was not required by the Quorum Clause. The practices flowing from that understanding have persisted and been used by both chambers of Congress to perform all sorts of business, ranging from the ministerial to passing landmark legislation to performing their duty to advise and provide consent to the President.

"The tradition is long enough to entitle the practice 'to great regard in determining the true construction' of the constitutional provision. And we are reluctant to upset this traditional practice where doing so would seriously shrink the authority that [Congresses] have believed existed and have exercised for so long." *Noel Canning*, 573 U.S. at 549 (citation omitted) (quoting *The Pocket Veto Case*, 279 U.S. 655, 690 (1929)).

No. 24-10386

### 3. Framers' Intent

Another argument Texas seems to implicitly make, and which has appeal at first glance, is something along the lines of: of course, the Framers meant physical presence because they could not have imagined any other.[7]

This argument, however, is nearly identical to an argument the Supreme Court rejected in *Noel Canning*. There, originalist scholars, as amici, argued "that the Founders would likely have intended the [Recess Appointments] Clause to apply only to inter-session recesses, for they hardly knew any other." *Noel Canning*, 573 U.S. at 533. The Court agreed that at the Founding that was the only understanding of what a recess was, but reasoned that the "problem with this argument, however, is that it does not fully describe the relevant founding intent." *Id.* The Court continued:

> The question is not: Did the Founders at the time think about intra-session recesses? Perhaps they did not. The question is: Did the Founders intend to restrict the scope of the Clause to the form of congressional recess then prevalent, or did they

---

[7] Conflating the familiar with the necessary can sometimes lead to absurd consequences. It was suggested at oral argument that not only must Congress assemble in person, but that, absent exigent circumstances, the Constitution requires Congress to meet at the Capitol. Construction on the Capitol, of course, did not begin until after the Constitution was adopted, with Congress first meeting at the Capitol in 1800. *See* William C. Allen, History of the United States Capitol 23–24, 41 (2001). History before that point, such as the Confederation Congress' assembly in Princeton during the Pennsylvania Mutiny of 1783, indicates that the founding generation would have understood the Quorum Clause to facilitate, rather than constrain, Congress's ability to assemble in order to transact legislative business. *See* Resolution of June 21, 1783, *reprinted in* 24 Journals of the Continental Congress 1774–1789, at 410 (Gaillard Hunt ed., 1922). Such experiences underscore that, to have the workable government that the Constitution contemplates, it is critical for Congress to be able to assemble to conduct the business of the national government even when—and perhaps especially when—an emergency renders the usual place of assembly unavailable.

No. 24-10386

intend a broader scope permitting the Clause to apply, where
appropriate, to somewhat changed circumstances?

*Id.* The Court reasoned that:

> The Founders knew they were writing a document designed to
> apply to ever-changing circumstances over centuries. After all,
> a Constitution is "intended to endure for ages to come," and
> must adapt itself to a future that can only be "seen dimly," if
> at all. *McCulloch,* 4 Wheat., at 415. We therefore think the
> Framers likely did intend the Clause to apply to a new
> circumstance that so clearly falls within its essential purposes,
> where doing so is consistent with the Clause's language.

*Id.* at 533–34.

The parties agree that an essential purpose of the Quorum Clause was
to minimize the undue influence of a minority and to ensure majoritarian
rule.[8] This position is substantiated. *See* THE FEDERALIST No. 58 (James
Madison); Br. for Legal Historians at 4, 7–11.

House Resolution 8 allowing the House to engage in business during
the COVID-19 pandemic helped ensure majoritarian rule. After all, over 99%
of House Members—an overwhelming majority—participated in the vote on
the bill at issue. As four Members of Congress voice: "Allowing the court to
now second-guess, or after-the-fact void, the House's exercise of its
rulemaking authority threatens to disenfranchise all congressional members,
and in turn their constituents, who voted in accordance with then-existing
House Rules in voting in favor of the Consolidated Appropriations Act." Br.
of Four Members of Cong. at 1. "These members did not assign away their
right to vote; they actively participated in the vote—sometimes using the

---

[8] Texas submits that a secondary aim of the Quorum Clause is deliberation. But
Texas does not sufficiently explain why physical assembly during a pandemic would have
furthered deliberation.

