No. 24-10386

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

STATE OF TEXAS,

Plaintiff-Appellee,

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL, in her official capacity as United States Attorney General; CHARLOTTE A. BURROWS, in her official capacity as Chair of the U.S. Equal Employment Opportunity Commission; JOCELYN SAMUELS, in her official capacity as Vice Chair of the U.S. Equal Employment Opportunity Commission; KEITH SOLDERLING, in his official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; ANDREA R. LUCAS, in her official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission; CHRISTOPHER W. LAGE, in his official capacity as General Counsel of the Equal Employment Opportunity Commission; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES DEPARTMENT OF JUSTICE,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Texas

———————————

## EN BANC BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

## STATEMENT REGARDING ORAL ARGUMENT

This Court's order granting rehearing en banc specifies that the Court intends to hear "oral argument on a date hereafter to be fixed."

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ......................................................3

STATEMENT OF THE ISSUES.............................................................4

STATEMENT OF THE CASE..................................................................4

    A.    Legal Background ...........................................................4

    B.    Factual and Procedural Background ..................................9

SUMMARY OF ARGUMENT............................................................ 16

STANDARD OF REVIEW .................................................................. 23

ARGUMENT ...................................................................................... 24

I.    Texas's Claim Is Foreclosed by the Enrolled-Bill Rule ..................... 24

    A.    Texas May Not Second-Guess the House's Determination that the Appropriations Act Validly Passed the House ....................24

    B.    The District Court's Contrary Conclusion Is Unavailing..........26

II.    The Appropriations Act Was Validly Enacted ...................................... 33

    A.    The Quorum Clause Does Not Prohibit the House from Counting Members Who Participate Remotely Toward Its Quorum ....................................................................35

    B.    The District Court's, and Texas's, Contrary Reasoning Is Unpersuasive....................................................................41

CONCLUSION .................................................................................. 51

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*BNSF Ry. Co. v. International Ass'n of Sheet Metal, Air, Rail & Transp. Workers,*
  973 F.3d 326 (5th Cir. 2020) ....................................................................... 23

*Braniff Airways, Inc. v. Civil Aeronautics Bd.,*
  379 F.2d 453 (D.C. Cir. 1967) ..................................................................... 36

*Chiafalo v. Washington,*
  591 U.S. 578 (2020) ............................................................................... 46, 48

*Evans v. Browne,*
  30 Ind. 514 (1869) ........................................................................................ 30

*Hurtado v. United States,*
  410 U.S. 578 (1973) ..................................................................................... 43

*Idaho v. Interstate Com. Comm'n,*
  939 F.2d 784 (9th Cir. 1991) ...................................................................... 36

*INS v. Chadha,*
  462 U.S. 919 (1983) ..................................................................................... 32

*Marshall Field & Co. v. Clark,*
  143 U.S. 649 (1892) ............................................... 2, 4, 12, 16, 17, 24, 24-25,
                                                          25, 26, 27, 28, 29, 30, 32, 33

*McCarthy v. Pelosi,*
  5 F.4th 34 (D.C. Cir. 2021) ..................................................................... 33, 49

*New Process Steel, L.P. v. NLRB,*
  560 U.S. 674 (2010) ..................................................................................... 35

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014) .................................................... 22, 36, 38, 40, 41, 45

*Public Citizen v. U.S. Dist. Ct. for D.C.,*
  486 F.3d 1342 (D.C. Cir. 2007) ............................................................. 31, 32

*United States v. Ballin,*
  144 U.S. 1 (1892) ....................................................... 5, 12, 22, 27, 28, 29, 34,
                                                          38, 39, 45-46, 46, 49, 50

*United States v. Farmer,*
  583 F.3d 131 (2d Cir. 2009) .................................................................. 17, 30

*United States v. Gonzalez-Arenas,*
  496 F. App'x 866 (10th Cir. 2012) .................................................. 31

*United States v. Munoz-Flores,*
  495 U.S. 385 (1990) ........................................................... 26, 31

*United States v. Small,*
  487 F. App'x 302 (7th Cir. 2012) ................................................. 30

## Constitutions:

U.S. Const. art. I, § 5, cl. 1 ...................... 1, 4, 13, 19, 21, 26, 33, 35, 42, 43, 48

U.S. Const. art. I, § 5, cl. 2 ........................................................ 4, 20, 38

U.S. Const. art. I, § 5, cl. 3 ........................................................... 28

U.S. Const. art. I, § 7 ................................................................. 32

U.S. Const. art. I, § 7, cl. 1 ........................................................... 31

N.J. Const. of 1776, art. III ............................................................ 48

## Statutes:

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) ................................. 1, 9, 10

1 U.S.C. § 6 .............................................................................. 9

28 U.S.C. § 1 .......................................................................... 36

28 U.S.C. § 46(d) ...................................................................... 35

28 U.S.C. § 1291 ........................................................................ 3

28 U.S.C. § 1331 ........................................................................ 3

## Legislative Materials:

139 Cong. Rec. 2739 (1993) ............................................................. 40

167 Cong. Rec. H43 (daily ed. Jan. 4, 2021) ......................................... 7, 8, 9, 33

168 Cong. Rec. H10,528 (daily ed. Dec. 23, 2022) .................................... 9, 29, 34, 44, 45

168 Cong. Rec. S10,065 (daily ed. Dec. 22, 2022) .............................................. 9

H.R. Res. 8, 117th Cong. (2021) ............................................................... 7

H.R. Res. 965, 116th Cong. (2020) ...................................................... 7, 8, 33

*Jefferson's Manual of Parliamentary Practice* § 528a, *reprinted in*
 H.R. Doc. No. 117-161 (2023) .............................................................. 6

Barry J. McMillion, Cong. Research Serv., R45622, *Judicial Nomination*
 *Statistics and Analysis: U.S. Circuit and District Courts, 1977-2022*
 (Apr. 3, 2023), https://perma.cc/2SK5-SB9L ......................................... 40

## Other Authorities:

John Ash, *New and Complete Dictionary of the English Language* (1795) ............................... 43

Clarence Cannon, *Cannon's Precedents of the House of Representatives of the*
 *United States* (1935-1941) ................................................................. 5

6 Clarence Cannon, *Cannon's Precedents of the House of Representatives of the*
 *United States* (1935-1941) ................................................................. 6

C-SPAN, House Session (Nov. 3, 1993), https://www.c-span.org/
 video/?52027-1/house-session (1:06:20-1:12:21) ...................................... 40

Lewis Deschler, *Deschler's Precedents of the House of Representatives of the*
 *United States* (1994-2013) ................................................................. 5

5 Lewis Deschler, *Deschler's Precedents of the House of Representatives of the*
 *United States* (1994-2013) ................................................................. 6

5 *Fletcher Cyclopedia of the Law of Corporations* § 2013, Westlaw
 (database updated Sep. 2025) ............................................................. 36

Benjamin Franklin, *Proposed Articles of Confederation, [on or Before 21 July 1775]*
 (July 21, 1775), https://perma.cc/J2N4-LPW4 ......................................... 47

GovInfo, *Precedents of the U.S. House of Representatives*,
    https://www.govinfo.gov/collection/precedents-of-the-house?path=/
    GPO/Precedents%20of%20the%20U.S.%20House%20of%20
    Representatives (last visited February 12, 2026) ............................................5

4 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the
    United States* (1907) ...................................................................... 5, 6, 40

1 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ............................43

2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ............................35

Kevin F. McCumber, 119th Cong., *Rules of the House of Representatives* (2025) ..............5, 6

William McKay & Charles W. Johnson, *Parliament & Congress:
    Representation & Scrutiny in the Twenty-First Century* (2010) ........................................ 6, 40

Press Release, Nancy Pelosi, Speaker of the House, Dear Colleague
    to All Members on Extension of Remote Voting 'Covered Period'
    (Nov. 10, 2022), https://web.archive.org/web/20221111142214/
    https://www.speaker.gov/newsroom/111022-1 ...........................................................8

Press Release, U.S. Sup. Ct., Press Release Regarding May Teleconference
    Oral Arguments (Apr. 13, 2020), https://perma.cc/37SS-LU7D ............................36

*Quorum*, Black's Law Dictionary (9th ed. 2009) ................................................35

Paul Seaward, *Pairs and Proxies*, History of Parliament (Oct. 1, 2018),
    https://perma.cc/PW9U-QC8L ..............................................................48

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833).................. 37, 42

John V. Sullivan et al., *House Practice: A Guide to the Rules, Precedents,
    and Procedures of the House* (2024) .......................................................... 5, 6, 40

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)....36-37, 37, 42, 45

3 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)...........................47

U.S. Senate, *The First Unanimous Consent Agreement* (Mar. 24, 1846),
    https://perma.cc/WT8Z-N3LZ ..............................................................40

Noah Webster, *An American Dictionary of the English Language* (1828) ............................43

**INTRODUCTION**

At the end of 2022, the House of Representatives and the Senate each passed, and the President signed, the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022). That $3 trillion omnibus appropriations statute funded programs across the federal government, with many billions of dollars of those appropriations remaining available until 2026, 2027, or later. It also included a number of pieces of permanent legislation. According to the congressional record, when the statute passed the House, more than 99% of then-sitting Members recorded their vote on the legislation and more than half of the sitting Members voted in favor of the legislation.

