No. 24-10386

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

STATE OF TEXAS,

*Plaintiff - Appellee*

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL, IN HER OFFICIAL CAPACITY AS UNITED STATES ATTORNEY GENERAL; CHARLOTTE A. BURROWS, IN HER OFFICIAL CAPACITY AS CHAIR OF THE U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; JOCELYN SAMUELS, IN HER OFFICIAL CAPACITY AS VICE CHAIR OF THE U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; KEITH SOLDERLING, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHRISTOPHER W. LAGE, IN HIS OFFICIAL CAPACITY AS GENERAL COUNSEL OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants - Appellants*

## BRIEF OF SENATOR MITCH MCCONNELL AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS

William P. Barr
Justin M. Romeo
Genevieve M. Kelly
L. Patrick Ellis II
TORRIDON LAW PLLC
801 17th Street NW, Suite 1100
Washington, DC 20006
(202) 249-6900
ecf@torridonlaw.com

*Counsel for* Amicus Curiae

February 20, 2026

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel certifies that the following listed persons and entities have an interest in the outcome of this case. This representation is made so that the Court may evaluate possible disqualification or recusal.

**Amicus Curiae:** Senator Mitch McConnell, as senior United States Senator from the Commonwealth of Kentucky, and as the former Republican Leader of the United States Senate.

**Counsel for Amicus:** William P. Barr, Justin M. Romeo, Genevieve M. Kelly, and L. Patrick Ellis II of Torridon Law PLLC, Washington, D.C.


Dated: February 20, 2026

/s/ William P. Barr
William P. Barr
TORRIDON LAW PLLC
801 17th Street NW, Suite 1100
Washington, DC 20006
(202) 249-6900
ecf@torridonlaw.com

Counsel for *Amicus Curiae*

i

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iii

Interest of *Amicus Curiae* ...................................................................................... 1

Introduction and Summary of Argument.......................................................... 3

Argument...................................................................................................................... 5

I.       The District Court Misapplied Settled Precedent, Taking A Standard
         Established By The Supreme Court For Restraint In Reviewing Congressional
         Rules As A License For Free-Flowing Analysis....................................................... 5

II.      Even If Review Were Appropriate, The District Court's Interpretation Finds
         No Support In Article I Or In Founding-Era History........................................ 13

III.     The Ruling Below Would Debilitate Congress In Times Of National
         Emergency, Threaten Longstanding Senate Procedures, And Threaten Critical
         Components Of The Appropriations Act. ........................................................... 17

         A.       The Ruling Below Would Hamstring Both Houses from Responding to
                  National Emergencies.................................................................................... 17

         B.       The Ruling Below Threatens Longstanding Senate Procedures Essential
                  to Its Functioning.......................................................................................... 18

         C.       An Affirmance by this Court Holding the Appropriations Act
                  Unconstitutionally Enacted Would Threaten Numerous Unrelated Laws
                  Currently on the Books. .............................................................................. 22

Conclusion................................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Attorney General v. Shepard*,
   62 N.H. 383 (1882) ....................................................... 15

*Baker v. Carr*,
   369 U.S. 186 (1962) ....................................................... 11

*Bianchi v. Brown*,
   111 F.4th 438 (4th Cir. 2024) ....................................................... 16

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ....................................................... 13

*Gojack v. United States*,
   384 U.S. 702 (1966) ....................................................... 6

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ....................................................... 13

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892) ....................................................... 12

*McConnell v. FEC*,
   540 U.S. 93 (2003) ....................................................... 1

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
   No. 23-10520, 2023 WL 5277700 (5th Cir. 2022) ....................................................... 23

*National Federation of Independent Business v. Sebelius*,
   567 U.S. 519 (2012) ....................................................... 12

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ....................................................... 1, 3, 9, 10

*Nixon v. United States*,
   506 U.S. 224 (1993) ....................................................... 11

*Quinn v. United States*,
   349 U.S. 155 (1955) ....................................................... 7

*Rucho v. Common Cause*,
588 U.S. 684 (2019) ............................................................................. 11

*United States v. Ballin*,
144 U.S. 1 (1892).................................................................................*passim*

*United States v. Munoz-Flores*,
495 U.S. 385 (1990) ............................................................................. 10

*Yellin v. United States*,
374 U.S. 109 (1963) ............................................................................... 6

**U.S. Constitution**

Art. I, § 5, cl. 1 ....................................................................................*passim*

Art. I, § 5, cl. 2 ..............................................................................2, 5, 16, 17

Art. I, § 5, cl. 3 .................................................................................... 16

Art. I, § 8, cl. 1 .................................................................................... 14

Art. I, § 8, cl. 2-18................................................................................ 14

Art. II, § 2 ............................................................................................ 20

**Statutes and Executive Orders**

21st Century Department of Justice Appropriations Authorization Act,
Pub. L. No. 107-273, 116 Stat. 1758 ............................................. 25

Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116
Stat. 81 (2002)................................................................................ 2, 13

Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136
Stat. 4459 (2022) ........................................................................*passim*

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No.
116-136, 134 Stat. 281 (2020) ........................................................ 3

Declaring a National Emergency Concerning the Novel Coronavirus
Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 13, 2020),
https://tinyurl.com/4tv7j5jc............................................................ 7

