No. 24-10386

IN THE

# United States Court of Appeals
# for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellee*,

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL, ET AL.

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of Texas, No. 5:23-cv-034-H
Before the Honorable James Wesley Hendrix

**BRIEF FOR *AMICI CURIAE* LEGAL HISTORIANS AND LEGISLATION PROFESSORS IN SUPPORT OF DEFENDANTS-APPELLANTS**

JESSICA L. ELLSWORTH
SAM H. ZWINGLI
ERIC ROYTMAN-CASH
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Amici Curiae Legal Historians*

February 20, 2026

# CERTIFICATE OF INTERESTED PERSONS

1.      Number and style of case:  *Texas v. Bondi, et al.*, 24-10386.

2.      Plaintiff-Appellee and Defendants-Appellants are governmental parties for whom certificates of interest are not required under Fed. R. App. P. 26.1.

3.      The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fed. R. App. P. 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

***Amici Curiae***
James J. Brudney
William N. Eskridge, Jr.
Dan Farber
John Ferejohn
Giuliana Perrone
Noah Rosenblum
Deborah A. Widiss

***Attorneys for Amici Curiae***
Jessica L. Ellsworth
Eric Roytman-Cash
Sam H. Zwingli
Hogan Lovells US LLP

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

**TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS ...........................................i

TABLE OF AUTHORITIES .................................................... iii

INTERESTS OF AMICI CURIAE..............................................1

INTRODUCTION ................................................................1

ARGUMENT ......................................................................6

I. THE ORIGINAL MEANING OF "A QUORUM TO DO BUSINESS" PERMITS CONGRESS TO COUNT MEMBERS VOTING BY PROXY TOWARDS A QUORUM ..............................................................6

    A. The Constitution Gives Congress Broad Authority To Make Rules About Its Own Proceedings..................................................7

    B. As Originally Understood, The Quorum Clause Requires A Majority To Do Business Without Prescribing A Method For Determining Whether A Majority Is Present ......................................................8

    C. That Framing Era Legislatures Did Not Use Proxy Voting Reflects Then-Existing Technological Limitations, Not Constitutional Concerns .........12

II. HUNDREDS OF YEARS OF CONGRESSIONAL PRACTICE CONFIRM THAT CONGRESS MAY CONSTITUTIONALLY COUNT MEMBERS VOTING BY PROXY TOWARDS A QUORUM ......................................15

    A. Congress Has Repeatedly Adjusted Its Quorum-Counting Rules To Legislate During National Emergencies....................................16

    B. The Centuries-Long Practice Of Voting By Unanimous Consent Confirms That The Constitution Imposes No Physical-Presence Requirement.................................................................20

III. THE PANEL DISSENT'S CONTRARY CONCLUSION IS WRONG......21

    A. The Quorum Clause's Plain Text Does Not Contain A Physical-Presence Requirement.................................................................22

**TABLE OF CONTENTS—Continued**

B. The Pre-Ratification History Does Not Suggest The Quorum Clause Prohibits Proxy Voting ............................................................... 24

C. Historical Practice Does Not Support A Physical-Presence Requirement ............................................................................. 27

CONCLUSION ....................................................................................... 29

# TABLE OF AUTHORITIES

Page

CASES:

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)..................................................................14, 28

*Chiafalo v. Washington*,
    591 U.S. 578 (2020)......................................................11, 12, 14, 25

*Citizens for Constitutional Integrity v. United States*,
    57 F.4th 750 (10th Cir. 2023) ...............................................8

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..................................................................23

*Freeman v. Bee Mach. Co.*,
    319 U.S. 448 (1943)..................................................................11

*Gregg v. Barrett*,
    771 F.2d 539 (D.C. Cir. 1985)..............................................15

*Haig v. Agee*,
    453 U.S. 280 (1981)..................................................................20

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977)..............................................15

*Hurtado v. United States*,
    410 U.S. 578 (1973)..................................................................11

*Landry's, Inc. v. Insurance Co. of the State of Pa.*,
    4 F.4th 366 (5th Cir. 2021) ....................................................28

*Marbury v. Madison*,
    1 Cranch 137 (1803) ..............................................................15

*McCarthy v. Pelosi*,
    5 F.4th 34 (D.C. Cir. 2021).......................................................1

*Mester Mfg. Co. v. INS*,
    879 F.2d 561 (9th Cir. 1989) ...............................................7, 8

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)....................................................15

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)........................... 3, 6, 7, 10, 14, 21, 26

*South Dakota v. Wayfair*,
585 U.S. 162 (2018)....................................................11

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)....................................................22

*Texas v. Bondi*,
149 F.4th 529 (5th Cir. 2025) ...................3, 4, 21-24, 26-28

*Texas v. White*,
74 U.S. 700 (1868)....................................................16

*The Amy Warwick*,
67 U.S. 653 (1862)....................................................16

*United States v. Ballin*,
144 U.S. 1 (1892)........................................... 2, 4, 6-8, 28

*United States v. Durenberger*,
48 F.3d 1239 (D.C. Cir. 1995)........................................8

*United States v. Rahimi*,
602 U.S. 680 (2024)....................................14, 15, 28

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. amend. XIII-XV .........................................17

U.S. Const. art. I, § 5, cl. 1...................................2, 8, 9, 19, 24

U.S. Const. art. I, § 5, cl. 2.....................................3, 6, 10

U.S. Const. art. I, § 8.............................................18

U.S. Const. art. I, § 9 ................................................................18

Md. Const. (1776) ......................................................................9

N.C. Const. (1776) ....................................................................9

N.C. Const., art. XLVI (1776) ................................................11

N.H. Const. (1784) ....................................................................9

N.J. Const. (1776) ................................................................9, 11

N.Y. Const. (1777) ....................................................................9

Va. Const. (1776) ......................................................................9

