**No. 24-10386**

# In the United States Court of Appeals for the Fifth Circuit

———

STATE OF TEXAS,

Plaintiff–Appellee,

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL, in her official capacity as UNITED STATES ATTORNEY GENERAL; CHARLOTTE A. BURROWS, in her official capacity as CHAIR OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; JOCELYN SAMUELS, in her official capacity as VICE CHAIR OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; KEITH SOLDERLING, in his official capacity as COMMISSIONER OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS, in her official capacity as COMMISSIONER OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHRISTOPHER W. LAGE, in his official capacity as GENERAL COUNSEL OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES DEPARTMENT OF JUSTICE,

Defendants–Appellants.

———

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division

———

## SUPPLEMENTAL EN BANC BRIEF
## OF APPELLEE STATE OF TEXAS

———

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

WILLIAM R. PETERSON
Solicitor General
William.Peterson@oag.texas.gov

WILLIAM F. COLE
Principal Deputy Solicitor General

MATTHEW M. HILDERBRAND
Assistant Solicitor General

CHRISTOPHER J. PAVLINEC
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

ROBERT E. HENNEKE
CHANCE WELDON
MATTHEW R. MILLER
ERIC HEIGIS

Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701

*Counsel for Plaintiff-Appellee*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-10386

———

STATE OF TEXAS,

Plaintiff–Appellee,

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL, in her official capacity as UNITED STATES ATTORNEY GENERAL; CHARLOTTE A. BURROWS, in her official capacity as CHAIR OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; JOCELYN SAMUELS, in her official capacity as VICE CHAIR OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; KEITH SOLDERLING, in his official capacity as COMMISSIONER OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; ANDREA R. LUCAS, in her official capacity as COMMISSIONER OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHRISTOPHER W. LAGE, in his official capacity as GENERAL COUNSEL OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES DEPARTMENT OF JUSTICE,

Defendants–Appellants.

———

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ William R. Peterson
WILLIAM R. PETERSON
*Counsel for Plaintiff-Appellee*

ii

# Statement Regarding Oral Argument

This Court has calendared this case for oral argument on May 12, 2026.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons .................................................................ii

Statement Regarding Oral Argument ...........................................................iii

Table of Authorities ...................................................................................v

Issues Presented ........................................................................................1

Introduction...............................................................................................2

Statement of the Case ................................................................................3

Summary of the Argument..........................................................................10

Standard of Review ....................................................................................12

Argument...................................................................................................13

    I.   The Enrolled-Bill Doctrine Does Not Apply..........................................13

        A.   The enrolled-bill doctrine is a narrow rule providing that an enrolled act is the authoritative version of a statute's text. ...............13

        B.   The enrolled-bill doctrine does not apply to quorum challenges so long as the official count is uncontested. .......................15

    II.  Presence by Proxy Violates the Quorum Clause.....................................22

        A.   The Quorum Clause's text requires physical presence......................23

        B.   Historical context and practice confirm the need for physical presence............................................................................................27

        C.   The practice of unanimous consent is not to the contrary. ...............39

        D.   The House's rulemaking authority does not extend to interpreting the Quorum Clause to permit presence by proxy. ..........40

        E.   Precedent strongly suggests that the Quorum Clause does not permit presence by proxy. ............................................................43

    III.  The Scope of Relief Is Narrow..............................................................45

Conclusion and Prayer ...............................................................................48

Certificate of Compliance ..........................................................................49

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023) .................................................................... 22, 23

*Braniff Airways, Inc. v. Civ. Aeronautics Bd.*,
379 F.2d 453 (D.C. Cir. 1967) .................................................................... 26

*Clinton v. City of New York*,
524 U.S. 417 (1998) .................................................................................... 22

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .................................................................................... 30

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) .................................................................................... 22

*Ex parte Wren*,
63 Miss. 512, 527, 532 (1886) .................................................................... 14

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) ........................................................................ 22

*Harwood v. Wentworth*,
162 U.S. 547 (1896) .................................................................................... 15

*Hurtado v. United States*,
410 U.S. 578 (1973) .................................................................................... 27

*Idaho v. ICC*,
939 F.2d 784 (9th Cir. 1991) ...................................................................... 26

*INS v. Chadha*,
462 U.S. 919 (1983) .......................................................................... 22, 46, 47

*Kyllo v. United States*,
533 U.S. 27 (2001) ...................................................................................... 38

*Marshall Field & Co. v. Clark*,
143 U.S. 649 (1892) .............................................................................*passim*

*Myers v. United States,*
  272 U.S. 52 (1926) ........................................................................22

*New Process Steel, L.P. v. NLRB,*
  560 U.S. 674 (2010) ......................................................................26

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014) .................................................................*passim*

*Powell v. McCormack,*
  395 U.S. 486 (1969)........................................................................ 18

*Tex. Ass'n of Concerned Taxpayers, Inc. v. United States,*
  772 F.2d 163 (5th Cir. 1985) ......................................................... 15

*Texas v. Bondi,*
  149 F.4th 529 (5th Cir. 2025) ..................................................*passim*

*Texas v. Garland,*
  719 F. Supp. 3d 521 (N.D. Tex. 2024) .....................................*passim*

*Texas v. United States,*
  50 F.4th 498 (5th Cir. 2022) .......................................................... 12

*Texas v. Yellen,*
  105 F.4th 755 (5th Cir. 2024) ........................................................ 12

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ................................................................. 35, 45

*Trump v. Mazars USA, LLP,*
  591 U.S. 848 (2020) ......................................................................22

*U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.,*
  508 U.S. 439 (1993)........................................................................ 15

*United States v. Ballin,*
  144 U.S. 1 (1892).....................................................................*passim*

*United States v. Farmer,*
  583 F.3d 131 (2d Cir. 2009) .......................................................... 21

*United States v. Gonzalez-Arenas*,
   496 F. App'x 866 (10th Cir. 2012) ................................................ 21

*United States v. Munoz-Flores*,
   495 U.S. 385 (1990)..............................................................*passim*

*United States v. Small*,
   487 F. App'x 302 (7th Cir. 2012) .................................................. 21

## Constitutional Provisions

U.S. Const. art. I, § 5 .........................................................*passim*

U.S. Const. art. I, § 6 ....................................................... 24, 25

## Statutes

1 U.S.C. § 106 ................................................................. 13

49 U.S.C. § 1481 ..............................................................26

Consolidated Appropriations Act of 2023,
   Pub. L. No. 117-328, 136 Stat. 4459 (2022).............................. 6, 7, 46

## Legislative Materials

1 Annals of Cong. (1789) ..................................................... 32, 33

7 Annals of Cong. (1797) ......................................................... 33

9 Annals of Cong. (1798) ......................................................... 33

14 Annals of Cong. (1804).......................................................... 33

56 Cong. Rec. (1918) ............................................................ 35

93 Cong. Rec. (1947) ............................................................ 21

100 Cong. Rec. (1954) ........................................................... 36

168 Cong. Rec. (daily ed. Dec. 23, 2022)..................................6, 7, 17, 20

Cong. Globe, 37th Cong., 2d Sess. 3189 (1862) ...................................34

*Ensuring the Continuity of the United States Government: The Congress: Hearing Before the S. Comm. on the Judiciary*, 108th Cong. 2 (2003) .................36

H.R. Journal, 1st Cong., 1st Sess. (1789)...............................................................33

H.R. Journal, 80th Cong., 1st Sess. (1947)........................................................... 21

H.R. Res. 8, 117th Cong. (2021) ...........................................................................6

H.R. Res. 965, 116th Cong. (2020) .........................................................2, 5, 6, 37

H.R. Rule III, 117th Cong. (2021)...................................................................... 4, 5

S. Journal, 1st Cong., 1st Sess. (1789).........................................................4, 32, 33

## Other Authorities

Antonin Scalia, *A Matter of Interpretation* (Amy Gutmann ed., 1997) ...................30

Asher C. Hinds, 4 *Hinds' Precedents of the House of Representatives of the United States* (1907) ...................................................................... 4, 16

Benjamin Franklin, *The Papers of Benjamin Franklin* (William B. Willcox ed., 1982) ....................................................................... 3, 29

Christopher M. Davis, Cong. Rsch. Serv., IN11372, *The Prior Practice of Proxy Voting in House Committee* (May 1, 2020) ...............................5

Continuity of Government Commission, *The Continuity of Congress*, Am. Enter. Inst. (Apr. 2022).................................................................. 37

Edward Coke, 4 *Institutes of the Laws of England: Concerning the Jurisdiction of Courts* 12 (London, E. & R. Brooke 15th ed. 1797) (1644) .............. 3, 30

Floyd M. Riddick & Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices* (1992) ....................................................................... 39

HC Deb (9 May 1837) (38) cols. 762–63 (UK) (Statement of T. Duncombe) ...........................................................................................3

James Barclay, *A Complete and Universal English Dictionary* (1792) ........... 23, 24, 25

James Madison, *Notes of Debates in the Federal Convention of 1787* (W.W. Norton & Co. 1987) (1840) .......................................................... 3, 28, 29

John Ash, 1 *The New and Complete Dictionary of the English Language* (2d ed. 1795) .............................................................................................. 24

John Bryan Williams, *How to Survive a Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress*, 48 Wm. & Mary L. Rev. 1025 (2006) .................................................. 34

Joseph Story, 1 *Commentaries on the Constitution of the United States* (1833) ................................................................................................................ 22

Joseph Story, 3 *Commentaries on the Constitution of the United States* (1833) ............................................................................................... 22, 24, 42

