# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 20, 2026

Thomas B. Plunkett, III
Clerk

---

No. 24-10386

---

State of Texas,

*Plaintiff—Appellee*,

*versus*

Todd Wallace Blanche, *U.S. Attorney General, in his official capacity as United States Attorney General*; Andrea R. Lucas, *in her official capacity as Chair of the U.S. Equal Employment Opportunity Commission*; Vice Chair of the U.S. Equal Employment Opportunity Commission; Kalpana Kotagal, *in her official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission*; Brittany Bull Panuccio, *in her official capacity as Commissioner of the U.S. Equal Employment Opportunity Commission*; Catherine Eschbach, *in her official capacity as Acting General Counsel of the Equal Employment Opportunity Commission*; Equal Employment Opportunity Commission; United States Department of Justice,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:23-CV-34

---

Before ELROD, *Chief Judge*, and JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES,* GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*, joined by ELROD, *Chief Judge*, and JONES, SMITH, WILLETT, HO, DUNCAN, ENGELHARDT, and OLDHAM, *Circuit Judges*:

During the COVID-19 pandemic, the House of Representatives adopted a rule allowing Members to record their presence by proxy for purposes of establishing a quorum. The House used this rule when passing the Consolidated Appropriations Act of 2023 (the Act), having mustered a quorum by counting hundreds of otherwise absent Members as present by proxy. The Senate then passed the bill, and the President signed it into law.

The State of Texas argues that the House's proxy-presence rule is inconsistent with the Constitution's Quorum Clause, which would mean that the House did not validly pass the Act. *See* U.S. CONST. art. I, § 5, cl. 1. Based on that proposition, Texas seeks injunctive relief against just one portion of the Act: The Pregnant Workers Fairness Act (PWFA). The federal Government responds that the enrolled-bill rule, which instructs that a bill's passage through the legislature is conclusive proof of its authenticity, precludes judicial review of whether the Act's passage complied with the Quorum Clause. Alternatively, the Government argues that the Quorum Clause permits proxy presence.

The district court held that the enrolled-bill rule did not apply and that the House's passage of the Act—through use of the proxy-presence rule

---

* JUDGE HAYNES states that she does not think it is appropriate to throw out the Federal House of Representatives in this arena, so she dissents. She also appreciates JUDGE GRAVES's dissent.

—violated the Quorum Clause. Accordingly, the district court enjoined the Government from enforcing the PWFA against Texas.

We conclude that the enrolled-bill rule does not bar our review because Texas's constitutional challenge does not implicate a dispute of fact regarding the Act's passage. We further conclude that the Act's passage was unconstitutional because the Quorum Clause does not allow proxies to be included when establishing a quorum. The Clause's text, context, original understanding, and unbroken historical application all indicate that Members of Congress must be present for quorum purposes—as the Supreme Court expressly held over 125 years ago, and as Congress has done ever since the Founding. "Proxy presence" does not count. While the chambers of the legislature have much discretion regarding their rules of procedure, the Quorum Clause's constraints on congressional power cannot be circumvented by congressional fiat. We therefore affirm the judgment of the district court.

## I.

### A.

In the early days of the global COVID pandemic, the House of Representatives adopted House Resolution 965:

> [A]t any time after the Speaker . . . is notified . . . that a public health emergency due to a novel coronavirus is in effect, the Speaker . . . may designate a period . . . during which a Member who is designated by another Member as a proxy . . . may cast the vote of such other Member or record the presence of such other Member in the House.

H.R. Res. 965 § 1(a), 116th Cong. (2020). To assign a proxy, the designating Member had to submit a signed letter specifying the designated Member. *Id.* § 2. The rule further stated:

> Any Member . . . whose presence is recorded by a designated proxy under this resolution shall be counted for the purpose of establishing a quorum under the rules of the House.

*Id.* § 3(b). Plainly put, the rule allowed an otherwise absent Member to record his or her presence by proxy for purposes of a quorum.

The House employed the proxy-presence rule when it passed the Consolidated Appropriations Act of 2023.[1] *See* 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022). The final vote tally on the Act was 225 yeas and 201 nays, with one Member voting present and four not voting. *Id.* at H10528.[2] Of the 427 Members who recorded a vote on the Act, the Congressional Record indicates that 226 Members—a majority of the House—had recorded their presence and their vote by proxy. *Id.* at H10529. Thus, when the House voted on the Act, less than a majority of Members were physically present.

During the vote, Representative Chip Roy commented that the Act was "moving off the floor without a physical quorum present" and reserved the right to object. *Id.* He asked whether there was any recourse to challenge the quorum determination, but the Speaker Pro Tempore (Representative G.K. Butterfield) told him that "a quorum was, indeed, present." *Id.* Representative Roy then asked how that was so, given that "there were 226 votes cast by proxy, *i.e.*, not physically present in the Chamber." *Id.* The Speaker Pro Tempore answered: "Members casting their vote or recording their presence by proxy [were] counted for the purpose of establishing a

---

[1] The House of Representatives for the 117th Congress maintained the rule. *See* H.R. Res. 8 § 3(s), 117th Cong. (2021).

[2] The House had four vacancies when the House approved the Act on December 23, 2022, so there were only 431 Members serving at the time. *See* The United States House of Representatives: History, Art & Archives: *Vacancies and Successors*, https://history.house.gov/dropdowntemplate?id=36507224009&htmlContentID=36507224028 [https://perma.cc/JVB5-AJ3F].

quorum." *Id.* When Representative Roy again inquired as to whether there was a recourse to ask the Speaker to count the Members physically present, the Speaker Pro Tempore replied that "under the rules of the House, a quorum was, indeed, present." *Id.* It is uncontested that a quorum was established only because the House included proxies in the quorum count.

After the House passed the Act, the Senate followed suit, and the presiding officers of both chambers of Congress printed and signed the bill. At that point, it became an "enrolled bill." *See* 1 U.S.C. § 106. The bill was transmitted to the President, who signed it into law. *See* Pub. L. No. 117-328, 136 Stat. 4459 (2022).

**B.**

The State of Texas sued a variety of federal entities and officials[3] (collectively, "the Government"), arguing that the House's passage of the Act violated the Quorum Clause of the United States Constitution. U.S. CONST. art. I, § 5, cl. 1. Texas sought injunctive relief barring the Government from enforcing two parts of the Act against Texas: (1) the PWFA, and (2) a $20 million appropriation to the Department of Homeland Security's Alternatives to Detention Case Management Pilot Program. Texas also requested a declaratory judgment that those parts of the Act were passed in violation of the Quorum Clause.

In response, the Government argued that Texas lacked Article III standing to bring its challenge, that the enrolled-bill rule prohibited judicial review of the Act's passage, and that the House's passage of the Act was consistent with the Quorum Clause.

---

[3] Pursuant to Federal Rule of Civil Procedure 25(d) and Federal Rule of Appellate Procedure 43(c)(2), all successors-in-office have been automatically substituted as defendants in this matter.

After a bench trial, the district court concluded that Texas had Article III standing to challenge the PWFA but not the Pilot Program. *See Texas v. Garland*, 719 F. Supp. 3d 521, 552–66 (N.D. Tex. 2024). The court then concluded that the enrolled-bill rule did not preclude it from reaching the merits, for two reasons. *Id.* at 567. First, "when the dispute turns on a clear constitutional limitation on Congress's power that does not devolve into battles over conflicting legislative records, the mere act of enrollment cannot thwart a court's ordinary power to resolve constitutional challenges." *Id.* And second, "to the extent that quorum-based challenges can implicate the principles of the enrolled bill doctrine, the Court must first resolve any challenge to the constitutionality of the procedural rule at issue that was used . . . to determine the existence of a quorum." *Id.*

The district court next proceeded to the merits of Texas's challenge under the Quorum Clause. The court concluded that "[g]iven the Constitution's text, original public meaning, and historical practice, . . . the House cannot count members voting by proxy to constitute a constitutionally compliant quorum." *Id.* at 582. As the district court put it, "[t]he Quorum Clause is not a majority-participation requirement, but a majority-presence requirement." *Id.* (citing *United States v. Ballin*, 144 U.S. 1, 6 (1892)).

As to the remedy, the district court stated that "Texas [was] entitled to a permanent injunction of the PWFA's enforcement against it," but denied Texas's request for a declaratory judgment because that "would be redundant and provide no further relief." *Id.* at 597, 599. The court also emphasized the "limited scope" of the injunctive relief that it awarded: The district court did not grant—and Texas did not seek—an injunction of the entire Consolidated Appropriations Act of 2023. *Id.* at 537. Rather, the court enjoined "only the application of the Pregnant Workers Fairness Act against Texas." *Id.*

A divided panel of our court reversed the district court's judgment and vacated the injunction, concluding that although the enrolled-bill rule did not preclude judicial review of Texas's challenge on the merits, the "Quorum Clause does not require physical presence for a house of Congress to conduct business." *Texas v. Bondi*, 149 F.4th 529, 545–46 (5th Cir. 2025). We granted rehearing en banc and vacated the panel opinion. 164 F.4th 446 (5th Cir. 2026) (mem.).[4]

## II.

We review a trial court's grant of a permanent injunction for abuse of discretion. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). "The district court abuses its discretion if it '(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.'" *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal,*

---

[4] The parties do not appeal the district court's rulings on standing (*i.e.*, that Texas has it to challenge the PWFA, but lacks it to challenge the Pilot Program). Nevertheless, federal courts have an independent obligation to ensure that subject-matter jurisdiction is met. U.S. CONST. art. III, § 2, cl. 1; *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016) (explaining that the power of the federal judiciary extends only to "[c]ases" and "[c]ontroversies"); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (illustrating the "irreducible constitutional minimum of standing"). The district court held that Texas has standing to challenge the PWFA because the law injures the State in three ways: through unrecoverable compliance costs it bears as a regulated employer, the burden of defending administrative investigations and litigation, and the abrogation of its sovereign immunity, all of which are fairly traceable to the federal government's enforcement authority and redressable through injunctive relief. In this instance, the requirements of Art. III standing continue to be satisfied.

Texas does not contest the district court's denial of declaratory relief or dismissal of the State's challenge to the Pilot Program. Accordingly, those issues are abandoned on appeal. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 56 n.4 (2002); *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009).

*Air, Rail, & Transp. Workers*, 973 F.3d 326, 333–34 (5th Cir. 2020) (quoting *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018)). We review *de novo* any questions of law underlying the district court's order. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016).

## III.

At issue is (A) whether the enrolled-bill rule precludes judicial review of Texas's claim that the Consolidated Appropriations Act of 2023 passed the House without a constitutionally required quorum; and, if not, (B) whether the district court erred in holding that the Quorum Clause does not permit proxies to be counted toward a quorum.

### A.

The parties agree that the Consolidated Appropriations Act of 2023 is an enrolled bill, *i.e.*, that it was signed by the presiding officers of both houses of Congress. *See* 1 U.S.C. § 106. The parties disagree as to what that means for Texas's constitutional challenge. The Government contends that judicial review of Texas's challenge is foreclosed by the enrolled-bill rule articulated in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892). Texas counters that the enrolled-bill rule is inapplicable, so review is appropriate. As we explain, the enrolled-bill doctrine does not bar review of Texas's challenge. Texas does not dispute facts regarding the Act's enrollment; rather, Texas asserts that the Act's passage did not legally comply with the Quorum Clause.

#### 1.

In *Marshall Field*, a bill had been signed by the Speaker of the House and the president of the Senate. *Id.* at 668. The appellants argued that the enrolled bill should be "deemed an absolute nullity, in all its parts, because . . . it [was] shown by the congressional records . . . that a section of the bill, as it finally passed, was not in the bill authenticated by the signatures of the

presiding officers of the respective houses of [C]ongress." *Id.* at 668–69. Put otherwise, their position was that an enrolled bill "cannot be regarded as a law of the United States if the journal of either house fails to show that it passed in the precise form in which it was signed." *Id.* at 672.