No. 24-10386

proxy procedures to change their vote in real-time." *Id.* at 13 (giving examples). They add that the undisputed "underlying purpose of the Quorum Clause is to prevent a congressional minority from dictating legislation," but "accepting the District Court's interpretation . . . would do just that. The ***majority*** of the House passed the Act." *Id.* at 26. They submit that the district court's interpretation "would mean that the ***minority*** who voted against the Act would now prevail—years after the fact." *Id.* at 27. Accepting Texas' demand would thus undermine the very purpose of the Quorum Clause: not allowing a tiny minority of the House to block the will of the vast majority of duly elected Congressmembers and the people they represent.

\* \* \*

The constitution plainly requires a majority for either chamber of Congress to conduct business. "But how shall the presence of a majority be determined? *The constitution has prescribed no method of making this determination, and it is therefore within the competency of the house* to prescribe any method which shall be reasonably certain to ascertain the fact." *Ballin*, 144 U.S. at 6 (emphasis added). This remains true. Just like how in 1892 the Constitution did not restrain how the House could determine whether a majority was present, the same unamended provision still does not restrain how the House can make that determination. The Constitution includes a "broad delegation of authority to the [House] to determine how and when to conduct its business. The Constitution explicitly empowers the [House] to 'determine the Rules of its Proceedings.'" *See Noel Canning*, 573 U.S. at 550 (quoting U.S. Const. art. I, § 5, cl. 2). It did just that.

The duty of this court is to ensure that the House, as it wielded its broad power to determine how and when to conduct its business—all matters of method of which are open to its determination—did not cross certain

No. 24-10386

constitutional limits. *See id*. It did not. The House's proxy-voting rule did not violate anyone's fundamental rights. There is a reasonable relationship between the rule and the result it seeks—majoritarian rule. And the constitutional text, history, and tradition indicate that the Quorum Clause contains no physical-presence requirement that the House's rule could have flouted.

At bottom, even if the Quorum "Clause's language, read literally, permits, though it does not naturally favor, our broader interpretation," and Texas' reading is the "most natural meaning" of presence, it fails to be "the only possible way to use the word." *Noel Canning*, 573 U.S. at 538. And even if "we concede that both interpretations carry with them some risk of undesirable consequences, we believe the narrower interpretation risks undermining constitutionally conferred powers more seriously and more often." *Id.* at 542. The same was true in *Noel Canning*; that led the Supreme Court to favor a broad interpretation of power because it was not delimited by the Constitution. We follow their lead and do the same.

In light of the plain language of the Clause, its basic purpose, and the historical practice of Congress since its inception, we conclude that the Quorum Clause does not require physical presence for a house of Congress to conduct business.

## III. CONCLUSION

In light of the Quorum Clause's text and intention, our precedent, and historical practice, we REVERSE the district court's judgment in favor of Texas based on its conclusion that the Quorum Clause required the physical presence of a majority of Members of the House of Representatives to duly pass the Consolidated Appropriations Act of 2023. Accordingly, we also VACATE the district court's permanent injunction limiting enforcement of the Pregnant Workers Fairness Act against Texas.

Cory T. Wilson, *Circuit Judge*, dissenting:

While I agree with the majority that the enrolled-bill rule does not preclude our review of the issues presented in this case, my esteemed colleagues and I part ways on our interpretation of the Quorum Clause. The Clause's text, its original public meaning and context, Supreme Court precedent, and Congress's historical practice all support that neither house of Congress may conduct business without a majority of its Members being physically present. Yet, in 2022, the House of Representatives did just that when it passed the Consolidated Appropriations Act of 2023 (the Act) while most of its Members were only present by proxy. Because Congress is not free to define the Constitution's quorum requirement out of existence, I would hold, as the district court did in its trenchant and thorough analysis, that the House acted outside its authority in passing the Act and that the Act is therefore constitutionally infirm. For that reason, I respectfully dissent.