Despite 99% of House Members recording their vote on the Appropriations Act, Texas now claims—and the district court agreed—that the Appropriations Act "never passed the House of Representatives" and is "not law" because, in Texas's view, the House lacked the required majority quorum at the time of the vote. ROA.66 (quotation omitted). The district court concluded that the Constitution's Quorum Clause—which provides that "a Majority of each [House] shall constitute a Quorum to do Business," U.S. Const. art. I, § 5, cl. 1—imposes a "physical-presence requirement" such that a majority of Members must be physically present on the House floor at the time of a vote to qualify as a quorum, ROA.1373. Because more than a majority of the House recorded a vote on the Act pursuant to remote-voting procedures that the House had authorized during the COVID-19 pandemic, the court

held that the House lacked a constitutional quorum at the time of its vote on the Act. *See* ROA.1391-92.

The district court was incorrect. At the threshold, Texas's claim must be rejected because the Supreme Court has made clear plaintiffs may not second-guess the validity of the enactment of bills that are "authenticated in" the proper manner by Congress and the President. *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672 (1892). And on the merits, Texas's claim fares no better. The Quorum Clause focuses on participation, not on physical presence. And engrafting a physical-presence requirement onto the text would be inconsistent with the ordinary understanding of a quorum, with the history and essential purposes of the Quorum Clause, with the Constitution's broad delegation of authority to the House and Senate to issue rules to govern their own proceedings, and with Congressional practice dating back to 1789.

And beyond all that, the "full legal and practical implications of affirming the district court's ruling are hard to fathom." Amicus Br. of Senate Republican Leader Mitch McConnell 25. Any affirmance would necessarily imply the invalidity of the entire Consolidated Appropriations Act, casting doubt on the government's ability to continue expending funds that were appropriated in that statute and calling into constitutional question a number of permanent pieces of legislation included in that statute. These include: a provision that authorized extensions of temporary judgeships in five judicial districts; the "Fairness for 9/11 Families Act," which "authoriz[es] catch-up payments for certain families of 9/11 victims as well as victims of" certain

other terrorist attacks; the SECURE 2.0 Act, which is "a significant reform of the regulation of retirement plans"; a provision allowing for "a continued special assessment imposed on human traffickers"; and the "Electoral Count Reform and Presidential Transition Improvement Act of 2022," which "reform[s] the process of counting electoral votes in presidential elections." *Id.* at 23-25.

And the ramifications would not end there. "Much of the business the Senate transacts" is accomplished through unanimous consent and voice vote processes that often are employed "when there is well less than a majority of senators"—indeed, "often as few as two"—physically present. Amicus Br. of Senate Republican Leader Mitch McConnell 18-19. Any constitutional physical-presence requirement would not only "significantly impair the daily operations of the Senate" moving forward, *id.* at 18, but would cast doubt on significant already enacted legislation and on the validity of the many Executive Branch and Judicial nominees who were confirmed by a vote with less than a majority of Senators physically present, *id.* at 20-22.

The district court's judgment should be reversed.

## STATEMENT OF JURISDICTION

Texas invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.67. The district court entered final judgment on February 27, 2024. ROA.1404. Defendants filed a timely notice of appeal on April 26, 2024. ROA.1409. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Texas's claim that the Appropriations Act did not pass the House of Representatives with a constitutionally required quorum is foreclosed by the enrolled-bill rule of *Marshall Field & Co. v. Clark*, 143 U.S. 649, 673 (1892); and

2. Whether the district court erred in concluding that the Appropriations Act was not duly passed by the House because the Constitution's Quorum Clause, U.S. Const. art. I, § 5, cl. 1, requires that a majority of the House be physically present on the House floor and thereby precludes the House from adopting a rule permitting Members who vote remotely to be counted towards a quorum.

## STATEMENT OF THE CASE

### A.     Legal Background

Article I, Section 5 of the Constitution provides that "a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1. It further specifies that "Each House may determine the Rules of its Proceedings." *Id.* cl. 2.

**1.** Since the Founding, the House of Representatives has developed practices and procedures for determining how and whether a quorum exists, which have changed over time. Originally, the House tied its quorum requirement to Members' participation in the relevant vote; thus, the "view prevailed in the House that it was

4

necessary for a majority of the Members to vote on a matter" in order to "satisfy the constitutional requirement for a quorum." John V. Sullivan et al., *House Practice: A Guide to the Rules, Precedents, and Procedures of the House*, ch. 43, § 5 (2024) (*House Practice*); *see also* 4 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States*, ch. 85, §§ 2895-2903 (1907) (*Hinds*).[1]

In 1890, however, the House changed its procedure for counting a quorum to focus on Members' mere presence, rather than their participation. Thus, House Speaker Thomas Reed ruled "that Members present in the Chamber" could be counted for purposes of determining a quorum, whether or not they voted. *House Practice*, ch. 43, § 5; *see also* 4 *Hinds'*, ch. 85, §§ 2895, 2905. The House subsequently codified that understanding into its rules. *See United States v. Ballin*, 144 U.S. 1, 5 (1892) (citing House rule); *see also* Kevin F. McCumber, 119th Cong., *Rules of the House of Representatives*, Rule XX.4(b) (2025) (House Rule) (current version of the rule).

In addition to those procedures for determining a quorum when such an inquiry is required, it was settled practice by the end of the 19th century that a

---

[1] The multi-volume precedents of the House comprise the decisions of past Speakers and Chairs on parliamentary questions that have arisen under the House Rules. *See Hinds'* (covering 1789-1907); Clarence Cannon, *Cannon's Precedents of the House of Representatives of the United States* (1935-1941) (covering 1907-1936) (*Cannon's*); Lewis Deschler, *Deschler's Precedents of the House of Representatives of the United States* (1994-2013) (covering 1936-2013) (*Deschler's*). The precedents are available online at GovInfo, *Precedents of the U.S. House of Representatives*, https://www.govinfo.gov/collection/precedents-of-the-house?path=/GPO/Precedents%20of%20the%20U.S.%20House%20of%20Representatives (last visited February 12, 2026).

quorum is "presumed always to be present unless a point of no quorum is made." 5 *Deschler's*, ch. 20, § 1.3; 4 *Hinds'*, ch. 85, § 2961; 6 *Cannon's*, ch. 206, § 624. Operating under this presumption, the House has long conducted business by "unanimous consent"—that is, by taking "action that is not in dispute and to which no Member has any objection," which may be accomplished with few Members physically present on the House floor. *See House Practice*, ch. 54, § 1.

Unanimous consent "is applied across a wide range of House business," including to "adopt or pass a measure." *House Practice*, ch. 54, § 7; *see also Jefferson's Manual of Parliamentary Practice* § 528a, *reprinted in* H.R. Doc. No. 117-161, at 288-89 (2023). Unanimous consent thus "permits many measures to be passed . . . when in fact fewer than a majority of Members" are physically present. *See* William McKay & Charles W. Johnson, *Parliament & Congress: Representation & Scrutiny in the Twenty-First Century* 85 (2010).

The House has also changed its views over time with respect to the legislative matters for which a quorum is required. Before the 1970s, the House viewed a quorum as required for debate and many other non-voting matters. *See* 5 *Deschler's*, ch. 20, § 10. Since that time, however, the House has understood the term "business" in the Quorum Clause as a "term of art which does not encompass all activities." *Id.* (quotation omitted); *see also House Practice*, ch. 43, §§ 1, 6. Today, under House Rule XX.7(a), a quorum is required only prior to a vote. *See* House Rule XX.7(a) ("The

Speaker may not entertain a point of order that a quorum is not present unless a question has been put to a vote.").

**2.** In May 2020, in response to the COVID-19 pandemic, the House of Representatives adopted House Resolution 965, which permitted certain changes to the House's procedures. *See* H.R. Res. 965, 116th Cong. (2020); H.R. Res. 8, § 3(s), 117th Cong. (2021) (extending to 117th Congress). The resolution authorized the Speaker of the House—after being "notified by the Sergeant-at-Arms, in consultation with the Attending Physician, that a public health emergency due to a novel coronavirus is in effect"—to "designate a period" during which Members could participate in the House's proceedings remotely by providing specific instructions to a fellow Member who was physically present in the chamber and who had been designated to cast the remote Member's vote pursuant to the specific instructions received. *See* H.R. Res. 965, § 1(a). The resolution provided that any Member who voted or recorded his or her presence pursuant to the remote-voting rule was to be "counted for the purpose of establishing a quorum under the rules of the House." *Id.* § 3(b).

The resolution set forth specific procedures for remote voting, and the House published additional regulations elaborating on these procedures. *See* 167 Cong. Rec. H43 (daily ed. Jan. 4, 2021). A Member wishing to vote remotely pursuant to the House's rule was required to submit to the Clerk of the House a signed and dated letter "specifying by name the Member who [was] designated" to physically cast the

vote on his or her behalf. *See* H.R Res. 965, § 2(a)(1); *see also* 167 Cong. Rec. H43.

Upon receipt of such a letter, the Clerk was required to "notify the Speaker, the

majority leader, [and] the Minority Leader" of the designation. H.R. Res. 965,

§ 2(a)(3).

The rule also prohibited Members from designating a general proxy to vote on

their behalf. Instead, the rule required Members wishing to vote remotely to provide

an "exact instruction," in writing, specific to a particular vote or quorum call, and the

rule required the Member designated to cast the remote Member's vote to do so

pursuant to "the exact instruction received." H.R. Res. 965, § 3(c). The remote

Member could revoke his or her proxy designation "at any time for any reason" and

could similarly provide new voting instructions at any time (including via electronic

communications). *See* 167 Cong. Rec. H43. If the text of a bill changed after a voting

instruction was given, the Member wishing to vote remotely was required to provide a

"new instruction," in writing. *Id.*

From May 20, 2020, through December 25, 2022, the Speaker of the House—

pursuant to notification that a public-health emergency was in effect—designated a

covered period pursuant to the resolution and permitted remote voting pursuant to

the prescribed procedures.[2]

---

[2] *See, e.g.*, Press Release, Nancy Pelosi, Speaker of the House, Dear Colleague to
All Members on Extension of Remote Voting 'Covered Period' (Nov. 10, 2022),
https://web.archive.org/web/20221111142214/https://www.speaker.gov/newsroo
m/111022-1.