Great American Outdoors Act, Pub. L. No. 116-152, 134 Stat. 682
(2020).................................................................................................................... 3

National Defense Authorization Act for Fiscal Year 2021, Pub. L. No.
116-283, 134 Stat. 3388 (2021)........................................................................... 3

**Other Authorities**

Andrew Desiderio and John Bresnahan, *McConnell warns House Democrats
over proxy voting on floor,* POLITICO (May 21, 2020),
https://tinyurl.com/42scrcne ........................................................................ 2

Daily Digest, U.S. SENATE (Dec. 5, 2023),
https://tinyurl.com/py9dk8wb ................................................................. 21

Deaths by Select Demographic and Geographic Characteristics, CDC
(rev. Sept. 27, 2023), https://tinyurl.com/28f2c54n ................................... 7

Jorge L. Ortiz, *When will US reach 100,000 deaths? After a horrific April, grim
milestone could hit in May*, USA TODAY (May 1, 2020),
https://tinyurl.com/4933js46 ...................................................................... 7

Kate Santaliz, et al., *Senate confirms 425 military nominees after Sen. Tommy
Tuberville drops his hold,* NBC NEWS (Dec. 5, 2023),
https://tinyurl.com/ysdhdvvt...................................................................... 21

Nomination of Reed Charles O'Connor, PN693 (110th Cong.),
CONGRESS.GOV (last accessed Feb. 20, 2026),
https://tinyurl.com/2srenpj8 ...................................................................... 21

Siobahn Roberts, *Flattening the Coronavirus Curve*, NY Times (Mar. 27,
2020), https://tinyurl.com/5n74bf25........................................................... 7

Supreme Court Nominations (1789-Present), U.S. SENATE (last visited
Feb. 20, 2026), https://tinyurl.com/32zkbubr............................................ 21

U.S. Senate Committee on Armed Services, "Committee Actions:
Nominations" (last accessed Feb. 20, 2026),
https://tinyurl.com/3u2xcp3f....................................................................... 21

U.S. Senate Floor Proceedings, C-SPAN, Dec. 5, 2023, 04:32:41 PM,
available at https://tinyurl.com/bdectuay.................................................... 22

Walter J. Oleszek, *Voting in the Senate: Forms and Requirements*,
  CONGRESSIONAL RESEARCH SERVICE (May 19, 2008),
  https://tinyurl.com/5faky6wm ..................................................................................... 19

## INTEREST OF *AMICUS CURIAE*[1]

Senator Mitch McConnell is the senior United States Senator from the Commonwealth of Kentucky and Chairman of the Senate Rules Committee. He has previously served as the Republican Leader in the United States Senate (for the longest period of any party leader in Senate history) and as Senate Majority Whip.

Senator McConnell is a respected senior statesman and a passionate defender of both Senate tradition and constitutional separation of powers. Senator McConnell understands and respects the critical role the Judiciary plays in interpreting the law and in ensuring that neither Congress nor the Executive Branch exceed their constitutional bounds. For example, in *NLRB v. Noel Canning*, 573 U.S. 513 (2014), a case concerning executive encroachment into the Senate's advice and consent power, he led the Republican conference as *amici curiae* at the Supreme Court petition and merits stages. There, Senator McConnell defended the Senate's constitutionally-assigned right to set the rules of its proceedings, including the determination of when it is in session, how it conducts business, and how it constitutes a quorum.

Senator McConnell has also himself sought recourse from the Judiciary when legislation has run afoul of the Constitution. For example, he was the lead plaintiff in *McConnell v. FEC*, 540 U.S. 93 (2003), a case which challenged the Bipartisan Campaign

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amicus* states that no party's counsel authored this brief in whole or in part, and no entity or person other than *Amicus* or his counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 (2002), as violating the First Amendment.

In this case, Senator McConnell was the Majority Leader of the Senate when the House first adopted proxy voting. From that leadership post, he spoke out in strong opposition to the practice, in part because of the legal controversies it could present.[2] Senator McConnell also served as the Republican Leader of the Senate when the law partially enjoined by the district court below, the Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022), was debated and enacted. Despite his fierce opposition to proxy voting, Senator McConnell believes it critical that courts nevertheless respect each house of Congress's power to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. Accordingly, Senator McConnell urges the Court to reverse.

---

[2] Andrew Desiderio and John Bresnahan, *McConnell warns House Democrats over proxy voting on floor*, POLITICO (May 21, 2020), https://tinyurl.com/42scrcne.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amicus* opposes proxy voting.  As a seasoned legislator, he believed proxy voting was unnecessary to conduct business during the COVID-19 pandemic and would invite unproductive controversy, a position he made clear when it was first adopted.  In his role as Majority Leader, Senator McConnell kept the Senate operating during the pandemic without resort to proxies.  Indeed, without proxies, the Senate under his leadership was able to pass the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388 (2021), and the Great American Outdoors Act, Pub. L. No. 116-152, 134 Stat. 682 (2020), and to confirm Justice Amy Coney Barrett to the Supreme Court.