**LEGISLATIVE MATERIALS:**

117 Cong. Rec. H10529 (daily ed. Dec. 23, 2022) ...................13

21 Cong. Rec. (daily ed. Jan. 29, 1890) ...................................18

Cong. Globe, 38th Cong., 1st Sess. (1864) .........................16, 17

Cong. Globe, 40th Cong., 2d Sess. (1868) ..............................17

*Continuity of Congress: An Examination of the Existing Quorum
    Requirement and the Mass Incapacitation of Members: Hearing
    Before the H. Comm. on Rules*, 108th Cong. 2d Sess. (2004)
    (testimony of Former Solicitor General Walter Dellinger),
    https://perma.cc/P3DW-8XYS ...........................................19

5 *Deschler's Precedents of the House of Representatives*, ch. 20,
    § 1.3, https://perma.cc/TS6Y-4K65 ...................................20

Benjamin Franklin, *Proposed Articles of Confederation, On or Before
    21 July 1775*, https://perma.cc/J2N4-LPW4 .......................26

H.R. 1308, 103rd Cong. (1993), 139 Cong. Rec. 9680-87 (1993) ..........................21

Jefferson's Manual, 118th Cong., 1st. Sess., H.R. Doc. No. 117-161, https://perma.cc/V6DZ-SEYK.............................................20

Journal of the House of Representatives, 37th Cong., 1st Sess. 107 (1861) ........................................................................16

Journal of the House of Representatives, 37th Cong., 1st Sess. 117 (1861) ........................................................................16

Library of Congress, https://www.congress.gov/u/cnXIcXdIj_axjr0I4X_U6.....................................21

Barry J. McMillion, Cong. Rsch. Serv., R45622, *Judicial Nomination Statistics & Analysis: U.S. Circuit & District Courts, 1977-2022* (2023), https://perma.cc/2SK5-SB9L .................................................21

Remote Voting by Proxy Regulations, 166 Cong. Rec. H2257 (daily ed. May 15, 2020) ................................................................13

Rule XX.5(c)(4)(A), Rules of the House of Representatives, 117th Cong. (2021) ......................................................................18

Standing Rules of the Senate, S. Doc. No. 113-18, R. VI (2013) ...........................17

U.S. Senate, *The First Unanimous Consent Agreement*, https://perma.cc/WT8Z-N3LZ....................................................20

**OTHER AUTHORITIES:**

HC Deb (9 May 1837) (38), https://perma.cc/D28A-ZA9J..............................11, 12

1 Samuel Johnson, A Dictionary of the English Language (4th ed. 1773) ............................................................10, 12, 24

2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) .........................................................................8

Letter to Spencer Roane (Sept. 2, 1819), *in* 8 *The Writings of James Madison* 447 (G. Hunt ed. 1908) .........................................15

# TABLE OF AUTHORITIES—Continued

Page

James Madison, Madison's Notes (Aug. 10, 1787), *in The Debates in
the Federal Convention of 1787* 377 (Gaillard Hund & James
Brown Scott eds., 1920).................................................................................25, 26

William McKay & Charles W. Johnson, *Parliament and Congress,
Representation and Scrutiny in the Twenty-First Century* (2010) .....................20

Saikrishna Prakash, *The Sweeping Domestic War Powers of Congress*,
113 Mich. L. Rev. 1337 (2015) ....................................................................18, 19

2 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911).........2, 9, 25

Susan Rosenfeld Falb, *Proxy Voting in Early Maryland Assemblies*,
73 MD. Hist. Mag. 217 (Sept. 1978), https://perma.cc/V5Y7-
V9GF.....................................................................................................................11

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation
of Legal Texts* (2012) ..........................................................................................28

Michael Stokes Paulsen, *The Constitution of Necessity*,
79 Notre Dame L. Rev. 1257 (2004) ...................................................................19

2 Joseph Story, *Commentaries on the Constitution of the United States*
(1833)...........................................................................................................6, 8, 13

*The Federalist* No. 22 (A. Hamilton).......................................................................19

*The Federalist* No. 59 (A. Hamilton).......................................................................19

Adrian Vermeule, *The Constitutional Law of Congressional
Procedure*, 71 U. Chi. L. Rev. 361 (2004) .........................................................14

1 Noah Webster, *An American Dictionary of the English Language*
(1828)............................................................................................................10, 12

John Bryan Williams, *How to Survive A Terrorist Attack: The
Constitution's Majority Quorum Requirement and the Continuity
of Congress*, 48 Wm. & Mary L. Rev. 1025 (2006)...........................9, 16, 18, 27

# INTERESTS OF *AMICI CURIAE*[1]

Amici curiae James J. Brudney, William N. Eskridge, Jr., Dan Farber, John Ferejohn, Giuliana Perrone, Noah Rosenblum, and Deborah A. Widiss are legal historians, legislation professors, and experts on the Constitution. They have written extensively on the Constitution's original meaning and its interpretation with special focus on congressional powers, and they have an interest in supporting interpretations of the Constitution that are consistent with Framing Era understandings and longstanding government practice.

# INTRODUCTION

Responding to the deadly threat of COVID in May 2020, the House of Representatives allowed Members to "cast their votes and mark their presence by proxy." *McCarthy v. Pelosi*, 5 F.4th 34, 36 (D.C. Cir. 2021). Under H.R. Res. 965, 116th Cong. (2020) (the "Proxy Rule"), during a public health emergency, a House Member who could not be physically present could select a colleague as a proxy. The proxy could then vote on the Member's behalf—but only with "exact instruction[s]" under the Member's supervision. *Id.* The Proxy Rule also allowed

---

[1] The parties to this appeal have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief, and that no one other than *amici* or their counsel contributed money toward this brief.

Members voting by proxy to be "counted for the purpose of establishing a quorum." *Id.*

Relying on the Proxy Rule, the House enacted the Consolidated Appropriations Act in December 2022, an omnibus law funding all three branches of the federal government. The Appropriations Act included the Pregnant Workers Fairness Act ("PWFA"), a bipartisan measure requiring covered employers to provide reasonable accommodations to pregnant workers—for example, allowing pregnant workers to sit instead of stand, or granting leave for healthcare appointments. The vast majority of the House—431 of 435 Members—voted on the Appropriations Act. The State of Texas nonetheless challenged the PWFA's constitutionality because 226 Members voted by proxy.