Kris W. Kobach, *May "We the People" Speak?: The Forgotten Role of Constituent Instructions in Amending the Constitution*, 33 U.C. Davis L. Rev. 1 (1999) ............................................................................................ 38

Lewis Deschler, 5 *Deschler's Precedents of the United States House of Representatives* (1994) ........................................................................... 39

Max Farrand, 3 *The Records of the Federal Convention of 1787* (1911) .................... 4, 30

Mychael Schnell, *Pelosi Extends Remote Voting in House Through Dec. 25*, The Hill (Nov. 10, 2022) ............................................................................. 6

Noah Webster, *An American Dictionary of the English Language* (1828) ........... 23, 24

Robert Luce, *Legislative Procedure: Parliamentary Practices and the Course of Business in the Framing of Statutes* (1922) ...................................... 28, 30

Samuel Johnson, 1 *A Dictionary of English Language* (6th ed. 1785) ........................ 24

Samuel Johnson, 2 *A Dictionary of English Language* (6th ed. 1785) ....................... 23

2 *The Documentary History of the Ratification of the Constitution* (John P. Kaminski et al., eds., 1976) ........................................................................ 31

24 *The Documentary History of the Ratification of the Constitution* (John P. Kaminski et al., eds., 1976) ........................................................................ 31

Thomas Sheridan, 1 *A Complete Dictionary of the English Language* (3d
  ed. 1790) ....................................................................................................24

Todd Garvey, Cong. Rsch. Serv., LSB10447, *Constitutional
  Considerations of Remote Voting in Congress* (Apr. 14, 2020) ................................4

Valerie Heitshusen, Cong. Rsch. Serv., RL34480, *Enrollment of
  Legislation: Relevant Congressional Procedures* (May 18, 2017) ........................... 13

*Whereas: Stories from the People's House—Sick Days*, U.S. House of
  Representatives: Hist., Art & Archives (Dec. 17, 2018)............................. 34, 35

*Whereas: Stories from the People's House—Chasing Congress Away*, U.S.
  House of Representatives: Hist., Art & Archives (June 1, 2015)..................31, 32

William Blackstone, 1 *Commentaries on the Laws of England*
  (Sharswood ed. 1893) ......................................................................................30

## Issues Presented

1. Whether the enrolled-bill doctrine bars judicial review of whether Congress passed an act without a quorum, when the Congressional Record states that the act passed only by counting absent Members who were deemed present by proxy.

2. Whether presence by proxy satisfies Article I, Section 5's requirement that a "Quorum" of "a Majority [of Members]" of a House of Congress is necessary "to do Business."

# INTRODUCTION

For more than 230 years, Congress required its members to be physically present to count towards a quorum. In 2020, the House of Representatives adopted a resolution permitting one Member of the House, by filing a signed letter with the clerk, to designate another Member as proxy to cast the vote or record the presence of the first Member. H.R. Res. 965 § 1(a), 116th Cong. (2020). In enacting the Pregnant Workers Fairness Act, the House relied on this presence-by-proxy procedure to count absent Members as present for purposes of a quorum. That practice conflicted with the plain text and historical understanding of the Quorum Clause.

This case concerns proxy presence for purposes of a quorum to conduct business, not remote voting. The House's rule did not involve virtual presence or new technologies unknown to the Framers. Signing a letter designating a physically present Member as a proxy for an absent Member and giving instructions requires only eighteenth-century technology. Indeed, proxy practice was well known to the Framers. This controversial practice existed in Parliament's House of Lords. And Benjamin Franklin and Alexander Hamilton had proposed proxy use early in this Nation's history, but the Framers did not adopt it, despite practical difficulties that naturally accompany requiring a quorum to conduct official business.

Instead, in response to concerns about the difficulty of mustering a quorum, the Framers empowered a minority to compel the attendance of absent Members. From the first Congress onward, the historical record reveals that a lack of a quorum could be solved only through the physical presence of a majority of Members.

## Statement of the Case

The Quorum Clause provides that "a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1.

By enacting the Quorum Clause, the Framers sought to prevent a minority of Members—such as those who lived geographically closer to the legislature—from making laws in the absence of a majority. George Mason argued, "[I]t would be dangerous to the distant parts [of the nation] to allow a small number of members of the two Houses to make laws." James Madison, *Notes of Debates in the Federal Convention of 1787*, at 429 (W.W. Norton & Co. 1987) (1840). "The Central States could always take care to be on the Spot" and "outstay[]" other Members in order to carry out legislation. *Id.*

The use of proxies was a practice known to the Framers. Although voting by proxy was banned in the House of Commons, it was a familiar and oft-abused feature of the House of Lords. *See* HC Deb (9 May 1837) (38) cols. 762–63 (UK) (Statement of T. Duncombe) (citing Edward Coke, 4 *Institutes of the Laws of England: Concerning the Jurisdiction of Courts* 12 (London, E. & R. Brooke 15th ed. 1797) (1644)).[1] As the district court noted, Benjamin Franklin proposed the use of proxies for the Articles of Confederation. *See* Benjamin Franklin, Proposed Articles of Confederation [on or before 21 July 1775], *in* 22 *The Papers of Benjamin Franklin* 120–25 (William B. Willcox ed., 1982). And Alexander Hamilton's proposed approach to the

---

[1] Available at https://tinyurl.com/5h49dfc4.

3

Constitution would have allowed Representatives to vote by proxy while prohibiting a "Representative present [to] be proxy for more than one who is absent." 3 Max Farrand, *The Records of the Federal Convention of 1787*, at 620 (1911). Neither proposal was adopted.

For more than 230 years, Congress understood the Quorum Clause to require physical presence. The first Congress, for example, waited nearly a month for enough Members to arrive, and the Senate had to issue letters to absent Senators, requesting their attendance because their "presence is indispensably necessary." *See* S. Journal, 1st Cong., 1st Sess. 6 (1789). Up until 2020, "neither the House nor Senate ha[d] previously adopted a method of determining the existence of a quorum disconnected from physical presence." Todd Garvey, Cong. Rsch. Serv., LSB10447, *Constitutional Considerations of Remote Voting in Congress* 3 (Apr. 14, 2020).

Indeed, for a time Congress required *more* than physical presence. As the federal government's brief notes (at 4–5), until 1890 the House required both presence and voting participation for quorum purposes. *See* 4 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* §§ 2895–2903 (1907).

Apart from the procedure at issue in this case, the Rules of the House of Representatives have reflected this understanding, requiring physical presence and even forbidding proxy voting. Rule III is the modern iteration of that principle: "Every Member shall be present within the Hall of the House during its sittings, unless excused or necessarily prevented, and shall vote on each question put[.]" H.R. Rule III, cl. 1, 117th Cong. (2021). "A Member may not authorize any other

person to cast the vote of such Member or record the presence of such Member in the House[.]" *Id.* cl. 2(a). "No other person may cast a Member's vote or record a Member's presence in the House[.]" *Id.* cl. 2(b). For a time, subcommittees of the House practiced proxy voting, but even then, "[p]roxy votes could not be used to form a quorum in committee," and "House rules have never authorized proxy voting on the floor." Christopher M. Davis, Cong. Rsch. Serv., IN11372, *The Prior Practice of Proxy Voting in House Committee* 1, 3 (May 1, 2020).

### *The House adopts a resolution permitting absent Members to count toward a quorum.*

On May 15, 2020, in response to the COVID-19 pandemic, the House of Representatives for the 116th Congress passed a resolution authorizing Members to both vote and be counted as part of the quorum by proxy.

"Notwithstanding rule III," House Resolution 965 authorized the Speaker of the House to "designate a period . . . during which a Member who is designated by another Member as a proxy . . . may cast the vote of such other Member or record the presence of such other Member in the House." H.R. Res. 965 § 1(a), 116th Cong. (2020). To designate a proxy for voting or quorum purposes, a Member was required to "submit to the Clerk a signed letter (which may be in electronic form) specifying by name the Member who is designated for such purposes." *Id.* § 2(a)(1). No single Member could serve "as a proxy . . . for more than 10 Members concurrently." *Id.* § 2(a)(4). "Prior to casting the vote or recording the presence of another Member as a designated proxy . . . , the Member shall obtain an exact instruction from the other Member with respect to such vote or quorum call." *Id.*

5

§ 3(c)(1). Before "casting the vote or recording the presence of another Member as a designated proxy," the proxy was required "to announce the intended vote or recorded presence" and follow "the exact instruction received from the other Member." *Id.* §§ 3(c)(2)–(3). The Resolution further provided that "[a]ny Member whose vote is cast or whose presence is recorded by a designated proxy under this resolution shall be counted for the purpose of establishing a quorum under the rules of the House." *Id.* § 3(b).

Through House Resolution 8, the House of Representatives for the 117th Congress continued the proxy voting and quorum procedure. H.R. Res. 8 § 3(s), 117th Cong. (2021). Relying on the COVID-19 pandemic, Speaker Nancy Pelosi extended the proxy procedure through December 25, 2022.[2]

On December 23, 2022, the House of Representatives relied on the proxy-presence procedure—counting absent Members as part of a quorum—when it passed the Consolidated Appropriations Act of 2023. According to the Congressional Record, 427 out of 431 total Members voted, but 226 absent Members were recorded as present and as having voted "pursuant to House Resolution 8." 168 Cong. Rec. H10,529 (daily ed. Dec. 23, 2022) (capitalization normalized). Of the 431 Members, only 205 were present in-person—fewer than the 216 needed for a quorum. *Id.* The names of the 226 absent Members who were recorded as present and voting by proxy are listed in the Congressional Record. *Id.*

---

[2] Mychael Schnell, *Pelosi Extends Remote Voting in House Through Dec. 25*, The Hill (Nov. 10, 2022), https://thehill.com/homenews/house/3730039-pelosi-extends-re-mote-voting-in-house-through-dec-25.