The Supreme Court disagreed, instead concluding that it was "not competent for the appellants to show, from the journals of either house, from the reports of committees, or from other documents printed by the authority of [C]ongress, that the enrolled bill, . . . as finally passed, contained a section that does not appear in the enrolled act." *Id.* at 680. If the presiding officers of both legislative houses sign the bill, that is "an official attestation by the two houses of such bill as one that has passed [C]ongress." *Id.* at 672. And when the President signs that bill, "its authentication as a bill that has passed [C]ongress should be deemed complete and unimpeachable." *Id.*

A few years later, the Supreme Court faced a nearly identical question in the context of territorial legislatures: Whether "evidence derived from the journals of the council and house of representatives" may be employed to show that an enrolled bill "contained, at the time of its final passage, provisions that were omitted from it without authority of the council or the house, before it was presented to the governor." *Harwood v. Wentworth*, 162 U.S. 547, 557–58 (1896). The Court found that "[u]pon the authority of *Field* . . . this question must be answered in the negative." *Id.* at 558. The Court saw "no reason to modify the principles announced in *Field*" when it came to territorial legislatures rather than the federal one. *Id.* at 562.

The Supreme Court more recently addressed the reach of *Marshall Field* in *United States v. Munoz-Flores*, 495 U.S. 385 (1990). The *Munoz-Flores* appellants argued that Congress had unconstitutionally passed a statute in violation of the Origination Clause, which requires that "All Bills for raising Revenue shall originate in the House of Representatives." *Id.* at 387; *see*

U.S. Const. art. I, § 7, cl. 1. Before deciding the merits of that issue, the Court dropped a footnote rejecting the notion that *Marshall Field*'s enrolled-bill rule prevented judicial review of the appellants' challenge:

> That case concerned "the nature of the evidence" the Court would consider in determining whether a bill had actually passed Congress. [*Marshall Field*, 143 U.S.] at 670. . . . The Court . . . held that the Constitution left it to Congress to determine how a bill is to be authenticated as having passed. *Id.* at 670–71. In the absence of any constitutional requirement binding Congress, [the Court] stated that "[t]he respect due to coequal and independent departments" demands that the courts accept as passed all bills authenticated in the manner provided by Congress. *Id.* at 672. Where, as here, a constitutional provision *is* implicated, *Field* does not apply.

*Munoz-Flores*, 495 U.S. at 391 n.4. This characterization of *Marshall Field* underscores that the enrolled-bill doctrine concerns what evidence can be considered for authenticating the fact of a bill's passage.[5]

If this language in *Munoz-Flores* is not sufficiently telling, additional context clarifies its meaning. The Court's brief explication of *Marshall Field* addressed an alternative interpretation offered by Justice Scalia. In his concurrence, Justice Scalia posited that *Marshall Field* dictated that the challenged statute's accompanying "H.J. Res." designation authoritatively "attests that the legislation originated in the House." *Id.* at 409 (Scalia, J., concurring). He thought the Court "should no more gainsay Congress'

---

[5] On the merits, the Court held that the challenged statute's passage did not violate the Origination Clause because that statute was not a "Bill for raising Revenue" within the meaning of that Clause. *Munoz-Flores*, 495 U.S. at 401 (brackets omitted). The Court therefore did not consider "whether the Origination Clause would require its invalidating if it *were* a revenue bill." *Id.*

official assertion of the origin of a bill than . . . gainsay its official assertion that the bill was passed by the requisite quorum." *Id.* at 410.

But the *Munoz-Flores* majority interpreted *Marshall Field*'s enrolled-bill rule differently: "Where, as here, a constitutional provision *is* implicated, *Field* does not apply." *Id.* at 391 n.4. So, although Congress's "H.J. Res." designation suggested that the bill originated in the House, "congressional consideration of the constitutional questions [did] not foreclose subsequent judicial scrutiny of the law's constitutionality." *Id.* at 391.

In another case shortly after *Munoz-Flores*, the Supreme Court reiterated that *Marshall Field*'s enrolled-bill rule concerns the nature of the evidence that courts may consider in assessing whether a bill passed Congress. *U.S. Nat. Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 n.7 (1993). The enrolled-bill rule was "irrelevant to th[e] case . . . [because] there is no doubt . . . that the [challenged] Act as printed in the Statutes at Large is identical to the enrolled bill." *Id.*

At bottom, the enrolled-bill doctrine instructs that a bill's enrollment is proof that the bill is indeed the one that passed Congress. Extrinsic, or even intrinsic, evidence cannot be used to demonstrate otherwise. This understanding is consistent not only with Supreme Court precedent, but also the opinions of our sister circuits. *See Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1350 (D.C. Cir. 2007) ("The Court crafted a clear rule: 'It is not competent for a party raising a bicameralism challenge to show, from the journals of either house, from the reports of committees or from other documents printed by authority of Congress, that an enrolled bill' differs from that actually passed by Congress." (cleaned up) (quoting *Marshall Field*, 143 U.S. at 680)); *OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197, 205 (2d Cir. 2007) ("Permitting litigants to *impeach the text* of an enrolled bill

by other congressional documents would likewise create 'uncertainty in the statute laws.'" (emphasis added) (quoting *Marshall Field*, 143 U.S. at 675)).

**2.**

The foregoing reveals why the enrolled-bill doctrine is inapplicable to Texas's Quorum Clause challenge: There are no disputed facts regarding the enrollment of the Consolidated Appropriations Act of 2023. Everyone agrees on the underlying facts of the Act's passage—relevantly, that the House established a purported quorum only by including proxies in the quorum count. But judicial review is not obviated by the mere fact that the House asserted that it had a quorum when it passed the Act. As the Court explained in *Munoz-Flores*, "[a] law passed in violation of the Origination Clause would . . . be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would be a law passed in violation of the First Amendment." 495 U.S. at 397. The same holds true for a law passed in violation of the Quorum Clause.

Bolstering this conclusion is the Supreme Court's decision in *United States v. Ballin*, 144 U.S. 1 (1892), decided the same day as *Marshall Field*. In *Ballin*, the House had adopted a rule allowing the quorum count to include non-voting Members who were nonetheless in attendance at the legislative session. *Id.* at 5. The House then used the rule in passing a bill. *Id.* at 4. The Court began by observing that "[t]he enrolled bill is found in the proper office, that of the secretary of state, authenticated and approved in the customary and legal form. There is nothing on the face of it to suggest any invalidity." *Id.* at 3. The Court also noted that "if reference may be had to [the House's] journal, it must be assumed to speak the truth." *Id.* at 4. And the House's journal denoted that the House had established a quorum only

by counting as present the attending-but-not-voting Members. *Id.*[6] There was thus no dispute as to the bill's authenticity, and no dispute as to how the House had established a quorum. The House's action on the bill "was taken in direct compliance with [the House's] rule." *Id.* at 5. "The question, therefore, [was] as to the validity of this rule"—a question that the Court then proceeded to answer. *Id.*

This discussion in *Ballin* exemplifies when judicial review of a Quorum Clause challenge is appropriate. The record indisputably showed that the House had reached a quorum only by counting non-voting Members as present, and with that determined, the Court proceeded to the merits of the Quorum Clause challenge. The House's mere assertion that it had a quorum did not cordon off the House's quorum-counting rule from scrutiny. As the Court explained, Congress "may not by its rules ignore constitutional restraints." *Id.* Texas's challenge is much like the one in *Ballin*: The parties agree on the underlying facts, but they disagree on the proper meaning of the Quorum Clause.

Our assessment gains additional support from the enrolled-bill rule's brief appearance in *NLRB v. Noel Canning*, 573 U.S. 513 (2014). There, the Supreme Court noted that under the enrolled-bill rule, courts "generally take at face value the Senate's own report of its actions." *Id.* at 551. So "when the Journal of the Senate indicates that a quorum was present, *under a valid Senate rule*, at the time the Senate passed a bill, [courts] will not consider an argument that a quorum was not, in fact, present." *Id.* (emphasis added).

---

[6] *See Ballin*, 144 U.S. at 2–3 (There were "212 members present, constituting a quorum present to do business," but 74 of those Members were "present and refus[ed] to vote.").

Here, Texas challenges the validity of the House's proxy-presence rule, through which the House ostensibly established a quorum. Unlike *Noel Canning*, Texas's argument does not require us to "determine such matters as who is, and who is not, in fact present on the floor during a particular [House] session." *Id.* at 555. Instead, we "take at face value the [House]'s own report of its actions." *Id.* at 551. And that (undisputed) report shows that the House's determination that it had a quorum relied on the inclusion of proxies. Therefore, the enrolled-bill rule is inapplicable to Texas's claim that the House's passage of the Act violated the Quorum Clause.

**3.**

The Government's alternative understanding of the enrolled-bill doctrine is unpersuasive. The Government insists that nothing in the Supreme Court's precedents limits the doctrine's application only to fact-intensive disputes as opposed to legal ones. Therefore, the Government essentially argues that our court, out of respect for a coordinate branch of government, should accept as legally conclusive the House's assertion that it had a quorum when it passed the Act.

That asks for too much. The enrolled-bill rule instructs that courts cannot second-guess the fact of a bill's passage; it does not command that we defer to Congress on constitutional questions. In *Munoz-Flores*, the Supreme Court explained that "[i]n the absence of any constitutional requirement binding Congress, [the Court] stated [in *Marshall Field*] that '[t]he respect due to coequal and independent departments' demands that the courts accept as passed all bills authenticated in the manner provided by Congress. Where . . . a constitutional provision *is* implicated, *Field* does not apply." 495 U.S. at 391 n.4 (citation omitted) (quoting *Marshall Field*, 143 U.S. at 672). Here, Texas's constitutional challenge hinges entirely on the proper meaning of the Quorum Clause. While the House may contend that its proxy-

presence rule is consistent with the Quorum Clause, we cannot merely take the House's word for it.[7] Given the uncontested fact that the House reached a quorum only by including proxies, the House's assertion that it had a quorum does not itself resolve the legal question of whether that supposed quorum was constitutionally valid.[8]

The Government next turns to persuasive authority, arguing that several of our sister circuits have held that the enrolled-bill rule precludes review of claims that a statute is invalid because a chamber of the legislature allegedly lacked a quorum at the time of its vote. *See United States v. Farmer*, 583 F.3d 131, 151–52 (2d Cir. 2009); *United States v. Small*, 487 F. App'x 302, 303 (7th Cir. 2012); *United States v. Gonzalez-Arenas*, 496 F. App'x 866, 867 (10th Cir. 2012). But rather than supporting the Government's position, these cases only illustrate the type of Quorum Clause challenges to which the enrolled-bill rule appropriately applies.

In *Farmer*, the defendant argued that the "Congressional Record . . . show[ed] that a quorum was not present" on the date that Congress passed the relevant statute. 583 F.3d at 152. The defendants in *Small* and *Gonzalez-Arenas* offered functionally identical arguments. *See Small*, 487 F. App'x at

---

[7] Before the House voted to adopt the proxy-presence rule, some in the House argued that the rule would violate the Quorum Clause. *See, e.g.*, 166 Cong. Rec. H2009; H2021; H2025 (daily ed. May 15, 2020). But given that the House ultimately adopted the rule, we presume that a majority of the House agreed that the rule was constitutional. *See Rust v. Sullivan*, 500 U.S. 173, 191 (1991) ("[W]e assume [Congress] legislates in the light of constitutional limitations.").