## I.

At the outset, it may be helpful to recapitulate the uncontested facts. During the COVID-19 pandemic, the House of Representatives passed House Resolution 965, permitting Members to designate a proxy who could "record the presence of [the absent] Member in the House." H.R. Res. 965 § 1(a), 116th Cong. (2020).[1] Section 3(b) of the resolution provides that "[a]ny Member whose vote is cast or whose presence is recorded by a

---

[1] As the majority notes, "[d]uring the 117th Congress, the House reaffirmed [House Resolution 965] in House Resolution 8 and continued to apply it." *Ante*, at 3. House Resolution 965 is the more pertinent of the two, because incident to the vote at issue in this case, the Speaker *pro tempore* stated that a quorum was present pursuant to Section 3(b) of that resolution, 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022). So I refer only to House Resolution 965.

designated proxy under this resolution shall be counted for the purpose of establishing a quorum under the rules of the House." [2] *Id.* at § 3(b).

In December 2022, the House passed the Act by a vote of 225–201, with one Member abstaining. 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022). The House recorded the votes by name, indicating each Member who recorded his or her presence and voted by proxy, alongside the name of his or her proxy. *Id.* That record reveals that 228 Members—a majority of the House—recorded both their presence and their vote by proxy. *Id.*

So, a "quorum" was established only because the House counted proxies as presence. During the vote, Congressman Charles Roy of Texas, "note[d] that this [multi-]trillion [dollar] legislation is moving off the floor without a physical quorum present," and he raised a parliamentary inquiry as to "whether there [was] a physical quorum present as required under the Constitution." *Id.* at H10529. In response, the Speaker *pro tempore* confirmed that "a quorum was, indeed, present. . . . [p]ursuant to section 3(b) of H. Res. 965," offering the following explanation: "Members casting

---

[2] By challenging Section 3(b), Texas levies a challenge to the House's ability to count proxies for purposes of establishing a quorum. The majority accepts the Government's characterization of Texas's claim as broadly contesting Congress's ability to establish "remote voting" procedures or to *vote* by proxy. *Ante*, at 2–3, 24. But this overreads Texas's challenge. Indeed, at the time the House passed the Act, Congress had not yet authorized any form of "remote" or "virtual" voting. *See* H. Res. 965 § 5, 116th Cong. (2020). To be sure, there is much debate over whether Members of Congress may vote in such a manner. *See, e.g.*, Annie Karni, *In Congress, a Push for Proxy Voting for New Parents Draws Bipartisan Support*, N.Y. Times (Jan. 11, 2025), https://tinyurl.com/44btpfa3. However, that debate is for another day. As the Supreme Court has recognized, a Quorum Clause analysis is concerned only with presence, not with the act of voting. *United States v. Ballin*, 144 U.S. 1, 5–6 (1892); *see also* Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. Chi. L. Rev. 361, 403 (2004).

No. 24-10386

their vote or recording their presence by proxy are counted for the purpose of establishing a quorum under the rules of the House." *Id.*

Texas challenges that House rule as violative of the Quorum Clause. By extension, Texas argues that the House's passage of the Act contravened the Quorum Clause, such that the Act is invalid and Texas is entitled to injunctive relief. All that hinges on whether otherwise absent Members of Congress may, consistent with the Quorum Clause, be counted "present" by proxy for purposes of establishing a quorum.

## II.

### A.

The Quorum Clause of the United States Constitution provides that "a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. CONST. art. I § 5, cl. 1. As my colleagues note, the text itself does not include the word "presence" or "present." But in *United States v. Ballin*, the Supreme Court explicitly required what is implicit in the text: "the *presence* of a majority" to establish a quorum. 144 U.S. 1, 6 (1892) (emphasis added). At issue in *Ballin* was a House rule that allowed the Speaker to count non-voting Members who were nonetheless in the chamber for purposes of determining a quorum. *See id.* at 5. The House passed a tariff bill; a majority of Members was present only if 189 non-voting Members were counted. *Id.* at 2–4. The Speaker counted them, and the Court upheld the House's action:

> [W]hen a majority are present the [H]ouse is in a position to do business. Its capacity to transact business is . . . created by the mere presence of a majority, and does not depend upon the disposition or assent or action of any single member or fraction

No. 24-10386

of the majority present.  All that the [C]onstitution requires is the presence of a majority, and when that majority are present the power of the [H]ouse arises.

*Id.* at 5–6.

So *Ballin* focuses our Quorum Clause inquiry on the "presence" of a majority of Members, because without their presence, the House lacks any power "to do business."  *Id.* at 5.  But what does it mean for a Member to be "present" for purposes of the Quorum Clause?