### B.    Factual and Procedural Background

**1.** On December 23, 2022, the House passed the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022), after the Senate passed the bill the previous day. Because the version of the bill the Senate passed included amendments and was not identical to earlier versions, *see, e.g.*, 168 Cong. Rec. S10,065-71 (daily ed. Dec. 22, 2022), those Members of the House who wished to vote on the bill remotely pursuant to the House's rule were required to submit new instructions following the Senate's actions, *see* 167 Cong. Rec. H43.

According to the congressional record, 427 of the House's 431 Members recorded a vote on the Act: 225 Members voted in favor of the Act, 201 voted against it, one Member voted "present," and four did not record a vote. 168 Cong. Rec. H10,528-29 (daily ed. Dec. 23, 2022). At the time of the bill's passage, the presiding officer noted that "Members casting their vote or recording their presence" pursuant to the House's remote-voting rule "are counted for the purpose of establishing a quorum under the rules of the House" and that, "under the rules of the House," a quorum was present. *Id.* at H10,529. The bill thereafter became an enrolled bill, *see* 1 U.S.C. § 6, and was signed into law by the President on December 29, 2022. *See* ROA.1672.

The Appropriations Act is a $3 trillion omnibus statute that appropriated funds for the 2023 fiscal year. *See* ROA.1783. Among the Act's provisions, it provided funding for military service members' pay, military aircraft and weapons procurement,

the veterans' health care system, the federal judiciary, the Department of Homeland Security (and its components, such as U.S. Customs and Border Protection), and the U.S. Marshal's Service. *See, e.g.*, 136 Stat. at 4525, 4566-69, 4575-77, 4668-70, 4729-31, 4951-53; *see also* ROA.1779-82 (describing 12 appropriations provisions). The Act further made billions of dollars of grant funds available, including to States such as Texas. *See, e.g.*, 136 Stat. at 4473, 4871, 5676-77, 5727, 5737-38, 5789. The Act also contained several pieces of permanent legislation, including the Fairness for 9/11 Families Act, *id.* at 6106-11, and the Providing Urgent Maternal Protections for Nursing Mothers Act, *id.* at 6093-97.

As particularly relevant here, one permanent piece of legislation included in the Act is the Pregnant Workers Fairness Act (PWFA), which expands federal requirements related to providing reasonable accommodations to pregnant workers. *See* 136 Stat. at 6084-89. The PWFA makes it an unlawful employment practice for covered entities, including state employers, to refuse to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee" unless they can show that "the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* at 6085.

**2.** After the enactment of the Appropriations Act, the State of Texas filed this lawsuit and moved for a preliminary injunction in February 2023, asserting that the Appropriations Act "never passed the House of Representatives" because the House

allegedly lacked a quorum at the time of its vote. ROA.66 (quotation omitted); *see also* ROA.26. Texas acknowledged that 427 out of 431 Members voted on the Appropriations Act, and that a majority of those Members voted in favor of its passage. *See* ROA.68. But Texas asserted that the Quorum Clause "requires physical presence," ROA.74, and that 226 Members are recorded in the congressional record as having voted on the Appropriations Act pursuant to the House's remote-voting procedures, ROA.68. Based on that record, Texas alleged that "only 201" Members were "physically present" during the House's vote, which Texas claimed was less than the "physical" quorum that the Constitution requires. ROA.65, 74. Texas therefore asserted that, despite the President's signature on the enrolled bill, the Appropriations Act "has not been enacted" and is "not law." *See* ROA.66.

Texas did not seek relief against the Appropriations Act as a whole. Rather, Texas alleged that it was injured by a component of the Act—the PWFA, which applies to Texas as an employer—and Texas sought injunctive relief to prevent the federal government from enforcing the PWFA against it. *See* ROA.79.[3]

---

[3] Texas also claimed injury from the Act's appropriation of funds to a Department of Homeland Security case-management pilot program. *See* ROA.70. The district court concluded that Texas failed to establish standing to challenge the appropriation of funds to that program, however, and dismissed the defendants sued in connection with that claim. *See* ROA.1341, 1404; *see also* ROA.1288 & n.1 (further noting Texas agreed to dismiss "U.S. Customs and Border Enforcement" as a defendant, since "there is no federal agency" with such a name). The court also dismissed the President of the United States as a defendant. ROA.1341.

**3.** The government opposed the preliminary injunction and moved to dismiss. The district court consolidated a hearing on the motions with a bench trial on the merits and entered final judgment in favor of Texas. *See* ROA.1403-04.

As relevant here, the district court rejected the government's arguments that Texas's claim is foreclosed by the enrolled-bill rule of *Marshall Field & Co. v. Clark*, which provides that "an enrolled act, . . . attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution," 143 U.S. 649, 673 (1892). Although the court questioned whether the enrolled-bill rule applies at all to Quorum Clause claims, it acknowledged that the principles underlying the rule would apply to foreclose at least some claims alleging that Congress lacked a constitutional quorum at the time of its action. *See* ROA.1343, 1349. In the court's view, however, the enrolled-bill rule should apply to foreclose only "fact-intensive" Quorum Clause claims, ROA.1349, and does not apply to Texas's particular claim, which "centers around a legal challenge to the House's rule" permitting Members to vote remotely and be counted towards a quorum, ROA.1354-55. Relying on *Ballin*, 144 U.S. 1, the court reasoned it could properly look beyond the enrolled bill to decide Texas's "legal challenge." *See* ROA.1351, 1355.

On the merits, the district court agreed with Texas that the Quorum Clause contains a "physical-presence requirement," such that the House was precluded from adopting a rule permitting Members who vote remotely to be counted towards a

quorum, and that the Appropriations Act was therefore not duly enacted. *See* ROA.1373, 1391-92. The court acknowledged that the text of the Quorum Clause does not indicate whether a majority of Members must "be physically present" for the House's power to conduct business to arise. ROA.1373. The court reasoned, however, that the Quorum Clause must be understood to impose a physical-presence requirement because Article I, Section 5 further provides that "a smaller Number" of Members than required to establish a quorum may "compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide," U.S. Const. art. I, § 5, cl. 1, which the court believed "would serve no purpose if" Members were not required to be physically present to count towards a quorum, ROA.1373.

The district court also invoked the debate over the Quorum Clause at the Constitutional Convention, where the Framers discussed the difficulty of travel, which the court believed made sense only if the Framers understood the Quorum Clause to require the physical presence of Members. *See* ROA.1379. In addition, the court discussed at length the practices of early Congresses, which assembled in person and adjourned on the occasions that a majority of Members were not physically present. *See* ROA.1381-82.

The district court recognized that, under longstanding practice in both Chambers, each House may conduct business by unanimous consent provided that no Member has any objection, and that, under this practice, "measures [may] be passed in

13

the absence of a physical quorum." *See* ROA.1386-87. The court distinguished that practice from the House's remote-voting rule, however, on the basis that, under unanimous consent, "no counting of votes occurs" and a unanimous-consent agreement "ends if someone objects." *See* ROA.1389.

The district court further held that Texas had established the remaining permanent-injunctive factors and entered a permanent injunction preventing the Department of Justice and the Equal Employment Opportunity Commission from enforcing the PWFA against Texas. *See* ROA.1401.

**4.** The federal government appealed, and a panel of this Court reversed. At the threshold, the panel agreed with the district court that the enrolled-bill rule did not foreclose Texas's legal challenge—as contrasted with a "factual" challenge—to the House's determination that the Appropriations Act was validly enacted. Op. 7-17.

On the merits, however, the panel concluded that the Quorum Clause does not mandate a physical-presence requirement. At the outset, the panel observed that "the plain text of the Quorum Clause contains no *physical* presence requirement." Op. 20. Next, the panel concluded that historical practice undermined Texas's argument that the Quorum Clause constrains the House and Senate from adopting rules permitting the Chambers to conduct business without a majority of the Chamber physically present. The panel explained that "since 1789—the first year that the First Congress met"—the Senate has "continuously" used "the unanimous consent process" to conduct business "when there is well less than a majority of senators present." Op.

14

22-23 (quoting Amicus Br. of Senate Republican Leader Mitch McConnell 19). And the panel emphasized that this process has "been used to pass not only run-of-the-mill legislation, but to pass a 'super statute' like the Religious Freedom Restoration Act of 1993" and to confirm many nominees, including "69 Supreme Court justices." Op. 23.

In addition, the panel explained that the House's rule permitting remote voting comported with the "essential purpose of the Quorum Clause" to "minimize the undue influence of a minority and to ensure majoritarian rule": the rule "helped ensure majoritarian rule" by allowing "over 99% of House Members—an overwhelming majority"—to participate in the vote on the Appropriations Act. Op. 26. And the panel emphasized that the Constitution "includes a broad delegation of authority to the House to determine how and when to conduct its business," such that any doubt about the appropriate interpretation of the Quorum Clause should lead the "Court to favor a broad interpretation of [the House's] power." Op. 27-28 (alteration and quotation omitted).