But the merits of proxy voting are not properly before this Court.  The core question in this case is whether the courts can review the internal affairs of Congress, when such affairs are textually committed to each house by the Constitution.  They cannot.  Article I, Section 5 of the Constitution assigns the power to each house of Congress to "determine the Rules of its Proceedings."  In 1892, the Supreme Court relied on that principle to hold that, with very limited exceptions, Congress's power to set its own rules is "absolute and beyond the challenge of any other body or tribunal." *United States v. Ballin*, 144 U.S. 1, 5 (1892).  This principle of deference derives from "the Constitution's broad delegation of authority to [Congress] to determine how and when it conducts business." *NLRB v. Noel Canning*, 573 U.S. 513, 550 (2014).

3

*Ballin* held that courts may not opine on the manner in which Congress conducts its business where the text of the Constitution does not place express limits on congressional action. The district court misapplied that holding, assigning to itself the duty to define terms that the Framers never intended courts to interpret. The judgment below grafts onto Article I a new, atextual limitation on Congress's discretion to assemble a quorum. In so doing, it disregards the deference owed to Congress and undermines the very purpose of the Quorum Clause, which was meant to ensure that business could continue notwithstanding the unavailability of some members. The ruling below is also inconsistent with the enumerated powers granted to Congress under Article I.

What's more, the district court's retooling threatens Congress's ability to conduct business on a day-to-day basis. An ironclad physical presence requirement removes necessary flexibility during national emergencies. It risks invalidating longstanding Senate procedures, particularly the ubiquitous practices of unanimous consent and voice votes. Finally, it imperils a significant portion of already-enacted legislation. *Amicus* disagrees with how the House exercised its Article I powers in adopting proxy voting, but neither he nor the Judiciary is in a position to second-guess that decision.

## ARGUMENT

**I.**    **The District Court Misapplied Settled Precedent, Taking A Standard Established By The Supreme Court For Restraint In Reviewing Congressional Rules As A License For Free-Flowing Analysis.**

Article I, Section 5 of the Constitution assigns to each house of Congress the power to "determine the Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2.  In *Ballin v. United States*, the Supreme Court held that, in most circumstances, Congress's power over its own rule is "absolute and beyond the challenge of any other body or tribunal."  *United States v. Ballin*, 144 U.S. 1, 5 (1892).  The district court's decision violated the core tenant of *Ballin* and should be reversed.

The Constitution's exclusive assignment of rulemaking power to each chamber is fundamental to the separation of powers.  As James Madison explained in 1788, "the great security" against the concentration of powers in a single branch "consists in giving to those who administer each department the necessary *constitutional means* and personal motives *to resist encroachments of the others*."  The Federalist No. 51 (James Madison) (emphasis added).

The Supreme Court directly addressed this issue of potential encroachment in *United States v. Ballin,* an 1892 case strikingly similar to this one.  *Ballin* involved a challenge to a House Rule that established a new manner of ascertaining a quorum. *Ballin*, 144 U.S. at 9.  Plaintiffs challenged the practice of counting members as present who were in the hall of the House Chamber, but who did not vote.  *Id.* at 4.  The Supreme Court rejected the challenge under the deference owed by the separation of

5

powers. *Id.* To that end, *Ballin* provided narrow exceptions for when a court may review an internal congressional rule. Review may only occur when a rule flouts constitutional restraints, infringes fundamental rights, or has no reasonable relation between its means used and the result sought. *Id.* at 5. Outside of those categories, Congress's "continuous power" to craft and modify its rules is "absolute and beyond the challenge of any other body or tribunal." *Id.* "Neither the wisdom or folly of such a rule present any matters for judicial consideration." *Id.* (cleaned up).

Unpacking the *Ballin* exceptions, Texas has not argued, nor did the district court hold, that the House Rule at issue here, or the manner of passage of the Appropriations Act, infringed fundamental rights. There are many examples of cases where Congress was held to infringe fundamental rights through, for instance, its investigative activities. And some of these cases turned on application of congressional rulemaking. A quick look shows how distinct those cases are from this dispute. For instance, during the height of international-communist infiltration of American institutions in the mid-twentieth century, the Supreme Court reined in the House's investigative activities when it encroached on the rights of private citizens. This included, in one instance, holding Congress to account for violating *its own rules*. *Yellin v. United States*, 374 U.S. 109, 123-24 (1963) (overturning conviction after hold that, as a matter of due process, a witness was entitled to have a House Committee comply with its own rules). In *Gojack v. United States*, 384 U.S. 702 (1966), the Supreme Court threw out another contempt conviction, holding that the House Committee "fail[ed] to authorize its own investigation." *Id.* at

6

714.  And in *Quinn v. United States*, [349 U.S. 155](#) (1955), the Supreme Court overturned a contempt conviction because a House Subcommittee trampled on the witness's Fifth Amendment rights.  *Id.* at 166.  In sum, vindicating individual rights is an essential duty of the courts, but this case does not fall into the "fundamental rights" exception permitting judicial review.[3]

Neither did Texas argue, nor did the district court hold, that review is appropriate under the *Ballin* exception for rules lacking a reasonable relation between the means prescribed and the end sought to be obtained.  Nor could it.  President Trump declared COVID-19 to be a national emergency on March 13, 2020.[4]  In April 2020, nearly 60,000 Americans lost their lives to COVID.[5]  The prevailing advice on how to prevent catastrophic loss of life was "social distancing."[6]  Because physical proximity could be deadly, the pandemic threatened to stifle congressional business.  The Senate under Senator McConnell's leadership successfully continued business in person.  The House

---

[3] The constitutional provision in *Quinn* was an individual right, held by the target of the investigation under the Constitution. The Quorum Clause, by contrast, is a general administrative provision of the Constitution, vesting no such rights on any individuals.