Overwhelming historical evidence shows that the Proxy Rule is constitutional. The Quorum Clause has one rule: each House of Congress must have "a Majority" "to do Business." U.S. Const. art. I, § 5, cl. 1. The Framers drafted the Quorum Clause to ensure majoritarian rule so "that no law or burden could be imposed … by a few men." 2 *Records of the Federal Convention of 1787* 253 (Max Farrand ed., 1911) ("2 Farrand"). The Framers did not, however, debate the merits of proxy versus in-person voting or prescribe a method "for ascertaining the presence of a majority." *United States v. Ballin*, 144 U.S. 1, 5-6 (1892).

That was intentional. The Framers—who had just lived through the Revolutionary War—understood that Congress would need to adjust its procedural rules over time to ensure that legislative business could be done in "ever-changing circumstances over centuries." *NLRB v. Noel Canning*, 573 U.S. 513, 534 (2014). The Framers thus added a Rules of Proceedings Clause, directing Congress to "determine" all other "Rules of its Proceedings" for itself. U.S. Const. art. I, § 5, cl. 2. Congress has done so for more than 200 years, repeatedly modifying its quorum-counting rules to ensure that Congress can continue to legislate during national emergencies like the Civil War and 9/11. The Proxy Rule followed that tradition to a tee.

This history and tradition have long "guide[d]" the interpretation of the Quorum Clause. *See Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring in judgment). Indeed, the Supreme Court has never invalidated a congressional action for violating the Clause. Upholding that tradition, the panel below found the Proxy Rule constitutional. "[T]he plain text of the Quorum Clause," it explained, has "no *physical* presence requirement." *Texas v. Bondi*, 149 F.4th 529, 541 (5th Cir. 2025). And "if the Framers wanted to require physical presence, they would have done just that." *Id.* at 542. "[H]istorical practice," too, "strongly favors rejecting" an alternative reading. *Id.* at 543. Recognizing that the House "wield[s] its broad power to determine how and when to conduct its business," the panel concluded that the

Constitution "contains no physical-presence requirement that the House's rule could have flouted." *Id.* at 545.

Dissenting, Judge Wilson interpreted the Quorum Clause to bar either Chamber of Congress from "conduct[ing] business without a majority of its Members being physically present." *Id.* at 546 (Wilson, J., dissenting). That interpretation is not rooted in the plain text of the Quorum Clause, and it disregards volumes of evidence about the original meaning of that text and centuries of congressional practice.

Judge Wilson acknowledged that the Quorum Clause itself does not require Members to be physically present, *id.* at 547, but would graft this requirement onto the Clause based on dicta in *Ballin*. *See Ballin*, 144 U.S. at 5 ("[W]hen a majority are present the house is in a position to do business."). Yet, by Judge Wilson's own admission, *Ballin* did not "squarely address[]" what "it mean[s] for a Member to be 'present' for purposes of the Quorum Clause"—much less interpret the Clause to require Members' physical presences. *Bondi*, 149 F.4th at 547. To the contrary, *Ballin* held that the Constitution empowered the Legislature, not the Judiciary, to make this determination. *Ballin*, 144 U.S. at 6.

Nor can the dissent divine a physical-presence rule from the Compulsion Clause, which empowers Congress to "compel the Attendance" of their "absent" colleagues. For starters, "Attendance" and "absent" have never referred invariably

to physical presence.  At the Framing, they denoted attention, communication, and participation.  And the Framers chose such broad words for good reason.  The Compulsion Clause was designed to work in tandem with the Quorum Clause to root out minority rule:  The Framers worried that the majority quorum requirement would allow a minority faction to "bust" the quorum and prevent a legislative majority from passing laws.  Authorizing Congress to compel Members' attendance solved that problem.  So once again, the Framers' focus was on safeguarding majoritarian practices, not debating what kind of participation counts as attendance.

In any case, it would be entirely ahistorical to read the Compulsion Clause, which *expands* Congress's power to legislate, to *constrain* Congress's ability to act.  It would be exceedingly dangerous, too: Congress's legislative powers are critical to the United States' survival during national emergencies, especially crises that are so sweeping that they preclude lawmakers from gathering in one place.  It is inconceivable that the Framers would so pinion Congress's power after the Revolutionary War—and that they would do so by implication, through an eleven-word Clause that says nothing about physical presence.  This Court should affirm the panel majority's opinion.

**ARGUMENT**

## I. THE ORIGINAL MEANING OF "A QUORUM TO DO BUSINESS" PERMITS CONGRESS TO COUNT MEMBERS VOTING BY PROXY TOWARDS A QUORUM.

The Constitution authorizes each House to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. This power has long been exercised by every legislature from the "humblest assembly of men" to the most powerful "councils." 2 Joseph Story, *Commentaries on the Constitution of the United States* § 837 (1833). Without it, "it would be utterly impracticable to transact the business of the nation." *Id.* The Rules of Proceedings Clause thus confers a "broad delegation of authority to [Congress] to determine how and when to conduct … business," and to adapt its rules "to ever-changing circumstances." *Noel Canning*, 573 U.S. at 534, 550.

The only limitation on this authority is that Congress may not "ignore [other] constitutional restraints or violate fundamental rights." *Ballin*, 144 U.S. at 5. So, the question in this case is whether the Quorum Clause expressly *prohibits* the House from counting Members voting by proxy towards a quorum. A faithful historical reading of the Quorum Clause makes clear it does no such thing. And while some Framing Era legislatures did not permit proxy voting, that was because of technological limitations, not constitutional concerns.

**A.    The Constitution Gives Congress Broad Authority To Make Rules About Its Own Proceedings.**

All agree that Congress may not transgress constitutional boundaries.  "But within these limitations all matters of method are open to the determination of the [H]ouse" and Senate.  *Ballin*, 144 U.S. at 5.  Courts have long afforded Congress broad authority to craft its own rules and procedures.  In *Ballin*, the Supreme Court confirmed that the House may prescribe any "method for ascertaining the presence of a majority" so long as there is "a reasonable relation between" the method "and the result which is sought to be attained."  *Id.* at 5-6.  The Court thus declined to invalidate a quorum rule simply because "some other way would be better, more accurate, or even more just" or because another rule had been "in force for a length of time."  *Id.* at 5.