Representative Chip Roy reserved the right to object, noting, "[T]his $1.7 trillion legislation is moving off the floor without a physical quorum present. There were 218 votes cast by proxy on the rule and 226 votes cast by proxy on the final passage of the bill." *Id.* at H10,529. In response, the Speaker *pro tempore* informed Representative Roy that "[t]he Chair will just note that a quorum was, indeed, present" "[p]ursuant to section 3(b) of H. Res. 965, the 116th Congress[,] carried forward by section 3 of H. Res. 8, [under which] Members casting their vote or recording their presence by proxy are counted for the purpose of establishing a quorum under the rules of the House." *Id.*[3]

The bill passed, was signed by the President, and was published in the Statutes at Large. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022).

### *The district court enjoins part of the Act as to Texas.*

In February 2023, the State of Texas filed suit in the Northern District of Texas, challenging two components of the Act: (1) the Pregnant Workers Fairness Act (PWFA) and (2) a $20 million appropriation for a Department of Homeland Security Case Management Pilot Program. *Texas v. Garland*, 719 F. Supp. 3d 521, 537 (N.D. Tex. 2024), *rev'd and vacated sub nom. Texas v. Bondi*, 149 F.4th 529 (5th Cir. 2025), *reh'g en banc granted, opinion vacated*, 164 F.4th 446 (5th Cir. 2026). The district court found that Texas has standing to challenge only the PWFA. *Id.* at 559.

---

[3] Representative Roy then withdrew his reservation, stating, "No objection." 168 Cong. Rec. H10,529.

Following trial, the district court permanently enjoined enforcement of the PWFA against Texas. *Id.* at 599. In a thorough opinion spanning 120 pages, the district court first rejected the Federal Government's non-justiciability arguments, including the enrolled-bill doctrine. *Id.* at 566–74. The court then held that the passage of the Act violated the Quorum Clause, reasoning that the constitutional text, unbroken historical practice, and Supreme Court precedent confirm that the Clause requires physical presence. *Id.* at 582–94.

### *The divided panel reverses.*

A divided panel of this Court reversed. All three panel members agreed with the district court that because the Congressional Record itself confirmed the absence of a physical quorum, this Court need not question the evidence of Congress's proceedings, and thus the enrolled-bill doctrine is inapplicable. *See Bondi*, 149 F.4th at 534–40. The panel members disagreed on the merits of the Quorum Clause issue.

Two judges held that the Quorum Clause does not require physical presence. They reasoned that "the plain text of the Quorum Clause contains no *physical* presence requirement," *id.* at 541, and that the historical practice of unanimous consent (when Congress presumes a quorum exists whenever Members unanimously agree on a bill or resolution) demonstrates that Congress has long "understood that physical attendance was not required by the Quorum Clause," *id.* at 543. In the absence of an express physical-presence requirement, the majority reasoned that the Court should defer to Congress's determination of how it counts a quorum. *Id.* at 545.

8

Judge Wilson dissented. In his view, "Congress is not free to define the Constitution's quorum requirement out of existence" by permitting absent Members to be counted present by proxy. *Id.* at 546 (Wilson, J., dissenting). Judge Wilson explained that the Constitution's provision for the House to "compel the Attendance of absent Members" makes sense only if physical presence were required. *Id.* at 550 (quoting U.S. Const. art. I, § 5, cl. 1). The Founding-era practice and post-ratification practices, he reasoned, further confirm that Congress historically has understood the Clause to require physical presence. *Id.* at 550–52. As for unanimous consent, Judge Wilson noted that the presumption of a quorum is "automatically defeated" any time the absence of a quorum is "disclosed by a vote or questioned by a point of no quorum," as in this case. *Id.* at 553 (citation omitted). "In this case . . . there was, from the House's official record, neither unanimous consent, nor a proper quorum. Its passage of the Act absent a quorum therefore runs afoul of the Quorum Clause's conditions for doing so." *Id.* at 554. He thus would have affirmed the district court.

This Court granted the State's petition for rehearing en banc. 164 F.4th 446 (5th Cir. 2026).

9

## Summary of the Argument

This Court should affirm the district court's permanent injunction against enforcement of the PWFA as to Texas.

First, the enrolled-bill doctrine does not bar this Court's review of Texas's constitutional challenge. As the panel and district court correctly held, that doctrine is a narrow evidentiary rule that prohibits courts from questioning the validity of an enrolled statute's text by comparing the text with prior drafts found in legislative materials. For more than 130 years, the Supreme Court has permitted courts to examine congressional journals in resolving constitutional challenges to the legislative process—so long as the facts stated in the journals are not called into question. It is undisputed, and the Congressional Record confirms, that a majority of Members were absent when the House voted on the Act. The enrolled-bill doctrine does not apply.

Second, the Quorum Clause requires physical presence. The Quorum Clause's text, informed by history, tradition, and Supreme Court precedent, confirms that proxies—signed letters allowing a present Member to record the presence of and to vote on an absent Member's behalf—violate that constitutional limitation.

The most natural reading of the Constitution's text—which permits Congress to "compel the Attendance of absent Members"—concerns physical presence, not mental attentiveness. The Framers were familiar with but never suggested that proxies could satisfy the Quorum Clause. And the practice of unanimous consent merely presumes that a physically present quorum exists until it is challenged.

10

During the ratification debates, the Framers raised significant concerns about difficulties in mustering a quorum, difficulties which would not have existed if Members could be counted present by proxy. Similarly, despite difficulties in assembling a quorum throughout history, until 2020, Congress never adopted proxy presence.

The Supreme Court's *United States v. Ballin* decision, its only guidance on the issue, all but says that physical presence is necessary to establish a quorum. 144 U.S. 1 (1892). The "capacity to transact business" of a house of Congress is "created by the mere presence of a majority." *Id.* at 5–6. Although it is "within the competency of the house to prescribe any method which shall be reasonably certain to ascertain th[is] fact," *id.* at 6, Congress cannot redefine the fact to be ascertained. The House's resolution regarding proxy voting and presence by proxy are not methods of ascertaining whether a quorum is present within the original understanding of the Quorum Clause.

11

## STANDARD OF REVIEW

This Court reviews a district court's grant of a permanent injunction for abuse of discretion and the legal issues underlying the grant of the injunction de novo. *Texas v. Yellen*, 105 F.4th 755, 763 (5th Cir. 2024). A district court abuses its discretion if it grants an injunction based on erroneous conclusions of law. *Texas v. United States*, 50 F.4th 498, 530 (5th Cir. 2022).

## ARGUMENT

## I.   The Enrolled-Bill Doctrine Does Not Apply.

The panel and district court correctly determined that the enrolled-bill doctrine does not bar this Court from reviewing the State's arguments. The rule of *Marshall Field* is only that an enrolled bill is the authoritative version of a statute, such that courts may not rely on legislative materials to question the "true" content of a bill.

So long as no one questions the official record of events, a court may consider constitutional challenges to the passage of an act. Indeed, the very day the Supreme Court issued *Marshall Field*, it also issued *United States v. Ballin*, which consulted the House Journal to resolve whether a statute was passed with a requisite quorum under a new House rule. Because Texas asks the Court to take the Congressional Record at face value and to resolve only the legal question whether the Quorum Clause permits presence by proxy, the enrolled-bill doctrine does not apply.

## A.   The enrolled-bill doctrine is a narrow rule providing that an enrolled act is the authoritative version of a statute's text.

"An enrolled bill . . . is the form of a measure finally agreed to by both chambers, which is printed on parchment or paper." Valerie Heitshusen, Cong. Rsch. Serv., RL34480, *Enrollment of Legislation: Relevant Congressional Procedures* 1 (May 18, 2017) (footnotes omitted). "Enrollment occurs in the chamber in which the measure originated. First, the Speaker of the House, and then the Senate's presiding officer, must sign each enrolled bill to confirm that the text reflects that which was passed by the House and Senate, respectively." *Id.* (footnotes omitted); *see generally* 1 U.S.C. § 106 (describing the enrollment process).

13

The enrolled-bill doctrine originated in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892). In that case, importers challenged the assessment of certain tariffs on the ground that "a section of the bill [authorizing the tariffs], as it finally passed, was not in the bill authenticated by the signatures of the presiding officers of the respective houses of congress, and approved by the president." *Id.* at 669. The importers sought to prove their point by comparing the enrolled act to versions of the act reflected in legislative journals. *Id.* at 680. Because, the importers contended, the enrolled act did not match what Congress actually voted on, the importers argued that the tariff statute was "not a law of the United States." *Id.* at 665–66.

The Supreme Court rejected the importers' challenge, holding that the importers would not be permitted to "show, from the journals of either house, from the reports of committees, or from other documents printed by authority of congress, that the enrolled bill . . . as finally passed, contained a section that does not appear in the enrolled act in the custody of the state department." *Id.* at 680. First, the Court reasoned, "[t]he respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed congress, all bills authenticated" by the leaders of each house "as one that has passed congress." *Id.* at 672. Second, the Court emphasized the destabilizing consequences that would result if the validity of a statute hinged on a perfect match between the statute as enrolled and the legislative journals. *Id.* at 673.