[8] The Government's position would mean that in *Ballin*, the Supreme Court itself violated *Marshall Field*'s enrolled-bill rule: The *Ballin* Court assumed, albeit without deciding, that it was appropriate to look to the House's undisputed journal in setting the stage for its Quorum Clause analysis. *Ballin*, 144 U.S. at 4. By the Government's reckoning, the Court should have found dispositive the House's mere pronouncement that it had a quorum. Yet the *Ballin* Court, on the same day that it decided *Marshall Field*, did not do so.

303; *Gonzalez-Arenas*, 496 F. App'x at 867. In all three cases, the courts applied the enrolled-bill doctrine to foreclose what would have turned into factual investigations of Congress's legislative actions. And in all three cases, the defendants' challenges did not turn on the Quorum Clause's proper meaning, but on whether—as a factual matter—the Clause's agreed-upon requirements had been met.

Texas's Quorum Clause challenge is the opposite. Texas does not contest the facts regarding the House's passage of the Act, conspicuously including that the House established a quorum only by counting proxies. Instead, Texas argues that the House rule permitting that is inconsistent with the constitutional limitations of the Clause. In short, Texas's claim implicates only the legal meaning of the Quorum Clause. Resolving that issue requires no investigatory fact-finding proscribed by the enrolled-bill rule.

With both Supreme Court precedent and persuasive authority unavailing, the Government points as its redoubt to the principles underlying the enrolled-bill doctrine, namely, veneration of the separation of powers and the Supreme Court's recognition of the significant consequences that would flow from declaring an enrolled bill not properly enacted. In the Government's view, those concerns are no less implicated by a legal challenge than a factual one. The Government therefore warns that both legal and factual Quorum Clause challenges risk the "uncertainty and disruption that would result if statutes could be invalidated on the basis of an alleged lack of quorum."

We are mindful that the separation of powers entitles a coordinate branch of government to great respect and deference. *See United States v. Harris*, 106 U.S. 629, 635 (1883). But we must remain equally mindful of our own role: It is "the duty of . . . court[s], from the performance of which [they] may not shrink, to give full effect to the provisions of the

[C]onstitution relating to the enactment of laws." *Marshall Field*, 143 U.S. at 670. "[H]owever disagreeable that duty may be, in cases where [the court's] own judgment shall differ from that of other high functionaries, it is not at liberty to surrender, or to waive it." *United States v. Dickson*, 40 U.S. 141, 162 (1841) (STORY, J.). Our deep respect for the national legislature does not enable us to turn a blind eye to potential constitutional problems with one of its enactments.

As for the "uncertainty and disruption" that the Government warns may follow if we do not apply the enrolled-bill rule to Texas's challenge, the Government's position asks us to exceed the constraints of our judicial role. As has often been repeated, the courts "have neither force nor will but merely judgment." THE FEDERALIST NO. 78 (A. Hamilton). Our duty, while unflinching, is therefore a limited one: "[T]o say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And that duty forbids us from allowing our judgment to be infected by extrajudicial considerations. *See Hall v. Florida*, 572 U.S. 701, 721 (2014). "Too big to be unconstitutional" is not an accepted canon of constitutional interpretation.

In sum, the enrolled-bill doctrine does not foreclose judicial review of whether the House's passage of the Consolidated Appropriations Act of 2023 was consistent with the Quorum Clause. It is uncontested that the House established a quorum for passage only because hundreds of proxies were included in its quorum count. Texas's challenge rests on no disputed facts; the issue is a question of law properly brought before the judiciary.

## B.

We now turn to the merits of Texas's challenge. Pursuant to the House's proxy-presence rule, the House passed the Act after mustering a quorum only by counting proxies. Texas argues that this is inconsistent with the Constitution's Quorum Clause. The Government responds that the

Quorum Clause contains no physical-presence requirement that would prohibit the House from adopting its proxy-presence rule.

At the outset, we clarify that the question before us is not whether the Quorum Clause necessarily requires physical, bottom-in-a-seat presence. Nor is it whether Congress may employ *voting* by proxy. Rather, the question is only whether the Quorum Clause allows proxy presence to be included in a quorum count, *i.e.*, whether an absent Member's assignment of a proxy may render that Member "present" for quorum purposes. The answer is no.

**1.**

The Quorum Clause provides:

> [A] Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

U.S. CONST. art. I, § 5, cl. 1. Apart from its decision in *United States v. Ballin*, the Supreme Court has had little occasion to construe the Clause.

At issue in *Ballin* was a House rule that allowed the Speaker to count, for purposes of establishing a quorum, non-voting Members who were nonetheless in the legislative chamber during the session. 144 U.S. at 5. The House utilized that rule when passing a tariff bill in May 1890. The measure received 138 votes in favor, while another 74 Members in attendance did not vote. *Id.* at 2–3. In total, 212 Members were in the House chamber during the vote; in 1890, that constituted a majority of the House. *Id.* at 4.

The Court concluded that the Quorum Clause had been satisfied:

> [W]hen a majority are present the [H]ouse is in a position to do business. Its capacity to transact business is . . . created by the mere presence of a majority, and does not depend upon the

> disposition or assent or action of any single member or fraction of the majority present. All that the [C]onstitution requires is the presence of a majority, and when that majority are present the power of the [H]ouse arises.

*Id.* at 5–6. The Court explained that the Constitution "prescribed no method of making th[e] determination" of "the presence of a majority." *Id.* at 6. Therefore, the House could "prescribe any method which shall be reasonably certain to ascertain the fact." *Id.* The Court then listed a few permissible examples: The House could "prescribe answer to roll-call," or "require the passage of members between tellers" with "their count as the sole test," or use "the count of the speaker" and an "announcement from the desk of the names of those who are present." *Id.* The Court thus upheld the validity of the House's quorum-counting rule because "all that the rule attempt[ed] to do [was] prescribe a method for ascertaining the presence of a majority." *Id.*

*Ballin* explicitly required what is implicit in the Quorum Clause's text: "the *presence* of a majority." *Id.* (emphasis added). Without the "presence" of a majority of Members, the House is powerless "to do business." *Id.* at 5. But what does it mean for a Member to be "present" for purposes of the Quorum Clause? *Ballin* does not directly supply that answer.

Granted, Congress may "adopt any method which shall be reasonably certain to ascertain the fact" of how many Members are present. *Id.* at 6. Yet *Ballin* does not stand for the proposition that Congress may define the fact itself—what being "present" means—particularly to redefine it into nonexistence.[9] The Constitution fixes that inquiry; the fact exists

---

[9] Contra our dissenting colleagues' reading, *Ballin* brings into relief the distinction between the immutable fact to be ascertained—that a quorum must be present—and a rule delineating the procedures used to do so. We agree that the focus of the case is on "the validity of this rule." *Post*, at 46 (citing *Ballin*, 144 U.S. at 5). But the validity of the House's proxy-presence rule turns on the fact that it redefines "quorum" by redefining

independent of the procedures used to "ascertain" it. *See id.* (holding that the Constitution lets Congress "determine its rules of proceedings," but that Congress "may not by its rules ignore constitutional restraints."). As opposed to determining the *fact* of whether a majority is present, determining what it *means* to be present is a matter of interpreting and applying the text of the Constitution.

**2.**

To discern constitutional meaning, "we begin as always with the precise text of the Constitution." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 378 (2024). Indeed, we "must begin with the language of the instrument," because it "offers a fixed standard for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (citations and quotation marks omitted).

That meaning is discerned by seeking the text's "original public meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576–77 (2008). For the Constitution's original public meaning, we look to the Founding Era. *See id.* at 577 (considering "the founding generation['s]" understanding).

We may also consider post-ratification history, for "[w]hen faced with a dispute about the Constitution's meaning or application, '[l]ong settled and established practice is a consideration of great weight.'" *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). "Often, 'a regular course of practice' can illuminate or 'liquidate' our founding document's 'terms & phrases.'" *Id.* (quoting

---

presence, something the House cannot do irrespective of its power under the Rulemaking Clause. *Cf. id.* at 45-46, 55.

Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 WRITINGS OF JAMES MADISON 450 (G. Hunt ed. 1908)).

However, such evidence "cannot by itself establish an early American tradition." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020). And "to the extent later history contradicts what the text says, the text controls." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022); *see also Espinoza*, 591 U.S. at 482 ("recognizing that such evidence may reinforce an early practice but cannot create one").

**3.**

Returning to the text: "[A] Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members." U.S. CONST. art. I, § 5, cl. 1. The Quorum Clause does not state what kind of "presence" is required, *cf. Ballin*, 144 U.S. at 5, but "contextual and idiomatic clues"—including the interplay between the Clause's components—readily resolve any ambiguity. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 70 (2012) ("[C]ontext disambiguates. . . . [A] thoroughly fluent reader can reliably tell in the vast majority of instances from contextual and idiomatic clues which of several possible senses a word or phrase bears.").

A key clue pointing to the type of "presence" that the Quorum Clause envisions comes from the Clause's empowerment of a minority to muster a quorum by "compel[ling] the *Attendance* of *absent* Members." U.S. CONST. art. I, § 5, cl. 1 (emphasis added). If the "attendance" of a previously "absent" Member suffices to include him or her in the quorum count, then textually, that Member's absence would exclude him or her from the quorum count. In other words, an "absent" Member—one who is not in

"attendance" at the legislative session—is not "present" for quorum purposes.

Founding-era dictionaries support this admittedly intuitive reading. Granted, many dictionaries defined the terms "absent" and "attendance" in both a physical sense (not physically present) and a mental sense (not paying attention).[10] But to the extent there is definitional ambiguity, we are not left with two equally probable meanings: The mental sense of "absent" and "attendance" does not fit within the context of the Quorum Clause, leaving only the physical sense of those words as plausibly illuminating the meaning of the Clause's text.

Consider the counterfactual. If the Quorum Clause is satisfied by a Member's being merely mentally "present," the Constitution's strict procedural limit on congressional power hinges on legislators' capacity to focus on or pay attention to their chamber's proceedings. That reading is facially untenable, for a variety of reasons. As a matter of simple practicality, it would be impossible to define with any precision when a Member is mentally, as opposed to physically, present. And, even if such a standard

---

[10] *See* James Barclay, A Complete and Universal English Dictionary (1792) (defining "absent" as "at a distance from, out of the sight and hearing of a person. Figuratively, inattentive to, or regardless of something present"; defining "attendance" as "the act of waiting upon as a servant; service; the person in waiting; a servant"); *accord* 2 Samuel Johnson, A Dictionary of English Language (6th ed. 1785) (similarly defining "absent" and "attendance"); 1 John Ash, The New and Complete Dictionary of the English Language (2d ed. 1795) (same); 1 Thomas Sheridan, A Complete Dictionary of the English Language (3d ed. 1790) (defining "absent" as "[n]ot present, absent in mind, inattentive"; defining "attendance" as "[t]he act of waiting on another; service; the person waiting, a train; attention, regard"); 1 Noah Webster, An American Dictionary of the English Language (1828) (defining "absent" as "[n]ot present," "not in company," or "at such a distance as to prevent communication"; defining "attend" as "[t]o be present for some duty" or "in business").

could be articulated, it could not be administered: It would be impossible to prove when a Member's attention had fallen below the required minimum. Even hurdling those impediments, this reading could result in a scenario in which Congress vacillates between having a quorum and not having one on a moment-by-moment basis, even without a Member leaving the floor. This may be why the Government points to no legislative quorum requirement anywhere, from any era, that turns upon legislators' *mental attentiveness*.[11]

Moreover, such a reading cannot be squared with the second part of the Quorum Clause, which empowers a minority to compel the "Attendance of absent Members." Reading "absent" and "attendance" in only their mental sense devolves the compulsion power into a hollow ability to oblige distracted Members to snap out of it and pay attention. Again, the Government offers no instance in which a legislative chamber used the compulsion power in this way. On the other hand, the Quorum Clause—encompassing both its majority-presence requirement and its compulsion power—is perfectly cogent as read through the prism of the physical definitions of "absent" and "attendance." A Member is "absent," *i.e.*, not present, when he or she is a no-show, and, to muster a quorum, a minority of the legislative chamber may "compel" his or her personal "attendance."[12]

---

[11] And the irreconcilability of reading of "absent" and "attendance" to refer to mental attentiveness is doubly apparent in the context of the House's proxy-presence rule. The designation of a proxy does nothing to ensure a Member's presence of mind. If anything, a Member can more easily be *both* physically and mentally absent by delegating his or her "presence" to a proxy holder.