The Supreme Court has never squarely addressed this question, either in *Ballin* or in any case since.  For their part, my panel colleagues conclude that the meaning of "present" is malleable, and they read *Ballin* to instruct that courts should defer to however Congress defines the term so long as Congress's definition is reasonable.  *Ante*, at 27 ("The constitution has prescribed no method of making this determination, and it is therefore within the competency of the [H]ouse to prescribe any method which shall be reasonably certain to ascertain the fact." (quoting *Ballin*, 144 U.S. at 6)).  But with great respect, this overreads *Ballin* and conflates two distinct concepts: the fact to be ascertained and the method used to ascertain it.

To be sure, Congress may adopt "any method which shall be reasonably certain to ascertain the fact" of how many of its Members are present.  *Ballin*, 144 U.S. at 6.  But *Ballin* does not stand for the proposition that Congress may define the fact itself—what being "present" means— particularly to define it into nonexistence.  The Constitution fixes that inquiry; the fact exists independent of the procedures used to "ascertain" it. *See id.*  And that is so even if some procedures Congress may adopt might yield more reliable results than others.  In *Ballin*, the Court merely laid the foundation for today's question, articulating that the "presence" of a majority of Members is the essential fact underpinning the Quorum Clause's

No. 24-10386

operation. The Court left it to Congress to adopt any method "reasonably certain to ascertain the fact," suggesting that Congress may "prescribe answer to roll-call . . . ; or require the passage of members between tellers . . . ; or [use] the count of the speaker or the cle[r]k, and an announcement from the desk of the names of those who are present." *Id.*[3] And it declined to assess "the advantages or disadvantages, the wisdom or folly" of Congress's choice. *Id.* at 5.

## B.

Which brings us to today's case, which turns on the unresolved interpretive question—whether the House rule at issue recognizes the same sort of "presence" as the Constitution requires—without regard for *how* Congress counts noses. To answer, "we begin as always with the precise text of the Constitution." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 378 (2024). Indeed, we "must begin with the language of the instrument," because it "offers a fixed standard for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (citations and quotation marks omitted). That meaning is discerned by seeking the text's "original public meaning." *Abbott v. Biden*, 70 F.4th 817, 829 (5th Cir. 2023) (quotation marks and citation omitted); *see also District of Columbia v. Heller*, 554 U.S. 570, 576–77 (2008). To discern the Constitution's original public meaning, we look to the Founding Era. *Abbott*,

---

[3] Of course, as discussed *infra*, *Ballin*'s analysis all but states physical presence is required. There, the non-voting Members were physically present in the House chamber; and the Court's suggested methods for "reasonably . . . ascertain[ing]" the existence of a quorum all assume physical presence. *Ballin*, 144 U.S. at 6. At the least, *Ballin* thus encapsulates helpful late 19th-century evidence that tends to confirm that the Quorum Clause envisions physical presence. *See Gamble v. United States*, 587 U.S. 678, 702 (2019).

No. 24-10386

70 F.4th at 835–38; *see Heller*, 554 U.S. at 577 (considering "the founding generation['s]" understanding).

We may also consider post-ratification history, for "[w]hen faced with a dispute about the Constitution's meaning or application, '[l]ong settled and established practice is a consideration of great weight.'" *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *The Pocket Veto Case*, 279 U. S. 655, 689 (1929)). "Often, 'a regular course of practice' can illuminate or 'liquidate' our founding document's 'terms & phrases.'" *Id.* (quoting Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)). However, such evidence "cannot by itself establish an early American tradition." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482 (2020). And "to the extent later history contradicts what the text says, the text controls." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022); *see also Espinoza*, 591 U.S. at 482 ("recognizing that such evidence may reinforce an early practice but cannot create one").

Returning to the text: "[A] Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members . . . ." U.S. Const. art. I § 5, cl. 1. The Quorum Clause does not explicitly state what sort of "presence" is required or, for that matter, the sense in which it uses the words "Attendance" and "absent." But "contextual and idiomatic clues"—including the Clause's purpose and the interplay of its component parts—readily resolve any ambiguity. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 70 (2012) ("[C]ontext disambiguates . . . . [A] thoroughly fluent reader can reliably tell in the vast majority of instances from contextual and idiomatic clues which of several possible senses a word or phrase bears.").