Judge Wilson dissented and would have agreed with Texas that the Quorum Clause's text requires the physical presence of Members.

**5.** Texas petitioned for rehearing en banc. This Court granted that petition, ordered that the case be reheard en banc, and vacated the panel opinion. *See* Order (5th Cir. Jan. 14, 2026) (en banc).

15

## SUMMARY OF ARGUMENT

**I.A.** Texas claims that the Appropriations Act "never passed the House of Representatives" and is "not law" because a majority of House Members were not "physically present" in the House chamber at the time of the House's vote on the bill. *See* ROA.66, 68 (quotation omitted). That claim is foreclosed at the threshold by the enrolled-bill rule of *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892).

Texas does not dispute that the Appropriations Act was enrolled and signed by the presiding officers of Congress and the President of the United States. *See* ROA.1672. But in *Marshall Field*, the Supreme Court expressly rejected the notion that parties may look behind the Houses' official attestations on an enrolled bill to challenge the procedural validity of the bill's enactment. 143 U.S. at 672-73. Instead, the Court explained, the Judiciary is "require[d]" to "accept, as having passed Congress, all bills authenticated in" the proper manner by the Houses and the President. *Id.* at 672; *see also id.* (describing that authentication as "complete and unimpeachable"); *id.* at 673 (describing the relevant attestations as "conclusive evidence" that the relevant bill "was passed by Congress, according to the forms of the Constitution"). Any other rule, the Court explained, would be inconsistent with "the respect due to a coordinate branch of the government" and would result in an "absolutely intolerable" "state of uncertainty in the statute laws of the land." *Id.* at 673, 675 (quotation omitted). Those principles preclude Texas's attempt to argue that the Appropriations Act was not validly enacted.

16

**B.** The district court's contrary conclusion is unavailing. At the outset, the court accepted that the enrolled-bill rule could apply to foreclose "fact-intensive" claims alleging that Congress lacked a sufficient quorum at the time of a vote, but the court believed that the rule does not apply to Texas's particular Quorum Clause claim here, which involves a "legal challenge to the" House's remote-voting rule. *See* ROA.1349, 1355. But the Supreme Court has never drawn a distinction between legal and factual challenges in this context. And the Court's justifications for the enrolled-bill rule do not support that distinction. That rule is grounded in respect for the separation of powers and the Supreme Court's recognition of the significant public "consequences" that would result if it were to "declare that an enrolled bill, on which depend public and private interests of vast magnitude," "was not in fact passed." *See Marshall Field*, 143 U.S. at 670. Those concerns are no less implicated by a "legal" challenge than by a factual one.

Nor does the district court's broader suggestion (at ROA.1344) that Quorum Clause claims may not be subject to the enrolled-bill rule at all carry weight. In all relevant respects, a Quorum Clause claim is similar to the bicameralism claim at issue in *Marhsall Field*—and, indeed, the Court in *Marshall Field* favorably cited a state-court decision applying the enrolled-bill rule to a state Quorum Clause claim. *See* 143 U.S. at 677. Courts of appeals have therefore properly applied *Marshall Field* to Quorum Clause claims. *See, e.g.*, *United States v. Farmer*, 583 F.3d 131, 151-52 (2d Cir. 2009). And Texas's similar argument (at Br. 16-17) that the constitutional nature of its claim

forecloses application of the enrolled-bill rule is also incorrect; indeed, *Marshell Field* itself involved a constitutional challenge.

Texas's claim here underscores the relevant point. Texas asks the Court to second-guess the House's determination that a quorum was present at the time of its vote and decide that a $3 trillion omnibus appropriations bill "has not been enacted" despite the signatures of the presiding officers of Congress on the enrolled bill and the signature of the President of the United States. *See* ROA.66. Any such after-the-fact determination by the Judiciary would deeply intrude into Congress's prerogatives to determine the rules of its own proceedings and would be deeply destabilizing— calling into question not just the entirety of the $3 trillion enactment but also a variety of other statutes that have been enacted without a physically present quorum as well as a host of Executive Branch and Judicial nominations.

**II.** Regardless, the Appropriations Act was lawfully enacted. It is undisputed that the Appropriations Act passed the House of Representatives in a vote in which 427 of the 431 Members—more than 99%—participated. It is also undisputed that the Members who participated in the vote remotely did so in accordance with a House rule authorizing such participation. The only question, then, is whether the Quorum Clause so plainly requires that a majority of Members be physically present on the House floor that it disables the House from exercising its own discretionary authority to adopt rules authorizing Members who participate remotely to be counted towards the quorum requirement. It does not.

18

**A.** Starting with the text, the Quorum Clause itself says nothing about physical presence. By its plain terms, the Quorum Clause establishes the minimum number of Members that must participate for the House's power to conduct business to arise—a "Majority of each" House, U.S. Const. art. I, § 5, cl. 1—but the Clause says nothing about the manner in which Members may participate. And that focus on participation, rather than physical presence, is consistent with the application of quorum requirements in analogous contexts, where it is readily understood that a quorum may be established regardless of physical presence. These contexts include, for example, the statutory quorum requirements for the federal courts of appeals and the Supreme Court, as well as quorum requirements for multi-member agencies and for shareholder meetings.

That focus of the Quorum Clause on participation, regardless of physical presence, is also consistent with the Clause's history and essential purposes. The Framers set the quorum requirement at a majority to balance between two evils: the potential that a higher requirement would allow minority factions to grind legislative business to a halt and the potential that a lower requirement would allow a small minority to enact legislation against the majority's will. Here, allowing for remote participation to count towards the quorum requirement furthers those goals, ensuring that legislative business will not grind to a halt when Members are unable to travel to Washington while also reducing the risk that the subset of Members who are able to convene in person will enact counter-majoritarian legislation. Indeed, the

19

Appropriations Act proves the point: more than 99% of Members recorded a vote on the legislation, reflecting extremely broad participation across the House and ameliorating any concern that the legislation does not reflect the will of the majority.

To the extent any doubt remained, the Rulemaking Clause, which immediately follows the Quorum Clause in the Constitution, resolves that doubt in favor of the House. That Clause grants each House broad power to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. The House was well within its broad constitutional authority to adopt a rule during the COVID-19 pandemic specifying a means by which Members could participate remotely and be counted towards a quorum. The House's rule did not change the number of Members required to establish a quorum, but rather provided an additional means by which Members could cast their vote during a public-health emergency when they otherwise might not have been able to do so.

Finally, longstanding practice of the House and Senate confirms that a physical majority of Members is not required to transact business. Since the First Congress, the Senate has conducted business by "unanimous consent" with no more than a few Members physically present on the floor—and the House has done the same for nearly two centuries. That practice has been used to adopt a variety of legislation, including statutes such as the Religious Freedom Restoration Act of 1993, and to confirm an extremely large number of Executive Branch and Judicial nominees, including 69 Supreme Court justices. That long and established practice confirms that

the Quorum Clause does not include a physical presence requirement—and highlights the destabilizing consequences of adopting Texas's novel interpretation.

**B.** Although the text of the Quorum Clause does not require the physical presence of Members, the district court reasoned that the Clause must be understood to impose such a requirement. The court's primary basis for that reasoning is that a neighboring phrase in Article I, Section 5 authorizes "a smaller Number" of Members than required to establish a quorum "to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1. According to the court, that power "would serve no purpose" if Members did not need to be physically present to count toward the constitutionally required quorum. *See* ROA.1373. That is incorrect. The Framers empowered a smaller number of Members to compel the attendance of absent Members to ensure that, if a faction of Members were to engage in quorum-busting techniques to prevent the House from conducting business, a smaller number than required to establish a quorum may act to secure a quorum so that legislative matters may proceed.

But nothing about the provision, any more than Quorum Clause itself, specifies how participation or absence must be determined. Thus, where the House has prescribed by its rules particular methods for Members to participate in House business, a Member participating in accordance with those rules is attending to legislative business and is not "absent." By contrast, if a Member were refusing to participate in legislative business and thereby seeking to deny the House a quorum, a

21

smaller number of Members than required to establish a quorum could act in that circumstance—if the House has authorized such a rule—to "compel" such an absent Member to attend to legislative business, through whatever procedures the House has prescribed for participation.

The district court's additional reasons for grafting a physical-presence requirement onto the Quorum Clause are no more persuasive. Relying on the Framers' debate over the Quorum Clause at the Constitutional Convention and the practice of early Congresses, the court emphasized (at ROA.1376, 1379, 1381) that the Framers assumed that Members would assemble in person to establish a quorum and conduct legislative business. But nothing in the relevant debates reflects any direct suggestion that the Quorum Clause incorporates a physical-presence requirement. And even if the Framers assumed—given the technological realities of the time—that business would be conducted in person, that does not mean that the Framers intended to "restrict" future Congresses to only that method of participation. *See NLRB v. Noel Canning*, 573 U.S. 513, 533 (2014). To the contrary, the text of the Quorum and Rulemaking Clauses establish that the Framers intended each House to determine, over time, how Members may participate and how a quorum is to be established. *See United States v. Ballin*, 144 U.S. 1, 4-5 (1892).

Nor does the district court's discussion (at ROA.1379-80) of the Framers' awareness of proxy voting support its view. For one, the court cites no evidence that the Constitutional Convention specifically considered and rejected any provision to

permit proxy voting—or that the delegates believed that the Constitution's silence on the matter of proxy voting would be understood as forever disabling Congress from adopting rules permitting the practice. Regardless, the form of proxy voting that the Framers would have discussed bears no resemblance to the proxy voting at issue here. At the Founding, proxy voting involved the practice of delegating discretionary voting power to another Member, effectively allowing a single Member to cast multiple votes. The House rule at issue here, by contrast, required any Member participating remotely to provide instructions in writing to his or her proxy that were specific to each vote—and that had to be updated any time that the text of the bill changed. That practice does not raise the same concerns as the practice that the Founders would have been aware of.