[4] Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, [85 Fed. Reg. 15,337](#) (Mar. 13, 2020), https://tinyurl.com/4tv7j5jc.

[5] Jorge L. Ortiz, *When will US reach 100,000 deaths? After a horrific April, grim milestone could hit in May*, USA TODAY (May 1, 2020), https://tinyurl.com/4933js46; Deaths by Select Demographic and Geographic Characteristics, CDC (rev. Sept. 27, 2023), https://tinyurl.com/28f2c54n.

[6] *See* Siobahn Roberts, *Flattening the Coronavirus Curve*, NY Times (Mar. 27, 2020), https://tinyurl.com/5n74bf25.

adopted proxy voting. While proxy voting was not the best response to COVID, it was still reasonably tailored to keeping the House in business during a pandemic.

The district court was thus left with the final *Ballin* exception, whether the rule "ignore[s] constitutional restraints." *Ballin*, 114 U.S. at 5. The district court read this *exception* as broad license to decide what it believed was the best interpretation of a constitutional phrase. But the central tenant of *Ballin* was deference, not free-flowing inquiry.

Plaintiffs in *Ballin* challenged a new House Rule that permitted non-voting members present in the hall of the House Chamber to be counted toward a quorum. *Id.* at 4. To assess the propriety of this challenge, the Court did not parse the language of the Quorum Clause or nearby text, nor did it consult dictionaries or The Federalist Papers to deduce the meaning of "quorum." Instead, it simply read the clause: "a Majority of each shall constitute a Quorum to do Business." U.S. Const. art. I, § 5, cl. 1. Seeing no express language as to how a quorum is to be constituted and no express language foreclosing the House's interpretation of the clause, the Supreme Court ended its inquiry. *Ballin*, 144 U.S. at 6. To the question of "how shall the presence of a majority be determined" the Court answered, "[t]he constitution has prescribed no method of making this determination, and it is therefore within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact." *Id.*

8

*Ballin* thus established the principle that courts will not review a rule under the "constitutional restraints" exception unless the rule is challenged as violating an express constitutional restraint. Under that principle, *Ballin* concluded that the Constitution's prescription that "a Majority of each [house] shall constitute a Quorum to do Business" in no way forecloses counting members in the hall of the chamber. U.S. Const. art. I, § 5, cl. 1.

Here, Texas's case relies on the phrase "a smaller Number [of members] may . . . be authorized to compel the Attendance of absent Members." *See, e.g.*, ROA.69, 73-74. But what does it mean to attend? Is the phrase "compel the Attendance" any more definitive than the phrase "constitute a Quorum"? Because it is not, the House's interpretation of "attendance" is "absolute and beyond the challenge of any other body or tribunal." *Ballin*, 144 U.S. at 4.

The district court attempted to justify its reading of license under *Ballin* by placing heavy emphasis on Justice Breyer's use of the word "valid" in *NLRB v. Noel Canning*, 573 U.S. 513 (2014). In *Noel Canning*, the Court had to decide whether to defer to the Senate's own statement that it was in session, which depended on the Chamber's unanimous consent practice (through which the Senate may conduct business during *pro forma* sessions). *Id.* at 550-51. The Supreme Court stated that "when the Journal of the Senate indicates that a quorum was present, under a *valid* Senate rule, at the time the Senate passed a bill, we will not consider an argument that a quorum was not, in fact, present." *Id.* at 551 (emphasis added) (citing *Ballin*, 114 U.S. at 9). The district court

9

here read this single word—valid—to invite a wide-open inquiry into the "valid[ity]" of congressional rules.   ROA.1350–56.   But nothing in the analysis of *Noel Canning* suggested that interpretation.   *Noel Canning's* direct citation to *Ballin* suggests that the word "valid" merely referenced *Ballin's* exceptions to the general rule of deference.   As explained above, nothing in *Ballin* supports a blue-sky inquiry into a definition of "quorum" that could hamstring congressional rulemaking.

In sum, the Supreme Court in *Noel Canning* and *Ballin* deferred to the Senate and the House's own determinations of whether a quorum was present.   Neither undertook to scrutinize the validity of the manner in which the houses of Congress made those determinations.   *Ballin* held and *Noel Canning* confirmed that the Quorum Clause gives unreviewable deference on this question to Congress.   *Ballin*, 144 U.S. at 6; *Noel Canning*, 573 U.S. at 551.

The district court also misapplied *United States v. Munoz-Flores*, 495 U.S. 385 (1990).   *Munoz-Flores* involved the Origination Clause, which states that "All Bills for raising Revenue shall originate in the House of Representatives."   *Id.* at 388 (quoting U.S. Const., art. I, § 7, cl. 1).   But the Origination Clause on its face provides an express constitutional restraint to apply: a bill for the raising of revenue must originate in the House.   *Munoz-Flores* does not support Plaintiffs' position here.[7]

---

[7] The district court cited *Munoz-Flores* as support for rejecting application of the Enrolled Bill Doctrine. ROA.1343–48.   That was error given the distinct nature of the case.   *See* Appellants' Br. at 31.