*Ballin*'s deferential approach has been the rule ever since.  In *Noel Canning*, the Supreme Court affirmed the Senate's "determination about what constitutes a session," because the Constitution gives Congress "extensive control" over its procedures.  573 U.S. at 550-551.  Reasoning that courts owe "extreme deference" to "reasonable procedures Congress has ordained for its internal business," the Ninth Circuit approved Congress's practice of presenting bills for presidential signature after adjournment *sine die*. *Mester Mfg. Co. v. INS*, 879 F.2d 561, 571 (9th Cir. 1989).  And citing "a highly deferential standard of review," the Tenth Circuit rejected a constitutional challenge to the Congressional Review Act, which created

an expedited process for Congress to repeal administrative rules. *Citizens for Constitutional Integrity v. United States*, 57 F.4th 750, 767 (10th Cir. 2023) (quotation omitted). "Where there are plausible reasons for Congress' action," the court said, "our inquiry is at an end." *Id.* (citation omitted); *see also United States v. Durenberger*, 48 F.3d 1239, 1243 (D.C. Cir. 1995) (courts ought not "impose judicially-formulated rules of conduct on the legislative branch").

In short, a court can invalidate the Proxy Rule only if the Constitution "express[ly]" directs it to do so. *Mester*, 879 F.2d at 571.

**B.** **As Originally Understood, The Quorum Clause Requires A Majority To Do Business Without Prescribing A Method For Determining Whether A Majority Is Present.**

The Quorum Clause provides that "a Majority of each [House] shall constitute a Quorum to do Business." U.S. Const. art. I, § 5, cl. 1. In the Framing Era, a "quorum" meant "a number of any officers as is sufficient to do business." 2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785). So, the only thing the Constitution requires "is the presence of a majority"; all else is "within the competency of the house." *Ballin*, 144 U.S. at 6.

Historical evidence from the Framing Era explains the reason behind this minimal command. The Quorum Clause was a product of the Framers' interest in preserving majoritarian rule, *see* 2 Story § 833 (explaining that minority rule would "subvert the fundamental principle of a republican government"), though they also

8

worried about how to do so effectively. As the Framers recognized, a prevalent tactic during the Framing Era was "secession" or "quorum-busting," whereby a minority faction would refuse to engage with legislative business to prevent a majority from passing any laws to "extort … some unjust & selfish measure." *See* John Bryan Williams, *How to Survive A Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress*, 48 Wm. & Mary L. Rev. 1025, 1039 (2006). The Framers were concerned that a high quorum requirement would make secession easier, perpetuating the very problem of minority rule that the Quorum Clause was meant to fix.

Amidst these concerns, delegates sought guidance from state constitutions which generally imposed majority quorum requirements. *Id.* at 1039-40; 2 Farrand at 300; *see, e.g.,* N.J. Const. (1776); Md. Const. (1776); N.H. Const. (1784); Va. Const. (1776); N.Y. Const. (1777); N.C. Const. (1776). Delegates agreed that a majority quorum prevented antimajoritarian rule while bringing "confidence to the people that no law or burden could be imposed on them, by a few men." 2 Farrand at 253 (Oliver Ellsworth). And to "guard[] against" recalcitrant minority factions, *id.*, the Framers added the Compulsion Clause authorizing legislators to "compel the Attendance of absent Members" to reach a quorum, U.S. Const., art. I, § 5, cl. 1.

The Framers did not specify *how* Congress should ensure a majority's presence, but they used the Rules of Proceedings Clause to ensure Congress held

responsibility for making this determination. U.S. Const., art. I, § 5, cl. 2. They gave Congress flexibility to execute this task by enacting general language, like "Attendance" and "absent," in the Compulsion Clause. "Absent" meant "inattentive" and "at such a distance as to prevent communication." 1 Noah Webster, *An American Dictionary of the English Language* (1828) ("Webster's Dictionary"); *accord* 1 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773) ("Johnson's Dictionary"). Similarly, "to attend" was defined as "present for some duty," Webster's Dictionary, and "within reach or call," Johnson's Dictionary. And "Attendance" meant "attention," "regard," Johnson's Dictionary, and "careful application of mind," Webster's Dictionary. Thus, the Founders authorized Members to compel attendance and participation but left it to each Chamber to decide what attendance looked like.

It is true that other definitions of "Attendance" and "absent" referred to physical presence. *E.g.*, Johnson's Dictionary (defining "to attend," among others, as being "present with, upon a summons"). But the question in this case is whether the Constitution *forbids* counting proxy votes towards a quorum. Because physical presence is only *one possible* meaning of "Attendance" and "absent," the Compulsion Clause does not prohibit the Proxy Rule. *See Noel Canning*, 573 U.S. at 538. In fact, the Supreme Court has always read "attendance" broadly. In *Hurtado v. United States*, for example, the Court held that when a statute uses the

phrase "attending in court" but "does not speak in terms of 'physical' … attendance," courts should not "engraft such a restriction upon the statute" because "attendance" does not automatically require "physical presence." 410 U.S. 578, 584-585 (1973); *see also South Dakota v. Wayfair*, 585 U.S. 162, 181 (2018); *Freeman v. Bee Mach. Co.*, 319 U.S. 448, 454 (1943).

"The Framers could have done it differently." *Chiafalo v. Washington*, 591 U.S. 578, 590 (2020). Both New Jersey's and North Carolina's state constitutions defined quorums based on physical presence. N.J. Const. (1776) ("[N]o Law shall pass, unless there be a Majority of all the Representatives of each Body *personally present* and agreeing thereto.") (emphasis added); N.C. Const., art. XLVI (1776) ("[N]either House of the General Assembly shall proceed upon public business, unless a majority of all the [M]embers of such House are *actually present*.") (emphasis added). On the other hand, the English Parliament had permitted proxy voting in the House of Lords since the 1600s. HC Deb (9 May 1837) (38) col.761, https://perma.cc/D28A-ZA9J ("Hansard") (Thomas Slingsby Duncombe). And Maryland too had permitted proxy voting in its assemblies. *See* Susan Rosenfeld Falb, *Proxy Voting in Early Maryland Assemblies*, 73 MD. Hist. Mag. 217 (Sept. 1978), https://perma.cc/V5Y7-V9GF. If the Framers wanted to specify that physical presence was required, explicitly preclude proxy voting, or create a physical-presence requirement enforceable in court, they could have easily done so. Yet "no

language of that kind made it into the document they drafted." *Chiafalo*, <u>591 U.S.</u> <u>at 591</u>. That resolves the question.