*Marshall Field* stands for the modest proposition that "the enrolled act . . . is the sole exposition of its contents." *Id.* at 676 (citing *Ex parte Wren*, 63 Miss. 512, 527, 532 (1886)). "The *Marshall Field* doctrine . . . is irrelevant" when "there is no doubt

14

. . . that the . . . Act as printed in the Statutes at Large is identical to the enrolled bill." *U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 n.7 (1993). For more than a century, the Supreme Court has interpreted *Marshall Field* to stand for this narrow proposition.[4]

### B. The enrolled-bill doctrine does not apply to quorum challenges so long as the official count is uncontested.

Because Texas does not challenge the authenticity of the Act's text or that the Act was enrolled, the panel and district court correctly concluded that the enrolled-bill doctrine is "irrelevant." *Id.*

---

[4] *See id.* ("The *Marshall Field* doctrine, indeed, is irrelevant to this case. In *Marshall Field & Co. v. Clark*, the Court stated that a law consists of the 'enrolled bill,' signed in open session by the Speaker of the House of Representatives and the President of the Senate, but there is no doubt in these cases that the 1916 Act as printed in the Statutes at Large is identical to the enrolled bill." (internal citations omitted)); *United States v. Munoz-Flores*, 495 U.S. 385, 391 n.4 (1990) ("[*Marshall*] *Field* . . . concerned 'the nature of the evidence' the Court would consider in determining whether a bill had actually passed Congress. Appellants had argued that the [Journal Clause, U.S. Const. art. I, § 5] implied that whether a bill had passed must be determined by an examination of the [legislative] journals." (internal citations omitted)); *id.* at 408 (Scalia, J., concurring in the judgment) ("*Marshall Field & Co. v. Clark* held that federal courts will not inquire into whether the enrolled bill was the bill actually passed by Congress[.]" (internal citations omitted)); *Harwood v. Wentworth*, 162 U.S. 547, 557–58 (1896) ("Is it competent to show, by [legislative materials], that this act . . . contained, at the time of its final passage, provisions that were omitted from it without authority of the council or the house, before it was presented to the governor for his approval? Upon the authority of *Field v. Clark*, this question must be answered in the negative." (internal citations omitted)); *see also, e.g., Tex. Ass'n of Concerned Taxpayers, Inc. v. United States*, 772 F.2d 163, 167 (5th Cir. 1985) ("The [*Marshall Field*] Court declined to look beyond the enrolled bill to the journals of Congress, the reports of committees or other Congressional documents to determine the true contents of the bill.").

**1.**   The Federal Government argues (at 25–26) that *Marshall Field* broadly bars courts from looking at "extrinsic evidence" to evaluate whether a statute was enacted in accordance with the Constitution.

Not only does the federal government ask this Court to extend *Marshall Field* beyond the narrow rule recognized by the Supreme Court, but such an extension would conflict with *United States v. Ballin*, 144 U.S. 1 (1892), decided the same day as *Marshall Field*. In *Ballin*, the Supreme Court considered an argument that a tariff statute had not "legally passed" the House due to a lack of quorum. *Id.* at 3. Following a House rule, the Speaker of the House included, for quorum-counting purposes, Members of the House who were "present" and "in the hall of the house" but "refusing to vote." *Id.* at 3, 5. Before that, House quorum practice focused on Member participation (voting) instead of physical presence, permitting Members in the minority to break quorum by refusing to vote. *See id.*; *see also* 4 Hinds, *supra*, §§ 2895–2904.

The Supreme Court upheld that rule as consistent with the minimum required by the Quorum Clause. *Ballin*, 144 U.S. at 5–6. Having resolved the constitutionality of the rule, the Court then looked to the House Journal to confirm that "there was present a majority, a quorum," so "the house was authorized to transact any and all business." *Id.* at 6.

*Ballin* confirms that *Marshall Field* neither bars judicial review of congressional procedure nor categorically bans consulting legislative journals in resolving questions of quorum. *Ballin* acknowledged *Marshall Field* and held that "if reference may be had to [a legislative] journal" in deciding "the question whether a law has

been legally enacted," the journal simply "must be assumed to speak the truth." *Id.* at 4. Courts may not resort to external evidence to show "that the facts stated on the journal are not true." *Id. Ballin* thus confirms that *Marshall Field* establishes an evidentiary principle, barring courts from questioning the facts surrounding the passage of a law reflected in a journal but not barring judicial review of the constitutionality of legislative procedure.

Here, Texas does not contest that the Act was enrolled or call into question the House's record of the vote. The Congressional Record itself states that a quorum was present only because Members recorded their presence and vote by proxy. 168 Cong. Rec. H10,528–29 (daily ed. Dec. 23, 2022). The names of the 226 absent Members are listed in the official record. *Id.* Texas's challenge parallels *Ballin*, not *Marshall Field*.[5]

*United States v. Munoz-Flores*, 495 U.S. 385 (1990), issued a century later, confirmed that *Marshall Field* does not bar courts from "review[ing] the constitutionality of congressional enactments." 495 U.S. at 391. In *Munoz-Flores*, a criminal defendant challenged his sentencing on the ground that a statute was a bill "for raising Revenue" that originated in the Senate rather than the House, in violation of the Origination Clause. *Id.* at 388. The government argued that "the House's passage of [the] bill conclusively establishe[d] that the House has

---

[5] The enrolled-bill doctrine likely would apply if, for example, the Congressional Record stated that a majority of Members were physically present but a party tried to prove the absence of a quorum using footage from C-SPAN. Here, in contrast, the Congressional Record itself states that a quorum was not physically present.

determined either that the bill is not a revenue bill or that it originated in the House" and that "a court's invalidation of a law on Origination Clause grounds would evince a lack of respect for the House's determination." *Id.* at 390. The Supreme Court disagreed and addressed the constitutional question on the merits. *Id.* at 396.

Writing separately, Justice Scalia agreed with the federal government that *Marshall Field* should be extended to bar the Origination Clause challenge. He noted that the enrolled bill bore the indication "H.J. Res.," which "attests that the legislation originated in the House." *Id.* at 409 (Scalia, J., concurring in the judgment). Thus, he reasoned, under *Marshall Field* the "H.J. Res." designation on the enrolled bill should be conclusive that the bill originated in the House, and a court should not inquire whether the bill actually originated in the Senate. *See id.* at 408–09. In his view, courts "should no more gainsay Congress' official assertion of the origin of a bill than we would gainsay its official assertion that the bill was passed by the requisite quorum." *Id.* at 410. Instead, he argued, "official representations regarding such matters of internal process [should] be accepted at face value." *Id.*

The majority in *Munoz-Flores* rejected Justice Scalia's position: "Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." *Id.* at 391 (quoting *Powell v. McCormack*, 395 U.S. 486, 549 (1969)). The majority reiterated that *Marshall Field* "concerned 'the nature of the evidence' the Court would consider in determining whether a bill had actually passed Congress." *Id.* at 391 n.4 (quoting *Marshall Field*,

18

143 U.S. at 670). Because "a constitutional provision"—in *Munoz-Flores*, the Origination Clause and in this case, the Quorum Clause—"is implicated, [*Marshall*] *Field* does not apply." *Id.*

Even under the broader interpretation of *Marshall Field* urged in Justice Scalia's concurrence in the judgment, the enrolled-bill doctrine would not apply in this case. Nothing in the enrolled bill recites that the Act was passed by the requisite quorum in the House of Representatives, so the State does not ask this Court to "gainsay" any official assertion by Congress in the enrolled bill. The State simply asks that, as Justice Scalia urged, the Court take Congress's official representation—that a majority of Members were absent—"at face value." *Id.* at 410 (Scalia, J., concurring in the judgment).

*NLRB v. Noel Canning*, 573 U.S. 513 (2014), confirms that courts may look to the legislative journal in resolving a constitutional challenge. In *Noel Canning*, the Supreme Court held that three recess appointments to the NLRB were unconstitutional because the Senate was not actually in recess. In reaching that conclusion, the Court looked to the Senate Journal to determine that "the Senate said it was in session" during the recess appointments. *Id.* at 552. Consistent with *Marshall Field* and *Ballin*, the Court rejected the federal government's invitation to look beyond the legislative record and conduct an independent "factual appraisal" regarding "who is, and who is not, in fact present on the floor during a particular Senate session," instead "taking the Senate's report of its official action at its word." 573 U.S. at 555.

The enrolled-bill doctrine provides, at most, that courts may not conduct an independent factual inquiry to call into doubt Congress's official record of proceedings. In this case, Texas makes no such factual challenge and instead asks this Court to take the House's report "at its word": at the time it passed the Act, the House did not have a majority of Members present.

**2.**    The federal government also argues that even if courts can look to congressional records, courts may consider only materials "the Constitution requires to be placed on the journal." Gov't En Banc Br. 28–29 (citing *Ballin*, 144 U.S. at 4). Because the Journal Clause requires only that "the Yeas and Nays of the Members . . . be entered on the Journal," U.S. Const. art. I, § 5, cl. 3, and does not require a list of Members who voted by proxy, the federal government argues that this Court can consider only the final vote tally and not the list of who voted by proxy.

That argument suffers from several flaws. First, there *is* an applicable constitutional requirement: that a quorum must be present. *See* U.S. Const. art. I, § 5, cl. 1. "Where, as here, a constitutional provision is implicated, [*Marshall*] *Field* does not apply." *Munoz-Flores*, 495 U.S. at 391 n.4.

Second, the list of Members recorded as present and voting by proxy appears in the same official document as the yeas and nays, right after the list of votes. *See* 168 Cong. Rec. H10,528–29 (daily ed. Dec. 23, 2022).

Third, it ignores precedent like *Ballin*, where the Court looked to the House Journal's list of Members present during the roll call for purposes of determining that "there was present a majority, a quorum." 144 U.S. at 6. Cases like *Ballin* stand only for the proposition that "if reference may be had to such journal, it must be

assumed to speak the truth." *Id.* at 4; *see also Noel Canning*, 573 U.S. at 555 (looking to Senate Journal to determine when it was in session, even though the Journal Clause does not require such information to be recorded). Nothing in *Ballin* or *Noel Canning* suggests that this Court must (or even can) disregard any portion of the record.