[12] Even though the Quorum Clause's compulsion component most logically refers to physical presence, the Clause's implicit "presence" requirement could nonetheless be satisfied by something less than physical presence. Whatever the outer contours of the Clause's application, its plain text and textual clues bely any notion that the Quorum Clause is satisfied with mere mental "presence." And as we explain shortly, such a view of the

The physical-presence reading of the Quorum Clause gains further support from a neighboring constitutional provision: "[Members] shall . . . be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same." U.S. CONST. art. I, § 6, cl. 2.[13] Apart from the Quorum Clause, the Privilege from Arrest Clause is the only other time the Constitution uses the term "Attendance."[14] And it is plain as day that the Privilege from Arrest Clause employs "Attendance" to mean physical presence rather than mental attentiveness. The Clause refers to "Attendance *at* the Session," not "Attendance *to* the Session." Even more obvious, the Clause privileges Members from arrest while they are "going to and returning from"

---

Clause finds no support in the historical record. At minimum, the Quorum Clause requires more than presence-by-proxy.

[13] There is further evidence of the interplay between quorum and presence in Founding-era commentary regarding the Treaty Clause, which empowers the President "to make Treaties, provided two thirds of Senators *present* concur." U.S. CONST. art. II, § 2, cl. 5 (emphasis added). In short: It was routinely assumed that a quorum required presence. *See, e.g.*, 6 JOHN P. KAMINSKI ET AL., THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1264 (1993 ed.) ("[R]ules should be under restraint. Congress [has] great powers—sometimes a majority of a *quorum* is required—sometimes two-thirds *present*, as in treaties.") (emphasis added); 10 JOHN P. KAMINSKI ET AL., THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1244 (1993 ed.) ("[B]y this Constitution, two-thirds of the Senators *present*, with the President, can make any treaty. A *quorum* is fourteen, two-thirds of which are ten.") (emphasis added); *id.* at 1381 ("Although two-thirds of the Senators *present* could form a treaty, it was not presumable it could often happen, that there should be but a bare *quorum* present on so important an occasion, when the consequence of non-attendance was so well known.") (emphasis added).

[14] "Words in one provision are, of course, often understood 'by comparing them with other words and sentences in the same instrument.'" *Currier v. Virginia*, 585 U.S. 493, 504 (2018) (quoting 1 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 400, p. 384 (1833)); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text.").

legislative sessions. Given this language, the mental definition of "attendance" is a non-starter; the Clause protects Members' physical presence for congressional business. *See* 3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §§ 859–64, p. 607–10 (4th ed. 1873) (noting the privilege's importance because "a member has superior duties to perform *in another place*" and that "[i]n respect to the time of going and returning, the [privilege] . . . allows [a Member] time to settle his private affairs, and to prepare for his *journey*") (emphasis added). What is more, the notion of "proxy presence" renders nonsensical the Privilege from Arrest Clause: If an arrested Member could be counted present by proxy, and therefore in "Attendance at the Session," the Privilege from Arrest Clause has little if any work to do of its own.

Resisting this straightforward interpretation, the Government suggests that the Constitution's Rulemaking Clause buttresses the notion that the Quorum Clause's "presence" requirement is legislatively pliable, thus allowing Congress to permit proxy presence. Our dissenting colleagues likewise emphasize Congress's power under the Rulemaking Clause to bless the House's proxy-presence rule. *See post*, at 45-46, 55. We disagree. The Rulemaking Clause, which immediately follows the Quorum Clause, provides that "Each House may determine the Rules of its Proceedings." U.S. CONST. art. I, § 5, cl. 2. And indeed, the Supreme Court has described the Rulemaking Clause as a "broad delegation of authority to the [House] to determine how and when to conduct its business." *Noel Canning*, 573 U.S. at 550.

But the Quorum Clause is not a discretionary procedural rule; it is a constitutional prerequisite to "do[ing] Business" in a legislative chamber. U.S. CONST. art. I, § 5, cl. 1. As the Supreme Court explained in *Ballin*, "[t]he [C]onstitution empowers each house to determine its rules of proceedings," but a chamber of Congress "may not by its rules ignore

constitutional restraints." 144 U.S. at 5; *see also* John O. McGinnis & Michael B. Rappaport, *The Constitutionality of Legislative Supermajority Requirements: A Defense*, 105 YALE L.J. 483, 484 (1995) ("Under the Rules of Proceedings Clause, the House may enact a rule governing its internal operations so long as the rule does not violate another provision of the Constitution."). The very order of the Clauses in the Constitution is telling: Congress *has no power* to "determine the Rules of its Proceedings" unless and until a quorum is first present. Congress cannot vary by its subsidiary rulemaking power the very threshold by which "the power of [Congress] arises." *Ballin*, 144 U.S. at 6. The Rulemaking Clause is not so expansive that it can be read, as the Government urges, to subsume the Quorum Clause.

The Government next infers support from the Quorum Clause's silence on proxies, reasoning that if the Framers had intended to prohibit proxies, they would have done so explicitly. In particular, the Government points us to New Jersey's Founding-era constitution, which stated that "no law shall pass, unless there be a majority of all the Representatives of each body *personally present*, and agreeing thereto." N.J. CONST. art. III (1776) (emphasis added). Therefore, its argument goes, the Quorum Clause's textual silence regarding proxies should weigh in favor of allowing Congress to decide what kind of "presence" satisfies the Clause.

There are two problems with that argument. First, as discussed above, the argument rests on a flawed premise: Rather than textual silence, the constitutional text, context, and structure all cut against the Government's position. Second, New Jersey's *pre*-Founding-era constitution explicitly *embraced* proxies for quorum purposes. *See* THE FUNDAMENTAL CONSTITUTIONS FOR THE PROVINCE OF EAST NEW JERSEY IN AMERICA, art. IV (1683) ("[A] quorum of this great [legislative] Council shall be half of the Proprietors, *or their proxies*[.]") (emphasis added). Historically speaking, then, New Jersey's Founding-era

quorum requirement of "personal presence" is better understood as a rejection of its prior, explicit allowance of proxies—and not to support that the absence of such language in the Quorum Clause implies that the Founders countenanced proxy presence in Congress. Indeed, New Jersey's next constitution amended the quorum language again, this time employing the exact language used by the federal Constitution. *See* N.J. CONST. art. IV, § 4, cl. 2 (1844).[15] Applying the Government's textual-silence argument, that means that New Jersey (1) first explicitly allowed proxies, (2) then explicitly disallowed proxies, and (3) now *implicitly* allows proxies. That cannot be right.

If anything, the textual silence point cuts against the Government. Other historical evidence suggests that absent explicit authorization of proxies, they were presumably prohibited. A mid-19th century treatise summarized: "In the commons, house of parliament, and in all the legislative bodies of the United States, the attendance must be in person; in the house of lords, after a member has appeared in person, and has been qualified, he may afterwards give his attendance and vote by proxy." LUTHER STEARNS CUSHING, LEX PARLIAMENTARIA AMERICANA: ELEMENTS OF THE LAW AND PRACTICE OF LEGISLATIVE ASSEMBLIES IN THE UNITED STATES OF AMERICA § 434, at 177 (1856). And, albeit in a different context, early corporate law corroborates the notion that proxies were disallowed absent an indication otherwise. *See Philips v. Wickham*, 1 Paige Ch. 590, 598 (N.Y. Ch. 1829) ("The right of voting by proxy is not a general right, and the party who claims it must show a special authority for that purpose. The only case in which it is allowable, at the common law, is by peers of England, and that is said to be in virtue of a

[15] New Jersey's current constitution has retained that language. *See* N.J. CONST. art. IV, § 4, cl. 2 (1947).

special permission of the king."); *see also* 1 SEYMOUR D. THOMPSON, COMMENTARIES ON THE LAW OF PRIVATE CORPORATIONS § 736, at 577–78 (1895) ("At the common law all voting at every election is required to be done *in propria persona*. The only exception . . . has been in the case of the peers in England, who have been . . . allowed to make other lords of parliament their proxies to vote for them in their absence.").[16] To the extent there is textual silence in the Quorum Clause regarding proxy presence, that likely *excludes* proxies; at the least, it does not justify them.

The most natural reading of the Quorum Clause's text, the interoperation of its components, contemporary definitions of the Clause's key terms, and the additional context of the Privilege from Arrest Clause all

[16] Further, several 19th century state constitutions adopted similar if not the same quorum language as the federal Constitution, but explicitly authorized proxies in the corporate context. *See, e.g.*, W.VA. CONST. art. VI, § 24 (1872) ("A majority of the members elected to each House of the Legislatures, shall constitute a quorum. But a smaller number may adjourn from day to day, and shall be authorized to compel the attendance of absent members."); W.VA. CONST. art. XI, § 4 (1872) ("The legislature shall provide by law that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote . . . in person or by proxy."); MISS. CONST. art. IV, § 54 (1890) ("A majority of each house shall constitute a quorum to do business; but a less number may adjourn from day to day, and compel the attendance of absent members."); MISS. CONST. art. VII, § 194 (1890) ("The legislature shall provide by law, that in all elections for directors or managers of incorporated companies, every stock-holder shall have the right to vote in person or by proxy."); S.C. CONST. art. III, § 11 (1895) ("[A] majority of each house shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and may compel the attendance of absent members."); S.C. CONST. art. IX, § 11 (1895) ("The General Assembly shall provide by law for the election of directors, trustees, or managers of all corporations so that each stockholder shall be allowed to cast [votes] in person or by proxy."); *see also* CAL. CONST. art. IV, § 8 (1879) (legislative quorum requirement); CAL. CONST. art. XII, § 12 (1879) (corporate proxies); NEB. CONST. art. III, § 7 (1875) (legislative quorum requirement); NEB. CONST. art. XI, § 5 (1875) (corporate proxies); MONT. CONST. art. V, § 10 (1890) (legislative quorum requirement); MONT. CONST. art. XV, § 4 (1889) (corporate proxies); KY. CONST. § 37 (1890) (legislative quorum requirement); KY. CONST. § 207 (1890) (corporate proxies).

indicate that the Quorum Clause is concerned with *physical* presence.[17] The Rulemaking Clause does not dictate otherwise. And this understanding of the Quorum Clause sits uneasily with the notion of proxy presence: When an otherwise absent Member is only counted "present" via proxy, that Member cannot be fairly considered to be in "attendance" at the legislative session.

**4.**

Our textual reading aligns with historical evidence of the original understanding of the Quorum Clause. At the Constitutional Convention, the Framers vigorously debated a quorum threshold for Congress to conduct business. In settling on a "Majority," they balanced a desire to avoid the potential for a minority "Juncto" to exercise legislative power by artifice and secession against the reality of physical obstacles that Congress might face in mustering a quorum. *See* 2 MAX FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, 251–54 (1911) (recording debates over the distance legislators needed to travel to get to the Capitol, the inconvenience and delay caused thereby, and the possibility that legislators might physically secede to thwart congressional business). These competing concerns would have been misplaced if Members could simply be counted "present" by proxy. Indeed, early legislatures never attempted to ameliorate such concerns via proxies, even though the Founding generation was surely aware of the existence of that device.