No. 24-10386

As my panel colleagues recognize, Founding-era dictionaries defined the terms "absent" and "attendance" in both the physical sense (not physically present) and the mental sense (not paying attention).[4] *Ante*, at 21; *see also Texas v. Garland*, 719 F. Supp. 3d 521, 584–85 (N.D. Tex. 2024). As a result, they reason that the Constitution's text does not require *physical* presence, even if that reading is the "most natural reading," because it is possible to read terms like "absent" and "Attendance" in the mental sense. *Ante*, at 21, 27–28. In other words, given that the Quorum Clause bears *some* textual ambiguity, either possible reading (or some other reading Congress confects) is constitutional. Thus, without affirmatively defining what it means to be "present" for purposes of establishing a quorum, my panel colleagues bless a reading of the Quorum Clause's strict procedural limit on congressional power that is satisfied based upon legislators' capacity to focus on or pay attention to their chamber's proceedings. *Id.* By the same token, and to harmonize this reading of "presence," they reduce the second part of the Clause, authorizing a minority to compel the "Attendance of absent Members," to vesting merely the power to compel distracted Members to snap out of it and give their attention. *See ante*, at 21. This is straining at a gnat while swallowing a camel.

---

[4] 1 Thomas Sheridan, A Complete Dictionary of the English Language (3d ed. 1790) (defining "absent" as "[n]ot present, absent in mind, inattentive"; defining "attendance" as "[t]he act of waiting on another; service; the person waiting, a train; attention, regard"); James Barclay, A Complete and Universal English Dictionary (1792) (defining "absent" as "at a distance from, out of the sight and hearing of a person. Figuratively, inattentive to, or regardless of something present"; defining "attendance" as "the act of waiting upon as a servant; service; the person in waiting; a servant"); *accord* 2 Samuel Johnson, A Dictionary of English Language (6th ed. 1785) (similarly defining "absent" and "attendance"); 1 John Ash, The New and Complete Dictionary of the English Language (2d ed. 1795) (same).

No. 24-10386

In the context of cabining the legislative power "to do Business," my colleagues' reading of the Quorum Clause makes little sense. Unsurprisingly, neither the Government nor they point to any legislative quorum requirement anywhere, from any era, that hinged upon legislators' *mental attentiveness* in the legislative chamber.   And theoretically harmonizing the Clause's compulsion component, such that it grants a minority of Members the mere authority to rouse a majority of absent-minded Members, equally lacks support.   Rather, the context in which the Clause employs the terms "absent" and "Attendance"—delineating when Congress may exercise its power to legislate—resolves any ambiguity as to whether those terms are used in the mental or in the physical sense. Particularly given the interoperation of the Quorum Clause's majority threshold and its grant of power to a minority to compel attendance of absent members to meet that threshold, it is clear that the Quorum Clause is concerned with *physical*, and not mental, presence, as I read *Ballin* to have all but stated.[5]

That textual reading aligns with the original understanding of the Quorum Clause.   At the Constitutional Convention, the Framers debated how high to set the quorum requirement for Congress to conduct business. In settling on a "Majority," they were animated by both a desire to avoid the potential for a minority "Juncto" to exercise legislative power by artifice, as well as the *physical* obstacles Congress would face in mustering a quorum. *See*

---

[5] Even if my reading were incorrect and Congress may choose between the two senses in which these terms were used in 1787, it is puzzling to figure out how House Resolution 965's allowance of proxy presence satisfies either the physical or mental sense of "Attendance."   Reading "Attendance" in the mentally-tuned-in sense, neither the Government nor the majority offers any explanation for how a Member's proxy presence fulfills a requirement that the Member give his or her presence of mind, or mentally "attend," to the business of the House.   If anything, a Member can more easily be *both* physically and mentally absent by delegating his or her "presence" to a proxy.

No. 24-10386

2 MAX FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, 251–54 (1911) (recording debates over the distance legislators needed to travel to get to the Capitol, the inconvenience and delay caused thereby, and the possibility that legislators might physically secede to thwart congressional business). Thus, as with so many other provisions in the Constitution, the Framers balanced the Quorum Clause's majority threshold with the Clause's empowerment of a minority to rectify a failure to muster one—either because of travel difficulties, unforeseen circumstances, or deliberate shenanigans. Tellingly, in debating and settling upon this balance, all the concerns the Framers allayed regarded *physical* obstacles and *physical* absence. And it seems plain that in empowering a minority of Members "to compel the Attendance of absent Members," U.S. CONST. art. I § 5, cl. 1, the Framers meant that as compelling *physical presence*, *e.g.*, by the Sergeant at Arms physically hauling a Member into the chamber, or by fining a Member until he showed up. *See id.*; *see also* DAVID HUTCHISON, THE FOUNDATIONS OF THE CONSTITUTION 63–64 (1975).