## STANDARD OF REVIEW

"A trial court's grant of a permanent injunction is reviewed for abuse of discretion." *BNSF Ry. Co. v. International Ass'n of Sheet Metal, Air, Rail & Transp. Workers*, 973 F.3d 326, 333 (5th Cir. 2020) (footnote omitted). "The district court abuses its discretion if," among other things, it "relies on erroneous conclusions of law." *Id.* at 333-34 (quotation omitted).

## ARGUMENT

### I.    Texas's Claim Is Foreclosed by the Enrolled-Bill Rule

#### A.    Texas May Not Second-Guess the House's Determination that the Appropriations Act Validly Passed the House

Texas contends that the Appropriations Act "never passed the House of Representatives" and is "not law" because a majority of House Members were not "physically present" in the House chamber at the time of the House's vote on the bill. ROA.66, 68 (quotation omitted); *see* ROA.78. That claim fails at the threshold under the enrolled-bill rule of *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892).

In *Marshall Field*, importers contended that a tariff statute "had not in fact been passed by Congress." 143 U.S. at 669. The statute had been enrolled and "attested by the signatures" of the Speaker of the House and the President of the Senate and had been signed by the President. *Id.* at 668, 671. Nonetheless, the plaintiffs argued that the statute was a "nullity, in all its parts," because the enrolled bill allegedly omitted a "a section of the bill, as it finally passed" Congress. *Id.* at 668-89. The plaintiffs sought to establish their claim by relying on "the Congressional record of proceedings," conference and committee reports, "and other papers printed by authority of Congress." *Id.*

The Supreme Court declined to entertain the plaintiffs' claim. The Court agreed with the "general principle" that a bill approved by the President "does not become a law of the United States if it had not in fact been passed by Congress." *Marshall Field*,

143 U.S. at 669. The Court stressed, however, that this "general principle" did not resolve the question of "the nature of the evidence upon which a court may act when the issue is made as to whether a bill" was passed by Congress. *Id.* at 670. In resolving that question, the Court held that the plaintiffs could not rely on extrinsic evidence to challenge the two Houses' "official attestation[s]" on the enrolled bill that the bill had been properly enacted. *See id.* at 672. Instead, the Court concluded, when a bill has been "attested" to by the Houses, has been "delivered to" the President, and has "receive[d] his approval," its "authentication as a bill that has passed Congress should be deemed complete and unimpeachable." *Id.*; *see also id.* ("The respect due to coequal and independent departments requires the judicial department . . . to accept, as having passed Congress, all bills authenticated in the manner stated . . . .").

The Supreme Court explained that it would be inconsistent with "the respect due to a coordinate branch of the government" for the Judiciary to look behind the official attestations of Congress to declare that a bill had not become law. *See Marshall Field*, 143 U.S. at 673. Similarly, the Court emphasized the significant public "consequences" that would result if the Court were to "declare that an enrolled bill, on which depend public and private interests of vast magnitude," "was not in fact passed." *Id.* at 670. If "every act" could "at any and all times be liable to be put in issue and impeached by the journals, loose papers of the legislature and parol evidence," "[s]uch a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable." *Id.* at 675 (quotation omitted); *see id.* at 677. Thus,

the Supreme Court held, "an enrolled act . . . attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution." *Id.* at 673.

That enrolled-bill rule forecloses Texas's claim. Texas does not dispute that the Act was enrolled and signed by the presiding officers of each House of Congress and signed by the President of the United States. *See* ROA.66, 1672. Under *Marshall Field*, that resolves the inquiry: Texas may not appeal to extrinsic evidence to demonstrate that the Act was not enacted "according to the forms of the Constitution." *See Marshall Field*, 143 U.S. at 673; *see also United States v. Munoz-Flores*, 495 U.S. 385, 409-10 (1990) (Scalia, J., concurring in the judgment) (recognizing that, under *Marshall Field*, courts should not "gainsay [Congress's] official assertion that [a] bill was passed by the requisite quorum" (citing U.S. Const. art. I, § 5, cl. 1)).

## B.    The District Court's Contrary Conclusion Is Unavailing

**1.** At the outset, the district court erred in concluding (at ROA.1349, 1355) that the enrolled-bill rule may apply only (at most) to a "fact-intensive" Quorum Clause claim rather than to a "legal challenge to the House's rule" governing how Members are counted towards the required quorum. That distinction does not find footing in *Marshall Field*'s holding or logic and does not properly permit Texas's suit to proceed in any event.

26

Nothing in *Marshall Field* suggests that the enrolled-bill rule is limited to only "fact-intensive" disputes about a bill's passage. Instead, as explained, *Marshall Field* is grounded in the Supreme Court's conclusion that the separation of powers requires that the Judiciary give conclusive weight to the official attestations of the other two branches that a measure was duly enacted—and the Court's determination that the public should be permitted to rely on those attestations. *See* 143 U.S. at 672-73. The respect due coordinate branches of government is no less implicated by a purported "legal" challenge than by a "fact-intensive" one. Nor does the uncertainty and disruption that would result if statutes could be invalidated on the basis of an alleged lack of a quorum vary by any such distinction.

The district court also erred in interpreting *United States v. Ballin*, 144 U.S. 1 (1892), to support this approach. *See* ROA.1351. The claim in *Ballin* arose after the House had changed its quorum rules. *See* 144 U.S. at 3, 5. The plaintiffs in *Ballin* alleged that a bill had not "legally passed" the House where it had been voted on pursuant to the new quorum procedures. *Id.* at 3. In addressing that claim, the Supreme Court "assumed," "without deciding," that it could look to the House's official journal for its record of the roll-call vote; on that assumption, the Court discussed the House's record of its vote and explained that the House's new quorum rule was within its constitutional power to enact. *Id.* at 4-6.

The Court in *Ballin* did not purport to make any distinction between "fact-intensive" and "legal" claims, nor did the Court hold that the enrolled-bill rule did not

27

apply to the plaintiffs' quorum challenge there. To the contrary, *Ballin* recognized that the plaintiffs' claim was of the same "nature" as the claim at issue in *Marshall Field*, which the Court had decided that same day. *See Ballin*, 144 U.S. at 3 (quotation omitted). The Court in *Ballin* only assumed that it could look to the House's journal, and even in proceeding on that assumption, the Court emphasized "the danger of appealing to" extrinsic legislative history "to overthrow" a "bill enrolled and authenticated by the signatures of the presiding officers of the two houses and the President of the United States." *Id.* at 3-4. The Court discussed the House's record of its vote and the Quorum and Rulemaking Clauses only in the course of confirming that the enrolled bill "as found in the office of the Secretary of State is beyond challenge." *Id.* at 4, 9.

Furthermore, to the extent the Court in *Ballin* assumed that it could look to extrinsic legislative history, it assumed only that it could look to the House's official journal, and only with respect to the material "the Constitution requires to be placed on the journal." 144 U.S. at 3-4; *see* U.S. Const. art. I, § 5, cl. 3. In *Marshall Field*, by contrast, the Supreme Court precluded resort to the House's journal when it was asked to consider matters "the Constitution does not require to be entered" there. 143 U.S. at 679. The Court emphasized that, with respect to that material, there is no basis to conclude that the House's record is "complete" and accurate, and the Court therefore closed the door on relying on any such extrinsic legislative history to show that an enrolled bill was not duly enacted. *See id.* 679-80.

28

Here, even if the Court were to look to the House's official record to see "whether the yeas and nays were ordered, and if so," "the vote disclosed thereby," *Ballin*, 144 U.S. at 4, that record does not aid Texas. The House's official record of its vote on the Appropriations Act shows that there were 225 yeas, 201 nays, one Member voting "present," and four not voting—a vote that, on its face, establishes a quorum. *See* 168 Cong. Rec. H10,528. Texas's assertion that "only 201" Members were physically present during the House's vote relies on a list of Members who are identified in the congressional record as having voted on the Act pursuant to the House's remote-voting rule, *see* ROA.68, 1392, which the Constitution did not require the House to record. Thus, even under a capacious reading of *Ballin*, Texas may not properly rely on this factual information to mount a challenge to the validity of the enrolled bill.

**2.** The district court's broader suggestion (at ROA.1344) that the enrolled-bill rule might not apply at all to claims under the Quorum Clause is equally unavailing. Similar to the bicameralism claim at issue in *Marshall Field*, a Quorum Clause claim necessarily asks the Court to inquire into Congress's internal proceedings and second-guess its official attestations in order to decide that a bill "was not passed by Congress." *Marshall Field*, 143 U.S. at 670.

This case illustrates the point. Texas asks the Judiciary to disregard the House's determination that a quorum was present when the House voted on the Appropriations Act and to conclude that a $3 trillion omnibus appropriations statute

29

"has not been enacted," despite the attestations of the presiding officers of Congress on the enrolled bill and the signature of the President of the United States. *See* ROA.66; *see* ROA.78 (alleging that the President "signed a bill that was not passed by a majority of a quorum of the House" and the bill therefore "was never enacted into law"). The separation-of-powers and public-policy concerns underlying the enrolled-bill rule apply with full force to that claim. *See Marshall Field*, 143 U.S. at 672, 675.