Deference to congressional rulemaking stems from the same principles inherent in the Political Question Doctrine and the Enrolled Bill Doctrine. The Political Question Doctrine mandates deference on questions purely political in nature, including those concerning "a demonstrable constitutional commitment of the issue to a coordinate political department," and those that lack "judicially discoverable and manageable standards." *Baker v. Carr*, 369 U.S. 186, 217 (1962). For example, in *Nixon v. United States*, 506 U.S. 224 (1993), the Supreme Court held that the word "try" in the Impeachment Clause "lacks sufficient precision to afford any judicially manageable standard of review of the Senate's actions." *Id.* at 230. Speaking on the open-ended nature of gerrymandering claims, the Supreme Court explained that "'[a]ny standard for resolving such claims must be grounded in a 'limited and precise rationale' and be 'clear, manageable, and politically neutral.'" *Rucho v. Common Cause*, 588 U.S. 684, 703 (2019) (quoting *Vieth v. Jubelirer*, 541 U.S. 267 at 306-08 (2004) (Kennedy, J., concurring in the judgment)).

A similar problem arises here. The district court found a judicial role in reading the Quorum Clause to impose a physical presence requirement. But what is meant by physical presence? Does physical presence require members to be on the Floor? Does vestibule voting count? In the House, where voting is done by electronic card, can one member use another member's card while its owner waits in the cloakroom? What about voting from the galleries? The House and Senate have rules and precedents to account for these situations: are those rules subject to judicial review? Will the courts

effectively be in the business of establishing a code of rules for how the House and Sente conduct business?   The court did not begin to provide an answer to these questions, nor can it.

The district court also erred by declining to apply the Enrolled Bill Doctrine to this case, as explained by Appellants.  Appellants' Br. at 24-33.  In *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672 (1892), the Supreme Court declined to pour through legislative history, including potentially "the journals, loose papers of the legislature, and parol evidence," to adjudicate whether certain text was missing from a version of a bill actually voted on.  *Id.* at 675 (quoting *Sherman v. Story*, 30 Cal. 253, 275 (Cal. 1866)).  In rejecting the claim, the Court set forth a sensible bright-line rule: the enrollment of a bill (signed by leaders of both houses, assented to by the President, and deposited in the public archives) precludes judicial review over the manner of its passage.  *Marshall Field*, 143 U.S. at 672.  That doctrine also resolves this case.

Finally, the district court also erred by equating its interpretive actions here to "standard constitutional interpretation that courts routinely undertake."  ROA.1365-66.  Courts are routinely called upon to examine the *substance* of legislation against the powers and protections afforded by the Constitution.  But a look at a few prominent examples shows just how different that task is from what occurred here.  In *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), the Supreme Court held that the Affordable Care Act's draconian Medicaid expansion provisions constituted an unconstitutional coercion of the States under the Spending Clause.  *Id.* at 581-82.  In

*Citizens United v. FEC*, 558 U.S. 310 (2010), the Court struck down provisions of the Bipartisan Campaign Reform Act of 2002 as violating the First Amendment. *Id.* at 366-71. And in *Gonzales v. Carhart*, 550 U.S. 124 (2007), the Supreme Court upheld the constitutionality of the Partial-Birth Abortion Ban Act. *Id.* at 168. These types of "standard" judicial review of the substantive legality of a law juxtapose themselves from the type of *process* review undertaken by the district court below.

Because judicial review in this case must yield to the deference owed to Congress under the Constitution's separation of powers, the judgment should be reversed.

## II. Even If Review Were Appropriate, The District Court's Interpretation Finds No Support In Article I Or In Founding-Era History.

Even if it were appropriate for the district court to venture down the path of deciding the *best* interpretation of the Quorum Clause, it arrived at the wrong place. The district court's interpretation undermines Congress's Article I powers and misapplies contemporaneous evidence of the meaning of the clause. These realities are grounds for reversal in their own right, and they also provide additional support for the principle of deference established above.

Article I of the Constitution begins: "*All legislative Powers herein granted* shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1 (emphasis added). These legislative powers are, of course, enumerated, and among them are the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence

13

and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress shall also have the power to borrow money, regulate commerce and currency, constitute the lower courts, oversee federal lands, declare war, and make all laws necessary and proper for executing its own powers and the other federal powers established by the Constitution. U.S. Const. art. I, § 8, cl. 2-18.

To this list of enumerated powers, the district court would place an asterisk: these congressional powers are null and void during any emergency that prevents a majority of members from being physically present together when they establish a quorum. Putting aside the merits of the proxy-voting rule at issue in this case, and arguments over its necessity, in the district court's view, the Constitution *never*, no matter how grave an emergency the United States faces, "allows the House to adopt a mechanism to deem those [physically] absent members present and part of the quorum." ROA.1391. This debilitating reading of Article I turns its central purpose on its head.