C. **That Framing Era Legislatures Did Not Use Proxy Voting Reflects Then-Existing Technological Limitations, Not Constitutional Concerns.**

Early American legislatures expected legislators to be physically present because of logistical constraints. In the late 1700s, it could take weeks or months for a missive from a proxy to reach its destination, meaning that when a Member designated another to vote on his behalf, he was effectively giving a blank check for "general voting on all legislative measures," an outcome "intolerable" in a democracy. Hansard at col.766 (Tennyson D'Eyncourt); *accord id.* at col.770 (Thomas Wakley) (noting it could take "weeks or months" for "pieces of paper … authori[zing] any [M]ember of a legislative body to vote for another" to reach the Parliament). There were also rampant authentication issues—as one Parliament Member once put it, a legislator voting by proxy in the early 1800s was quite "possibly in the grave" when his proxy cast a vote on his behalf. *Id.* at col.763.

Modern technology has obviated those concerns. Telephone, email, and Zoom conferences ensure Members of Congress can "yield" their "attention" to the matters being discussed, *see* Johnson's Dictionary, and "communicate" with the chamber, *see* Webster's Dictionary, even if they are not physically present in the Capitol. Contemporaneous news coverage allows Members to monitor their proxy

holders to ensure they follow instructions. And officials can instantly resolve authentication issues by calling a remote colleague directly.

Harnessing these technological innovations, the Proxy Rule creates robust guardrails that ensure each voting Member's active participation in lawmaking. "Before a Member's presence may be recorded by proxy during a quorum call," the Member must give the proxy an "exact instruction" on how to vote. Remote Voting by Proxy Regulations §§ C.2, C.3, 166 Cong. Rec. H2257 (daily ed. May 15, 2020). That instruction must specify whether the Member "intend[s] to vote yea, nay, or present on the specific text or matter at hand." *Id.* Members receive "24-hours' notice before any vote on the final disposition of bills" to draft an informed instruction. *Id.* at § E.1. And if a bill's language "changes after such instruction is received," the proxy must wait for further instructions before casting a ballot. *Id.* at § C.4. Indeed, three Representatives changed their votes on the Appropriations Act in real time while voting by proxy. 117 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).

The Proxy Rule is thus nothing like the blank-check voting that raised concerns in the Framing Era. Far from undermining majority rule, the Proxy Rule ensures that the acts of the House reflect the "opinion of a majority of the representative body," 2 Story, § 832, by enabling participation by Members who would otherwise be unable to vote. *See* Adrian Vermeule, *The Constitutional Law*

*of Congressional Procedure*, 71 U. Chi. L. Rev. 361, 407-408 (2004) ("proxy voting . . . bolsters majoritarianism").

That physical presence may have been a key aspect of the legislative process at the Founding does not answer the question presented here. There is a difference between the "original meaning" of the Constitution's text and the Framers' "expectations about how the text would apply." *United States v. Rahimi*, 602 U.S. 680, 739 n.\* (2024) (Barrett, J., concurring); *cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020) ("[T]he limits of the drafters' imagination supply no reason to ignore the law's demands."). "The question is not: Did the Founders at the time think" that Congress would prefer a particular legislative practice? *Noel Canning*, 573 U.S. at 533. It is instead: "Did the Founders intend to restrict" Congress to the "congressional [practice] then prevalent?" *Id.* Because the Framers did not "reduce their thoughts" about proxy voting "to the printed page," *Chiafalo*, 591 U.S. at 592, their "expectations about how the text would apply" do not "control[]," *Rahimi*, 602 U.S. at 739 n.\*. Nothing about the original meaning of the Quorum Clause's text or early American legislative practice precludes Congress from allowing quorum-by-proxy today.

## II. HUNDREDS OF YEARS OF CONGRESSIONAL PRACTICE CONFIRM THAT CONGRESS MAY CONSTITUTIONALLY COUNT MEMBERS VOTING BY PROXY TOWARDS A QUORUM.

"[W]here a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide" interpretation of the Constitution's text. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) (quotation omitted); *Rahimi*, 602 U.S. at 724-728 (Kavanaugh, J., concurring); *see also Marbury v. Madison*, 1 Cranch 137, 177 (1803). It "was foreseen at the birth of the Constitution" that "a regular course of practice" would "liquidate & settle the meaning" of constitutional terms. Letter to Spencer Roane (Sept. 2, 1819), *in* 8 *The Writings of James Madison* 447, 450 (G. Hunt ed. 1908).

History and tradition carry even more weight where a court reviews "a constitutionally delineated prerogative of the Legislative Branch." *Harrington v. Bush*, 553 F.2d 190, 214 (D.C. Cir. 1977). Consistent with the Rules of Proceedings Clause, a court "cannot provide a second opinion on what is the best procedure" where Congress "has institutionally determined and redetermined" that issue for hundreds of years. *Gregg v. Barrett*, 771 F.2d 539, 549 (D.C. Cir. 1985). In this case, more than 200 years of consistent practice confirms that Congress has broad power to adjust its quorum-counting rules, and that the Constitution imposes no physical-presence requirement constraining that power.