**3.** Finally, the federal government points (at 30–31) to a handful of decisions by other courts that applied the enrolled-bill doctrine to Quorum Clause challenges. The panel and district court correctly distinguished those cases, however, because the challengers urged courts to look beyond the official Congressional Record to determine that a quorum was lacking. *See United States v. Farmer*, 583 F.3d 131, 151–52 (2d Cir. 2009); *United States v. Small*, 487 F. App'x 302, 303 (7th Cir. 2012); *United States v. Gonzalez-Arenas*, 496 F. App'x 866, 867 (10th Cir. 2012). In each of those cases, the official record lacked a vote count, H.R. Journal, 80th Cong., 1st Sess. 343–44 (1947); 93 Cong. Rec. 5048–49 (1947), and reflected that a quorum was present on that day, H.R. Journal, 80th Cong., 1st Sess. 341 (1947).

*       *       *

The panel and district court correctly concluded that the enrolled-bill doctrine does not bar Texas's challenge. According to the Congressional Record, a majority of Members registered their presence and vote by proxy pursuant to House Resolution 965. As in *Ballin*, *Munoz-Flores*, and *Noel Canning*, this Court may properly consider whether, crediting the official record, the Act complied with the Constitution's procedural requirements for legislation.

21

## II.  Presence by Proxy Violates the Quorum Clause.

The Quorum Clause provides that "a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number . . . may be authorized to compel the Attendance of absent Members." U.S. Const. art. I, § 5, cl. 1.

"The procedures governing the enactment of statutes set forth in the text of Article I were the product of the great debates and compromises that produced the Constitution itself." *Clinton v. City of New York*, 524 U.S. 417, 439 (1998). "[T]he power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Id.* at 439–40 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). The Constitution's quorum requirement, in particular, "secure[s] the public from any hazard of passing laws by surprise, or against the deliberate opinion of a majority of the representative body." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 832 (1833).

Constitutional "analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189 (1824); and 1 Story, *supra*, § 399, at 383. The actions of the "Founding-era Congress" can also inform the proper understanding of the Constitution. *Abbott v. Biden*, 70 F.4th 817, 841–42 (5th Cir. 2023); *see Myers v. United States*, 272 U.S. 52, 174–75 (1926); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 858–60 (2020). A court must "interpret the Constitution in light of its text, structure, and original understanding—as informed by history and

22

tradition." *Abbott*, 70 F.4th at 827 (internal quotation marks omitted) (quoting *Noel Canning*, 573 U.S. at 573 (Scalia, J. concurring)).

Whether a house of Congress may count absent Members appearing by proxy as part of the quorum to conduct business is a novel question. But text, history, and precedent confirm that proxies do not satisfy the Quorum Clause's presence requirement.

## A. The Quorum Clause's text requires physical presence.

**1.** The Constitution's plain text requires the physical presence of Members. Dictionaries from the time defined "quorum" as "such a number of any officers as is sufficient to do business." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of English Language* (6th ed. 1785); Noah Webster, *An American Dictionary of the English Language* (1828) ("such a number of officers or members as is competent by law or constitution to transact business"). Although the word "quorum," standing alone, does not necessarily suggest that Members must be physically present, the Clause's second half—empowering Congress to "compel" the "[a]ttendance" of "absent" Members—strongly indicates such a requirement. U.S. Const. art. I, § 5, cl.1.

As Judge Hendrix noted, Founding-era dictionaries consistently defined the term "absent," as well as the meaning of "attendance" or "attend," in physical terms. *See Garland*, 719 F.Supp.3d at 584–85 (collecting dictionary definitions).

"Absent" is defined as "[n]ot present," "not in company," and "at such a distance as to prevent communication." Webster, *supra*; *see* James Barclay, *A Complete and Universal English Dictionary* (1792) (defining absent as "at a distance from, out of the sight and hearing of a person"). Noah Webster defined

23

"attendance" to include "[t]he act of waiting on, or serving" or "being present on business of any kind; as, the *attendance* of witnesses or persons in court; *attendance* of members of the legislature." Webster, *supra*; *see* Barclay, *supra* ("the act of waiting upon as a servant; service; the person in waiting"). Definitions for "attend" similarly invoke physical presence: (1) "[t]o be present with, upon a summons," 1 Johnson, *supra*; 1 Thomas Sheridan, *A Complete Dictionary of the English Language* (3d ed. 1790), (2) "to accompany," 1 John Ash, *The New and Complete Dictionary of the English Language* (2d ed. 1795); Barclay, *supra*, and (3) "[t]o be present for some duty" or "in business," Webster, *supra*. These definitions call to mind Members physically accompanying one another on legislative business. Naturally read, the Clause empowers the "smaller Number" of Members to create a quorum by forcing absent Members to be physically present in the legislature.

That reading makes the most sense of a related constitutional provision as well. Senators and Representatives are "privileged from Arrest during their Attendance at the Session of their respective Houses, *and in going to and returning from the same*." U.S. Const. art. I, § 6, cl. 1 (emphasis added). The phrase "going to and returning from" presupposes *physical* travel to "Attendance at the Session." The privilege protects "against all process, the disobedience to which is punishable by attachment of the person . . . because a member has superior duties to perform *in another place*." 3 Story, *supra*, § 857 (emphasis added). Otherwise, "[w]hen a representative is withdrawn from his seat by a summons, the people, whom he represents, lose their voice in debate and vote." *Id.* An arrest would not withdraw a Member from his seat if he could vote by proxy from a prison cell.

24

In other words, to secure a quorum, a minority of a house of Congress can "compel the Attendance of absent Members," U.S. Const. art. I, § 5, cl. 1, and "attendance" involves travel, *i.e.*, "going to and returning from." *Id.* § 6, cl. 1.

The federal government cites (at 43) Founding-era dictionaries providing nonphysical definitions, such as "inattentive" for "absent" and "[a]ttention" or "regard" for "attendance." But these alternative definitions are relevant only if they are a plausible usage of the words in the text.

They are not. Those definitions concern the "mental" sense of these terms. *Cf.* Barclay, *supra* (noting that "inattentive" is a "figurative[]" use of the word "absent"). This definition makes little sense in context since it would confer "the power to compel distracted Members to snap out of it and give their attention." *Bondi*, 149 F.4th at 549 (Wilson, J., dissenting). Neither the ratification debates for the Constitution nor any history in Congress suggests that the phrase has ever been understood to allow compelling "absent" Members to pay attention.

The Supreme Court recognized as much in *Ballin*, when it held that the House's "capacity to transact business" is "created by the mere *presence* of a majority" and not "the disposition or assent or action" of the Members. 144 U.S. at 5–6. "If no affirmative act or particular disposition of a member is necessary to count towards the quorum, it would be odd for the Framers to place a provision requiring a member's attention or participation in the latter half of the Quorum Clause." *Garland*, 719 F. Supp. 3d at 585. Similarly, if "Attendance" reflected mental alertness, then the privilege against arrest would turn on a mental state—despite references to physical travel and presence in that Clause. *See* U.S. Const. art. I, § 6,

25

cl. 1. The federal government does not explain how these definitions make sense in this context.

**2.**    The federal government's other textual arguments do not justify a contrary result. It first contends (at 35) that "the term 'quorum' focuses on 'participat[ion],'" "not physical presence." In its cited case, *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 683–84 (2010), the Supreme Court used the word "participate" when describing a "quorum," but it simultaneously cited dictionaries defining "quorum" as describing persons who "must be present" or "whose presence is necessary" or who are "duly assembled." *Id.* at 684 (citations omitted).

The federal government also cites (at 35–36) statutes defining a quorum for judicial panels or for agency bodies. But these do not change the textual analysis of the Quorum Clause because they reinforce the conclusion that context is key. For instance, the D.C. Circuit concluded that members of the Civil Aeronautics Board did not need to "be physically present together" for quorum purposes because the statute broadly "authorize[d] the Board to 'conduct (its) proceedings in such manner as will be conducive to the proper dispatch of business and to the ends of justice.'" *Braniff Airways, Inc. v. Civ. Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967) (quoting 49 U.S.C. § 1481 (1964)); *see also Idaho v. ICC*, 939 F.2d 784, 788 (9th Cir. 1991) (citing similar language as permitting a rule for "notational voting" by members of the Interstate Commerce Commission). These statutes lack the context clues in the Quorum Clause that reveal a physical-presence understanding— namely, that "a smaller Number . . . may be authorized to compel the Attendance of absent Members." U.S. Const. art. I, § 5, cl. 1.

The federal government cites *Hurtado v. United States* for the proposition that the terms "absent" and "attendance" "do not necessarily refer to physical presence in a particular location." Gov't En Banc Br. 43 (citing 410 U.S. 578, 583–84 (1973)). The witness compensation statute at issue in *Hurtado* provided that a "witness attending in any court of the United States . . . shall receive $20 for each day's attendance and for the time necessarily occupied in going to and returning from the same." *Id.* at 580. Avoiding a construction that would only compensate witnesses when they appear in the courtroom to testify, the Supreme Court concluded that the language "attending in any court" included "witnesses who have been summoned and are in necessary attendance on the court, in readiness to testify." "[W]hether he waits in a witness room, a prosecutor's office, a hotel room, or the jail, he is still available to testify, and it is that availability that the statute compensates." *Id.* at 585. A statute compensating a witness's availability for being physically present *near* the courthouse does not justify a process permitting a Member's complete physical absence.