---

[17] Of course, *Ballin* also supports this reading of the Quorum Clause; that case all but states that physical presence is required. There, the non-voting Members were physically present in the House chamber; and the Court's suggested methods for "reasonably . . . ascertain[ing]" the existence of a quorum all assumed physical presence. *Ballin*, 144 U.S. at 6. At the least, *Ballin* thus encapsulates additional late 19th century evidence that tends to confirm that the Quorum Clause envisions physical presence. *See Gamble v. United States*, 587 U.S. 678, 702 (2019).

The Framers reasoned that "[i]n this extended Country, . . . it would be dangerous to the distant parts to allow a small number of members of the two Houses to make laws." *Id.* at 251–52. With too low of a quorum requirement, "[t]he Central States could always take care to be on the Spot and by meeting earlier than the distant ones, or wearying their patience, and outstaying them, could carry such measures as they pleased." *Id.* at 252. But too high of a quorum requirement would "put it in the power of a few by seceding at a crucial moment to introduce convulsions, and endanger the Government." *Id.* at 251. "[I]f few can break a quorum, they may seize a moment when a particular (part) of the Continent may be in need of immediate aid, to extort, by threatening a secession, some unjust and selfish measure." *Id.* at 252. Therefore, "the Secession of a small number ought not to be suffered to break a quorum." *Id.*; *see also* THE FEDERALIST NO. 58 (J. Madison).

Thus, as with so many other provisions in the Constitution, the Framers crafted offsetting counterbalances—a majority quorum threshold that was not-too-high yet not-too-low, and the empowerment of a minority to rectify a failure to muster one, either because of travel difficulties, unforeseen circumstances, or deliberate shenanigans. Tellingly, in debating and settling upon this balance, all the concerns the Framers allayed regarded *physical* obstacles and *physical* absence. And it seems plain that in empowering a minority of Members "to compel the Attendance of absent Members," U.S. CONST. art. I § 5, cl. 1, the Framers meant that as compelling *physical presence*, *e.g.*, by the Sergeant at Arms physically hauling a Member into the chamber, or by fining a Member until he showed up. *See* DAVID HUTCHISON, THE FOUNDATIONS OF THE CONSTITUTION 63–64 (1975); *see also* 2 MAX FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, 253 (1911).

When addressing Congress's ability to muster a quorum, the Framers never seriously considered the use of proxies—despite their clear knowledge of the practice—as a way for Congress to meet the Quorum Clause's majority presence requirement. Alexander Hamilton suggested allowing proxy *voting* in both legislative chambers, but he never proposed counting those proxies toward a quorum. *See* 3 MAX FARRAND, THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 620 (1911). And Benjamin Franklin's proposed Articles of Confederation suggested proxy voting, but Franklin's proposal expressly rejected that proxies could be counted towards a quorum. 22 THE PAPERS OF BENJAMIN FRANKLIN 120–25 (1775) ("At every Meeting of the Congress One half of the Members return'd exclusive of Proxies be necessary to make a Quorum").

The Framers' silence on quorum-by-proxy is also understandable in the light of their prior experience under the British Crown.[18] Proxies were generally prohibited in the British House of Commons, as its members were themselves proxies for the constituencies who elected them.[19] 4 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 12 (1644) (explaining

[18] The Framers were very likely aware of the proxy controversies in the House of Lords and the prohibition on proxies in the Commons, as the documents and debates surrounding ratification of the Constitution are filled with comparisons between the structures of Parliament and the proposed Congress. *See, e.g.*, THE FEDERALIST NO. 52 (J. Madison); THE FEDERALIST NO. 58 (J. Madison); 2 MAX FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, 274–75 (1911).

[19] Both chambers of the proposed Congress would share this feature with the Commons, in that Representatives and Senators would hold their positions in trust for their constituents, and would differ from the House of Lords, in that neither Senators nor Representatives were entitled to their seats. *See, e.g.*, 8 JOHN P. KAMINSKI, ET AL., THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 326 (1988); *cf. Raines v. Byrd*, 521 U.S. 811, 821 (1997) (noting that Members of Congress hold their seats "as trustee[s] for [their] constituents, not as a prerogative of personal power").

that a member of the Commons could not "by any means make any Proxy, because he is elected and trusted by multitudes of people"); 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 162 (T. Cooley ed. 1871) (noting that a member of the House of Lords "may make another lord of parliament his proxy, to vote for him in his absence," but that a member of the Commons can "by no means have" that "privilege," as "he is himself but a proxy"); *see also* 38 Parl. Deb., H.C. (3d ser.) (1837) 762 (T. Duncombe) (explaining that "the Commons [did] not hav[e] this privilege, as they were but proxies for the people"). Because proxies were prohibited altogether in the Commons, they could not have been counted in that body for purposes of establishing a quorum.

Much like the House of Commons, Founding-era American legislatures required physical presence to establish a quorum. In September 1787, the Pennsylvania Assembly faced problems when members physically left the chamber to deprive the Assembly of a quorum and obstruct legislative business. 2 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 95–126 (Merrill Jensen ed., 1976).[20] The Assembly eventually mustered a quorum, but only after the seceding members were forcibly brought into the chamber. *Id.* at 102–04.

Similarly, when the first Congress struggled to gather a quorum, it sent circulars to absent Members demanding their attendance. *See* Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. CHI. L. REV. 361, 369 (2004). And it is plain from the official records of the first Congress that physical presence was what was understood to be required:

---

[20] Somewhat ironically, the business obstructed by the seceding legislators was the legislature's selection of the members of Pennsylvania's ratification convention that would go on to approve the newly proposed Constitution.

> When no additional *members appearing*, it was agreed that another circular should be written to eight of the nearest absent members, particularly desiring *their attendance*, in order to form a quorum. . . . RICHARD HENRY LEE, from Virginia, then *appearing*, *took his seat*, and formed a quorum of the whole Senators of the United States.

1 Annals of Cong. 15–16 (1789) (emphasis added).[21] Indeed, from the documentary evidence before us, a quorum was constituted only by Members who appeared, "presented [their] credentials," and physically took the seats to which they were entitled as Members. *See, e.g.*, *id.* at 1039–40 (1790) (recognizing a quorum when a majority of the "whole House was present" by "appearing and taking their seats"); Howard M. Wasserman, *The Trouble with Shadow Government*, 52 EMORY L.J. 281, 302–03 (2003) (citing 1 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS 1789-1791, at 6–7 (Linda Grant De Pauw et al. eds. 1972)). There is not even a hint that, had an absent Member returned a proxy letter in response to such a "circular," he would have been counted as present for purposes of a quorum.

From the Constitutional Convention to Founding-era state legislatures and the first Congress itself, historical evidence from the Founding era points in one direction: The Founding generation understood the Quorum Clause to require the physical, personal presence of a majority of Members to establish a quorum. Though the use of proxies was known at the time of the Founding, practiced in one house of Parliament (while

---

[21] *See also* 15 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS 16 (2004) ("It is expected that a sufficient number to form a quorum will arrive this evening."); *id.* at 132 (noting that it was "expected that there will be a quorum this week" because additional Members were "in the vicinity"); *id.* at 47 (John Jay relaying to Thomas Jefferson that "[m]any Members of the new Congress are now *here*, but not a sufficient number of both Houses to form Quorums") (emphasis added).

prohibited in the other), and perhaps contemplated by the Framers, the contemporaneous record divulges no use of presence-by-proxy.

**5.**

Post-ratification congressional practice confirms this view of the Quorum Clause's original meaning. The Government concedes, as it must, that it was not until 2023—over 230 years after ratification of the Constitution—that either chamber of Congress first employed "proxy" presence to muster a quorum. Indeed, for the two and ⅓ centuries before 2023, Congress recognized only the physical presence of a majority of Members as sufficient to establish a quorum. *See Garland*, 719 F. Supp. 3d at 589–91 (citing 7 Annals of Cong. 469–70, 625–27 (1797); 9 Annals of Cong. 2417–18 (1798); 14 Annals of Cong. 677–78, 685 (1804); 41 Cong. Rec. 3572 (1907); 81 Cong. Rec. 2793 (1937); 96 Cong. Rec. 1811 (1950)).

If the Quorum Clause's original meaning permitted proxy presence all along, it stands to reason that history would disclose at least a few examples—or even one?—of legislators' employing proxies to be counted "present" for quorum purposes. Evidence substantiating such an expectation, or a lack thereof, may "provide evidence of the original public meaning" of the text. *Chiafalo v. Washington*, 591 U.S. 578, 608 (2020) (THOMAS, J., concurring); *see also* Lawrence B. Solum, *The Public Meaning Thesis: An Originalist Theory of Constitutional Meaning*, 101 B.U. L. REV. 1953, 1992 (2020) ("Application expectations may provide evidence of public meaning."). And "widespread practice around the Founding" would be indicative of a constitutional provision's "original public meaning." *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th 941, 951 (5th Cir. 2022) (citing *McDonald v. City of Chicago*, 561 U.S. 742, 769–70 (2010)). Surveying congressional practice between 1789 and 2023, the evidence of use of proxies for quorum purposes can be summarized succinctly: Crickets. None has

been offered, or unearthed. That the Government does not contest this complete absence of historical support for its position strongly suggests that proxy presence does not satisfy the Quorum Clause. *Cf.* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 48–49 (2d ed. 1829) (describing the Quorum Clause as an "express provision" which "require[d] no elucidation").

To be sure, Congress has from time to time adjusted its quorum-counting rules. In the aftermath of the Civil War, the Senate changed its rules to count Members who had been "duly chosen and sworn," as opposed to the Senate's total number of seats (occupied or not). *See* John B. Williams, *How to Survive a Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress*, 48 WM. & MARY L. REV. 1025, 1062 (2006) (citing CONG. GLOBE, 40th Cong., 2d Sess. 1628 (1868)). After the September 11 terrorist attacks, the House of Representatives adopted a rule allowing the Speaker to adjust the "whole number of the House" in case of the "death, resignation, expulsion, disqualification, or removal of a Member." *See id.* at 1064 (citing Rules of the House of Representatives, 108th Cong. (2003) Rule XX, cl. 5(c)). But neither of these is an instance in which Congress functionally redefined what it means to be "present" for quorum purposes. That has apparently never happened, until this case.[22]

Nor may the Government simply chalk up its dearth of supporting evidence to the technological limitations of a bygone era, *i.e.*, that the

---

[22] Even today, the House's rules report states that "[t]he Constitution requires that a quorum, defined as a majority of the House, be *present on the floor* when the House transacts business." *See* ELIZABETH RYBICKI, CONG. RSCH. SERV., RL98988, VOTING AND QUORUM PROCEDURES IN THE HOUSE OF REPRESENTATIVES (2023) (emphasis added).

Framers could not have envisioned Zoom calls or other "virtual" attendance, &c. The Founding generation was well aware of proxies. If anything, the logistics of getting to Washington, the tumult of war and other disruptions, and the pace of travel and communication in the early decades of the Republic more strongly lent themselves to the use of proxies than do conditions in the 2020s.[23] Regardless, the case before us does not turn on the more analytically difficult issue of how a Founding-era principle might apply to modern technologies unimaginable to the Framers.[24] Whether the Quorum Clause's "presence" requirement would be satisfied by Members' participation in House business by videoconference—a question not presented in this case—presence by proxy clearly does not do so.

---

[23] At the time of the first Congress, James Madison wrote a letter to Thomas Jefferson explaining that a central reason why "a quorum [was] not yet formed" was because of "the peculiar badness of the weather." 15 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS 147 (2004). Echoing Madison, Representative Mike Gallagher, one of the four Members who did not record his vote or presence at the time the House approved the Consolidated Appropriations Act of 2023, wrote a letter to the Speaker indicating that he was not "present" because he had "returned home . . . to attend a family matter and avoid dangerous travel ahead of the powerful snow storm." 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).