This is not simply a vestige of the era, i.e., that the Framers could not have envisioned Zoom calls or other "virtual" attendance, &c. Whether the Quorum Clause's "presence" requirement would be satisfied by a Member's real-time participation in House business by videoconference—a question not presented in this case—presence by proxy clearly does not. As they addressed the obstacles facing Congress's ability to muster a quorum, the Framers never mentioned the use of proxies—despite their knowledge of the practice—as a way for Congress to meet the Quorum Clause's majority presence requirement. *See* 2 MAX FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, 251–54 (1911). Indeed, Alexander Hamilton proposed proxy *voting* in both Houses, but he never proposed counting those proxies to establish a quorum. 3 MAX FARRAND, THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 620 (1911).

Benjamin Franklin's proposed Articles of Confederation also suggested proxy voting, but Franklin's proposal expressly rejected that proxies could be counted for quorum purposes. 22 THE PAPERS OF BENJAMIN FRANKLIN 120–25, https://franklinpapers.org/framedVolumes.jsp ("At every Meeting of the Congress One half of the Members return'd exclusive of Proxies be necessary to make a Quorum"). Other than those two—unadopted—examples, I have found no instance in which the Framers considered the use of proxies in congressional procedure, much less in satisfying the condition precedent of establishing a quorum.

The Framers' silence on quorum-by-proxy is understandable in the light of their prior experience under the British Crown. Proxies were generally prohibited in the British House of Commons, as its members were themselves proxies for the constituencies who elected them.[6] 4 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 12 (1644) (explaining that a member of the Commons could not "by any means make any Proxy, because he is elected and trusted by multitudes of people."); 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 162 (1765–69) (noting that a member of the House of Lords "may make another lord of parliament his proxy, to vote for him in his absence," but that a

---

[6] Both chambers of the proposed Congress would share this feature with the Commons, in that Representatives and Senators would hold their positions in trust for their constituents, and would differ from the House of Lords, in that neither Senators nor Representatives were entitled to their seats. *See, e.g.*, 8 JOHN P. KAMINSKI, ET AL., THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 326 (1988); *cf. Raines v. Byrd*, 521 U.S. 811, 821 (1997) (noting that Members of Congress hold their seats "as trustee[s] for [their] constituents, not as a prerogative of personal power"). The Framers were likely aware of the proxy controversies in Great Britain's House of Lords and the prohibition on proxies in the Commons, as the documents and debates surrounding ratification of the Constitution are filled with comparisons between the structures of Parliament and the proposed Congress. *See, e.g.*, THE FEDERALIST No. 52 (Hamilton or Madison); THE FEDERALIST No. 58 (Madison).

No. 24-10386

member of the Commons can "by no means have" that "privilege," as "he is himself but a proxy for a multitude of people"); *see also* House of Commons, Vote By Proxy (T. Duncombe), 38 Commons Sitting Col. 762 (May 9, 1837) (explaining that "the Commons [did] not hav[e] this privilege, as they were but proxies for the people"). And because proxies were prohibited altogether in the Commons, they could not have been counted for purposes of establishing a quorum.

Much like the House of Commons, Founding-era American legislatures required members' physical presence to satisfy their respective quorum requirements. Those bodies never permitted the delegation of their members' representative capacities to others for quorum purposes.[7] Indeed, in September 1787, the Pennsylvania Assembly faced problems with secession, a practice in which members physically left the chamber to deprive the Assembly of a quorum and thereby obstruct legislative business. 2 Documentary History of the Ratification of the Constitution 95–126 (Merrill Jensen ed., 1976). The Assembly eventually mustered a quorum, but only after the seceding members were forcibly brought into the chamber. *Id.* at 102–04.