Indeed, in surveying decisions that supported its approach, the *Marshall Field* Court favorably cited a state-court decision applying the enrolled-bill rule to a state Quorum Clause challenge. *See* 143 U.S. at 677 (citing *Evans v. Browne*, 30 Ind. 514 (1869)). In that case, the Indiana Supreme Court refused to look beyond an enrolled bill to decide whether a "constitutional quorum" was present at the time of the state legislature's vote, relying on the same separation-of-powers and public-policy considerations that *Marshall Field* later emphasized. *See Evans*, 30 Ind. at 515, 523-27.

Those concerns remain no less powerful today than when *Marshall Field* was decided. Thus, applying *Marshall Field*, courts of appeals have consistently held that the enrolled-bill rule applies to claims alleging that a statute is invalid because Congress allegedly lacked a quorum at the time of its vote. *See United States v. Farmer*, 583 F.3d 131, 151-52 (2d Cir. 2009) ("Farmer contends that the Congressional Record from the date that the Act was passed shows that a quorum was not present . . . . [T]he enrolled-bill rule precludes [that] challenge . . . ."); *see also United States v. Small*, 487 F. App'x 302, 303 (7th Cir. 2012) (unpublished opinion) (recognizing that the

enrolled-bill rule "foreclosed" the defendant's argument that a statute "was passed without a quorum in the House of Representatives"); *United States v. Gonzalez-Arenas*, 496 F. App'x 866, 867 (10th Cir. 2012) (unpublished opinion) (similar).

Contrary to the district court's suggestion (at ROA.1345-46), the Supreme Court's decision in *Munoz-Flores*, 495 U.S. 385, does not establish otherwise. The question at issue in *Munoz-Flores* was whether a provision that had passed Congress was a bill for raising revenue. *Id.* at 387-88. If so, the Constitution required that the provision originate in the House of Representatives. U.S. Const. art. I, § 7, cl. 1. The Court in *Munoz-Flores* ultimately found "consideration of [the] origination question 'unnecessary'" because it determined that the challenged bill "was not one for raising revenue." 495 U.S. at 401. In a footnote, however, the Court also rejected the contention that the Origination Clause question was foreclosed by *Marshall Field*. *Id.* at 391 n.4. As other courts of appeals have recognized, the Supreme Court's reasoning in that footnote is not entirely clear. *See, e.g., Public Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1352, 1354 (D.C. Cir. 2007) (recognizing the footnote is "oblique" and "def[ies] easy comprehension"). It is clear, however, that while the Court declined to extend *Marshall Field* to the Origination Clause claim at issue in that case, the Court did not purport to "modify the enrolled bill rule" or limit its application where, as here, a plaintiff challenges whether an "enrolled bill ha[s] passed Congress." *See id.* at 1353-54; *see also Munoz-Flores*, 495 U.S. at 391 n.4.

31

**3.** Finally, Texas's apparent contention (at Br. 16-17) that the enrolled-bill rule does not apply to constitutional claims—or applies only to constitutional provisions that involve "grant[s] of power" to, rather than constraints on, Congress—is incorrect. *Marshall Field* itself involved a constitutional challenge: the plaintiffs alleged that a statute had not passed both Houses of Congress as required by the Bicameralism Clause, U.S. Const. art. I, § 7; *see Marshall Field*, 143 U.S. at 669; *id.* at 670 (recognizing that the case concerned "the provisions of the Constitution relating to the enactment of laws"); *see also Public Citizen*, 486 F.3d at 1354 ("The decision in *Marshall Field* addressed a bicameralism challenge . . . ."). And the Bicameralism Clause is itself a constraint on Congress's power, not a grant of power. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 948-49 (1983) (emphasizing that the bicameralism requirement serves to "restrain[]" legislative authority (quotation omitted)).

Texas underscores this misunderstanding in quoting (at Br. 19-20) *Marshall Field*'s language that the Judiciary must "accept, as having passed Congress," an enrolled bill that has been signed by the presiding officers of Congress, "leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the constitution." *Marshall Field*, 143 U.S. at 672. The Supreme Court was distinguishing in that passage between familiar constitutional claims that a court may properly address—claims that ask whether a law, by its terms or as applied, is consistent with a constitutional requirement, such as the First Amendment or the Commerce Clause—and claims that, like the bicameralism claim

at issue in *Marshall Field*, ask the Court to look behind Congress's official attestations and declare that an enrolled bill, "appearing, upon its face, to have become a law in the mode prescribed by the Constitution," was not in fact "passed by Congress, according to the forms of the Constitution." *See id.* at 668-70, 673. Texas's Quorum Clause claim plainly falls in the latter category. *Cf.* ROA.66, 78 (claiming that the Appropriations Act "never passed the House of Representatives" and was "never enacted into law" (quotation omitted)).

## II.     The Appropriations Act Was Validly Enacted

The Quorum Clause provides that "a Majority of each" House of Congress "shall constitute a Quorum to do Business." U.S. Const. art. I, § 5, cl. 1. At the time the Appropriations Act was enacted, a House rule permitted the Speaker of the House to authorize Members to participate remotely—and thereby be counted toward the quorum—when certain conditions were met. *See* H.R. Res. 965, §§ 1(a), 3(b). To participate remotely, each Member was required to provide "an exact instruction" in writing to a physically present Member. *See id.* § 3(c). The instruction was required to be "specific to a *particular* vote or quorum call," and if the text of a bill changed after the instruction was given, the Member wishing to vote remotely was required to provide a new written instruction. *See McCarthy v. Pelosi*, 5 F.4th 34, 37 (D.C. Cir. 2021) (emphasis added) (citing H.R. Res. 965, § 3(c)(1), (6)); *see also* 167 Cong. Rec. H43.

It is undisputed that the Appropriations Act passed the House of Representatives through a vote in which 427 of the 431 Members—more than 99%—

participated and in which a majority of those Members voted in favor of the Act's

passage. *See* 168 Cong. Rec. H10,528-29. It is also undisputed that the Members who

participated remotely did so in accordance with the House rule authorizing such

participation. The House thus determined that a quorum existed and the

Appropriations Act properly passed. *See id.* at H10,529 (statement of Speaker pro

tempore); ROA.1672 (enrolled bill).

Nonetheless, the district court concluded that the Appropriations Act was not

validly enacted because fewer than half of the House Members were physically

present in the Chamber at the time of the vote. In the court's view, the Quorum

Clause requires that a majority of the House be physically present, and the House has

no latitude to adopt a rule counting Members who participate remotely toward the

quorum. That is incorrect. As the Supreme Court has explained, the "Constitution

empowers each house to determine its rules of proceedings"; although the House

"may not by its rules ignore constitutional restraints," "within these limitations all

matters of method are open to the determination of the house." *Ballin*, 144 U.S. at 5.

And here, the Quorum Clause's text and essential purpose, along with historical

practice, confirm that the Clause does not contain a physical-presence requirement

that circumscribes the House's broad latitude to set its own rules. The Appropriations

Act was thus validly enacted, and the district court's judgment should be reversed.

**A.    The Quorum Clause Does Not Prohibit the House from Counting Members Who Participate Remotely Toward Its Quorum**

**1.** The Quorum Clause's text does not preclude the House from adopting a rule counting remote participation toward the required quorum. The term "quorum"—today and at the Founding—means the "number of members of a larger body that must participate for the valid transaction of business." *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 683-84 (2010) (citing *Quorum*, Black's Law Dictionary (9th ed. 2009)); *see* 2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785). In setting this number at "a Majority of each" House, the Quorum Clause requires that at least half of each Chamber participate to conduct legislative business. *See* U.S. Const. art. I, § 5, cl. 1.

Nothing in that text requires that a Member be physically present to count toward the House's quorum. To the contrary, the term "quorum" focuses on "participat[ion]," *New Process Steel*, 560 U.S. at 683-84—not physical presence. And consistent with that focus, it is readily understood in analogous contexts that a quorum can be established regardless of physical presence. A "quorum" for purposes of the federal courts of appeals, for example, is "[a] majority of the number of judges authorized to constitute a court or panel thereof." 28 U.S.C. § 46(d). But courts have long understood that requirement to be satisfied so long as a majority of a merits or motions panel participates in the relevant proceedings, regardless whether that majority is physically located in a single location. Similarly, while "any six" of the nine

35

Supreme Court justices "shall constitute a quorum," *id.* § 1, the Supreme Court retained the power to hear and decide cases remotely throughout the pandemic, *see* Press Release, U.S. Sup. Ct., Press Release Regarding May Teleconference Oral Arguments (Apr. 13, 2020), https://perma.cc/37SS-LU7D (announcing proceedings during which "the Justices and counsel will all participate remotely").

And that understanding extends beyond the courts. Thus, for example, the members of a multi-member agency or commission do not need to "be physically present together" to decide a matter in order to satisfy statutory quorum requirements. *See Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967); *see also, e.g.*, *Idaho v. Interstate Com. Comm'n*, 939 F.2d 784, 787 & n.2 (9th Cir. 1991). And it is a well-established rule of corporate law that a shareholder who is not physically present may be counted towards a required quorum if she votes by proxy. *See* 5 *Fletcher Cyclopedia of the Law of Corporations* § 2013, Westlaw (database updated Sep. 2025) ("A shareholder holding proxies for other shareholders and present and participating in the meeting will be regarded as present both in the shareholder's individual and representative capacities, in counting a quorum.").