The purpose of the Quorum Clause is to enable legislative business, not to hobble it. As the district court acknowledged, the Framers intended the Quorum Clause to serve two related purposes: facilitate the houses' ability to conduct business and impede minority factions from unduly influencing that business. ROA.1377-78. The former goal grew from a concern that requiring too many members for a quorum could empower an absent faction. As the court noted, John Mercer described this concern as "the power of a few [to] seced[e] at a critical moment to introduce convulsions, and endanger the Government." ROA.1377 (citation omitted). On the

14

other hand, a quorum rule that was too relaxed could empower action by any minority of members able to assemble in the capital.  As George Mason put it, "it would be dangerous . . . to allow a small number of members of the two Houses to make laws" when some members from "[t]he Central States" could reach the capital more easily than others and enact legislation before other members had an opportunity to participate.  ROA.1378 (citation omitted).

Just as the goals of the Quorum Clause are served when Congress counts physically present but non-voting members toward a quorum, *Ballin*, 144 U.S. at 5-6, so might Congress further those goals in an emergency by counting physically absent, but voting members toward a quorum (as occurred here).  If merely the "majority of [a] quorum [is] sufficient to decide the most important question," *i.e.*, to enact legislation, then certainly the majority of a house of Congress can still decide important questions after deeming some of its members unable to conduct business face to face.  *Ballin*, 144 U.S. at 8 (quoting *State v. Deliesseline*, 12 S.C.L. 52, 62 (S.C. Const. App. 1821)).  After all, "the requirement of a quorum . . . was not intended to furnish a means of suspending the legislative power and duty of a quorum." *Attorney General v. Shepard*, 62 N.H. 383, 383 (1882).

The district court stated that "[i]f no affirmative act or particular disposition of a member is necessary to count towards the quorum, it would be odd for the Framers to place a provision requiring a member's attention or participation in the latter half of the Quorum Clause." ROA.1375.  "Instead," the court continued, "the most natural

reading based on this provision's placement in the Constitution is that it allows a minority of members to force members who are not present at the House's meeting to physically appear so that a quorum may be reached and business can be conducted." *Id.* That reading led the district court to conclude that "[w]hen a majority of members are revealed to be [physically] absent, the Quorum Clause gives the House two options: adjourn or compel the attendance of absent members." ROA.1391. But Article I gives Congress the responsibility to determine who of its members are present or absent. U.S. Const. art. I, § 5, cl. 2-3. And short of *compelling* the attendance of physically absent members (such as those a house deems unable to physically gather due to a national emergency) nothing in the Quorum Clause prevents a house from *allowing* those members to be counted as present when the house believes that special circumstances make it appropriate for members to conduct business remotely.

In quoting several dictionaries published close in time to the ratification of the Constitution, the district court understood that the Framers did not contemplate members being present to conduct business by video phone, email, electronic document sharing, etc. *See* ROA.1373-75. However, the district court erred in effectively concluding that because the Framers did not contemplate such technological advancement, the Quorum Clause prohibits Congress from considering those advances when deciding whether to deem some of its members present by proxy. This is akin to the false argument that the Second Amendment does not protect modern sporting rifles that were unknown to the musket-bearing Framers. *See Bianchi v. Brown*, 111 F.4th 438,

501 (4th Cir. 2024) (en banc) (Richardson, J., dissenting).

The absence of any text in the Quorum Clause limiting Congress's ability to define what constitutes the presence or absence of a member is magnified by the clause immediately following it: "Each house may determine the rules of its proceedings." U.S. Const. art. I, § 5, cl. 2.  Simply put, there is nothing in the text of the Constitution to suggest that the House or Senate lacks the power to enact an emergency proxy voting rule.  Where the text of the Constitution does not support it, the Court should certainly not read into it "[a]n arbitrary, technical, and exclusive method of ascertaining whether a quorum is present, operating to prevent the performance of official duty and obstruct the business of government."  *Ballin*, 144 U.S. 1, 9 (1892) (quoting *Att'y Gen. v. Shepard*, 62 N.H. 383, 383 (1882)).

## III.   The Ruling Below Would Debilitate Congress In Times Of National Emergency, Threaten Longstanding Senate Procedures, And Threaten Critical Components Of The Appropriations Act.

### A.    The Ruling Below Would Hamstring Both Houses from Responding to National Emergencies.

The district court held that absent a majority of physically present members, a house has only "two options: adjourn or compel the attendance of absent members." ROA.1391.  Left intact, that holding would dramatically hamper both houses of Congress—no matter which political party leads them—in their efforts to continue legislating and to maximize participation during a future national emergency.  This could include new and more deadly pandemics, terrorist attacks, or acts of war.  It is

little comfort that the district court left open the possibility of allowing Congress to establish a quorum during a national emergency without the physical presence of members who have been killed or left incapacitated. ROA.1362 n.19 (stating that this case does not involve circumstances in which "terrorists could shut Congress down by killing or incapacitating a sufficient number of Representatives or Senators") (internal citation omitted). There are any number of emergencies, short of killing or incapacitation, that could temporarily prevent members from participating in a vote. Yet surely the Framers gave Congress the authority to function in those circumstances as well. To read the Quorum Clause otherwise is to cripple Congress's ability to legislate in the very moments the country most needs Congress to act.