**A. Congress Has Repeatedly Adjusted Its Quorum-Counting Rules To Legislate During National Emergencies.**

Changes to quorum-counting rules are nothing new. In the nation's first half-century, Congress calculated the quorum by using the maximum possible number of representatives as the denominator—that is, "for the House, the legally apportioned number of seats and, for the Senate, twice the number of states currently admitted to the Union." Williams, *supra*, at 1056. But it became near-impossible to achieve "a quorum based on the majority of all apportioned … seats" during the Civil War, because seceding States refused to send representatives to Congress. *Id.* at 1057. The Supreme Court then confirmed that these States were "enemies, though not foreigners," *The Amy Warwick*, <u>67 U.S. 653, 674</u> (1862), so each seceding State "continued to be a State," *Texas v. White*, <u>74 U.S. 700, 726</u> (1868), and the number of apportioned seats remained the same. Rather than allow legislative business to grind to a halt, the House and Senate adjusted: They changed their quorum rules so that the denominator comprised the Senators and Representatives that were "chosen," rather than the total possible number of seats. *See* Journal of the House of Representatives, 37th Cong., 1st Sess. 107 (1861); Cong. Globe, 38th Cong., 1st Sess. 2085 (1864).

In the House, this change was "not challenged" by a single representative. Williams, *supra*, at 1059 (citing Journal of the House of Representatives, 37th Cong., 1st Sess. 117 (1861)). In the Senate, only Garrett Davis of Kentucky argued

the change was unconstitutional because such a rule had never been enacted before. Cong. Globe, 38th Cong., 1st Sess. 2086 (1864). Other Senators disagreed. Reverdy Johnson explained that "in the absence of any express [constitutional] provision" to the contrary, the Senate could enact the quorum rules that "the business of the country demands" because "the government [must] go on." *Id.* at 2085-86. John Sherman added that the Framers "never intended that their schemes should be broken up and this Government disorganized by the absence of the representatives of some of the States caused by death, secession, or anything of that kind." *Id.* at 2051. In the end, the Senate overwhelmingly voted to change the quorum rule. Except for a minor revision in 1868, the rule persists to this day. *See* Standing Rules of the Senate, S. Doc. No. 113-18, R. VI at 4 (2013); Cong. Globe, 40th Cong., 2d Sess. 1628-1630 (1868) ("A quorum shall consist of a majority of the Senators duly chosen *and sworn*.") (emphasis added).

Operating under these adjusted rules, the Civil War and Reconstruction Congresses enacted some of the most consequential legal reforms in American history, including the Civil Rights Act of 1871 (providing for § 1983 suits), as well as constitutional amendments to abolish slavery, guarantee equal protection of the laws, and bar race discrimination in voting. *See* U.S. Const. amend. XIII-XV.

The House adjusted its quorum rules again in 1890, this time changing the way it calculated the numerator. Since the First Congress, the House calculated the

numerator based on the Members who actually voted on a bill. Williams, *supra*, at 1069. But in 1890, the Democratic minority busted the quorum by "simply refusing to vote and requiring the Republicans to establish a quorum with their [M]embers alone." *Id.* at 1070. In response, Republicans changed the rules so that the numerator included all Members "present and refusing to vote." 21 Cong. Rec. 949-951 (daily ed. Jan. 29, 1890). As required by the Rules of Proceedings Clause, the Supreme Court rejected a constitutional challenge to this rule in *Ballin*.

The House revised its quorum rules once more in 2004 to prepare for future emergencies in light of the 9/11 attacks. Under the 2004 rules—which remain in force today—the Speaker may reduce the number needed for a quorum to include only non-incapacitated Members after a catastrophic event. Rule XX.5(c)(4)(A), Rules of the House of Representatives, 117th Cong. (2021).

The consequences of a contrary, rigid approach to the Quorum Clause are severe. The Constitution vests Congress with the power to "raise and support Armies," "declare War," "coin" and "borrow" money, "define and punish ... Offences against the Law of Nations," "provide and maintain" the Navy, regulate "the Militia," and suspend the writ of habeas corpus. U.S. Const. art. I, §§ 8-9. These legislative powers are "indispensable means of handling crises." Saikrishna Prakash, *The Sweeping Domestic War Powers of Congress*, 113 Mich. L. Rev. 1337, 1350 (2015). Yet a crisis can easily prevent Members of Congress from assembling

at the Capitol. It is "simply inconceivable" that the Framers, drafting the Constitution after the Revolutionary War, would impose requirements so restrictive as to prevent legislation when it is needed most. *See Continuity of Congress: An Examination of the Existing Quorum Requirement and the Mass Incapacitation of Members: Hearing Before the H. Comm. on Rules*, 108th Cong. 2d Sess. 35 (2004) (testimony of Former Solicitor General Walter Dellinger), https://perma.cc/P3DW-8XYS. It is even more improbable that the Framers would do so by means of an eleven-word clause that does nothing more than require "a Majority" "to do Business." U.S. Const. art. I, § 5, cl. 1.

Reinforcing that the Framers sought to ensure Congress could act in emergencies, *The Federalist* No. 22 (A. Hamilton) recognizes the "necessity for action" during the "emergencies of [the] nation." This Court should respect the Framers' choice of Congress as the "repository of [the] crisis power," Prakash, *supra*, at 1350, for "[e]very government ought to contain in itself the means of its own preservation," *The Federalist* No. 59 (A. Hamilton); *see also* Michael Stokes Paulsen, *The Constitution of Necessity*, 79 Notre Dame L. Rev. 1257, 1275 (2004) ("[T]he Constitution should be construed, where possible, to avoid grave harm to the nation."). It would be odd indeed if the Framers intended the Quorum Clause to cripple Congress during emergencies like a global pandemic—especially as the Supreme Court has long cautioned lower courts against converting the Constitution

into a "suicide pact." *Haig v. Agee*, <u>453 U.S. 280, 309-310</u> (1981) (quotation omitted).

**B.  The Centuries-Long Practice Of Voting By Unanimous Consent Confirms That The Constitution Imposes No Physical-Presence Requirement.**

The longstanding congressional practice of unanimous consent confirms that the Quorum Clause does not require physical presence.  Under this practice, Congress presumes that a quorum exists whenever Members unanimously agree on a bill or a resolution, even when it is obvious that "fewer than a majority of Members" are physically present in the chamber.  William McKay & Charles W. Johnson, *Parliament and Congress, Representation and Scrutiny in the Twenty-First Century* 85 (2010).  That presumption holds unless a Member makes "a point of no quorum," and business is done by a voice vote without a tally being recorded.  5 *Deschler's Precedents of the House of Representatives*, ch. 20, § 1.3, https://perma.cc/TS6Y-4K65.