Because the Constitution did not use "absent" and "attendance" in the mental sense, it necessarily uses those terms in the physical sense. The Clause enables physically present Members to force physically absent Members to attend the legislative session and thereby create a quorum.

## B. Historical context and practice confirm the need for physical presence.

The ratification debates confirm this understanding of the Quorum Clause. Throughout the debates about how high to set the quorum requirement, the Framers

27

expressed concerns about the *physical* obstacles of mustering a majority of Members who were spread across the continent.

**1.** The first constitutions of the original States revealed that quorum requirements had "become general, though not universal." Robert Luce, *Legislative Procedure: Parliamentary Practices and the Course of Business in the Framing of Statutes* 27 (1922). But States varied on the requisite number, with Pennsylvania and Vermont having a two-thirds requirement, New York and North Carolina having a majority requirement, and Massachusetts, South Carolina, and Georgia requiring less than a majority (though all three eventually abandoned it). *Id.* at 28.

These practices informed the ratification debates for the federal constitution. Nathaniel Gorham expressed concern that a majority requirement would be inconvenient and delay legislative business. *See* Madison, *supra*, at 428–29. John Mercer was concerned that a majority requirement would empower the "few" who could "seced[e] at a critical moment" and halt legislative business. *Id.* at 429. Gorham and Mercer's concerns presuppose that physical presence affects a quorum, as past "[e]xamples of secessions . . . in some of the States" had demonstrated. *Id.*; *see* Luce, *supra*, at 24–27, 31–46 (detailing lack of quorums due to illness or delay in travel as well as deliberate quorum breaks).

In reply, George Mason warned that, without a majority requirement, "a small number of members" could "make laws," which "would be dangerous to the distant parts [of the country]," and the "Central States could always take care to be on the Spot and by meeting earlier than the distant ones, or wearying their patience, and

28

outstaying them, could carry such measures as they pleased." Madison, *supra*, at 429.

Mason's concerns make sense only if physical presence is required. After all, if a house could adopt rules allowing geographically distant Members to be present or vote via proxy, then Members from distant States could never be "outstay[ed]." *Id.*; *see also id.* (documenting that Rufus King "admitted there might be some danger of giving an advantage to the Central States; but was of opinion that the public inconveniency on the other side was more to be dreaded").

In support of a majority requirement and to assuage the concerns over quorum breaks, Oliver Ellsworth suggested that "the inconveniency of secessions may be guarded against by giving to each House an authority to require the attendance of absent members." *Id.* at 430. Randolph and Madison then proposed to add the compulsion power, and all present delegations agreed (save for Pennsylvania). *Id.* at 431; *see* U.S. Const. art. I, § 5, cl. 1. Notably, disagreements over the majority requirement for a quorum preceded mention of the compulsion power, confirming the compulsion power was intended to create a physically-present quorum—to "guard against" "[t]he inconveniency of secessions," Madison, *supra*, at 430— rather than to address a Member's lack of attentiveness during a legislative session.

Despite these concerns over travel, inconvenience, and delay, the Framers never adopted (or suggested) proxies as a solution. That is not because they were ignorant of the practice. Benjamin Franklin previously proposed the use of proxies for the Articles of Confederation. Franklin, *supra*, at 120–25. Alexander Hamilton's proposed plan of government permitted Representatives to vote by proxy while

29

prohibiting a "Representative present [to] be proxy for more than one who is absent." 3 Farrand, *supra*, at 620. A note in the margin of Hamilton's copy noted a possible justification for proxies: "to provide for distant States." *Id.*[6]

The use of proxies would also have been well known from English practice. In Parliament, proxies were permitted in the House of Lords but not in the House of Commons: "any Lord of the Parliament, by licence of the King, upon just cause, to be absent, may make a proxy; . . . but a knight, citizen, or burgess of the House of Commons cannot by any means make any proxy, because he is elected and trusted by multitudes of the people." 4 Coke, *supra*, at 12 (cleaned up); *accord* 1 William Blackstone, *Commentaries on the Laws of England* 168 (Sharswood ed. 1893) (recognizing that the prohibition on proxies for a member of the House of Commons exists because "he is himself but a proxy for a multitude of other people."). This requirement certainly caused inconveniences. For instance, in December 1648, "so many of the members were in prison that sometimes the Speaker was obliged to send the guards to bring in enough prisoners for making up the twoscore." Luce, *supra*, at 24.

---

[6] Despite the federal government's contrary framing (at 47), Texas offers these historical facts to show that the Framers were aware of proxies, not to suggest that these specific plans were considered during the ratification debates. *Garland*, 719 F. Supp. 3d at 586 n.22 ("The Court refers to these texts not as a search for the subjective intent of the Framers but instead as evidence of the public understanding of the text at the time of its adoption, which is 'a critical tool of constitutional interpretation.'") (citing *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008); Antonin Scalia, *A Matter of Interpretation* 38 (Amy Gutmann ed., 1997)).

The tradeoffs inherent in requiring physical presence were made apparent during the ratification debates. For example, the Anti-Federalists in Pennsylvania "stayed away" from the state ratifying convention "to prevent a quorum"; this practice was "not new in Pennsylvania politics" and "facilitated by the Pennsylvania constitution" which "defined a quorum as two-thirds of the elected members." 2 *The Documentary History of the Ratification of the Constitution* 54, 55 (John P. Kaminski et al., eds., 1976) (hereinafter "*Documentary History*"). In response, "[t]he members present then ordered the sergeant at arms . . . to bring in the absent members" which led to "a mob . . . forcibly return[ing]" those absent. *Id.* at 55. Notably, "Pennsylvania was the focus of national attention during the first few weeks after the Constitutional Convention" and "the force it used to secure a quorum, was reported throughout the United States." *Id.* at 5. So too in Rhode Island, where the August 1787 legislative session "had failed to attain a quorum" due to the Antifederalist party refusing to attend. 24 *Documentary History*, *supra*, at 3. The party "did not attend . . . because it did not want to deal with the criticism directed at the legislature's failure to send delegates to the Constitutional Convention." *Id.*

Even earlier, in 1783, hundreds of Pennsylvania's disgruntled state militia members marched on Philadelphia to confront the president of the state's executive council, John Dickinson, whose chambers were in the same building as the hall of the Confederation Congress. *Whereas: Stories from the People's House—Chasing Congress Away* (June 1, 2015), U.S. House of Representatives: Hist., Art & Archives, https://history.house.gov/Blog/2015/June/6-1-Chasing-Congress/. Congressional delegates were alarmed, but Dickinson refused to call the local militia to quash the

insurrection. *Id.* With hundreds gathered at the state house, Hamilton convinced the president of the Confederation Congress, Elias Boudinot, to call an emergency meeting. *Id.* But "too few braved the crowd to achieve a quorum to conduct business," and those who did attend were threatened. *Id.* A quorum of congressmen had to meet later at Boudinot's residence, and they resolved to leave Philadelphia and proceed to Princeton. *Id.* Eventually, order was restored in Philadelphia, but only after severe disruption to the Confederation Congress's ability to conduct business. *Id.*

Concerns about forming a quorum were well known to the Framers, and of the possible solutions to ensure the presence of a majority, the Framers selected the compulsion power, not the use of proxies.

**2.** And after ratification, these concerns about a quorum became manifest. As Judge Hendrix detailed, Congress time and time again grappled with failed quorum calls and delays in business due to physically absent Members. *See Garland*, 719 F. Supp. 3d at 588–91.

The first Congress struggled to gather a quorum for nearly a month, with many quorum calls failing. The Senate first sent circulars to "to the absent members," and when that failed, they sent more circulars to "eight of the nearest absent members . . . desiring *their attendance*, in order to form a quorum." 1 Annals of Cong. 15–16 (March 4, 1789–April 6, 1789) (Joseph Gales ed., 1834) (emphasis added). The first letter stated that it was "of the utmost importance that a quorum sufficient to proceed to business be assembled" for the "absent members" "to attend as soon as possible." S. Journal, 1st Cong., 1st Sess. 5–6 (1789). The second reiterated that

32

their "presence [was] indispensably necessary" and that the present Members "therefore again earnestly request[ed] [their] immediate attendance." *Id.* at 6. The Senate achieved a quorum on April 6 once twelve Senators were "assembled" and "present." *Id.* at 7; *see also* 1 Annals of Cong. 15–16, 95–96 (1789) (listing house and senate Members who "appeared and took their seats" each day).

For its part, the House finally achieved a quorum on April 1, 1789. *Id.* at 96; H.R. Journal, 1st Cong., 1st Sess. 3–6 (1789). The next year, the documentary evidence reveals that a quorum in the House formed only after enough Members appeared and physically took their seats. *See, e.g.*, 1 Annals of Cong. 1039–40 (Jan. 7, 1790) (recognizing a quorum when a majority of the "whole House was present" by "appearing and taking their seats").

Subsequent Congresses had similar problems achieving a quorum. The fifth Congress's second session was delayed in both chambers because a majority had not "assembled in their Chamber." 7 Annals of Cong. 469–70, 625–26 (1797). Even after the House formed its initial quorum, on November 20, 1797, it could not conduct business "for some time" that day until a majority arrived. *Id.* at 627. At the third session, the House again was "fourteen short of a quorum" because after "the names of all the members were called," only forty were present. 9 Annals of Cong. 2417–18 (1798). And in the second session of the eighth Congress, the House initially had a quorum because a majority of Members "appeared and took their seats," but a week later, "[n]o quorum [was] present," so the Members adjourned that day. 14 Annals of Cong. 677–78, 685 (1804).