[24] While Members' attendance by telephone or videoconference surely would not have been the Framers' expected application of the Quorum Clause, it may nonetheless fall within the text's original meaning. A text's "linguistic meaning" or "semantic content" is "not the same as expectations about the application of that meaning to future cases." Lawrence B. Solum, *Incorporation and Originalist Theory*, 18 J. CONTEMP. LEGAL ISSUES 409, 414 (2009); *see also* ANTONIN SCALIA, A MATTER OF INTERPRETATION 144 (1997); RANDY BARNETT, RESTORING THE LOST CONSTITUTION: THE PRESUMPTION OF LIBERTY 95 (2004). The text's original meaning is what is binding, not expectations about how the text might apply in new circumstances. *United States v. Rahimi*, 602 U.S. 680, 739 n.* (2024) (BARRETT, J., concurring). However, we express no view on this question, as it is not before this court.

**6.**

The Government proffers Congress's practice of operating by unanimous consent as perhaps most analogous to the House's proxy-presence rule. JUDGE GRAVES's dissent likewise emphasizes Congress's use of unanimous consent as a historical practice, itself dating to 1789, that "strongly favors rejecting [our] narrow interpretation" of the Quorum Clause. *Post*, at 52. But unanimous consent is perfectly consistent with our understanding of the Quorum Clause's requirements.

Unanimous consent is a practice long used by Congress to establish a presumption that it has a quorum unless and until a Member raises a point of no quorum or an on-the-record vote reveals the absence of a quorum. *See, e.g.*, 5 LEWIS DESCHLER, DESCHLER'S PRECEDENTS OF THE UNITED STATES HOUSE OF REPRESENTATIVES Ch. 20 § 1 (1994); 6 CLARENCE CANNON, CANNON'S PRECEDENTS OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES § 660 (1936); *see also* FLOYD M. RIDDICK & ALAN S. FRUMIN, RIDDICK'S SENATE PROCEDURE: PRECEDENTS AND PRACTICES 1038 (1992). The practice allows Congress to conduct business without holding constant quorum calls. And true enough, it leaves open the possibility that Congress may end up taking actions without a quorum actually present. *See* FLOYD M. RIDDICK & ALAN S. FRUMIN, RIDDICK'S SENATE PROCEDURE: PRECEDENTS AND PRACTICES 1038 (1992). Regardless, there are several reasons why Congress's use of unanimous consent does not support the Government's pliable interpretation of the Quorum Clause.

To begin, Congress may not operate under unanimous consent without first mustering an actual quorum and thereby establishing the presumption for subsequent proceedings. *See* 5 LEWIS DESCHLER, DESCHLER'S PRECEDENTS OF THE UNITED STATES HOUSE OF

Representatives Ch. 20 § 1.4 (1994). Only from that point may Congress conduct business under the presumption that a quorum persists. *See, e.g.*, *id.* at § 1.3. To be sure, "[t]his presumption 'permits many measures to be passed by unanimous consent, voice votes, or other non-recorded votes when in fact fewer than a majority of [m]embers of either [h]ouse are present, since the [r]ecord does not disclose the absence of a quorum which would reverse this presumption.'" *Garland*, 719 F. Supp. 3d at 592 (quoting William McKay & Charles W. Johnson, Parliament and Congress: Representation and Scrutiny in the Twenty-First Century 85 (2010)) (alterations in original). But the fact remains: A quorum is first required to establish the presumption.

Useful as it may be for conducting legislative business, the presumption is very weak. In the House, it is automatically defeated any time "the absence of a quorum" is "disclosed by a vote or questioned by a point of no quorum." 5 Lewis Deschler, Deschler's Precedents of the United States House of Representatives Ch. 20 § 1 (1994); *see also* Floyd M. Riddick & Alan S. Frumin, Riddick's Senate Procedure: Precedents and Practices 1041–42 (1992). Once the point is raised, the House may not conduct further business until a quorum has been re-established, even if there is "a unanimous-consent request to withdraw the point of no quorum." 5 Lewis Deschler, Deschler's Precedents of the United States House of Representatives 295, Ch. 20 § 1 (1994). So, even under unanimous consent, the House may only conduct business for as long as it maintains a unanimous representation that a quorum is present; official records to the contrary or a Member's objection destroys the presumption and deprives the House of its power to do business.

Finally, lacking a contrary vote count or a Member's point of no quorum, courts may not question Congress's determination that a quorum

was present during periods of unanimous consent. *Marshall Field*, 143 U.S. at 672. Doing so would invade the very internal operations of Congress that *Marshall Field* fenced off. Or as *Ballin* put it, Congress may use "any method which shall be reasonably certain to ascertain the fact" of a quorum. 144 U.S. at 6. Thus, the Quorum Clause's requirement that a majority of Members be present to establish a quorum may coexist with Congress's use of unanimous consent to presume an ongoing quorum. Functionally, unanimous consent is just another "method which shall be reasonably certain to ascertain" the presence of a quorum. *Id.* Therefore, in most cases, courts would have no basis to question what Congress has represented: That during periods of unanimous consent, a quorum is present.[25] But in the case at hand, the House's official record indicates that there was neither unanimous consent nor a proper quorum. The House's passage of the Act absent a quorum therefore ran afoul of the Quorum Clause's requirements.

**7.**

We close our discussion of the Quorum Clause with two final points. The first is about the limitless nature of the Government's reading of the Clause, and the second is about the limited reach of our decision in the case before us.

First, the Government's theory of the Quorum Clause—that Congress may define what it means to be "present" for quorum purposes—has no limiting principle. And that theory's implications are sweeping. As the Government conceded at oral argument, its position would mean that

---

[25] Of course, to the extent that Congress's use of unanimous consent contravenes the Quorum Clause, a question we need not address in today's case, past practice cannot vest Congress with power not already conferred by the Constitution. *Medellin v. Texas*, 552 U.S. 491, 532 (2008) ("[P]ast practice does not, by itself, create power." (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981))); *see Garland*, 719 F. Supp. 3d at 590.

nothing in the Quorum Clause prevents the House from adopting a rule allowing *every* Member simultaneously to designate the Speaker as his or her proxy.[26] In that scenario, the Speaker's personal attendance alone would constitute a quorum for conducting business. That startling result is in deep tension with the Founders' emphasis on the close connection between representatives and their constituents. *See* GORDON WOOD, CREATION OF THE AMERICAN REPUBLIC 163–65 (1998 ed.); THE FEDERALIST NO. 52 (J. Madison).

Perhaps to assuage concerns about the vast implications of its view, the Government notes that the House's proxy-presence rule was adopted in the midst of the COVID-19 pandemic. But that fact does nothing to minimize the ramifications of the Government's theory, because nothing about that theory depends on the existence of an emergency. Under the Government's view, the House needs no external justification whatsoever before allowing Members to delegate their presence to a proxy for quorum purposes. While an "emergency may afford a reason for the exertion of a living power already enjoyed," an emergency "may not call into life a power which has never lived." *Wilson v. New*, 243 U.S. 332, 348 (1917).

Second, we emphasize the narrow scope of our judgment. The Government warns that affirming the district court would jeopardize the entire Consolidated Appropriations Act of 2023. Not so. Texas did not request—and the district court did not grant—injunctive relief undoing

---

[26] Even Alexander Hamilton's proposal for proxy voting included limits on how many absent Members a proxy may represent. *See* 3 MAX FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787 620–22 (1911) (one for a House proxy, and two for a Senate proxy). As did the proxy-presence rule at issue in this case. *See* H.R. Res. 965 § 2(a)(4), 116th Cong. (2020) ("A Member may not be designated as a proxy under this section for more than 10 Members concurrently."). But on the Government's view of the Quorum Clause, the House is free to let 434 Representatives give the Speaker their proxies.

every provision of the Act as to everyone across the country. Rather, the district court enjoined only the enforcement of the PWFA, and only against Texas. As the district court clarified, "the relief granted here is limited to abating the injury that Texas has proven will occur." *Garland*, 719 F. Supp. 3d at 537.

On appeal, all that is before us is the district court's judgment. While we conclude today that the House's passage of the Act violated the Quorum Clause, our decision extends no further than affirming the relief awarded by the district court.

* * *

The enrolled-bill doctrine articulated in *Marshall Field* does not preclude judicial review of Texas's Quorum Clause challenge. There are no disputed facts regarding the House's passage of the Act such that we would need to sift any extrinsic evidence. On the contrary, the parties agree that the House purportedly established a quorum only because it counted hundreds of proxies as "present." Texas's challenge therefore depends solely on the Quorum Clause's proper meaning.

Through that lens, the House's passage of the Consolidated Appropriations Act of 2023 contravened the Quorum Clause. The Clause's text, context, original understanding, and historical application all indicate that proxies may not be counted to establish a quorum. As the Supreme Court has held, and as Congress had previously done for over 230 years, Members must be present to satisfy the Quorum Clause. Presence-by-proxy does not suffice. An absent Member's assignment of his or her proxy cannot render that Member present for purposes of the Quorum Clause.

Texas has carried its burden to show that it is entitled to a permanent injunction against the PWFA. The judgment of the district court is

AFFIRMED.

JAMES E. GRAVES, JR., *Circuit Judge*, joined by STEWART, RICHMAN, SOUTHWICK, HIGGINSON, DOUGLAS, and RAMIREZ, *Circuit Judges,* dissenting:

In this suit, the State of Texas sought a preliminary injunction preventing enforcement of one portion of the Consolidated Appropriations Act of 2023, the Pregnant Workers Fairness Act (PWFA), attempting to veto Congress's protections for pregnant workers and new parents while retaining millions in federal funding.

On May 15, 2020, in response to the COVID-19 pandemic, the House of Representatives adopted House Resolution 965, which authorized remote committee proceedings and remote voting in the House. Resolution 965 provides that:

> 1. [A]t any time after the Speaker . . . is notified . . . that a public health emergency due to a novel coronavirus is in effect, the Speaker . . . may designate a period . . . during which a Member who is designated by another Member as proxy in accordance with section 2 may cast the vote of such other Member or record the presence of such other Member in the House.

H.R. Res. 965 § 1(a), 116th Cong. (2020).

Section 2 described the process for remote participation through designating proxies: the designating Member had to submit a signed letter to the Clerk that specified the designated Member. *Id.* § 2. Section 3 outlined the process for voting during covered periods, which, absent an extension, ran for forty-five days after the Speaker, or their designee, designated such a period. *Id.* §§ 1(b), 3. Section 4 authorized remote Committee proceedings. *Id.* § 4. Section 5 mandated that the chair of the Committee on House Administration certify that it would be feasible to use technology to conduct remote voting in the House, required that the chair of the Committee on Rules submit regulations providing for the implementation of remote voting,

and provided for remote voting once those regulations were in place. *Id.* § 5. Section 6 required that Sections 1, 2, and 3 be carried out in accordance with existing House rules to the extent practicable. *Id.* § 6. During the 117th Congress, the House reaffirmed this practice in House Resolution 8 and continued to apply it. H.R. Res. 8 § 3(s), 117th Cong. (2021).

At issue here: the House used these procedures as it voted on and passed the Consolidated Appropriations Act of 2023. *See* 168 Cong. Rec. H10,529 (daily ed. Dec. 23, 2022). Under House rules, a quorum of the 435-Member House is a simple majority: 218. *See, e.g.*, Rules of the House of Representatives, R. XX, cl. 6(b), H.R. Doc. No. 116-177, at 873–74 (2021). The vote on the final passage of the Act was 225 yeas, 201 nays, 1 "present," and 4 non-votes. 168 Cong. Rec. H10,528 (daily ed. Dec. 23, 2022). Out of the 431 votes, 205 votes were cast by Members in person and 226 were cast remotely by proxy. *See id.* at H10,529.