Similarly, when the first Congress—in which nineteen of the Framers of the Constitution served as Members—struggled to gather a quorum, it sent circulars to absent Members demanding their attendance. *See* Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. Chi. L. Rev. 361, 369 (2004). And it is plain from the official records of that Congress that physical presence was what was understood to be required:

---

[7] *Cf.* James C. Ho, *Ensuring the Continuity of Government in Times of Crisis: An Analysis of the Ongoing Debate in Congress*, 53 Cath. U. L. Rev. 1049, 1069 (2004) (noting in the context of the Quorum Clause that Members of Congress cannot delegate their authority).

No. 24-10386

> "When no additional *members appearing*, it was agreed that another circular should be written to eight of the nearest absent members, particularly desiring *their attendance*, in order to form a quorum. . . . Richard Henry Lee, from Virginia, then *appearing*, *took his seat*, and formed a quorum of the whole Senators of the United States."

1 Annals of Cong. 15–16 (March 4, 1789–April 6, 1789) (emphasis added). Indeed, from the documentary evidence before us, a quorum was constituted only by Members who appeared, "presented [their] credentials," and physically took the seats to which they were entitled as Members. *See, e.g.*, *id.* at 1039–40 (Jan. 7, 1790) (recognizing a quorum when a majority of the "whole House was present" by "appearing and taking their seats"); Howard M. Wasserman, *The Trouble with Shadow Government*, 52 Emory L.J. 281, 302–03 (2003) (citing 1 Documentary History of the First Federal Congress 1789-1791, at 6–7 (Linda Grant De Pauw et al. eds. 1972)). There is not even a hint that, had an absent Member returned a proxy letter in response to such a "circular," he would have been counted as present for purposes of a quorum.

Thus, the practice of both Founding-era state legislatures and the first Congress assembled under the new Constitution confirms that the Founding generation understood the Quorum Clause to require the physical and personal presence of a majority of Members before a quorum was established. By contrast, though the use of proxies was known at the time of the Founding, practiced in one house of Parliament (while prohibited in the other), and at least contemplated by our Framers, contemporaneous records divulge no use of presence-by-proxy for quorum purposes.

## C.

Congress's post-ratification practices from the 18th to 20th centuries confirm this reading of the Quorum Clause. Indeed, for more than 200 years,

No. 24-10386

Congress recognized only the physical presence of a majority of Members as sufficient to establish a quorum. *See Texas v. Garland*, 719 F. Supp. 3d at 589–91 (citing 7 Annals of Cong. 469–70, 625–27 (1797); 9 Annals of Cong. 2417–18 (1798); 14 Annals of Cong. 677–78, 685 (1804); 41 Cong. Rec. 3572 (1907); 81 Cong. Rec. 2793 (1937); 96 Cong. Rec. 1811 (1950)). Neither the Government nor my panel colleagues appear to contest these historical facts.

Instead, the Government, like several *amici* and the majority, justifies an elastic reading of the Quorum Clause by pointing to Congress's operating by unanimous consent. *See ante*, at 22–24. Unanimous consent is a practice long used by Congress to establish a presumption that a quorum is present unless and until a Member raises a point of no quorum or an on-the-record vote reveals the absence of a quorum. *See, e.g.*, 5 Lewis Deschler, Deschler's Precedents of the United States House of Representatives Ch. 20 § 1 (1994); 6 Clarence Cannon, Cannon's Precedents of the House of Representatives of the United States § 660 (1936); *see also* Floyd M. Riddick & Alan S. Frumin, Riddick's Senate Procedure: Precedents and Practices 1038 (1992). The practice allows Congress to conduct business without conducting constant quorum calls. And true enough, it leaves open the possibility, if not a likelihood, that actions are taken by Congress without a quorum physically present. *See* Floyd M. Riddick & Alan S. Frumin, Riddick's Senate Procedure: Precedents and Practices 1038 (1992). Regardless, Congress's use of unanimous consent does not support consigning a pliable interpretation of the Quorum Clause to Congress, for several reasons.