**2.** That understanding of the Quorum Clause's focus on participation, not presence, makes particular sense given the Clause's history and "essential purposes," *NLRB v. Noel Canning*, 573 U.S. 513, 532-34 (2014). The Framers settled on "a Majority" to constitute a quorum after debating proposals for higher or lower numbers. *See* 2 *The Records of the Federal Convention of 1787*, at 251-54 (Max Farrand ed.,

36

1911). Some delegates urged that a quorum should be "less than a Majority" out of

concern that a higher requirement would allow minority factions to prevent the

legislature from acting. *See id.* at 251-52. Others feared that a lower requirement would

allow "a small number of members" to "make laws." *See id.* at 252-53. Ultimately, the

delegates decided that a quorum would be a majority, *see id.* at 252-54; that

compromise reduced the risk of minority factions grinding the legislature to a halt

while also ensuring that issues are not "decided by a very small number of the

members" "against the deliberate opinion of a majority," 2 Joseph Story, *Commentaries*

*on the Constitution of the United States* § 832 (1833).

Nothing about that history suggests that the Framers intended for the quorum

requirement to focus on physical presence, rather than participation. To the contrary,

the Framers' concerns underpinning the Quorum Clause would be exacerbated, rather

than ameliorated, by a rule requiring physical presence. The House's remote-voting

rule during the COVID-19 pandemic allowed Members to continue to participate in

House business even when they were unable to travel and when gathering in person

was contrary to public-health advice. Future crises, too, may arise that make travel or

in-person assembly difficult or impossible. *Cf.* Amicus Br. of Senate Republican

Leader Mitch McConnell 17-18; Amicus Br. of Former Nat'l Sec. Officials 1-14.

Permitting Members to vote remotely allows House business to proceed in such a

circumstance with majority participation from Members representing districts from

across the country, rather than risking legislative business grinding to a halt or

permitting issues to be decided by only those Members able to travel under the circumstances and attend in person. The district court erred in adopting an interpretation of the Quorum Clause that unduly constrains the House's ability to adapt its rules to respond in such circumstances, where that restrictive interpretation is not compelled by the Quorum Clause's text and risks frustrating its "essential purposes." *See Noel Canning*, 573 U.S. at 532-34.

**3.** Moreover, to the extent that any doubt existed about the Quorum Clause's requirements, that doubt would be properly resolved in favor of allowing the House to determine the appropriate implementation of the quorum requirement pursuant to its power under the Rulemaking Clause.

While the Quorum Clause establishes the minimum number of Members who must participate for each House to conduct business, it does not specify further details, including how Members may participate in legislative business and be counted towards a quorum. The Supreme Court has explained that the Constitution leaves such unanswered questions to each House to address pursuant to the Rulemaking Clause. *See Ballin*, 144 U.S. at 5-6. That clause grants to each House the power to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. Pursuant to that "broad delegation" of authority, each House has "wide latitude to determine" how to conduct its business. *Noel Canning*, 573 U.S. at 550-51.

The Supreme Court stressed the breadth of the House's rulemaking power as it concerns the quorum requirement in *Ballin. See* 144 U.S. at 5-6. As discussed above,

*Ballin* arose after the House had amended its rules so that all Members "in the hall of the house"—rather than only those Members who recorded a vote, as had been the historical practice—were to "be counted" in determining a quorum. *See id.* at 3, 5 (quotation omitted). The Court held that the House's rule complied with the Quorum Clause. The Court stated that while the Quorum Clause requires that "a majority" of Members be "in a position to do business," it does not fix a method for determining whether a quorum exists, and "it is therefore within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact." *Id.* at 5-6. The Court emphasized that the "Constitution empowers each house to determine its rules of proceedings," and while the House "may not by its rules ignore constitutional restraints or violate fundamental rights," "within these limitations all matters of method are open to the determination of the house." *Id.* at 5.

Here, the House exercised its own constitutional authority to adopt a rule expressly providing that Members who vote remotely will be counted towards the required quorum. That rule reflected the House's judgment that such remote voting qualifies as the participation required by the Quorum Clause; at the least, that judgment falls within the wide latitude granted to the House to determine how to conduct its own proceedings.

**4.** Finally, longstanding historical practice confirms that the Quorum Clause does not constrain the House from adopting rules that permit it to conduct business with less than a majority of the Members physically present. Specifically, both the

39

House and the Senate have long conducted business by "unanimous consent"—that is, by a single Member requesting that the Chamber take "some action that is not in dispute and to which no Member has any objection"—even with no more than a few Members physically present. *See House Practice*, ch. 54, §§ 1, 7; *see also see also* Amicus Br. of Republican Senate Leader McConnell 19-22; McKay & Johnson, *supra*, at 85. This practice dates to at least 1832 in the House and originated in the Senate as early as 1789. *See* 4 *Hinds'*, ch. 88, § 3155; *see also* U.S. Senate, *The First Unanimous Consent Agreement* (Mar. 24, 1846), https://perma.cc/WT8Z-N3LZ.

Unanimous consent "is applied across a wide range of House business," including to "adopt or pass a measure." *House Practice*, ch. 54, § 7. Indeed, the House has passed landmark legislation pursuant to this practice, including the Religious Freedom Restoration Act of 1993.[4] And "[h]istorically," the Senate has "confirmed most U.S. circuit and district court nominations by unanimous consent or by voice vote." Barry J. McMillion, Cong. Research Serv., R45622, *Judicial Nomination Statistics and Analysis: U.S. Circuit and District Courts, 1977-2022*, at 33 (Apr. 3, 2023), https://perma.cc/2SK5-SB9L.

Moreover, the Supreme Court has recognized the validity of this practice. In *Noel Canning*, the Supreme Court considered whether the Senate was "in session" or "in recess" during two "*pro forma* sessions." 573 U.S. at 550. The Court held that the

---

[4] *See* 139 Cong. Rec. 2739-41 (1993); C-SPAN, House Session (Nov. 3, 1993), https://www.c-span.org/video/?52027-1/house-session (1:06:20-1:12:21).

Senate was "in session" during those times because, "under its own rules," the Senate "retain[ed] the capacity to transact Senate business." *Id.* Although "the Senate Chamber was, according to C-SPAN coverage, almost empty," the Court recognized that, if the Senate had wished, it could have conducted business "by passing a unanimous consent agreement" pursuant to the presumption "that a quorum is present." *Id.* at 552-54. The Court emphasized that "[t]he Senate in fact conducts much of its business through unanimous consent." *Id.* at 553.

This "[l]ong settled and established" congressional practice underscores the breadth of the House's rulemaking power, and it further confirms that the Quorum Clause does not incorporate a physical-presence requirement. *See Noel Canning*, 573 U.S. at 524 (alteration in original) (quotation omitted).

## B.   The District Court's, and Texas's, Contrary Reasoning Is Unpersuasive

The district court acknowledged that the text of the Quorum Clause gives no "indication" that a majority of Members must be "physically present" in the House chamber for a quorum to be established. *See* ROA.1373. Citing Founding-era dictionaries, the court agreed that the Quorum Clause refers to the "number of members for either house of Congress to do business." ROA.1373 & n.20 (citing numerous Founding-era dictionaries). The court's reasons for nonetheless interpreting the Quorum Clause to impose a "physical-presence requirement" such that a

41

"physical quorum" of Members must be present on the House floor, ROA.1373, 1384, are without merit.

**1.** The district court's, and Texas's, primary argument for reading a physical-presence requirement into the Quorum Clause is that a neighboring phrase in Article I, Section 5, authorizes "a smaller Number" of Members than required to establish a quorum to "compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1. In their view, that power "would serve no purpose" if Members did not need to be physically present to count toward the constitutionally required quorum. *See* ROA.1373; Texas Br. 37.

That reasoning is incorrect. The Framers authorized less than a majority of Members to "compel the Attendance of absent Members" to ensure that, if a faction of Members were to engage in quorum-busting techniques to prevent a quorum and stop legislative business from proceeding, a smaller number of Members than required to establish a quorum could act to secure a quorum so that legislative business may proceed. *See* 2 *The Records of the Federal Convention of 1787*, *supra*, at 252-54; 2 Joseph Story, *supra*, § 834 (1833).

But nothing about that provision, any more than the Quorum Clause itself, specifies how Members' participation or absence must be determined. If the House has prescribed particular procedures for Members to participate, then Members participating in accordance with those procedures are not "absent" from legislative

business and there is no need for their attendance to be "compel[led]." U.S. Const. art. I, § 5, cl. 1. By contrast, if a faction of Members were refusing to participate in legislative business through any of the prescribed methods and thereby seeking to deny the House a quorum, a smaller number of Members could act—if the House has authorized such a rule—to "compel" those absent Members to attend to legislative business through whatever procedures the House has adopted.

The district court reasoned that the terms "absent" and "attendance" "often ha[ve] a physical component." *See* ROA.1374; *see also* Texas Br. 28. But those terms do not necessarily refer to physical presence in a particular location. *See, e.g.*, *Hurtado v. United States*, 410 U.S. 578, 583-84 (1973) (recognizing that a statute addressing payment for witnesses "'attending in any court of the United States' . . . 'for each day's attendance'" did "not speak in terms of 'physical' or 'actual' attendance," and declining to "engraft such a restriction upon the statute"). Founding-era dictionaries confirm that the term "absent" can mean, for example, "inattentive." 1 Samuel Johnson, *supra*. Similarly, the term "attendance" can mean "[a]ttention" or "regard." Noah Webster, *An American Dictionary of the English Language* (1828); *see also, e.g.*, 1 Samuel Johnson, *supra* (defining "to attend" as "[t]o yield attention," "[t]o regard," or "to fix the mind upon"); John Ash, *New and Complete Dictionary of the English Language* (1795) (similar).