**B.    The Ruling Below Threatens Longstanding Senate Procedures Essential to Its Functioning.**

The decision below would also significantly impair the daily operations of the Senate. Of particular concern to Senator McConnell is how the opinion below threatens two hundred years of history and tradition in the Senate, endangering longstanding Senate procedures. Much of the business the Senate transacts—both on the legislative and executive calendars—is accomplished via complex processes of unanimous consent. Importantly, the final legislative action taken by the Senate in these unanimous consent exercises is typically during what is termed "wrap up," at which time the Majority Leader or his designee runs through all the agreed upon matters, calling voice votes and presenting measures or matters for adoption without objection,

often only in the presence of the presiding officer.  While a quorum is presumed in those situations *under Senate rules and precedents*, this would easily run afoul of any physical presence requirement.

As Appellants explain, the practice of unanimous consent originated in the Senate as early as 1789.  Appellants' Br. at 40.  The first recorded unanimous consent agreement in the Senate was on March 24, 1846.  *Id.*  Under the unanimous consent process, there is no recording of the yeas and nays.  As such, it is almost universally the case that the unanimous consent process is employed when there is well less than a majority of senators present.  Again, it is often as few as two in the room: one serving as the presiding officer, the other requesting consent to pass a measure.  The same holds true for voice votes.  When a voice vote is called for, the presiding officer asks for all in favor to say "aye" and all in favor say "nay," and the chair then decides which side has prevailed.  However, a voice vote may also occur when the presiding officer states, "Without objection the amendment [bill, resolution, motion, etc.] is agreed to [or not agreed to]."[8]  This process is thus practically indistinguishable from unanimous consent.

The district court attempted to distinguish between proxy voting on one side and unanimous consent and voice votes on the other side by reasoning that the latter procedures operate on the "presumption" of a quorum, which can be broken with only

---

[8] Walter J. Oleszek, *Voting in the Senate: Forms and Requirements*, CONGRESSIONAL RESEARCH SERVICE (May 19, 2008), https://tinyurl.com/5faky6wm.

a single objection.   ROA.1386-91.   The district court's technical distinction is unconvincing.   For one thing, it finds no support within its own textual analysis concerning the meaning of "attendance" and "absent."   Under the district court's logic, one can "presume" physical presence because *at some point in the past 12 or 24 months*, tracing back to the initial convening of the term of Congress, a majority of members were physically present in the Chamber.   Yet, by the same token, the district court deems it anathema to the Constitution that a house of Congress count as present a member who certifies his or her vote with the assistance of another member who is physically located on the House Floor.   Moreover, while a majority was physically present at the beginning of the Congress when a quorum was initially established, so too was a majority physically present when the House adopted the proxy voting rule at issue.   Both proxy voting and the presumption of a quorum derive from the power of Congress to establish its own rules.

A core function of the Senate that often relies upon voice votes and unanimous consent is to provide "Advice and Consent" for the appointment of "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States."   U.S. Const. art. II, § 2.   Given the sheer volume of ambassadors, judges, cabinet secretaries, high ranking military officials, and other Officers of the United States, unanimous consent and voice votes are essential to the Senate's productivity.   In our nation's history, some 69 Supreme Court justices were confirmed

by voice vote (of the 116 confirmed)[9]— 59 percent of all justices serving in the Nation's history.  While the contentious nature of Supreme Court nominations today makes voice votes all-but impossible, the practice has continued for other non-controversial judges.  As just one example, in 2007 Judge Reed O'Connor was confirmed to the United States District Court for the Northern District of Texas by voice vote.[10]  It is highly unlikely that a physical quorum was present for that action.

The numbers are even more significant for military promotions, many of which must be confirmed by the Senate.[11]  Such promotions are approved en bloc and by unanimous consent.  This reality was on full display in 2023 when Alabama Senator Tommy Tuberville delayed for ten months the promotion of hundreds of military flag officers by denying unanimous consent in order to express his opposition to President Biden's unlawful provision of abortion in the Department of Defense.[12]  When Senator Tuberville lifted his hold on the nominations, 422 promotions were agreed to by voice vote.[13]  These confirmations occurred without the need for any more than two senators

---

[9] Supreme Court Nominations (1789-Present), U.S. SENATE (last visited Feb. 20, 2026), https://tinyurl.com/32zkbubr.

[10] Nomination of Reed Charles O'Connor, PN693 (110th Cong.), CONGRESS.GOV (last accessed Feb. 20, 2026), https://tinyurl.com/2srenpj8.

[11] The Senate Committee on Armed Services processes 50,000 civilian and military nominations each year, the vast majority of which are military promotions.  *See* U.S. Senate Committee on Armed Services, "Committee Actions: Nominations" (last accessed Feb. 20, 2026), https://tinyurl.com/3u2xcp3f.

[12] Kate Santaliz, et al., *Senate confirms 425 military nominees after Sen. Tommy Tuberville drops his hold*, NBC NEWS (Dec. 5, 2023), https://tinyurl.com/ysdhdvvt.

[13] Daily Digest, U.S. SENATE (Dec. 5, 2023), https://tinyurl.com/py9dk8wb.

in the Chamber at a time, Majority Leader Chuck Schumer, and Vermont Senator Peter Welch, who served as the presiding officer.[14]

While military officers are a glaring example of the necessity for the Senate to operate under its own established rules, the list of measures or matters that are agreed to via unanimous consent exercises is long. Senate resolutions—including resolutions authorizing action by Senate Legal Counsel—are almost always passed through the unanimous consent process. Non-controversial, bipartisan legislation moves every week in wrap up.