The Senate has "been conducting routine business by unanimous consensus since 1789." U.S. Senate, *The First Unanimous Consent Agreement*, https://perma.cc/WT8Z-N3LZ.  The House began doing so in 1832.  Jefferson's Manual, 118th Cong., 1st. Sess., H.R. Doc. No. 117-161, § 872, https://perma.cc/V6DZ-SEYK.  And both Chambers have used the rule for some of the most significant lawmaking in this Nation's history.  For example, "the Senate

confirmed most U.S. circuit and district court nominations by unanimous consent or by voice vote."  Barry J. McMillion, Cong. Rsch. Serv., R45622, *Judicial Nomination Statistics & Analysis: U.S. Circuit & District Courts, 1977-2022* 33 (2023), https://perma.cc/2SK5-SB9L.  And the House has passed thousands of bills doing so, including the Religious Freedom Restoration Act.  H.R. 1308, 103rd Cong. (1993),    139    Cong.    Rec.    9680-87    (1993);    Library    of    Congress, https://www.congress.gov/u/cnXIcXdIj_axjr0I4X_U6.    A    newfound    judicial discovery of a physical presence requirement would render "thousands of" statutes and judicial appointments "illegitimate" overnight, *Noel Canning*, 573 U.S. at 556, as Congress would have acted unconstitutionally over and over (and over again) for hundreds of years—a fact that cuts resoundingly against there being merit to this argument.  As required by the Rules of Proceedings Clause, the Supreme Court has long assumed the practice *is* constitutional.  *See id.* at 553-554 (the Senate may "pass[] a bill by unanimous consent" even when "the Senate Chamber [is], according to C-SPAN coverage, almost empty").

## III.    THE PANEL DISSENT'S CONTRARY CONCLUSION IS WRONG.

The panel dissent would read the Quorum Clause to prohibit both "house[s] of Congress [from] conduct[ing] business without a majority of its Members being physically present."  *Bondi*, 149 F.4th at 546 (Wilson, J., dissenting).  Nothing the Framers wrote in the Constitution or said during the constitutional debates supports

that reading. Nor does Congress's post-ratification practice indicate the Clause requires a physical-presence requirement.

### A. The Quorum Clause's Plain Text Does Not Contain A Physical-Presence Requirement.

Despite claiming to start "with the precise text of the Constitution," the dissent fixates on the word "presence," which it admits appears nowhere in the eleven words of the Quorum Clause. *Bondi*, 149 F.4th at 547-548. The reason that the dissent gives for adding a "presence" requirement to the Quorum Clause is that it reads the Supreme Court's opinion in *Ballin* to "explicitly require[] what is implicit in the [Quorum Clause's] text: 'the *presence* of a majority' to establish a quorum." *Id.* at 547. In the dissent's telling, because "the non-voting Members [in *Ballin*] were physically present in the House chamber," *Ballin* "all but states physical presence is required." *Id.* at 547-550 & n.3.

This conclusion rests on faulty premises. For starters, Judge Wilson's conclusion has no basis in the Quorum Clause's text and wholly ignores the Rules of Proceedings Clause, which commits questions of legislative procedure to *Congress*, not courts. Indeed, by 1787, quorum rules had existed for generations, but the historical record reveals that courts rarely, if ever, set aside statutes for lack of a quorum. Second, the Supreme Court has repeatedly admonished that courts ought not "dissect the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)

(Scalia, J.).  Third, *Ballin* declined to second-guess congressional procedures adopted under the Rules of Proceedings Clause and neither asked nor answered whether the Quorum Clause mandates that only physically present Members count towards a quorum.

The dissent's appeal to the Compulsion Clause is equally unpersuasive.  The dissent reasons that the Compulsion Clause's use of "Attendance" and "absent" most naturally refer to physical presence so that the Clause authorizes legislators "to compel the [physical] Attendance of [physically] absent Members."  *Bondi*, 149 F.4th at 550.  That is constitutional interpretation backwards.  The dissent's admission that the Quorum Clause contains no physical-presence requirement should have been the end of the matter for a straightforward reason: the Compulsion Clause cannot contradict the Quorum Clause's plain language and "original understanding."  *District of Columbia v. Heller*, 554 U.S. 570, 577, 625 (2008).

Indeed, the Supreme Court's reasoning in *Heller* resolves this interpretive question.  That case concerned the Second Amendment, which is also "naturally divided into two parts": the "prefatory" militia clause that explains the Amendment's purpose, and the "operative" clause that confers a substantive right to bear arms.  *Id.* at 577.  The prefatory militia clause "does not limit the [operative clause] grammatically," the Court explained, so it cannot affect the scope of the substantive right.  *Id.*  Just so here.  The Compulsion Clause stands alone grammatically and so

cannot limit Congress's authority under the Quorum Clause, particularly because the Compulsion Clause was designed to *expand* Congress's authority to legislate. *See supra* pp. 7-12.

In any event, the dissent's reading of the Compulsion Clause belies the plain meaning of the words as they were used during the Framing Era. "Founding-era dictionaries defined the terms 'absent' and 'attendance' in both the physical sense (not physically present) and the mental sense (not paying attention)." *Bondi*, 149 F.4th at 549. Yet, Judge Wilson selected the "physical" definition, reasoning that a quorum should not "hinge[] upon legislators' *mental attentiveness* in the legislative chamber." *Id.* at 550. But it makes good sense to say that a Member is in "attendance" when she is "within reach or call," Johnson's Dictionary—i.e., available to "do business," U.S. Const. art. I, § 5, cl. 1. And the key question is whether the Constitution textually commits Congress to a physical-presence requirement. *See supra* pp. 6, 10. Because "Attendance" and "absent" do not *demand* that result, the answer is no.