33

During the beginning of the Civil War, the Senate struggled to maintain a quorum as Members from seceded States would not attend. Cong. Globe, 37th Cong., 2d Sess. 3189–94 (1862); *see also* John Bryan Williams, *How to Survive a Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress*, 48 Wm. & Mary L. Rev. 1025, 1059–61 (2006). Senator John Sherman contended that under his "plain reading of the Constitution," "[i]f some of them are absent, those who are present can compel the attendance of the absentees, and as soon as there is a majority of those elected present, they can go on and transact the business of the body." Cong. Globe, 37th Cong., 2d Sess., at 3190.

Senator John Carlile emphasized that the Quorum Clause "conferred upon those present" the power "to send for the Senators [who] are absent." *Id.* And for quorum purposes, the Senate considered those "in [their] seat[s]" and omitted a Senator who "ha[d] gone" after being present the prior day. *Id.* at 3192. Senator Lafayette Foster also remarked that a quorum must be present and that they could lose a quorum if "members go away." *Id.* Foster warned his fellow Senators of the need to comply with the Quorum Clause because if they failed to suspend business and passed a bill even one short of a quorum, "the bill which [they] passed would not be a law" and instead would be a "nullit[y]." *Id.* at 3193.

And during the 1918 flu pandemic, the House repeatedly failed to obtain a quorum as few Members attended legislative sessions. *Whereas: Stories from the People's House—Sick Days*, U.S. House of Representatives: Hist., Art & Archives (Dec. 17, 2018), https://perma.cc/ 7L3U-49KY. Despite only having fewer than 50 Members in attendance, leaders of both parties reached an agreement to pass by

unanimous consent a bill enabling the Public Health Service to mobilize civilian doctors as an emergency response to combat severe flu outbreaks. *Id.* While "two Members initially balked at the plan and demanded a quorum call," they were convinced to withdraw their requests. *Id.* The bill ultimately passed without objection, but "[i]mmediately afterward, a point of order was made that a quorum was not present, and the House adjourned." *Id.; see* 56 Cong. Rec. 11,288–89 (1918). This abuse of the unanimous consent procedure is evidenced by the fact that Members urged the withdrawal of objections: "they knew a quorum call would reveal the obvious—the House lacked the physical presence of a quorum and therefore could not proceed to business." *Garland*, 719 F. Supp. 3d at 590.

Notably, despite these repeated difficulties in mustering a quorum, neither house of Congress proposed the use of proxies. "Had [Congress] believed [itself] to possess the tool, surely [Congress] would not have let it lie idle." *Trump v. CASA, Inc.*, 606 U.S. 831, 846 (2025).

**3.** The federal government raises the concern that the physical-presence requirement would make it more difficult for Congress to respond to "[f]uture crises" that "may arise that make travel or in-person assembly difficult or impossible." Gov't En Banc Br. 37 (citing Amicus Br. of Sen. Mitch McConnell 17–18; Amicus Br. of Former Nat'l Sec. Offs. 1–14).

But as discussed above, such difficulties were contemplated by the Framers (and occurred throughout our history), who nonetheless adopted a quorum requirement. To address the challenges recognized by the federal government, Members of the Senate have advocated constitutional amendments to ensure that Congress could

conduct legislative business in the case of a catastrophic attack. *E.g.*, 100 Cong. Rec. 7658–69 (1954) (discussing and voting on a constitutional amendment); *Ensuring the Continuity of the United States Government: The Congress: Hearing Before the S. Comm. on the Judiciary*, 108th Cong. 2, 29–30 (2003) (calling for a constitutional amendment because "[u]nder the Constitution's requirement of a majority for a quorum, terrorists could shut Congress down by killing or incapacitating a sufficient number of Representatives or Senators"). Amending the Constitution is the proper way of addressing the federal government's concerns about the difficulty in assembling a quorum.

4.    The federal government's primary response (at 43–45, 49) is that this historical focus on physical presence "merely reflect[s] the available means of communication at the time," *id.* at 45, and that "modern technology" allows Members of the House who are "voting remotely" to not be "at such a distance as to prevent communications" or "out of 'sight and hearing' of their physically present colleagues," *id.* at 44. In today's world, the federal government argues, Members can access various "information and communication regardless of physical distance." *Id.* at 49.

But this case does not concern novel technology or even technology-enabled virtual presence. Such issues can be left for another day. Congress might, perhaps,

36

in the future, adopt rules involving remote voting or forms of presence that were unknown to the Framers.[7]

The House resolution here permitted Members to submit signed letters to the Clerk of the House with written instructions—technology that was available in the eighteenth century. *See* H.R. Res. 965, § 2(a)(1), 116th Cong. (2020). The procedure did not require real-time participation, whether on video, via audio, or through instantaneous message. *Id.*; *see also Garland*, 719 F. Supp. 3d at 593 n.26 (noting that "examples of virtual attendance at least implicate some sort of presence, whereas the proxy rule here counted members who were not 'present' in any ordinary sense of the word").

As demonstrated by Franklin's and Hamilton's proposals for proxy practice and the Framers' general background knowledge of parliamentary procedure, proxy designation by signed letter was nothing new to the Framers. If appearing by proxy via signed letter were acceptable under the Quorum Clause, then Congress could have adopted an identical rule in the eighteenth century. There is no evidence that such an arrangement was ever contemplated, despite its obvious advantages of convenience. Instead, the Framers empowered a minority to compel the attendance of absent Members.

---

[7] *See Garland*, 719 F. Supp. 3d at 593 n.26 (raising a similar point); *see also* Continuity of Government Commission, *The Continuity of Congress*, Am. Enter. Inst. (Apr. 2022) (advocating for a constitutional amendment to provide for virtual participation for Congress Members in the event of emergency), https://www.aei.org/wp-content/uploads/2022/04/The-Continuity-of-Congress.pdf?x97961.

The federal government asserts (at 48–49) that "the Framers could not have contemplated [the] type of remote-voting procedure" at issue because the House procedure required specific instructions for the proxy votes. As an initial matter, the issue before this Court is not whether proxy votes should have been counted—it is only whether a quorum was present. More significantly, during the Continental Congress and under the Articles of Confederation, delegates routinely received specific, written instructions on how to vote. *See generally* Kris W. Kobach, *May "We the People" Speak?: The Forgotten Role of Constituent Instructions in Amending the Constitution*, 33 U.C. Davis L. Rev. 1 (1999) (detailing the historical use of instructions). The concept of written instructions directing how votes should be cast was not outside the Framers' contemplation.

This is not a case in which this Court must apply original principles to new technology, such as the Fourth Amendment and thermal imaging in *Kyllo v. United States*, 533 U.S. 27 (2001). The federal government instead suggests (at 49) that new technology—permitting sharing "information and communication regardless of physical distance"—renders any historical prohibition on proxy presence obsolete. But even if the federal government were correct, any change to the Constitution must come through Article V's amendment process.

For this reason, the federal government's invocation of modern communications technology is a red herring. Writing a letter designating a proxy—even with specific instructions—is not dependent on twenty-first century technology.

## C.  The practice of unanimous consent is not to the contrary.

The practice of operating by unanimous consent—where a house presumes that a quorum exists when all Members unanimously agree on a bill or resolution—comports with the physical-presence understanding of the Clause. That practice merely presumes that the quorum continues after having first been established at the start of the session. *See* 5 Lewis Deschler, *Deschler's Precedents of the United States House of Representatives* Ch. 20 § 1.4 (1994); *Noel Canning*, 573 U.S. at 553–54 (describing these rules in the Senate). And it presumes a quorum only until the absence of one is "disclosed by a vote or questioned by a point of no quorum." 5 Deschler, *supra*, at Ch. 20 § 1; *see also* Floyd M. Riddick & Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices* 1041–42 (1992).

Although this presumption "leaves open the possibility" that Congress could sometimes act "without a quorum physically present," it cannot be used to *create* a quorum where there is none. *Bondi*, 149 F.4th at 553 (Wilson, J., dissenting). That unanimous consent "is applied across a wide range of House business" or used for judicial confirmations, Gov't En Banc Br. 40, does not change the fact that a physically present quorum is a prerequisite to conducting business. In other words, the practice of unanimous consent merely concerns how long a physically present quorum is assumed (and when the existence of a physically present quorum is evaluated).

As Judge Hendrix observed, "even if the House or Senate can presume that a quorum exists to conduct business under procedures that would not demonstrate the lack of a quorum, affirmatively counting an absent member as present even though a

39

roll-call vote shows the lack of a quorum is an entirely different matter." *Garland*, 719 F. Supp. 3d at 593. While discussing the practice, the Supreme Court noted that "[i]f any present Senator had raised a question as to the presence of a quorum, and by roll call it had become clear that a quorum was missing, the Senators in attendance could have directed the Sergeant at Arms to bring in the missing Senators." *Noel Canning*, 573 U.S. at 554.

In that scenario, because the presumption of quorum ended, physical presence of a majority of Members would have been needed to conduct further business. Reaffirming the presence requirement here would not change the use of this presumption. *Contra* Amicus Br. of Sen. Mitch McConnell 18–22. *See also id.* at 21 (detailing how, under the Senate rules, one Senator continuously denied unanimous consent "to express his opposition to President Biden's unlawful provision of abortion in the Department of Defense" and thus "delayed for ten months the promotion of hundreds of military flag officers").

### D. The House's rulemaking authority does not extend to interpreting the Quorum Clause to permit presence by proxy.

The federal government relies heavily on the House's authority under the Rulemaking Clause. Gov't En Banc Br. 20, 22, 38–41, 45–47. But that power cannot erase a constitutional limit on the legislature's power to do business.

The federal government contends (at 38) that "to the extent that any doubt existed about the Quorum Clause's requirements, that doubt would be properly resolved in favor of allowing the House to determine the appropriate implementation of the quorum requirement pursuant to its power under the Rulemaking Clause." It

40

cites (at 38–39) *Noel Canning* to justify this broad interpretation of the Rulemaking Clause as promoting legislative "participation," and concludes that the House's choice "to adopt a rule expressly providing that Members who vote remotely will be counted towards the required quorum" is "within the wide latitude granted . . . to determine how to conduct its own proceedings."

*Noel Canning*, which interpreted the Recess Appointments Clause, does not support the federal government. After recognizing two textually permissible constructions of the constitutional text and 200 years of historical practice favoring the broader construction, the Supreme Court adopted the broader construction in part to advance the Clause's "purpose . . . to permit the President to obtain the assistance of subordinate officers" during a recess. 573 U.S. at 540. It did so after weighing the purposes of the President's recess-appointment power and the Senate's advice-and-consent process. A broad interpretation of the Clause could permit a president to "avoid Senate confirmations" by waiting for a recess to "provide all potential nominees with recess appointments." *Id.* at 541. That practice would surely undermine the Senate's "advice and consent" process. *Id.* at 542. Nevertheless, while acknowledging that "both interpretations carry with them some risk of undesirable consequences," the Supreme Court held that "the narrower interpretation risks undermining constitutionally conferred powers more seriously and more often." *Id.*

If anything, *Noel Canning's* analysis supports Texas. First, unlike in *Noel Canning*, there is no textual ambiguity to resolve. *See id.* at 539 (citing Jefferson's and Attorney General Wirt's attempts to discern the intended meaning due to

41

textual ambiguities); *id.* at 543 (canvassing ambiguous actions of presidents Washington, Adams, and Jefferson to try and determine their views on the Clause). As demonstrated above, *supra* Part II.A, the ordinary meanings of "absent" and "attendance" reflect physical presence—as confirmed in the ratification debates—and there are no other sensible definitions of those terms in this context.

Second, just as in *Noel Canning*, "[h]istorical practice over the past 200 years strongly favors" the physical-presence requirement. 573 U.S. at 543; *see supra* Part II.B. With unambiguous text and uniform historical practice both pointing in the same direction, there is no need consider how the Quorum Clause's "purpose" would be served under various, competing interpretations. *Cf.* 573 U.S. at 541. Instead, both text and practice work together to *reject* presence by proxy. And presence by proxy disserves another purpose of the Quorum Clause: deliberation between Members. *See* 3 Story, *supra* § 832; *cf. Garland*, 719 F. Supp. 3d 521, 585 (noting that "proxy participation permits a member to focus on another matter while someone else conducts the legislative business on the absent member's behalf").

Third, *Noel Canning* addressed an inter-branch tension between two competing powers, but the Quorum Clause is a constitutional *limit* on Congress, not a grant of power. *See* 573 U.S. at 555 (addressing how its holding would not "significantly alter the constitutional balance" between the President and the Senate). In the federal government's view (at 38), a house of Congress may use its "broad delegation of [rulemaking] authority" to circumvent a constitutional restraint on its own authority. But nothing in *Noel Canning* sanctions this reasoning. Drawing lines between two competing powers is different than enabling a house of Congress to

42

circumvent a constitutional limitation. Congress "may not by its rules ignore constitutional restraints." *Ballin*, 144 U.S. at 5.

### E. Precedent strongly suggests that the Quorum Clause does not permit presence by proxy.

The only guidance from the Supreme Court on the Quorum Clause—*United States v. Ballin*—confirms that the Constitution requires physical presence. While Congress may choose methods to determine presence, it may not eliminate the presence requirement altogether.

**1.**    In *Ballin*, the Supreme Court upheld a House rule permitting the Speaker to count non-voting Members who were nonetheless physically present in the Chamber. 144 U.S. at 5. It held that the phrase "a majority of each [house] shall constitute a quorum to do business" described, "[i]n other words, when a majority are present the house in a position to do business." *Id.* A house's "capacity to transact business is then established, created by the mere presence of a majority." *Id.* "All that the constitution requires is the presence of a majority, and when that majority are present the power of the house arises." *Id.* at 6.

The Supreme Court then held that, because the Constitution "has prescribed no method" of determining the presence of a majority, "it is therefore within the competency of the house to prescribe any method which shall be reasonably certain *to ascertain the fact*." *Id.* (emphasis added). The Court emphasized that a house's "capacity to transact business" is established by the "presence of a majority, and does not depend upon the disposition or assent or action of any single member or

43

fraction of the majority present." *Id.* at 5–6. Presence of Members is thus constitutionally necessary to create a quorum.

The opinion's examples of how a house of Congress might ascertain the presence of a quorum confirm this understanding. Methods included "answer[ing] to roll-call," "requir[ing] the passage of members between tellers, and their count," or relying on "the count of the [S]peaker or the cle[r]k, and an announcement from the desk of the names of those who are present." *Id.* at 6. All presuppose that Members are physically present. As Judge Wilson correctly observed, *Ballin* "all but states" the point at issue: presence meant physical presence. *Bondi*, 149 F.4th at 548 n.3 (Wilson, J., dissenting). *Ballin* confirms what text and history have already shown: that a quorum requires a physically present majority of Members.

Applying *Ballin* in this case, counting proxies of indisputably absent Members is not a "method . . . reasonably certain to ascertain" whether those absent Members are physically present. 144 U.S. at 6.

**2.** The federal government denies (at 49–50) that *Ballin* concluded that "physical presence is the sole criterion Congress may use in determining whether it is in a 'condition to transact business.'" The federal government insists (at 50) that *Ballin* held that physical presence is just one permissible method among others, and therefore "Congress reasonably exercised that discretionary authority when it concluded that Members are participating in its business and may be counted towards a quorum where they cast a vote on a particular piece of legislation."

The federal government is incorrect. The Supreme Court's discussion of presence was not as a "method" to define a quorum but as the fact to be ascertained.

44

Presence is *required* for a quorum: "All that the *constitution requires* is the *presence of a majority*, and when that majority are *present* the power of the house arises." *Id.* at 6 (emphasis added).

The federal government conflates Congress's discretion on how to evaluate whether a majority is present with the ability of Congress to define what presence means. As Judge Wilson explained, "*Ballin* does not stand for the proposition that Congress may define the fact itself—what being 'present' means—particularly to define it into nonexistence." *Bondi*, 149 F.4th at 548 (Wilson, J., dissenting). That proposition would violate *Ballin*'s instruction that Congress "may not by its rules ignore constitutional restraints." 144 U.S. at 5. Instead, *Ballin* stands for the basic proposition that a house of Congress has latitude to determine how to count the present Members, not to define "presence" out of existence.

*    *    *

Text, history, and precedent all point in the same direction: The Quorum Clause requires that a majority of Members be physically present when Congress conducts business, and Congress cannot satisfy that requirement through proxies.

## III. The Scope of Relief Is Narrow.

Affirming the district court's order would uphold a narrow injunction against enforcement of the PWFA as to Texas alone. *See CASA*, 606 U.S. at 841. Enforcing the Quorum Clause's physical-presence requirement will not affect laws other than the Consolidated Appropriations Act of 2023, the only law that passed with a majority of Members counted as present by proxy. A decision in favor of the State will

45

affect only one law from the short-lived proxy-voting era: the Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022).

The federal government's consequentialist arguments concern future hypothetical cases. The federal government contends (at 1–3) that a ruling for Texas will call into question the Act's spending provisions and its permanent legislation, but as Judge Hendrix observed, "Texas only requests that the Court enjoin the specifically challenged portions of the Act as to it—not the Act as a whole." *Garland*, 719 F. Supp. 3d at 597; *cf. id.* ("If a request for an injunction of the entire Act were before the Court, these concerns about the public's interest in the continued funding . . . albeit through an unconstitutionally passed act, would weigh much heavier than they do here.").

Any future litigants seeking to challenge the Act's spending provisions would likely face significant standing hurdles, just as Texas did with its challenge to one of the Act's other provisions. *Id.* at 561 ("[T]o the extent that Texas's injuries are connected to the CMPP funding due to the actions of a subrecipient . . . it must demonstrate that the 2023 funds will be awarded to a Texas entity. It has not done so[.]").

The Supreme Court has upheld Article I's strict limitations on the lawmaking power even when the consequences in doing so were far-reaching. In *INS v. Chadha*, the Court held invalid hundreds of legislative veto provisions across a wide range of statutes. 462 U.S. 919 (1983). While conceding that the legislative veto may be useful, the Court concluded that "policy arguments supporting even useful 'political inventions' are subject to the demands of the Constitution which defines powers and, with respect to this subject, sets out just how those powers are to be exercised."

46

*Id.* at 945; *see id.* at 959–60 (Powell, J., concurring in the judgment) ("The breadth of this holding gives one pause. Congress has included the veto in literally hundreds of statutes, dating back to the 1930s."). As the district court below recognized, "there is no too-big-to-be-unconstitutional exception for congressional action." *Garland*, 719 F. Supp. 3d at 596. The Quorum Clause sets out how Congress's powers are to be exercised, and it cannot be discarded for utility or expediency.

## Conclusion and Prayer

For these reasons, this Court should affirm.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

/s/ William R. Peterson
William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

William F. Cole
Principal Deputy Solicitor General

Matthew M. Hilderbrand
Assistant Solicitor General

Christopher J. Pavlinec
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Robert E. Henneke
Chance Weldon
Matthew R. Miller
Eric Heigis

Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,261 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned for viruses and is free of viruses.

/s/ William R. Peterson
WILLIAM R. PETERSON