Even though less than a majority was physically present at the time of the vote, no Member objected that a quorum was lacking. *Id.* Representative Chip Roy of Texas, however, noted that a physical quorum was not present and reserved the right to object. *Id.* In response to a series of parliamentary inquiries from Representative Roy as to how a quorum was present, the Speaker Pro Tempore, Representative G.K. Butterfield, responded that a quorum was present because "Members casting their vote or recording their presence by proxy [we]re counted for the purpose of establishing a quorum" pursuant to House Resolution 8. *Id.*

After the Act passed the House, presiding officers of both chambers of Congress printed and signed the bill. *See* 1 U.S.C. § 106. At that point, it was an "enrolled bill." *Id.* The enrolled bill was then sent to the President, who signed the Consolidated Appropriations Act of 2023 into law. *See* Pub. L. No. 117-328, 136 Stat. 4459 (2022).

The $1.7 trillion-dollar government funding bill was passed in accordance with House Rules, including House Resolution 8, which allowed members to record their presence remotely by proxy during the coronavirus pandemic. 431 votes were cast with respect to the bill. At the time, no Member objected that a quorum was lacking. Nonetheless, the State of Texas, having accepted the vast majority of the funds that Congress appropriated to it, now contends that the portion of the bill providing protections for pregnant women and workers violates the Quorum Clause. Texas contends that the Act is invalid because the Quorum Clause required that a majority of Members be *physically* present on the House floor at the time of the vote. In so doing, Texas asks the courts to graft an additional requirement to the Quorum Clause of the Constitution.

I agree with the majority that the enrolled-bill rule does not bar our review of this particular constitutional challenge. However, I cannot agree with their addition of a new requirement to the Quorum Clause. Even though the majority declares that its reasoning is limited to the question of "whether the Quorum Clause allows proxy presence to be included in the quorum count," *ante* at 17–18, their conclusion is far more expansive. The conclusion that "[t]he Quorum Clause is concerned with *physical* presence" shoehorns a much larger requirement into the Constitution. *Ante* at 28. Because the plain text of Article I, Section 5, Clause 1, historical practice, and evidence of the framers' intent all weigh against the addition of the majority's new "physical presence" requirement, I respectfully dissent.

The Text

When faced with competing interpretations of the Constitution, we begin with the text. "Constitutional analysis must begin with the language of the instrument, which offers a fixed standard for ascertaining what our

founding document means." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (citation modified).

Article I, Section 5 of the United States Constitution provides, first, in Clause 1, that:

> Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

U.S. Const. art. I, § 5, cl. 1. Second, in Clause 2, the Constitution makes clear that the House determines its own rules:

> 2. Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.

U.S. Const. art I, § 5, cl. 2. As noted by the majority, the Supreme Court has rarely had to interpret Clause 1's second sub-clause, the Quorum Clause, and the only notable case was *United States v. Ballin*, 144 U.S. 1 (1892).

At issue in *Ballin* was House Rule 15, which allowed the Speaker to count non-voting Members who were in the chamber when determining if a quorum was present to do business. *See Ballin*, 144 U.S. at 5. Pursuant to this rule, the House passed a bill classifying worsted cloths as woolen cloths, and directing the Secretary of the Treasury to impose the relevant tariff. *Ballin*, 144 U.S. at 1. When the bill came to a vote, there were 138 yeas, 3 nays, and 189 non-votes. *Id.* at 2. Given the power granted to him under House Rule 15, the Speaker counted dozens of non-voting Members as present, which combined with the yeas showed a total of 212 Members present, more than enough for a quorum at the time. *Id.* at 2–4.

Because the Speaker's action "was in direct compliance" with Rule 15, the court's inquiry was limited to the validity of that rule: "The question, therefore, is as to the validity of this rule, and not what methods the speaker may of his own motion resort to for determining the presence of a quorum, nor what matters the speaker or clerk may of their own volition place upon the journal." *Id.* at 5.

Here, just like in *Ballin*, the House acted pursuant to a rule, House Resolution 8. *See* H.R. Res. 8 § 3(s), 117th Cong. (2021). Similarly, the Speaker's action here "was in direct compliance" with the rule, so our question is "as to the validity of this rule." Accordingly, we should follow the same principles and mode of analysis as the Court in *Ballin*, and focus on the validity of the House's chosen procedures for assembling a Majority to do Business.

After naming that the relevant question was the validity of the rule, the *Ballin* Court stated that:

> Neither do the advantages or disadvantages, the wisdom or folly, of such a rule present any matters for judicial consideration. With the courts the question is only one of power. The constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained.

*Id.* at 5. In this context, when we are reviewing a co-equal branch's internal rules, we must be attentive to the explicit delegation of rulemaking authority to Congress in Section 5, Clause 2. Thus we may only assess the House's rule to ensure that it (1) does not "ignore constitutional restraints," (2) does not "violate fundamental rights," and (3) does have "a reasonable relation" between means and ends. *Id.*

Texas and the majority focus on the first of these limitations and reason that the House has ignored a constitutional restraint: an alleged physical presence requirement in the Quorum Clause. *See ante* at 25–26.

But the plain text of the Quorum Clause contains no *physical* presence requirement. As the Supreme Court explained in *Ballin*,

> The constitution provides that 'a majority of each [house] shall constitute a quorum to do business.' In other words, when a majority are present the house is in a position to do business. Its capacity to transact business is then established, created by the mere presence of a majority, and does not depend upon the disposition or assent or action of any single member or fraction of the majority present. All that the constitution requires is the presence of a majority, and when that majority are present the power of the house arises.

*Id.* at 5–6. In *Ballin*, the Court did not graft the word physical onto the constitutional text, as the majority chooses to do here.[1]

Texas concedes that the "word 'quorum,' standing alone, does not necessarily suggest that Members must be physically present." Texas' Supp. Br. at 34. Despite this, Texas argues that "the Clause's second half—empowering Congress to 'compel' the 'attendance' of 'absent' Members—strongly indicates such a requirement." *Id.* The majority accepts this "admittedly intuitive" reading, reasoning that because "[t]he mental sense

---

[1] The majority admits that *Ballin* does *not* say that physical presence is required for a quorum. *Ante* at 28, n. 17 ("that case *all but* states that physical presence is required.")(emphasis added). And the Supreme Court has been disinclined to add such a requirement where the text did not expressly require physical attendance. *See Hurtado v. United States*, 410 U.S. 578, 583–84 (1973) ("The statute provides to a 'witness attending in any court of the United States' $20 'for each day's attendance.' . . . [The statute] does not speak in terms of 'physical' or 'actual' attendance, and we decline to engraft such a restriction upon the statute." (quoting 28 U.S.C. § 1821 (1970))).

of 'absent' and 'attendance' does not fit within the context of the Quorum Clause," only physical presence will do. *Ante* at 21–22.

This argument, however, begs the question. It only works if one assumes precisely the conclusion sought to be proved—that the presence compelled must be physical. And that proposition is not commanded in the Constitution. Just like the Quorum Clause fails on its face to help us understand whether presence requires *physical* presence, the ability to compel said presence does little to help us understand what the limits or modifiers of the presence being compelled are. I can discern no reason why, for example, if Congress faces a necessity—a pandemic, a military exigency—to assemble digitally, it could not exercise its Article I authority to encourage legislative action and participation through remote work, while at the same time compelling non-participating Members to remotely join the session.

The majority points out that "many [founding-era] dictionaries defined the terms 'absent' and 'attendance' in both a physical sense (not physically present) and a mental sense (not paying attention)." *Ante* at 21–22. So, the majority concedes, that even at the Founding, the ordinary public meaning of the term "absent" did not entail a lack of physical presence. This suggests that if the Framers wanted to require physical presence, they would have done just that. *See United States v. Rahimi*, 602 U.S. 680, 715 (2024) (Kavanaugh, J., concurring) ("As a general matter, the text of the Constitution says what it means and means what it says. And unless and until it is amended, that text controls."). But they did not.

Historical Practice

The historical practice of Congress also weighs against the majority's conclusions.

"For more than 200 years, [courts have] relied on history when construing vague constitutional text in all manner of constitutional disputes." *Rahimi*, 602 U.S. at 717. "In other words, we recognize that 'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 36 (2022) (first quoting *Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring in the judgment); then citing *Myers v. United States*, 272 U.S. 52, 174 (1926); and then citing *Printz v. United States*, 521 U.S. 898, 905 (1997)); *see also Noel Canning*, 573 U.S. at 524–25 (majority opinion); Letter from James Madison to Spencer Roane (Sept. 2, 1819), in 8 *The Writings of James Madison* 447, 450 (Gaillard Hunt ed., 1908).

This historical inquiry leads to the same conclusion. Texas points to the ratification debates to highlight the Founders' concern about quorum manipulation and minority rule via "the inconveniency of secessions." Texas' Supp. Br. at 39–40 (quoting James Madison, *Notes of Debates in the Federal Convention of 1787*, at 430 (W.W. Norton & Co. 1987)(1840)). Texas also relies on the district court's explanation that during the First Congress "[b]oth chambers waited nearly a month for enough members to arrive, and the Senate specified in its letter that the 'presence' of a majority of members was 'indispensably necessary,'" *Tex. v. Garland*, 719 F. Supp. 3d 521, 589 (N.D. Tex. Feb. 2024) (quoting S. Journal, 1st Cong., 1st Sess. 6 (1789)). *See* Texas' Supp. Br. at 15.

However, amici explain that through the practice of unanimous consent, "Congress presumes that a quorum exists whenever members unanimously agree on a bill or a resolution, even when it is obvious that 'fewer than a majority of Members' are physically present in the chamber." Br. for Legal Historians at 29 (quoting WILLIAM MCKAY & CHARLES W. JOHNSON, PARLIAMENT AND CONGRESS: REPRESENTATION

and Scrutiny in the Twenty-First Century 85 (2010)); Br. for Sen. Mitch McConnell at 26 ("Under the unanimous consent process, there is no recording of the yeas and nays. As such, it is almost universally the case that the unanimous consent process is employed when there is well less than a majority of senators present."). "[T]he Majority Leader or his designee runs through all the agreed upon matters, calling voice votes and presenting measures or matters for adoption without objection, *often only in the presence of the presiding officer*." Br. for Sen. Mitch McConnell at 25–26 (emphasis added).

Of particular note, this process—that does not require the physical presence of Congressmembers—has been around since 1789, the first year that the First Congress met. Br. for Legal Historians at 29 (citing U.S. Senate, The First Unanimous Consent Agreement, https://perma.cc/ WT8Z-N3LZ)); Cong. Rsch. Serv., RL33939, The Rise of Senate Unanimous Consent Agreements 1 (2008), https://www.congress.gov/crs_external_products/RL/PDF/RL33939/RL33939.4.pdf. Several delegates to the Constitutional Convention, who signed the Constitution at Independence Hall, were members of the Senate in 1789. Charlene Bangs Bickford & Kenneth R. Bowling, Birth of the Nation: The First Federal Congress, 1789–1791, at 12 (1989). Presumably, if the charter they helped shape (over the months-long deliberation) and signed required physical presence for the Senate to do business, they would have piped up when the Senate adopted rules operating via unanimous consent, i.e., without members being physically present.

Moreover, not only has the Senate used this practice continuously since the Nation's Founding, but it has also been used to pass not only run-of-the-mill legislation, but to pass a "super statute" like the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb to 2000bb-4, to confirm 69 Supreme Court justices, i.e., nearly three-fifths of them to date,

and to promote 422 military flag officers in a single day. Br. for Sen. Mitch McConnell at 28; Br. for Nat'l Sec. Offs. at 16; Br. for Legal Historians at 30. Taken together, this evinces a strong history and tradition of understanding the Quorum Clause to *not* require *physical* presence.[2]

Nor does it matter that this variation of the legislative procedure allowed for remote voting instead of simply assuming a quorum when no quorum clearly existed. "It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time." *Ballin*, 144 U.S. at 5.[3] "The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house, and, within the limitations suggested, absolute and beyond the challenge of any other body or tribunal." *Id.*

---

[2] The same is true for voice voting, which is "practically indistinguishable from unanimous consent." Br. for Sen. Mitch McConnell at 26. While it has long been "without question that the establishment and use of these methods [among others] is well within Congress's rulemaking authority," amici point out that the majority's atextual physical-presence requirement could impede Congress's ability to use its own procedures to function. En Banc Br. of Five Members of Cong. at 32 n.9; Br. for Sen. Mitch McConnell at 26–27.

[3] Similarly, the fact that a procedure is unique does not by itself render that procedure invalid. Exigencies arise and Congress has historically adjusted to them. For example, the House typically selects its Speaker by majority vote. Speaker Elections Decided by Multiple Ballots, U.S. House of Representatives, https://history.house.gov/People/Office/Speakers-Multiple-Ballots/. But in 1849 and 1855, facing gridlock, the House instituted an alternative rule for selecting the Speaker by a plurality of votes, if the body was unable to select a Speaker by a majority. Jeffery A. Jenkins and Charles Stewart III, Fighting for the Speakership: The House and the Rise of Party Government 155–190 (2013). This procedure was not rendered unconstitutional solely because it varied from the chamber's usual practice. The Constitution is silent on whether a majority vote is required for selecting a Speaker—just as it is silent on whether the quorum for business must be physically present. U.S. Const. Art. 1, § 2, Cl. 5. The Constitution's silence on the issue does not make the usual procedure the only constitutional one. The majority's reliance on "post-ratification congressional practice" is misplaced. *Ante* at 34.

Put simply, historical practice over the last 235 years strongly favors rejecting the majority's narrow interpretation. Even the First Congress, which included Framers of our national charter, well understood that physical attendance was not required by the Quorum Clause. The practices flowing from that understanding have persisted and been used by both chambers of Congress to perform all sorts of business—from the ministerial, to passing landmark legislation, to performing their duty to advise and provide consent to the President.

"The tradition is long enough to entitle the practice 'to great regard in determining the true construction' of the constitutional provision. And we are reluctant to upset this traditional practice where doing so would seriously shrink the authority that [Congresses] have believed existed and have exercised for so long." *Noel Canning*, 573 U.S. at 549 (citation modified) (quoting *The Pocket Veto Case*, 279 U.S. 655, 690 (1929)).

Framers' Intent

Another argument Texas seems to implicitly make, and which has "admittedly intuitive" appeal at first glance *ante*, at 21, is something along the lines of: of course, the Framers meant physical presence because they could not have imagined any other. The majority accepts this argument. *See ante* at 32–33.

This argument, however, is nearly identical to an argument the Supreme Court rejected in *Noel Canning*. There, originalist scholars, as amici, argued "that the Founders would likely have intended the [Recess Appointments] Clause to apply only to inter-session recesses, for they hardly knew any other." *Noel Canning*, 573 U.S. at 533. The Court agreed that at the Founding that was the only understanding of what a recess was, but reasoned that the "problem with this argument, however, is that it does not fully describe the relevant founding intent." *Id.* The Court continued:

> The question is not: Did the Founders at the time think about intra-session recesses? Perhaps they did not. The question is: Did the Founders intend to restrict the scope of the Clause to the form of congressional recess then prevalent, or did they intend a broader scope permitting the Clause to apply, where appropriate, to somewhat changed circumstances?

*Id.* The Court reasoned that:

> The Founders knew they were writing a document designed to apply to ever-changing circumstances over centuries. After all, a Constitution is "intended to endure for ages to come," and must adapt itself to a future that can only be "seen dimly," if at all. *McCulloch,* 4 Wheat., at 415. We therefore think the Framers likely did intend the Clause to apply to a new circumstance that so clearly falls within its essential purposes, where doing so is consistent with the Clause's language.

*Id.* at 533–34.

Conflating the familiar with the necessary can sometimes lead to absurd consequences. It was suggested at oral argument before the panel that not only must Congress assemble in person, but that, absent exigent circumstances, the Constitution requires Congress to meet at the Capitol. Construction on the Capitol, of course, did not begin until after the Constitution was adopted, with Congress first meeting at the Capitol in 1800. *See* William C. Allen, History of the United States Capitol 23–24, 41 (2001). History before that point, such as the Confederation Congress' assembly in Princeton during the Pennsylvania Mutiny of 1783, indicates that the founding generation would have understood the Quorum Clause to facilitate, rather than constrain, Congress's ability to assemble in order to transact legislative business. *See* Resolution of June 21, 1783, reprinted in 24 Journals of the Continental Congress 1774–1789, at 410 (Gaillard Hunt ed., 1922). Such experiences underscore that, to have the workable government that the Constitution contemplates, it is critical for Congress to be able to assemble

to conduct the business of the national government even when—and perhaps especially when—an emergency renders the usual place of assembly unavailable.

The parties and the majority agree that an essential purpose of the Quorum Clause was to minimize the undue influence of a minority and to ensure majoritarian rule.[4] *Ante* at 29-30. This position is substantiated. *See* THE FEDERALIST NO. 58 (James Madison); Br. for Legal Historians at 11, 17–19.

House Resolution 8 allowing the House to engage in business during the COVID-19 pandemic helped ensure majoritarian rule. After all, over 99% of House Members—an overwhelming majority—participated in the vote on the bill at issue. As four Members of Congress voice: "Allowing the court to now second-guess, or after-the-fact void, the House's exercise of its rulemaking authority threatens to disenfranchise all congressional members, and in turn their constituents, who voted in accordance with then-existing House Rules in voting in favor of the Consolidated Appropriations Act." En Banc Br. of Five Members of Cong. at 11. "These members did not assign away their right to vote; they actively participated in the vote—sometimes using the proxy procedures to change their vote in real-time." *Id.* at 23 (giving examples). They add that the undisputed "underlying purpose of the Quorum Clause is to prevent a congressional minority from dictating legislation," but "accepting the District Court's interpretation . . . would do just that. The ***majority*** of the House passed the Act." *Id.* at 36. They submit that the district court's interpretation "would mean that the ***minority*** who

---

[4] Texas submits that a secondary aim of the Quorum Clause is deliberation. Texas' Supp. Br. at 53. But Texas does not sufficiently explain why or how physical assembly during a pandemic would have furthered deliberation.

voted against the Act would now prevail—years after the fact." *Id.* at 37. Accepting Texas' demand would thus undermine the very purpose of the Quorum Clause: not allowing a tiny minority of the House to block the will of the vast majority of duly elected Congressmembers and the people they represent.

* * *

The constitution plainly requires a majority for either chamber of Congress to conduct business. "But how shall the presence of a majority be determined? *The constitution has prescribed no method of making this determination, and it is therefore within the competency of the house* to prescribe any method which shall be reasonably certain to ascertain the fact." *Ballin*, 144 U.S. at 6 (emphasis added). This remains true. Just like how in 1892 the Constitution did not restrain how the House could determine whether a majority was present, the same unamended provision still does not restrain how the House can make that determination. The Constitution includes a "broad delegation of authority to the [House] to determine how and when to conduct its business. The Constitution explicitly empowers the [House] to 'determine the Rules of its Proceedings.'" *See Noel Canning*, 573 U.S. at 550 (quoting U.S. Const. art. I, § 5, cl. 2). It did just that.

Cognizant of the separation of powers sensitivity necessitated by Section 5, Clause 2 and highlighted in *Ballin* and *Noel Canning*, our only duty is to ensure that the House, as it wielded its broad power to determine how and when to conduct its business—all matters of method of which are open to its determination—did not cross certain constitutional limits. *See id.* It did not. The House's remote voting rule did not violate anyone's fundamental rights. There is a reasonable relationship between the rule and the result it

seeks—majoritarian rule.[5] And the constitutional text, history, and tradition indicate that the Quorum Clause contains no physical-presence requirement that the House's rule could have flouted.

At bottom, even if the Quorum "Clause's language, read literally, permits, though it does not naturally favor, our broader interpretation," and Texas' reading is the "most natural meaning" of presence, it fails to be "the only possible way to use the word." *Noel Canning*, 573 U.S. at 538. Even if "we concede that both interpretations carry with them some risk of undesirable consequences … the narrower interpretation risks undermining constitutionally conferred powers more seriously and more often." *Id.* at 542. The same was true in *Noel Canning*; that led the Supreme Court to favor a broad interpretation of power because it was not delimited by the Constitution. I would follow the Supreme Court's lead and do the same, given the separation of powers sensitivity of Section 5, Clause 2, the Supreme Court's caselaw, and the majority's failure to articulate a coherent remedy.

In light of the plain language of the Clause, its basic purpose, and the historical practice of Congress since its inception, I would conclude that the Quorum Clause does not require physical presence for a house of Congress to conduct business. In reaching this conclusion, I stand in good company. Nearly all amici in this case support this conclusion, including legal

---

[5] This reading does not render Congress's ability to set its own rules in the Rulemaking Clause "limitless." *Ante* at 39. The Supreme Court has already set limits to our deference to those rules in *Ballin*. 144 U.S. at 5.

The majority's comparison of Rule 8 to a proxy rule permitting the Speaker to serve as proxy for all members is a red herring. *Ante* at 39–40. Such a rule would also be subject to the restrictions in *Ballin*, and it is not before this court today. There is no evidence in the case at bar that the proxy rule adopted during the pandemic was "in deep tension with the Founders' emphasis on the close connection between representatives and their constituents." *Ante* at 40.

historians, legislation professors, and constitutional experts, members of the House of Representatives, former Senate Majority Leader Mitch McConnell, former high-ranking national security officials, including former Secretaries of Defense, CIA Directors, and Chairmen of the Joint Chiefs of Staff, and additional associations and organizations who will be affected by this decision.

Last, a word on the scope of this judgment. The majority concluded that the Consolidated Appropriations Act of 2023 was passed in violation of the Constitution, but circumscribed the relief granted only to Texas's enforcement of the PWFA. *Ante* at 41. The Consolidated Appropriations Act of 2023 also includes provisions that provide health, mental health, and educational benefits to veterans, including the GI Bill National Emergency Extended Deadline Act, the VA Beneficiary Debt Collection Improvement Act, the Support the Resiliency of Our Nation's Great Veterans Act, and the Joseph Maxwell Cleland and Robert Joseph Dole Memorial Veterans Benefits and Health Care Improvement Act. There is no explanation offered to explain why, if the entirety of the statute was unconstitutionally passed, this court's judgment should be limited only to one small sliver of the multi-trillion dollar bill. Nor does the majority explain how Texas may seek to enjoin enforcement of the PWFA despite accepting millions of dollars under the very same Consolidated Appropriations Act of 2023.

Congress exercised its authority under Article I, Section 5, Clause 2 to set its own procedures during a national pandemic. *Cf.* Amy Howe, *Courtroom Access: Faced with a Pandemic, the Supreme Court Pivots*, SCOTUSblog (Apr. 16, 2020), https://www.scotusblog.com/2020/04/courtroom-access-faced-with-a-pandemic-the-supreme-court-pivots/ (describing alterations in procedure by the United States Supreme Court, as well as various state supreme courts, in response to the COVID-19 pandemic). The challenged internal procedures

are consistent with the text of the Quorum Clause and Congress's longstanding practices, including unanimous consent. Simply put, the majority's decision is illogical, inexplicable, and invalid.

I respectfully dissent.