To begin, Congress may not operate under the presumption that a quorum is present without first mustering an actual quorum at the beginning of each session and establishing the presumption for the remainder of the session. *See* 5 Lewis Deschler, Deschler's Precedents of the

No. 24-10386

United States House of Representatives Ch. 20 § 1.4 (1994). Only from that point may Congress conduct its business under the presumption that a quorum persists. *See, e.g., id.* at § 1.3. To be sure, "[t]his presumption 'permits many measures to be passed by unanimous consent, voice votes, or other non-recorded votes when in fact fewer than a majority of [m]embers of either [h]ouse are present, since the [r]ecord does not disclose the absence of a quorum which would reverse this presumption.'" *Texas v. Garland*, 719 F. Supp. 3d at 592 (quoting William McKay & Charles W. Johnson, Parliament and Congress: Representation and Scrutiny in the Twenty-First Century 85 (2010)) (alterations in original). But the fact remains: A quorum is first required to establish the presumption.

Useful as it may be for conducting legislative business, the presumption is also weak. In the House, it is automatically defeated any time "the absence of a quorum" is "disclosed by a vote or questioned by a point of no quorum." 5 Lewis Deschler, Deschler's Precedents of the United States House of Representatives Ch. 20 § 1 (1994); *see also* Floyd M. Riddick & Alan S. Frumin, Riddick's Senate Procedure: Precedents and Practices 1041–42 (1992). Once the point is raised, the House may not conduct further business, even if there is "a unanimous-consent request to withdraw the point of no quorum," until a quorum has been re-established. 5 Lewis Deschler, Deschler's Precedents of the United States House of Representatives 295, Ch. 20 § 1 (1994). So, even under unanimous consent, the House may only conduct business for as long as it maintains a unanimous representation that a quorum is present; official records to the contrary or a Member's objection destroys the presumption and deprives the House of its power to do business.

No. 24-10386

Finally, lacking a contrary vote count or a Member's point of no quorum, courts may not question Congress's determination that a quorum was present during periods of unanimous consent. *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672 (1892); *see N.L.R.B. v. Noel Canning*, 573 U.S. 513, 551 (2014) ("[W]hen the Journal of the Senate indicates that a quorum was present, under a valid Senate rule, at the time the Senate passed a bill, we will not consider an argument that a quorum was not, in fact, present.").[8] To do so would invade the very internal operations of Congress that *Marshall Field* fenced off. Or as *Ballin* put it, Congress may use "any method which shall be reasonably certain to ascertain the fact" of a quorum. *Ballin*, 144 U.S. at 5–6. Thus, the Quorum Clause's requirement that a majority of Members be present to establish a quorum may coexist with Congress's use of unanimous consent to presume an ongoing quorum because the latter is more akin to a "method which shall be reasonably certain to ascertain" the former. *Id.* In most cases, courts thus would have no basis to question what Congress has represented: that during periods of unanimous consent, a quorum is present.[9] In this case, however, there was, from the House's official record, neither unanimous consent, nor a proper quorum. Its passage of the Act

_____

[8] My colleagues rely on representations by legal historians that during periods of unanimous consent it might be "obvious" that congressional bodies lack a quorum and by Members of Congress that "it is almost universally the case that the unanimous consent process is employed when there is well less than a majority of senators present." *Ante*, at 22–23 (citations and quotation marks omitted). But those representations are insufficient for a court to question Congress's official representation that a quorum was indeed present when it took action. *Marshall Field*, 143 U.S. at 672.

[9] Of course, to the extent that Congress's use of unanimous consent contravenes the Quorum Clause, a question we need not address in today's case, past practice cannot vest Congress with power not already conferred by the Constitution. *Medellin v. Texas*, 552 U.S. 491, 532 (2008) ("[P]ast practice does not, by itself, create power." (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981))); *see Texas v. Garland*, 719 F. Supp. at 590.

No. 24-10386

absent a quorum therefore runs afoul of the Quorum Clause's conditions for doing so.

## III.

Our Constitution is one of enumerated powers.  It provides specific grants of authority to the three branches of our federal government and imposes checks and balances on the exercise of that authority.  The Quorum Clause serves as such a check on congressional power; indeed, it is an organic constraint in our republican form of government because there is *no* power for a house of Congress "to do Business" until a quorum of its Members are present.  And though the House has authority to prescribe its internal rules for conducting the people's business, it may only do so within the Constitution's guardrails.

House Resolution 965's rule allowing "proxy presence" contravenes the Quorum Clause.  And because the House had a "quorum" only under that constitutionally invalid House rule, the House had no authority to do business at the time it passed the Act.  Therefore, I would hold that the Act is constitutionally infirm and afford Texas the relief it seeks.  For that reason, I respectfully dissent.