And even the purportedly physical definitions that the district court and Texas (at ROA.1374; Texas Br. 38) have embraced readily support the House's

determination to count Members voting remotely as not "absent." Under those definitions, "absent" means "at such a distance as to prevent communication" or "out of the sight and hearing of a person." ROA.1374 (quotation omitted). But given modern technology, Members voting remotely were not "at such a distance as to prevent communications" or out of "sight and hearing" of their physically present colleagues in the Chamber. Indeed, multiple Members who are recorded as having voted on the Appropriations Act pursuant to the remote-voting rule changed their vote during the course of the proceedings. *See* 168 Cong. Rec. H10,529. Those Members were not "absent" from legislative business.

**2.** The district court and Texas fare no better when they attempt to leverage the history and purposes of the Quorum Clause into a physical-presence requirement. Neither the court nor Texas has identified any discussion at the Constitutional Convention directly suggesting that the Quorum Clause incorporates a physical-presence requirement; instead, as explained, *see supra* pp. 36-37, that discussion focused on the number of Members required to establish a quorum, not on the manner in which Members could participate.

The district court also emphasized that, in debating the quorum requirement, some delegates stressed the difficulty of travel and the fear of a too-low quorum leading to issues being decided by "a few representatives of the states closest to the nation's capital." ROA.1376; *see also* Texas Br. 29, 33. But the Framers' statements about the difficulty and inconvenience of travel in the context of that discussion

merely reflect the available means of communication at the time. *See* 2 *The Records of the Federal Convention of 1787, supra*, at 252-54. And the House remote-voting rule is plainly consistent with the goal of ensuring that laws are not adopted by "a few men" and "against the deliberate opinion of a majority of the representative body." Texas Br. 29 (quotation omitted). As explained, by permitting Members to participate in the House's business even when those Members were unable to travel to Washington in person, the rule furthered the ability of a broad array of the House to participate. *See supra* pp. 37-38. Indeed, the passage of the Appropriations Act illustrates the point: more than 99% of Members cast a vote on the Act, and there is no dispute that 225 members voted in favor of the bill—a majority of the total number of House members at the time. *See* 168 Cong. Rec. H10,528.

Moreover, even if the district court is correct that the Framers assumed—given the available means of communication at the time—that Members would meet in person "in order to participate," ROA.1379, that assumption is inapposite. The "relevant" question for purposes of interpreting the Quorum Clause is whether the Framers intended to "restrict" future Congresses to only that method of participation. *Noel Canning*, 573 U.S. at 533-34. And nothing in the Framers' debate at the Convention—let alone in the text of the Constitution—suggests that the Framers intended to do so. Rather, the text of the Quorum and Rulemaking Clauses demonstrate that the Framers intended to leave it to future Houses to determine, over time, how Members may participate and how a quorum is to be determined. *See Ballin*,

45

144 U.S. at 5; *see also, e.g., Chiafalo v. Washington*, 591 U.S. 578, 592 (2020) (recognizing that where the Framers' "sparse instructions" in the Constitution "took no position" on a matter, the Framers left the matter "to the future" to be determined).

For similar reasons, the district court's discussion (at ROA.1381) of the practices of early Congresses, which met in person and adjourned when a majority of Members were not physically present, is not probative. That early congressional practice may reflect the technological realities of the time, but it does not mean that the Framers intended to prohibit future Houses from adopting rules that count Members who participate in ways other than being physically present on the House floor. To the contrary, the Supreme Court made clear in *Ballin* that the House's rulemaking power is a "continuous" one and that the House is free to change its rules over time. *See* 144 U.S. at 4-5. Exercising its rulemaking authority, the House has done so.

Indeed, it is the district court's interpretation that cannot be reconciled with longstanding congressional practice. As discussed above, for over a century, each House has prescribed procedures that permit legislation to be passed by unanimous consent with few Members physically present. The court acknowledged this longstanding and "widespread" practice, ROA.1386-87, but failed to persuasively reconcile that practice with its interpretation of the Quorum Clause. The court observed that, when the House proceeds by unanimous consent, "no counting of votes occurs" and any unanimous-consent agreement "ends if someone objects." *See*

46

ROA.1389. But it is unclear why that is relevant to the constitutional inquiry. If, as the court held, the Quorum Clause requires a "physical quorum" of Members in the House chamber for the House's power to conduct business to arise, that constitutional requirement presumably cannot be excused merely because no Member raises an objection and the House proceeds without a recorded vote. *See* ROA.1389.

**3.** Nor do the district court or Texas make any headway when they discuss the Framers' awareness of proxy voting. *See* ROA.1379-80; Texas Br. 29-30, 32, 41, 45. As an initial matter, neither the court nor Texas provides any evidence that the delegates to the Constitutional Convention specifically considered and rejected any provision to permit proxy voting. To the contrary, although the court cited a proxy-voting proposal contained in Alexander Hamilton's notes, those notes were "not submitted to the Convention and ha[ve] no further value than attaches to the personal opinions of Hamilton." 3 *The Records of the Federal Convention of 1787*, *supra*, at 619-20. And although the court and Texas both rely on a proposal by Benjamin Franklin that would have authorized allowing a representative to "appoint" another representative to vote for him and would not have counted proxies toward the required quorum, *see* Benjamin Franklin, *Proposed Articles of Confederation*, *[on or Before 21 July 1775]* (July 21, 1775), https://perma.cc/J2N4-LPW4, that reliance is misplaced. Franklin's proposal long predated the Constitutional Convention and neither the court nor Texas cites any evidence that the proposal was given any consideration at the Convention. If anything, by specifying that a "Quorum" would be "exclusive of Proxies," *see id.*, the

proposal only confirms that the term "Quorum," by itself, was not understood to specify how Members must participate to be counted or require physical presence.

And as for the text of the Constitution, the Framers specified only that a quorum is "a Majority of each" House. U.S. Const. art. I, § 5, cl. 1. To the extent the Framers "knew about proxy voting" and wanted to prohibit it, Texas Br. 41, they could have done so. But whatever the Framers may have thought about the question, they "did not reduce their thoughts" to "the printed page." *Chiafalo*, 591 U.S. at 592. That omission is particularly telling given that contemporaneous state constitutions did contain specific language prohibiting the practice. *See, e.g.*, N.J. Const. of 1776, art. III ("[N]o Law shall pass, unless there be a Majority of all the Representatives of each Body *personally present* . . . ." (emphasis added)).

Regardless, even if the Framers had rejected the form of proxy voting that they knew, that form of voting bears little resemblance to the House's remote-voting rule at issue here. The English practice referenced by Texas involved a Member "delegat[ing]" *discretionary* voting power to another Member, effectively allowing a Member to cast multiple votes in the way of his choosing. *See* Paul Seaward, *Pairs and Proxies*, History of Parliament (Oct. 1, 2018)[5]; *see also id.* (discussing the English Crown managing "the risk of difficult votes in the House of Lords" by "soliciting proxies" and distributing the delegated votes "among reliable peers"). That form of proxy

---

[5] https://perma.cc/PW9U-QC8L.

voting is meaningfully different—and raises very different concerns—than the House's rule here, which explicitly prohibited any such discretionary delegation and instead required Members to transmit an "exact" written instruction, in writing, "specific to a particular vote or quorum call," which the Member designated to physically cast the vote was required to follow. *See McCarthy*, 5 F.4th at 37 (quotation omitted).

Indeed, the Framers could not have contemplated that type of remote-voting procedure. The House's rule relied on modern technologies that permit instantaneous access to information and communication regardless of physical distance. Members participating remotely were thus able to do so in a manner that is materially indistinguishable from the manner in which those who are physically present participate: they, for example, had access to all relevant legislative materials, could communicate with their staff and other Members at any time, and could follow the legislative proceedings and change their vote in real time. Neither Hamilton, Franklin, nor the other Framers could possibly have had such circumstances in mind.

**4.** Finally, Texas's reliance (at Br. 38) on the Supreme Court's decision in *Ballin* is misplaced. Texas quotes *Ballin*'s language that the House's "capacity to transact business" is established by the "presence of a majority, and does not depend upon the disposition or assent or action of any single member or fraction of the majority present." 144 U.S. at 5-6. Texas interprets this sentence to mean that, for purposes of determining a quorum, whether a Member participates in House business is irrelevant.

49

That is incorrect. *Ballin* recognized that the House could permissibly adopt a rule counting Members physically present "in the hall of the house"—whether or not they voted—towards the quorum requirement. *See* 144 U.S. at 5 (quotation omitted). But *Ballin* did not conclude that a Member's physical presence is the sole criterion Congress may use in determining whether it is in a "condition to transact business." *Id.* at 6. To the contrary, the Supreme Court made clear that the Constitution does not fix the method for determining whether the requisite majority is in place and instead leaves it to "the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact." *Id.* And here, Congress reasonably exercised that discretionary authority when it concluded that Members are participating in its business and may be counted towards a quorum where they cast a vote on a particular piece of legislation pursuant to the specific remote-voting procedures the House adopted. If anything, that rule is more closely tied to the meaning of "quorum" at the Founding—which, as explained, focused on Members' participation, not their physical presence—than did the rule upheld in *Ballin*.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

RYAN R. RAYBOULD
*United States Attorney*

MICHAEL S. RAAB

*s/ Sean R. Janda*

SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

February 2026

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,906 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

_s/ Sean R. Janda_
Sean R. Janda