Without procedures for conducting business without a majority physically present on the floor of the Senate, business would grind to a halt. While the opinion below abjures this result, its logic threatens it nonetheless.

C.    **An Affirmance by this Court Holding the Appropriations Act Unconstitutionally Enacted Would Threaten Numerous Unrelated Laws Currently on the Books.**

While this appeal only deals with the Pregnant Worker Fairness Act, many other unrelated pieces of legislation rode on the Appropriations Act. A holding by this Court that the underlying bill was constitutionally defective would invite follow-on constitutional challenges to many of those existing laws.

---

[14] U.S. Senate Floor Proceedings, C-SPAN, Dec. 5, 2023, 04:32:41 PM, available at https://tinyurl.com/bdectuay.

It is customary for appropriations or other "must pass" legislative vehicles to include several "extraneous matters" that are added to the bill to secure their enactment. These bills are ones that enjoy bipartisan support and, to be included, have the approval of the four House and Senate Leaders as well as the chairmen and ranking members of the House and Senate committees of jurisdiction.[15]

Among the extraneous matters included in the Appropriations Act were:

- The Electoral Count Reform and Presidential Transition Improvement Act of 2022 (Division P) (a bill by Maine Senator Susan Collins and West Virginia Senator Joe Manchin to reform the process of counting electoral votes in presidential elections, including litigation reforms);

- The No TikTok on Government Devices Act (Division R) (a bill by Missouri Senator Hawley to ban the Chinese spy application, TikTok, on government phones);

- The SECURE 2.0 Act (Division T) (a significant reform of the regulation of retirement plans);

- An extension of the authorization for the special assessment for the domestic trafficking victims fund (Division X) (providing for a continued special assessment imposed on human traffickers);

––––––––––––––––––––

[15] *See* Br. of Amici Curiae of Senator Mitch McConnell et al., *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 23-10520, 2023 WL 5277700 (5th Cir. 2022) at *10 ("In fact, in order for authorizing legislation like HISA to be included in appropriations legislation, it must be so un-controversial that its inclusion is approved by the senior Republican and Democratic members of caucus and conference leadership, of the appropriations committees, and of the authorizing committees. Therefore, in order to have been included in this appropriations bill it would have needed the support of *twelve* senior legislators in Congress." (emphasis in original)).

- The Merger Filing Fee Modernization Act of 2021 (Division GG) (a bill by Iowa Senator Chuck Grassley and Minnesota Senator Amy Klobuchar to increase some Hart-Scott-Rodino Act (HSR Act) filing fees and concomitantly increase the authorizations for the Federal Trade Commission and Department of Justice);

- The Fairness for 9/11 Families Act (Division MM) (a bill authorizing catch-up payments for certain families of 9/11 victims as well as victims of the Khobar Towers and Beirut barracks bombings).

*See* 136 Stat. at 5233-41, 5258-59, 5275-404, 5523, 5967-70, 6106-11.

These are consequential pieces of legislation, affecting everything from retirement plans to 9/11 victims to the mechanics of choosing a President. If the opinion below is affirmed, the courts, and the Fifth Circuit in particular, will be open for business to aggrieved plaintiffs eager to apply the holding to their extraneous matters. Texas's challenge will be followed by challenges from merging multinational companies wanting to avoid their HSR Act filing fees and from child traffickers dodging payments for their victims.

The ramifications would not end there. Division E, Title III, § 306 of the Appropriations Act even included the standard authorizing extensions of "temporary judgeships" in the District of Kansas, the District of Hawaii, the Eastern District of Missouri, the Central District of California, and the Western District of North Carolina. *See* 136 Stat. at 4671-72. Three of these courts likely had vacancies in existence during

the authorizing period covered by the Appropriations Act.[16]  If the Appropriations Act was unconstitutionally enacted, it is unclear whether the Kansas and North Carolina seats still exist and it is entirely possible that a judge currently sitting in Los Angeles was appointed to a seat that has actually vanished.  The full legal and practical implications of affirming the district court's ruling are hard to fathom.

*      *      *

There are good reasons to criticize proxy voting, and particularly good reasons to have criticized the use of proxy voting in December 2022.  But not every principled disagreement has a remedy in court.  Because the decision below undermines the constitutional powers assigned to Congress, it cannot stand.

---

[16] Given life tenure, "temporary judgeships" are enacted by establishing a set point in the future when the first subsequent vacancy shall not be filled.  *See* The 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, 116 Stat. 1758, 1788.

## CONCLUSION

For the foregoing reasons, the judgment should be reversed.

Respectfully submitted,

*/s/ William P. Barr*
William P. Barr
Justin M. Romeo
Genevieve M. Kelly
L. Patrick Ellis II
TORRIDON LAW PLLC
801 17th Street NW, Suite 1100
Washington, DC 20006
(202) 249-6900
ecf@torridonlaw.com

Counsel for *Amicus Curiae*

February 20, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,339 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

Dated: February 20, 2026

/s/ *William P. Barr*
William P. Barr
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the Fifth Circuit using the Court's CM/ECF system, which will effectuate service upon all parties.

Dated: February 20, 2026

/s/ *William P. Barr*
William P. Barr
*Counsel for Amicus Curiae*