## B. The Pre-Ratification History Does Not Suggest The Quorum Clause Prohibits Proxy Voting.

The dissent's further conclusion that the Framers intended the Quorum Clause to address the "*physical* obstacles Congress would face in mustering a quorum," *Bondi*, 148 F.4th at 550, overreads the available evidence. When discussing the Quorum Clause at the Constitutional Convention, the vast majority of delegates

debated the *number* of legislators necessary for the quorum, not whether physical presence was required. Take John Mercer, who disfavored a majority quorum requirement, believing it would "put it in the power of a few by seceding at a critical moment to introduce convulsions." *See* 2 Farrand at 251. Governor Morris and Rufus King similarly proposed fixing the quorum "low [so legislators] will generally attend knowing that advantage may be taken of their absence." James Madison, Madison's Notes (Aug. 10, 1787), *in The Debates in the Federal Convention of 1787* 377, 377 (Gaillard Hund & James Brown Scott eds., 1920). And Oliver Ellsworth and James Wilson supported a majority quorum rule to provide "confidence to the people that no law or burden could be imposed on them, by a few men." *Id.*

The dissent minimized this historical context in favor of a single statement by delegate George Mason—who later refused to sign the U.S. Constitution and opposed its ratification. Mason was concerned that "[t]he Central States could always take care to be on the spot . . . [and] could carry such measures as they pleased." 2 Farrand at 252. But that concern simply reflected historical reality. As discussed, conducting legislative business by proxy was not logistically practical in 1789. *See supra* p. 12. So, it made good sense for Mason to worry that a low quorum requirement "would be dangerous to the distant parts" of the country. 2 Farrand at 251. When the Framers chose not to "reduce" any assumptions about physical presence to the Constitution's "printed page," *Chiafalo*, 591 U.S. at 592, they chose

to allow future Congresses to depart from the "then prevalent" legislative practice if and when technology allowed doing so, *Noel Canning*, 573 U.S. at 533.

Nor is it relevant that Alexander Hamilton's and Benjamin Franklin's drafts of the Articles of Confederation and Constitution, both of which mentioned proxy voting, were not accepted. *Contra Bondi*, 149 F.4th at 550-551. There is no evidence that either draft was rejected because any Framer thought proxy voting should be unconstitutional. An equally strong inference cuts the other way: The Framers knew that proxy voting was a possibility, yet they did not preclude the practice. Indeed, Franklin's proposed draft expressly *barred* the legislature from counting proxy votes towards a quorum. Benjamin Franklin, *Proposed Articles of Confederation, On or Before 21 July 1775*, https://perma.cc/J2N4-LPW4 (proposing a quorum would be "One half of the Members return'd *exclusive of Proxies*") (emphasis added). That suggests that at least one Framer believed such a choice was within the legislature's authority if the Constitution did not instruct otherwise.[2]

---

[2] Judge Wilson relies on the British House of Commons's practice barring proxy voting, *Bondi*, 149 F.4th at 551, but there is no evidence that the Framers found this important. Only one Framer mentioned the British legislature during the Quorum Clause debates and only to propose that the Constitution permit "the Legislature to fix the Quorum, as in Great Britain." Madison Notes (Aug. 10, 1787), *supra*, at 376.

### C. Historical Practice Does Not Support A Physical-Presence Requirement.

The dissent is mistaken in its assertion that the "practice of both Founding-era state legislatures and the First Congress" supports reading the eleven words of the Quorum Clause to impose a mandatory physical-presence requirement. *Bondi*, 149 F.4th at 552. Because the Pennsylvania Assembly once ordered the Sergeant at Arms in 1787 to bring absent Members to the chambers in order to obtain a quorum, the dissent reasons that state legislatures must have "required [M]embers' physical presence to satisfy their respective quorum requirements." *Id.* at 551-552.

But the historical record does not reflect that *any* Pennsylvania delegate—including James Wilson, a member on the Committee of Detail responsible for drafting the Quorum Clause—advocated for a physical-presence requirement. In fact, *none* of the delegates proposed a physical-presence requirement, even though such a requirement appeared in two state constitutions at the time. *See supra* pp. 11-12.

The fact that two States chose to mandate legislative "presence" by reference to being "personally" or "actually" present cuts against reading the Quorum Clause to contain a similar requirement. The Committee of Detail drafted the Clause using "language from contemporary state constitutions," Williams, *supra*, at 1037–38, and could have easily written that "a Majority of *personally present Members* shall constitute a Quorum" or "a Majority of each, *actually present*, shall constitute a

Quorum." The Framers instead codified a "distinct phrase[] to accomplish [a] distinct purpose[]." *Bostock*, 590 U.S. at 792 (Kavanaugh, J., dissenting); *see also Landry's, Inc. v. Insurance Co. of the State of Pa.*, 4 F.4th 366, 370 (5th Cir. 2021) (Oldham, J.) ("[A] material variation in terms suggests a variation in meaning.") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)). This Court should "not lightly toss aside" the Framers' "careful handiwork." *Bostock*, 590 U.S. at 792.

The dissent finally asserts that the First Congress considered a quorum to be only those "Members who appeared … and physically took the[ir] seats." *Bondi*, 149 F.4th at 552. Again, physical appearance reflected the practical reality of the time, but even when later House and Senate rules required physical presence, they never referred to it as *constitutionally required*. "It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time." *Ballin*, 144 U.S. at 5. "[O]riginalism does not require" a "use it or lose it" approach to constitutional interpretation. *Rahimi*, 602 U.S. at 740.

*       *       *

The question in this case is not whether the Quorum Clause affirmatively *permits* quorum-by-proxy, but whether the Quorum Clause *prohibits* it. Nothing about the original meaning of the Quorum Clause's text, the Framers' debates, or centuries of historical practice mandates physical presence or precludes proxy

voting. As much today as in 1789, debates over legislative procedure belong in Congress—not in court.

## CONCLUSION

For the foregoing reasons, the panel's judgment should be affirmed.

Respectfully submitted,

/s/ Jessica L. Ellsworth
JESSICA L. ELLSWORTH
SAM H. ZWINGLI
ERIC ROYTMAN-CASH
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

February 20, 2026

*Counsel for Amici Curiae Legal Historians and Legislation Professors*

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limits of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,499 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on February 20, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth